is in breach of or default under the terms of any Grizzly Material IP License where such breach or default has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly. To the Knowledge of Grizzly, no other party to any Grizzly Material IP License is in breach of or in default under the terms of any Grizzly Material IP Licenses where such breach or default has had, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly. Each Grizzly Material IP License is a valid and binding obligation of Grizzly or a Grizzly Subsidiary, and is in full force and effect, except insofar as (i) such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, or by principles governing the availability of equitable remedies, (ii) the failure to be a valid and binding obligation or to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly, (iii) such Grizzly Material IP License has previously expired in accordance with its terms, or (iv) such Grizzly Material IP License has been terminated in the ordinary course of business.

Section 7.14 <u>Material Contracts</u>.

(a) Section 7.14 of the Grizzly Disclosure Letter sets forth a list of all Grizzly Material Contracts in effect as of the date of this Agreement. For purposes of this Agreement, the term "<u>Grizzly Material Contracts</u>" means any of the following Contracts (other than this Agreement, each other Transaction Agreement, the documents relating to the financing transactions contemplated by this Agreement, and other than any Grizzly Benefit Plan), whether entered into prior to or after the date hereof, to which Grizzly or any Grizzly Subsidiary is a party:

(i) any non-competition agreements or other Contract that materially limits or will materially limit Grizzly or any of its Subsidiaries from competing or engaging in any business or geographic area;

(ii) any Contract with respect to any partnerships or joint ventures involving the sharing of profits or losses that is material to Grizzly and its Subsidiaries, taken as a whole;

(iii) any indenture, credit agreement or loan agreement pursuant to which Grizzly or any of its Subsidiaries has or will incur any indebtedness for borrowed money in excess of $1 million, other than between or among any of Grizzly and any of its Subsidiaries;

(iv) any Contract for the sale or acquisition (including by way of merger, purchase of equity or other business combination) of any operating business with respect to which Grizzly or any of its Subsidiaries still has remaining material obligations; and

(v) any Contract that provides for annual payments in excess of $10 million by or to Grizzly or any of its Subsidiaries.

(b) Neither Grizzly nor any Grizzly Subsidiary is in material breach of or material default under the terms of any Grizzly Material Contract. To the Knowledge of Grizzly, no other party to any Grizzly Material Contract is in material breach of or in material default under the terms of any Grizzly Material Contract. Each Grizzly Material Contract is a valid and binding

PPG102808

obligation of Grizzly or any Grizzly Subsidiary which is a party thereto and is in full force and effect, except insofar as (i) such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, or by principles governing the availability of equitable remedies, (ii) the failure to be a valid and binding obligation or to be enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly, (iii) the Grizzly Material Contract has previously expired in accordance with its terms, or (iv) the Grizzly Material Contract has been terminated by Grizzly or its Subsidiaries in the ordinary course of business.

Section 7.15 Grizzly Real Property.

(a) Section 7.15(a) of the Grizzly Disclosure Letter sets forth as of the date hereof a description of all Grizzly Owned Real Property. With respect to such Grizzly Owned Real Property, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly: (i) except for Permitted Encumbrances, neither Grizzly nor any of the Grizzly Subsidiaries has leased or otherwise granted to any Person the right to use or occupy such Grizzly Owned Real Property or any material portion thereof; and (ii) other than the right of Grizzly pursuant to this Agreement, there are no outstanding options, rights of first offer or rights of first refusal to purchase such Grizzly Owned Real Property or any material portion thereof or interest therein.

(b) Section 7.15(b) of the Grizzly Disclosure Letter sets forth as of the date hereof the address of all Grizzly Leased Real Property, and a true and complete list, in all material respects, as of the date hereof, of all Grizzly Leases for such properties for each such Grizzly Leased Real Property, in any such case, where annual payments under the applicable Grizzly Lease exceed $500,000 per year. Grizzly has made available to Burgundy a true and complete copy of each such Grizzly Lease document as of the date hereof, and in the case of any such Lease that is an oral Lease, a written summary of the material terms of such Lease. Except as set forth on Section 7.15(b) of the Grizzly Disclosure Letter, to Grizzly's Knowledge, there are no material disputes with respect to such Grizzly Lease. With respect to each such Lease, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly: (i) none of Grizzly or the Grizzly Subsidiaries has subleased, licensed or otherwise granted any Person the right to use or occupy such Grizzly Leased Real Property or any material portion thereof; (ii) none of Grizzly or the Grizzly Subsidiaries has collaterally assigned or granted any other security interest in such Grizzly Lease or any material interest therein; and (iii) there are no Liens on the estate or interest created by such Grizzly Lease other than Permitted Encumbrances.

Section 7.16 Opinion of Grizzly Financial Advisor. Grizzly has received the written opinion (or oral opinion to be confirmed in writing) of Barclays Capital Inc. to the effect that, as of the date hereof, from a financial point of view, the Exchange Ratio is fair to Grizzly. Grizzly has received the written opinion (or oral opinion to be confirmed in writing) of Houlihan Lokey Financial Advisors, Inc. to the effect that, as of the date hereof, from a financial point of view, the Exchange Ratio is fair to Grizzly.

Section 7.17 Brokers or Finders. Other than any agent whose fees and expenses will be paid solely by Grizzly, and all obligations to which will be solely obligations of Grizzly, no

54

agent, broker, investment banker, financial advisor or other similar Person is or will be entitled, by reason of any agreement, act or statement by Grizzly or any Grizzly Subsidiaries, directors, officers or employees, to any financial advisory, broker's, finder's or similar fee or commission, to reimbursement of expenses or to indemnification or contribution in connection with any of the transactions contemplated by this Agreement or each other Transaction Agreement.

Section 7.18 <u>Certain Board Findings</u>. The Grizzly Board, at a meeting duly called and held, (i) has determined that this Agreement and the transactions contemplated hereby, including the Merger, and the issuance of shares of Grizzly Common Stock pursuant to the Merger (and, to the extent applicable, the transactions contemplated by Schedule 8.3(e)), are advisable, fair to and in the best interests of Grizzly and the stockholders of Grizzly, (ii) has approved this Agreement and the transactions contemplated hereby, including the Merger (and, to the extent applicable, the transactions contemplated by Schedule 8.3(e)), and (iii) has resolved to recommend that the stockholders of Grizzly entitled to vote thereon vote in favor of the approval of the issuance of shares of Grizzly Common Stock pursuant to the Merger at the Grizzly Stockholders Meeting (and, to the extent applicable, the transactions contemplated by Schedule 8.3(e)) (the "<u>Grizzly Recommendation</u>").

Section 7.19 <u>Vote Required</u>. The only vote of the stockholders of Grizzly required under any of the DGCL, the NYSE rules or the Grizzly Charter for the transactions contemplated by this Agreement, including issuance of the Grizzly Common Stock issuable in the Merger, is, subject to the provisions of Schedule 8.3(e), the affirmative vote of the holders of a majority in interest of the stockholders of Grizzly present or by proxy and entitled to vote at the Grizzly Stockholders Meeting (sometimes referred to herein as the "<u>Grizzly Stockholder Approval</u>").

Section 7.20 <u>Spinco Common Stock</u>. Grizzly does not own (directly or indirectly, beneficially or of record) nor is it a party to any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of, in each case, any shares of capital stock of Spinco (other than as contemplated by this Agreement) or Burgundy. Assuming the accuracy of the representations set forth in <u>Section 6.20</u>, the limitations on business combinations contained in Section 203 of the DGCL are inapplicable to the Merger and the other transactions contemplated hereby.

Section 7.21 <u>Human Health and Safety</u>. Grizzly and the Grizzly Subsidiaries are, and since January 1, 2010, have been, in compliance with all applicable Laws relating to the protection of human health and safety (including workplace health and safety), except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly.

Section 7.22 <u>Contemplated Spinco Financing</u>. Pursuant to the Spinco Commitment Letter and the fee letters attached thereto (together, the "<u>Spinco Related Letter</u>"), the lenders party thereto have committed, subject to the terms and conditions set forth therein, to lend the amounts set forth therein for the purpose of financing the Special Below Basis Cash Distribution (the "<u>Spinco Financing</u>"). The Spinco Commitment Letter and the Spinco Related Letter, a true and fully executed copy of each of which have been provided to Burgundy, have not been amended or modified on or prior to the date of this Agreement, and as of the date of this Agreement the commitments contained in the Spinco Commitment Letter and the Spinco Related Letter

55

have not been withdrawn or rescinded in any respect. As of the date hereof, there are no side letters or Contracts to which Grizzly or Merger Sub is a party related to the funding of the Spinco Financing that could reasonably be expected to adversely affect the availability of the Spinco Financing. Grizzly or Merger Sub has fully paid any and all commitment fees or other fees in connection with the Spinco Commitment Letter and the Spinco Related Letter that are payable on or prior to the date hereof, and as of the date hereof the Spinco Commitment Letter and the Spinco Related Letter are in full force and effect and are the legal, valid and binding enforceable obligations of Grizzly and Merger Sub, as the case may be, and, to the Knowledge of Grizzly and Merger Sub, each of the parties thereto. There are no conditions precedent or other contingencies related to the funding of the full amount of the Spinco Financing, other than as expressly set forth in the Spinco Commitment Letter. As of the date hereof, subject to the accuracy of the representations and warranties of Burgundy set forth in Article V and Article VI, no event has occurred, which, with or without notice, lapse of time or both, would or would reasonably be expected to constitute a default or breach on the part of Grizzly or Merger Sub or, to the Knowledge of Grizzly or Merger Sub, any other party thereto under the Spinco Commitment Letter or Spinco Related Letter.

Section 7.23 Grizzly Rights Agreement. As of the date of this Agreement, there is no shareholder rights plan, "poison pill," anti-takeover plan or other similar device in effect, to which Grizzly or any of its Subsidiaries is a party or otherwise bound. The transactions contemplated by this Agreement are and, as of the Closing, will be exempt from any such shareholder rights plan, "poison pill," anti-takeover plan or other similar device adopted prior to the Closing to which Grizzly or any of its Subsidiaries is a party or otherwise bound.

Section 7.24 No Other Representations. Except for the representations and warranties of Grizzly and Merger Sub expressly set forth in this Agreement or any other Transaction Agreement, neither Grizzly nor any of its Subsidiaries nor any other Person acting on behalf of Grizzly or any of its Subsidiaries makes any representation or warranty, express or implied. Without limiting the generality of the foregoing, Burgundy and Spinco each acknowledge that no representations or warranties are made with respect to any projections, forecasts, estimates or budgets with respect to Grizzly and the Grizzly Subsidiaries that may have been made available to Burgundy, Spinco or any of their Representatives.

**ARTICLE VIII**

**COVENANTS AND AGREEMENTS**

Section 8.1 Conduct of Business by Grizzly and Merger Sub Pending the Merger. Following the date of this Agreement and prior to the earlier of the Effective Time and the Termination Date, except (i) as required by Law, (ii) as may be consented to in writing by Burgundy (which consent shall not be unreasonably withheld, conditioned or delayed), (iii) as expressly permitted or contemplated by this Agreement or the other Transaction Agreements or (iv) as set forth in Section 8.1 of the Grizzly Disclosure Letter, Grizzly covenants and agrees that each of Grizzly and the Grizzly Subsidiaries shall conduct its operations in accordance with its ordinary course of business, consistent with past practice, and shall use commercially reasonable efforts to conduct its operations in compliance with all Laws applicable to it or to the conduct of its business and to maintain its present business organization, maintain rights and franchises, keep available

56

the services of its current officers and key employees and maintain its relationships with key customers and key suppliers; provided, however, that no action by Grizzly or any of the Grizzly Subsidiaries with respect to matters specifically addressed by any other provisions of this Section 8.1 shall be deemed a breach of this sentence unless such action would constitute a breach of such other provision. Following the date of this Agreement and prior to the earlier of the Effective Time and the Termination Date (and notwithstanding the immediately preceding sentence), except (i) as may be required by Law, (ii) as may be consented to in writing by Burgundy (which consent shall not be unreasonably withheld, conditioned or delayed), (iii) as may be expressly permitted or contemplated by this Agreement or the other Transaction Agreements, or (iv) as set forth in Section 8.1 of the Grizzly Disclosure Letter, Grizzly shall not, nor shall it permit any of the Grizzly Subsidiaries to:

(a) (i) declare or pay any dividends on or make other distributions in respect of any shares of its capital stock (whether in cash, securities or property), except for the declaration and payment of (A) regular quarterly cash dividends not in excess of $0.08 per share of Grizzly Common Stock and (B) cash dividends or distributions paid on or with respect to a class of capital stock all of which shares of capital stock of the applicable corporation are owned directly or indirectly by Grizzly; (ii) split, combine or reclassify any of its capital stock or issue or authorize or propose the issuance of any other securities in respect of, in lieu of, or in substitution for, shares of its capital stock; or (iii) redeem, repurchase or otherwise acquire, or permit any Grizzly Subsidiary to redeem, repurchase or otherwise acquire, any shares of its capital stock (including any securities convertible or exchangeable into such capital stock), except as required by the terms of the securities of Grizzly outstanding on the date hereof or any securities of Grizzly issued after the date hereof not in violation of this Agreement or as required by the terms of a Grizzly Benefit Plan or any awards thereunder outstanding on the date hereof or granted thereunder after the date hereof in accordance with this Agreement;

(b) issue, deliver or sell, or authorize any shares of its capital stock of any class, any Grizzly Voting Debt or any securities convertible into, or any rights, warrants or options to acquire, any such shares, Grizzly Voting Debt or convertible securities, other than (i) the issuance of shares of Grizzly Common Stock upon the exercise of stock options or the vesting of restricted stock units that are outstanding on the date hereof pursuant to the Grizzly Benefit Plans; (ii) issuances by a wholly-owned Subsidiary of Grizzly of its capital stock to such Subsidiary's parent or another wholly-owned Subsidiary of Grizzly; and (iii) the granting of stock options or the granting of restricted stock units with respect to up to 500,000 shares of Grizzly Common Stock in the ordinary course of business, consistent with Grizzly's past practices;

(c) amend the Grizzly Charter;

(d) acquire or agree to acquire by merger or consolidation, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability entity, joint venture, association or other business organization or division thereof or otherwise acquire or agree to acquire any material assets (excluding the acquisition of assets used in the operations of the business of Grizzly and the Grizzly Subsidiaries in the ordinary course consistent with past practice, which assets do not constitute a business unit, division or all or substantially all of the assets of the transferor), in any such case, if such acquisition would reasonably be expected to, individually or in the aggregate, prevent or materially delay satisfaction of any of the conditions to the Merger set forth in Article IX;

PPG102812

(e) except in the ordinary course of business, consistent with past practice or as set forth in Section 8.1(e) of the Grizzly Disclosure Letter, sell, lease, license or otherwise encumber or subject to any Lien or otherwise dispose of, or agree to sell, lease, license or otherwise encumber or subject to any Lien or otherwise dispose of, any of its assets (including capital stock of the Grizzly Subsidiaries), except, in each case, sales, leases, licenses, encumbrances or other dispositions or Liens involving inventory and obsolete equipment, in the ordinary course of business consistent with past practice, or other dispositions of assets not in an amount exceeding $20 million in the aggregate;

(f) incur any indebtedness or guarantee or otherwise become contingently liable for any indebtedness or issue or sell any debt securities or warrants or rights to acquire any debt securities of Grizzly or any of the Grizzly Subsidiaries or guarantee any debt securities of others or enter into any material Lease (whether such Lease is an operating or capital Lease) or enter into any interest rate hedge, other than Liabilities incurred (i) under the Grizzly Existing Revolving Credit Agreement in an amount not to exceed $300 million and (ii) in the ordinary course of business consistent with past practice and not exceeding $20 million in the aggregate;

(g) (i) grant any material increases in the compensation of any of its directors, officers or employees, except in the ordinary course of business consistent with past practice; (ii) pay or agree to pay to any director, officer or employee, whether past or present, any pension, retirement allowance or other employee benefit not required or contemplated by any of the existing benefit, severance, termination, pension or employment plans, contracts or arrangements as in effect on the date hereof, except for the right to receive certain retention and bonus payments that are related to the transactions contemplated by this Agreement that Grizzly may agree to pay and pay to select executives and other employees, which will in no event exceed $10 million in the aggregate; (iii) except in the ordinary course of business consistent with past practice, enter into any new, or materially amend any existing, employment or severance or termination, contract with any director, officer or employee; (iv) accelerate the vesting of, or the lapsing of restrictions with respect to, any stock options or other stock-based compensation; or (v) become obligated under any new pension plan, welfare plan, multiemployer plan, employee benefit plan, severance benefit plan, benefit arrangement or similar plan or arrangement that was not in existence on the date hereof, or amend any such plan or arrangement in existence on the date hereof if such amendment would have the effect of materially enhancing any benefits thereunder;

(h) establish, adopt, enter into, terminate or amend any collective bargaining agreement, plan, trust, fund, policy or arrangement with a labor union, labor organization or works council for the benefit of any current or former directors, officers, employees or any of their beneficiaries, except, in each case, (i) as is necessary to comply with applicable Law or (ii) as would not result in a material increase in the cost of maintaining such collective bargaining agreement, plan, trust, fund, policy or arrangement;

(i) authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution of Grizzly or any of the Grizzly Subsidiaries;

58

PPG102813

(j) except as required by Law, make any material change in its methods of accounting in effect at the Interim Balance Sheet Date or change its fiscal year;

(k) make, change or revoke any material Tax election or settle, compromise or abandon any material Tax liability, other than in the ordinary course of business, consistent with past practice;

(l) except in the ordinary course of business, consistent with past practice, settle or compromise any actions, suits, arbitrations or proceedings (including any employee grievances) or pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), except (i) the payment, discharge or satisfaction (which includes the payment of final and unappealable judgments) of any such claims, liabilities or obligations in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the most recent consolidated financial statements (or the notes thereto) of Grizzly included in Grizzly's Annual Report on Form 10-K for the fiscal year ended December 31, 2011 or (ii) settlement or compromise of litigation if it does not involve a grant of injunctive relief against Grizzly or any of the Grizzly Subsidiaries and any amount paid by Grizzly or any Grizzly Subsidiary to the other party (including as reimbursement of legal fees and expenses) does not exceed $5 million;

(m) enter into any joint venture, partnership or other similar business arrangement for the production of chlorine or caustic soda; or build or establish a plant for the production of chlorine or caustic soda;

(n) enter into or amend any agreement or arrangement with any Affiliate of Grizzly or any Grizzly Subsidiary, other than with wholly owned Grizzly Subsidiaries, on terms less favorable to Grizzly or such Grizzly Subsidiary, as the case may be, than could be reasonably expected to have been obtained with an unaffiliated third party on an arm's-length basis;

(o) except in the ordinary course of business, or as required by Law, terminate or fail to use commercially reasonable efforts to renew any Grizzly Material Contract to which Grizzly or any of the Grizzly Subsidiaries is a party or modify, amend waive, release or assign any material rights or claims thereunder or enter into any Grizzly Material Contract not in the ordinary course of business consistent with past practice; or

(p) agree or commit to do any of the foregoing actions.

Section 8.2 <u>Conduct of Business by Spinco and Burgundy Pending the Merger</u>. Following the date of this Agreement and prior to the earlier of the Effective Time and the Termination Date, except (i) as required by Law, (ii) as may be consented to in writing by Grizzly (which consent shall not be unreasonably withheld, conditioned or delayed), (iii) as may be expressly permitted or contemplated by this Agreement or the other Transaction Agreements (including any schedules thereto) (including any restructurings or reorganizations necessary for the transactions contemplated hereby or thereby), or (iv) as set forth in Section 8.2 of the Burgundy Disclosure Letter, Burgundy and Spinco jointly and severally covenant and agree that each of the Eagle Entities will conduct the Eagle Business in accordance with its ordinary course of business, consistent with past practice, and shall use commercially reasonable efforts to conduct its operations

59

PPG102814

in compliance with all Laws applicable to it or to the conduct of its business and to maintain its present business organization, maintain rights and franchises, keep available the services of its current officers and key employees and maintain its relationships with key customers and key suppliers; provided, however, that no action by Burgundy, any of the Burgundy Subsidiaries, Spinco or any of the Spinco Subsidiaries with respect to matters specifically addressed by any other provisions of this Section 8.2 shall be deemed a breach of this sentence unless such action would constitute a breach of such other provision. Following the date of this Agreement and prior to the earlier of the Effective Time and the Termination Date (and notwithstanding the immediately preceding sentence), except (i) as may be required by Law, (ii) as may be consented to in writing by Grizzly (which consent shall not, other than with respect to the matters in clauses (g) and (h) of this Section 8.2, as to which Grizzly may grant or withhold its consent in its sole discretion, be unreasonably withheld, conditioned or delayed), (iii) as may be expressly permitted or contemplated by this Agreement or the other Transaction Agreements (including any schedules thereto) (including any restructurings or reorganizations necessary for the transactions contemplated hereby or thereby), or (iv) as set forth in Section 8.2 of the Burgundy Disclosure Letter, none of the Eagle Entities will, and Burgundy will cause all of the Eagle Entities not to:

(a) (i) split, combine or reclassify any of the capital stock of any member of the Spinco Group or issue or authorize or propose the issuance of any other securities in respect of, in lieu of, or in substitution for, shares of the capital stock of any member of the Spinco Group; or (ii) redeem, repurchase or otherwise acquire, or permit any Subsidiary to redeem, repurchase or otherwise acquire, any shares of the capital stock (including any securities convertible or exchangeable into such capital stock) of any member of the Spinco Group, except as required by the terms of the securities outstanding on the date hereof or any securities issued after the date hereof not in violation of this Agreement or as required by any Spinco Benefit Plan or any awards thereunder outstanding on the date hereof or granted thereunder after the date hereof in accordance with this Agreement;

(b) issue, deliver or sell, or authorize any shares of capital stock of any member of the Spinco Group of any class, any Spinco Voting Debt or any securities convertible into, or any rights, warrants or options to acquire, any such shares, Spinco Voting Debt or convertible securities including additional options or other equity-based awards that could be converted into any option to acquire Spinco Common Stock, other than issuances by a wholly owned Subsidiary of Spinco of its capital stock to such Subsidiary's parent or another wholly owned Subsidiary of Spinco;

(c) amend the certificate of incorporation or bylaws (or other similar organizational documents) of any member of the Spinco Group, other than an amendment to the certificate of incorporation of Spinco to increase the number of authorized shares of Spinco Common Stock in connection with the Distribution;

(d) acquire or agree to acquire by merger or consolidation, or by purchasing a substantial equity interest in or a substantial portion of the assets of, or by any other manner, any business or any corporation, partnership, limited liability entity, joint venture, association or other business organization or division thereof, in each case, that would be a Spinco Asset pursuant to the Separation Agreement; or otherwise acquire or agree to acquire any material assets that would be a Spinco Asset pursuant to the Separation Agreement (excluding the acquisition of assets

60

used in the operations of the business of Spinco and the Spinco Subsidiaries in the ordinary course consistent with past practice, which assets do not constitute a business unit, division or all or substantially all of the assets of the transferor);

(e) except in the ordinary course of business, consistent with past practice, sell, lease, license or otherwise encumber or subject to any Lien or otherwise dispose of, or agree to sell, lease, license or otherwise encumber or subject to any Lien or otherwise dispose of, any of its assets (including capital stock of Spinco Subsidiaries), except, in each case, sales, leases, licenses, encumbrances or other dispositions or Liens involving inventory and obsolete equipment, in the ordinary course of business consistent with past practice, or other dispositions of assets not in an amount exceeding $2 million in the aggregate;

(f) incur any indebtedness or guarantee or otherwise become contingently liable for any indebtedness or issue or sell any debt securities or warrants or rights to acquire any debt securities of any member of the Spinco Group or guarantee any debt securities of others or enter into any material Lease (whether such Lease is an operating or capital Lease) or enter into any interest rate hedge, other than Liabilities that would not be included in the Spinco Liabilities or Liabilities incurred in the ordinary course of business consistent with past practice, or other Liabilities not exceeding $500,000 in the aggregate;

(g) (i) grant any material increases in the compensation of any Spinco Employee, except in the ordinary course of business consistent with past practice; (ii) pay or agree to pay to any Spinco Employee, any pension, retirement allowance or other employee benefit not required or contemplated by any of the existing benefit, severance, termination, pension or employment plans, contracts or arrangements as in effect on the date hereof, except for the right to receive the retention and bonus payments for select Spinco Employees set forth in Article VIII of the Employee Matters Agreement; (iii) except in the ordinary course of business consistent with past practice, enter into any new, or materially amend any existing, employment or severance or termination, contract with any Spinco Employee; or (iv) except in connection with an action that applies uniformly to all similarly situated employees of Burgundy and the Burgundy Subsidiaries and that is not exclusive to the Spinco Employees, become obligated with respect to any Spinco Employee under any new pension plan, welfare plan, multiemployer plan, employee benefit plan, severance plan, benefit arrangement or similar plan or arrangement that was not in existence on the date hereof, or amend any such plan or arrangement in existence on the date hereof if such amendment would have the effect of materially enhancing any benefits thereunder;

(h) establish, adopt, enter into, terminate or amend any collective bargaining agreement, plan, trust, fund, policy or arrangement with a labor union, labor organization or works council for the benefit of any Spinco Employees or any of their beneficiaries, except, in each case, (i) as contemplated by the Employee Matters Agreement; (ii) as is necessary to comply with applicable Law; (iii) as would not result in a material increase in the cost of maintaining such collective bargaining agreement, plan, trust, fund, policy or arrangement; (iv) in connection with an action that applies uniformly to all similarly situated employees of Burgundy and its Subsidiaries and that is not exclusive to the Spinco Employees; or (v) as set forth in Section 8.2(h) of the Burgundy Disclosure Letter;

61

PPG102816

(i) authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution of Spinco;

(j) except as required by Law, make any material change in its methods of accounting in effect at the Interim Balance Sheet Date or change its fiscal year, to the extent it relates solely to the Eagle Business;

(k) make, change or revoke any material Tax election in respect of the Eagle Business that would bind Spinco or a Spinco Subsidiary for periods following the Effective Time or settle, compromise or abandon any material Tax liability for which Spinco or a Spinco Subsidiary would be responsible under the Tax Matters Agreement, in each case other than in the ordinary course of business, consistent with past practice;

(l) except in the ordinary course of business, consistent with past practice, settle or compromise any actions, suits, arbitrations or proceedings (including any employee grievances) or pay, discharge or satisfy any material claims, liabilities or obligations (absolute, accrued, asserted or unasserted, contingent or otherwise), except (i) the payment, discharge or satisfaction (which includes the payment of final and unappealable judgments) of any such claims, liabilities or obligations in accordance with their terms, of liabilities reflected or reserved against in, or contemplated by, the Spinco Financial Statements, or incurred in the ordinary course of business since the date of such financial statements), or (ii) settlement or compromise of litigation if it does not involve a grant of injunctive relief against the Eagle Entities and the amount paid to the other parties (including as reimbursement of legal fees and expenses) in respect of all such settlements and compromises of litigation does not exceed $2,000,000 in the aggregate;

(m) enter into or amend any agreement or arrangement that will be a Spinco Contract as of the Closing with any Affiliate of Burgundy or any Burgundy Subsidiary (other than Spinco or a Spinco Subsidiary);

(n) except in the ordinary course of business, or as required by Law, terminate or fail to use commercially reasonable efforts to renew any Spinco Material Contract, or any Contract that provides for annual payments in excess of $2 million by or to any member of the Spinco Group, or modify, amend, waive, release or assign any material rights or claims under any such Contract or any Spinco Material Contract, or enter into any Spinco Material Contract or any Contract that provides for annual payments in excess of $2 million by or to any member of the Spinco Group, in any such case, not in the ordinary course of business consistent with past practice;

(o) issue to Current Spinco Employees any additional Burgundy Options or Burgundy PSU Awards that would be subject to Section 3.4 of this Agreement, or modify or waive the terms of any outstanding Burgundy Options or Burgundy PSU Awards that are subject to Section 3.4 of this Agreement, or modify or waive the terms of any Burgundy Stock Plan as applied to any outstanding Burgundy Options or Burgundy PSU Awards that are subject to Section 3.4 of this Agreement;

(p) fail to make an amount of capital expenditures for the Eagle Business set forth in Section 8.2(p) of the Burgundy Disclosure Letter; or

62

(q) agree or commit to do any of the foregoing actions.

Section 8.3 <u>Tax Matters</u>.

(a) <u>Certain Tax Efforts</u>. Prior to the Effective Time, and from time to time, each of Burgundy, Spinco and Grizzly agrees to use its reasonable best efforts to (i) cause the Contribution and Distribution, taken together, to qualify as a "reorganization" within the meaning of Section 368(a)(1)(D) of the Code; (ii) cause the Merger to qualify as a "reorganization" within the meaning of Section 368(a) of the Code; and (iii) facilitate the issuance of the Private Letter Ruling (including the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling), including by (x) in the case of Burgundy, modifying or terminating the Burgundy Commitment Letter and (y) in the case of Grizzly, consenting to such changes to the Burgundy Commitment Letter, in each case as may be reasonably necessary or appropriate to facilitate the issuance of the IRS Debt Exchange Ruling. In the event that, as a result of any modification or termination effected as a result of this <u>Section 8.3</u>, the Burgundy Commitment Letter no longer provides for the exchange of Spinco Exchange Debt in full satisfaction of the Burgundy Debt (the "<u>Trigger Event</u>"), Grizzly shall use its reasonable best efforts to arrange and obtain a bridge facility from the lenders under the Burgundy Financing for the purpose of financing the Special Above Basis Debt/Cash Distribution as promptly as practicable following the occurrence of the Trigger Event, including using reasonable best efforts to enter into definitive agreements with respect thereto.

(b) <u>IRS Ruling</u>.

(i) Burgundy has submitted to the IRS a request (the "<u>Ruling Request</u>") for the IRS D Reorganization Ruling, the IRS Debt Exchange Ruling and certain related rulings. Burgundy in consultation with Grizzly, shall prepare and submit to the IRS supplemental materials relating thereto that Burgundy determines are necessary or appropriate to obtain the requested rulings from the IRS (each, an "<u>IRS Submission</u>"). As soon as reasonably practicable after the date of this Agreement, Burgundy shall submit one or more such IRS Submissions that include, but need not be limited to, the modifications described in Schedule 8.3(b)(i) of this Agreement (the "<u>Specified Submissions</u>"). Burgundy shall provide Grizzly with a reasonable opportunity to review and comment on each material IRS Submission prior to the filing of such IRS Submission with the IRS and Burgundy shall, in good faith, consider any comments provided by Grizzly on each such material IRS Submission; <u>provided</u> that Burgundy may redact from any IRS Submission any information ("<u>Redactable Information</u>") that (x) Burgundy, in its good faith judgment, considers to be confidential and not germane to Grizzly's or Spinco's obligations under this Agreement or any of the other Transaction Agreements, and (y) is not a part of any other publicly available information, including any non-confidential filing. No IRS Submission (including, without limitation, the Specified Submissions) shall be filed with the IRS unless, prior to such filing, Grizzly shall have agreed (which agreement will not be withheld unreasonably, conditioned or delayed) as to the contents of such IRS Submission, to the extent that such contents include statements or representations that Grizzly reasonably and in good faith determines will have a material effect on Grizzly or any of its Affiliates (including Spinco or the Spinco Subsidiaries for periods after the Effective Time) (it being agreed and understood that Grizzly has consented to the statements and representations in the Ruling Request). Burgundy shall provide Grizzly with copies of each IRS Submission as filed with the IRS promptly following the filing thereof, provided that Burgundy may redact any Redactable Information from the IRS Submission.

63

(ii) Subject to Schedule 8.3(b)(ii), Burgundy shall use its reasonable best efforts to notify Grizzly and Grizzly's representatives of any substantive communications with the IRS regarding any material issue arising with respect to the Ruling Request, including, without limitation, the Specified Submission, and to give Grizzly (or Grizzly's representatives) a reasonable opportunity to participate in any meetings or conferences with IRS personnel regarding such material issue, whether telephonically, in person or otherwise. Solely for the avoidance of doubt, nothing in this Section 8.3(b)(ii) shall provide grounds for Spinco or Grizzly to alter any obligation or limitation imposed upon it under this Agreement.

(c) Distribution Tax Opinion. Each of Burgundy, Spinco and Grizzly agrees to use its reasonable best efforts to obtain the Distribution Tax Opinion. The Distribution Tax Opinion shall be based upon the Ruling Request, the IRS Submissions and the Private Letter Ruling (including the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling) and customary representations and covenants, including those contained in certificates of Burgundy, Spinco, Grizzly and others, reasonably satisfactory in form and substance to Burgundy Tax Counsel (such representations and covenants, the "Distribution Tax Representations"). Each of Burgundy, Spinco and Grizzly shall deliver to Burgundy Tax Counsel for purposes of the Distribution Tax Opinion customary Distribution Tax Representations, reasonably satisfactory in form and substance to Burgundy Tax Counsel.

(d) Merger Tax Opinions. Burgundy and Spinco, on the one hand, and Grizzly, on the other hand, shall cooperate with each other in obtaining, and shall use their respective reasonable best efforts to obtain, a written opinion of Burgundy Tax Counsel, in the case of Burgundy and Spinco, and Jones Day, in the case of Grizzly ("Grizzly Tax Counsel"), in form and substance reasonably satisfactory to Burgundy and Grizzly, respectively (each such opinion, a "Merger Tax Opinion"), dated as of the Effective Time, to the effect that, on the basis of facts, representations and assumptions set forth in such opinion, the Merger will be treated as a "reorganization" within the meaning of Section 368(a) of the Code. Each of Grizzly, Burgundy and Spinco shall deliver to Grizzly Tax Counsel and Burgundy Tax Counsel for purposes of the Merger Tax Opinions customary representations and covenants, including those contained in certificates of Grizzly, Burgundy, Spinco and others, reasonably satisfactory in form and substance to Grizzly Tax Counsel and Burgundy Tax Counsel.

(e) Canadian Tax Matters.

(i) Each of Burgundy and Grizzly, together with Burgundy Tax Counsel, Grizzly Tax Counsel, and their other respective advisors as determined by each, shall consult with each other in good faith, and shall consult together with and seek a ruling (the "CRA Ruling Request") from the Canadian Revenue Agency ("CRA") substantially to the effect that the "Canadian Butterfly" transactions described in the Ruling Request (the "Canadian Butterfly Transaction") will qualify as a tax-free transaction for Canadian income tax purposes under the potential transaction structures contemplated by Burgundy and Grizzly and in accordance with Schedule 8.3(e).

64

(ii) Burgundy shall (A) notify Grizzly and Grizzly's representatives of any substantive communications with the CRA regarding the effect of the Merger on the intended tax-free treatment of the Canadian Butterfly Transaction for Canadian income tax purposes, give Grizzly (or Grizzly's representatives) a reasonable opportunity to participate in any scheduled meetings or conferences with CRA personnel regarding the effect of the Merger on the intended tax-free treatment of the Canadian Butterfly Transaction, whether telephonically, in person or otherwise, and use reasonable best efforts to schedule or re-schedule any meetings or conferences with the CRA personnel regarding the effect of the Merger on the intended tax-free treatment of the Canadian Butterfly Transaction; and (B) use its reasonable best efforts to notify Grizzly and Grizzly's representatives of any substantive communications with the CRA regarding any material issue arising with respect to the CRA Ruling Request and to give Grizzly (or Grizzly's representatives) a reasonable opportunity to participate in any meetings or conferences with CRA personnel regarding such material issue, whether telephonically, in person or otherwise. Solely for the avoidance of doubt, nothing in this Section 8.3(e)(ii) shall provide grounds for Spinco or Grizzly to alter any obligation or limitation imposed upon it under this Agreement.

Section 8.4 <u>Proxy Statement/Prospectus</u>.

(a) As promptly as reasonably practicable following the date hereof, Grizzly, Burgundy and Spinco shall prepare, and Grizzly shall file with the SEC, the Registration Statement, including the Proxy Statement/Prospectus with respect to the transactions contemplated by this Agreement, and Grizzly shall use its reasonable best efforts to have such Proxy Statement/Prospectus cleared by the SEC under the Exchange Act and the Registration Statement declared effective by the SEC under the Securities Act, as promptly as reasonably practicable after such filings or at such other time as Burgundy, Spinco and Grizzly may agree. The Registration Statement and the Proxy Statement/Prospectus will comply as to form in all material respects with the requirements of the Exchange Act and the Securities Act and the rules and regulations of the SEC thereunder.

(b) As promptly as reasonably practicable following the date hereof (in the event Burgundy elects to complete the Distribution by way of an Exchange Offer (followed by a Clean-Up Spin-Off)) or following the mailing of the Proxy Statement/Prospectus (in the event Burgundy elects to complete the Distribution by way of a One-Step Spin-Off), in each case if required under the Securities Act and/or Exchange Act (or otherwise required by the SEC), Grizzly, Burgundy and Spinco shall prepare, and Spinco shall file with the SEC, the Spinco Registration Statement and Spinco shall use its reasonable best efforts to have such Spinco Registration Statement declared effective by the SEC under the Securities Act, as promptly as practicable after such filings or at such other time as Burgundy, Spinco and Grizzly may agree. The Spinco Registration Statement will comply as to form in all material respects with the requirements of the Securities Act and the rules and regulations of the SEC thereunder.

(c) As promptly as practicable after the date on which the SEC shall clear (whether orally or in writing) the Proxy Statement/Prospectus and, if required by the SEC as a condition to

65

the mailing of the Proxy Statement/Prospectus, the date on which the Registration Statement shall have been declared effective, Grizzly shall mail, or cause to be mailed, the Proxy Statement/Prospectus to its stockholders.

(d) In the event Burgundy elects to complete the Distribution by way of an Exchange Offer (followed by a Clean-Up Spin-Off), as promptly as practicable after the date the Spinco Registration Statement has been declared effective, and to the extent such filings are required by applicable law, Grizzly, Burgundy and Spinco shall prepare and Burgundy will file with the SEC a Schedule TO (the "Schedule TO").

(e) Grizzly shall, as promptly as practicable after receipt thereof, provide to Burgundy copies of any written comments and advise Burgundy of any oral comments with respect to the Proxy Statement/Prospectus and the Registration Statement received from the SEC. Burgundy shall, as promptly as practicable after receipt thereof, provide to Grizzly copies of any written comments and advise Grizzly of any oral comments with respect to the Spinco Registration Statement received from the SEC.

(f) Grizzly shall provide Burgundy with a reasonable opportunity to review and comment on any amendment or supplement to the Proxy Statement/Prospectus or Registration Statement (which comments shall be reasonably considered by Grizzly) prior to filing the same with the SEC, and with a copy of all such filings made with the SEC. Grizzly will advise Burgundy promptly after it receives notice thereof, of the time when the Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order, of the suspension of the qualification of the Grizzly Common Stock issuable in connection with the Merger for offering or sale in any jurisdiction, or of any request by the SEC for amendment of the Proxy Statement/Prospectus or the Registration Statement or comments thereon and responses thereto or requests by the SEC for additional information.

(g) Burgundy shall provide Grizzly with a reasonable opportunity to review and comment on any amendment or supplement to the Spinco Registration Statement or the Schedule TO (which comments shall be reasonably considered by Burgundy) prior to filing the same with the SEC, and with a copy of all such filings made with the SEC. Burgundy will advise Grizzly promptly after it receives notice thereof, of the time when the Spinco Registration Statement has become effective or any supplement or amendment has been filed, of the issuance of any stop order, of the suspension of the qualification of the Spinco Common Stock issuable in connection with the Distribution for offering or sale in any jurisdiction, or of any request by the SEC for amendment of the Spinco Registration Statement or the Schedule TO or comments thereon and responses thereto or requests by the SEC for additional information.

(h) If, at any time prior to the Effective Time, any event or circumstance should occur that results in the Proxy Statement/Prospectus, the Registration Statement, the Spinco Registration Statement or the Schedule TO containing an untrue statement of a material fact or omitting to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading, or that otherwise should be described in an amendment or supplement to the Proxy Statement/Prospectus, the Registration Statement, the Spinco Registration Statement or the Schedule TO, Burgundy, Spinco and Grizzly shall promptly notify each other of the occurrence of such event and then promptly prepare, file and clear with the SEC and mail, or cause to be mailed, to Grizzly's stockholders each such amendment or supplement.

66

PPG102821

(i) Burgundy and Spinco agree to promptly provide Grizzly with the information concerning Burgundy and Spinco and their respective Affiliates required to be included in the Proxy Statement/Prospectus and the Registration Statement. In furtherance of the foregoing, Burgundy and Spinco shall use all reasonable best efforts to, or shall use all reasonable best efforts to cause their respective representatives to, furnish promptly to Grizzly such additional financial and operating data and other information, as to their and their respective Subsidiaries' businesses as Grizzly may require in connection with the preparation of the Proxy Statement/Prospectus and the Registration Statement.

(j) Grizzly agrees to promptly provide Burgundy and Spinco with the information concerning Grizzly and its Affiliates required to be included in the Spinco Registration Statement and the Schedule TO. In furtherance of the foregoing, Grizzly shall use all reasonable best efforts to, or shall use all reasonable best efforts to cause its representatives to, furnish promptly to Burgundy and Spinco such additional financial and operating data and other information, as to it and its Subsidiaries' businesses as Burgundy and Spinco may require in connection with the preparation of the Spinco Registration Statement and the Schedule TO.

Section 8.5 <u>Stockholders Meeting</u>.

(a) As promptly as practicable following the date on which the SEC shall clear (whether orally or in writing) the Proxy Statement/Prospectus and, if required by the SEC as a condition to the mailing of the Proxy Statement/Prospectus, the Registration Statement shall have been declared effective, Grizzly shall call a meeting of its stockholders (the "<u>Grizzly Stockholders Meeting</u>") to be held as promptly as practicable for the purpose of voting upon (i) the issuance of shares of Grizzly Common Stock pursuant to the Merger and (ii) related matters (including, to the extent applicable, the transactions contemplated by Schedule 8.3(e)). This Agreement shall be submitted to the stockholders of Grizzly at such meeting for the purpose of obtaining the approval by the stockholders of Grizzly of the issuance of shares of Grizzly Common Stock pursuant to the Merger (and, to the extent applicable, the transactions contemplated by Schedule 8.3(e)). Grizzly shall deliver, or cause to be delivered, to Grizzly's stockholders the Proxy Statement/Prospectus in definitive form in connection with the Grizzly Stockholders Meeting at the time and in the manner provided by the applicable provisions of the DGCL, the Exchange Act and the Grizzly Charter and Grizzly Bylaws and shall conduct the Grizzly Stockholders Meeting and the solicitation of proxies in connection therewith in compliance with such statutes, the Grizzly Charter and Grizzly Bylaws.

(b) Subject to the provisions of this Agreement, the Proxy Statement/Prospectus shall include the Grizzly Recommendation and Grizzly shall use its reasonable best efforts to obtain the Grizzly Stockholder Approval; <u>provided</u>, <u>however</u>, that if the Grizzly Board effects a Change in Recommendation, Grizzly may cease to use such efforts; <u>provided</u>, <u>further</u>, that in such event, Grizzly shall nevertheless call the Grizzly Stockholders Meeting for the purposes of voting on the matters set forth in <u>Section 8.5(a)</u>) and submit such matters to the vote of the Grizzly Stockholders.

67

Section 8.6 <u>Listing</u>. As promptly as practicable following the date hereof, Grizzly shall make application to the NYSE for the listing of the shares of Grizzly Common Stock to be issued pursuant to the transactions contemplated by this Agreement and use all reasonable best efforts to cause such shares to be Approved for Listing.

Section 8.7 <u>Reasonable Best Efforts</u>.

(a) Subject to the terms and conditions of this Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, and to assist and cooperate with the other parties in doing or causing to be done, all things necessary, proper or advisable under this Agreement and applicable Laws to consummate the Merger and the other transactions contemplated by this Agreement as soon as practicable after the date hereof, including (i) preparing and filing as practicable all documentation to effect all necessary applications, notices, petitions, filings and Tax ruling requests and to obtain as promptly as practicable all Grizzly Approvals and Burgundy Approvals and all other consents, waivers, licenses, orders, registrations, approvals, permits, rulings, authorizations and clearances necessary or advisable to be obtained from any third party and/or any Governmental Authority in order to consummate the Merger or any of the other transactions contemplated by this Agreement (collectively, the "<u>Approvals</u>"), (ii) taking all reasonable steps as may be necessary to obtain all Approvals (including Grizzly providing a guarantee of Spinco's obligations as reasonably necessary to obtain such Approvals) and (iii) taking reasonable efforts to share information protected from disclosure under the attorney-client privilege, work product doctrine, joint defense privilege or any other privilege pursuant to this <u>Section 8.7</u> in a manner so as to preserve the applicable privilege. Notwithstanding anything to the contrary in this <u>Section 8.7</u>, materials provided to the other party or its outside counsel may be redacted to remove references concerning valuation. In furtherance and not in limitation of the foregoing, each party hereto agrees to make (i) an appropriate filing of a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby as promptly as practicable, and in any event within 20 Business Days after the date hereof, (ii) appropriate filings, if any are required, with foreign regulatory authorities in accordance with applicable competition, merger control, antitrust, investment or similar applicable Laws, including the Competition Act ("<u>Foreign Competition Laws</u>"), with respect to the transactions contemplated hereby as promptly as practicable and (iii) all other necessary filings with other Governmental Authorities relating to the Merger, and, in each case, to supply as promptly as practicable any additional information and documentary material that may be requested pursuant to such applicable Laws or by such authorities and to use reasonable best efforts to cause the expiration or termination of the applicable waiting periods under the HSR Act and the receipt of the Approvals under such other applicable Laws or from such authorities as soon as practicable. In connection with and without limiting the foregoing, each of Grizzly and Merger Sub, on the one hand, and Burgundy and Spinco, on the other hand, shall, in connection with the efforts referenced in this <u>Section 8.7</u> to obtain all Approvals, use its reasonable best efforts to (i) cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry, including any proceeding initiated by a private party, (ii) promptly inform the other party of any communication received by such party from, or given by such party to, the Antitrust Division of the Department of Justice (the "<u>DOJ</u>"), the Federal Trade Commission (the "<u>FTC</u>") or any other Governmental Authority and of any material communication received or given in connection with any proceeding by a private party, in each case regarding any of the transactions contemplated hereby (and in each

68

case, if any such communication is in writing, share a copy with the other party) and (iii) permit the other party to review in advance any communication to be given by it to, and consult with each other in advance of any meeting or material telephone call with, the DOJ, the FTC or any such other Governmental Authority or, in connection with any proceeding by a private party, with any other Person, and to the extent permitted by the DOJ, the FTC or such other applicable Governmental Authority or other Person, give the other party the opportunity to attend and participate in such meetings and conferences.

(b) Without limiting this Section 8.7, but subject to the next sentence of this Section 8.7(b), each of the parties agrees to take, or to cause to be taken, any and all steps and to make any and all undertakings necessary to avoid or eliminate each and every impediment under any antitrust, merger control, competition or trade regulation Law that may be asserted by any Governmental Authority with respect to the Merger so as to enable the Closing to occur as soon as reasonably possible, including proposing, negotiating, committing to, and effecting, by consent decree, hold separate order, or otherwise, the sale, divestiture, licensing or disposition of such assets or businesses of Spinco (or the Spinco Subsidiaries) or Grizzly (or the Grizzly Subsidiaries), as applicable, or otherwise taking or committing to take actions that limit Spinco's or the Spinco Subsidiaries' or Grizzly's or the Grizzly Subsidiaries', as applicable, freedom of action with respect to, or their ability to retain, any of the businesses, product lines or assets of Spinco (or the Spinco Subsidiaries) or Grizzly (or the Grizzly Subsidiaries), in each case, as may be required in order to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order, or other order in any suit or proceeding, which would otherwise have the effect of preventing the Closing; provided that the effectiveness of any such sale, divestiture, license or disposition or action or commitment shall be contingent on consummation of the Merger. Notwithstanding the foregoing, the obligations of this Section 8.7(b) (i) shall not apply to each of the parties if compliance with this Section 8.7(b) would result in, or would reasonably be expected to result in, a Material Adverse Effect on the Eagle Business and (ii) for the avoidance of doubt, shall not require Burgundy to agree to any sale, divestiture, licensing or disposition of any assets or businesses, or restriction or change in the ownership, conduct or operations of any assets or businesses, that are not included in the Eagle Business.

Section 8.8 Accounting Matters.

(a) In connection with the information regarding the Eagle Business or the transactions contemplated by this Agreement provided by Spinco specifically for inclusion in, or incorporation by reference into, the Proxy Statement/Prospectus, the Registration Statement and the Spinco Registration Statement, to the extent that such letters are customarily delivered, Burgundy shall use all reasonable best efforts to cause to be delivered to Grizzly two letters of Deloitte & Touche LLP, one dated the date on which each of the Registration Statement and the Spinco Registration Statement shall become effective and the other dated the Closing Date, and addressed to Grizzly and Merger Sub, in form and substance reasonably satisfactory to Grizzly and customary in scope and substance for letters delivered by independent public accountants in connection with registration statements similar to the Registration Statement and the Spinco Registration Statement.

(b) In connection with the information regarding Grizzly or its Subsidiaries or the transactions contemplated by this Agreement provided by Grizzly specifically for inclusion in, or

69

incorporation by reference into, the Proxy Statement/Prospectus, the Registration Statement and the Spinco Registration Statement, to the extent that such letters are customarily delivered, Grizzly shall use all reasonable best efforts to cause to be delivered to Spinco two letters of each of Deloitte & Touche LLP and Ernst & Young LLP, one dated the date on which each of the Registration Statement and the Spinco Registration Statement shall become effective and the other dated the Closing Date, and addressed to Burgundy and Spinco, in form and substance reasonably satisfactory to Burgundy and customary in scope and substance for letters delivered by independent public accountants in connection with registration statements similar to the Registration Statement and the Spinco Registration Statement.

Section 8.9 <u>Access to Information</u>. Upon reasonable notice, (i) each of the Eagle Entities and Spinco, on the one hand, and (ii) Grizzly, on the other hand, shall, subject to applicable Law, afford to the other and to its respective officers, employees, accountants, counsel and other authorized representatives, reasonable access during normal business hours, throughout the period prior to the earlier of the Effective Time or the Termination Date, to its and its Subsidiaries' officers, employees, accountants, consultants, representatives, plants, properties, Contracts, commitments, books, records (including Tax Returns) and any report, schedule or other document filed or received by it pursuant to the requirements of the federal or state securities laws, and shall use all reasonable best efforts to cause its respective representatives to furnish promptly to the other such additional financial and operating data and other information, including environmental information, as to its and its Subsidiaries' respective businesses and properties as the others or their respective duly authorized representatives, as the case may be, may reasonably request; <u>provided</u> that nothing in this Agreement shall require any Person to permit any inspection or disclose any information to another Person that would cause a violation of any Contract, would cause a risk of a loss of privilege to the first Person, that is competitively sensitive information or to permit another Person to perform any onsite procedure with respect to any of the first Person's or its Subsidiaries' properties (<u>provided</u> that the Person that would otherwise be required to disclose information to the other shall take any and all reasonable action necessary to permit such disclosure without such loss of privilege or violation of agreement or Law). Notwithstanding any provision of this Agreement to the contrary, none of the parties shall be obligated to grant any access or make any disclosure in violation of applicable Laws or regulations, or if it would unreasonably interfere with the conduct of such party's business or result in damage to property (other than immaterial damage), without that party's written consent (which that party may grant or deny at its sole discretion), or grant any access to, or make any disclosure of, any customer Contracts. The parties hereby agree that the provisions of the Confidentiality Agreement shall apply to all information and material furnished by any party or its representatives thereunder and hereunder. The Confidentiality Agreement shall survive any termination of this Agreement.

Section 8.10 <u>Acquisition Proposals</u>.

(a) Grizzly will not, and will cause its Subsidiaries not to, and will use its reasonable best efforts to cause Grizzly's and its Subsidiaries' respective officers, directors, employees, agents and representatives (including any investment banker, attorney or accountant retained by it or any of its Subsidiaries, the "<u>Representatives</u>") not to, (i) initiate or solicit, or knowingly facilitate, assist or encourage, directly or indirectly, any inquiries with respect to, or the encouragement or making of, any Grizzly Acquisition Proposal, (ii) except as permitted below in <u>Section 8.10(b)</u>,

70

engage in negotiations or discussions with, furnish access to its properties, books and records or provide any information or data to, or cooperate with, any Person relating to a Grizzly Acquisition Proposal, (iii) except as permitted below in Section 8.10(d), approve, endorse or recommend, or propose publicly to approve, endorse or recommend, any Grizzly Acquisition Proposal, (iv) execute or enter into any letter of intent, agreement in principle, merger agreement, acquisition agreement or other similar agreement relating to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with Section 8.10(b)), (v) waive, terminate, modify or fail to enforce any provision of any "standstill" obligation of any Person other than Burgundy, (vi) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation (including any transaction under, or a third party becoming an "interested shareholder" under, Section 203 of the DGCL) inapplicable to any transactions contemplated by a Grizzly Acquisition Proposal (and, to the extent permitted thereunder, Grizzly shall promptly take all steps necessary to terminate any waiver that may have been heretofore granted, to any Person other than Burgundy or any of Burgundy's Affiliates, under any such provisions), or (vii) resolve, propose or agree to do any of the foregoing. Grizzly shall immediately cease any solicitations, discussions or negotiations with any Person that has made or indicated an intention to make a Grizzly Acquisition Proposal (except Burgundy, Spinco and their respective Representatives). It is understood that any violation of the restrictions set forth in this Section 8.10(a) by any of the Grizzly Subsidiaries or any of Grizzly's or the Grizzly Subsidiaries' Representatives shall be deemed to be a breach of this Section 8.10(a) by Grizzly.

(b) Notwithstanding anything to the contrary in this Agreement, at any time prior to obtaining the Grizzly Stockholder Approval, in the event that Grizzly receives a *bona fide* written Grizzly Acquisition Proposal that did not result from a breach of Section 8.10(a), Grizzly and the Grizzly Board may participate in discussions or negotiations (including, as a part thereof, making any counterproposal) with, or furnish, pursuant to an Acceptable Confidentiality Agreement, any information to (provided that all such information has previously been provided or made available to Burgundy or is provided or made available to Burgundy substantially concurrently with the time it is so furnished), any Person making such Grizzly Acquisition Proposal and its Representatives or potential sources of financing if the Grizzly Board determines in good faith, after consultation with outside legal counsel and a financial advisor, that such Grizzly Acquisition Proposal could reasonably lead to the receipt of a Grizzly Superior Proposal. In addition, nothing herein shall restrict Grizzly from complying with its disclosure obligations with regard to any Grizzly Acquisition Proposal under applicable Law; provided, however, that any action that would constitute a Change in Recommendation may only be made in compliance with Section 8.10(d). For purposes of this Agreement, a "Grizzly Superior Proposal" means any *bona fide* written offer made by a third party to acquire, directly or indirectly, by merger, consolidation or other business combination or other similar acquisition transaction, for consideration consisting of cash and/or securities, at least a majority of the shares of the Grizzly Common Stock then outstanding or all or substantially all of the assets of Grizzly and the Grizzly Subsidiaries, with respect to which the Grizzly Board (after consultation with outside legal counsel and a financial advisor) has determined in good faith judgment that the consummation of the transactions contemplated by such written offer (x) would be more favorable to Grizzly's stockholders than the Merger, after taking into account all the terms and conditions of such proposal (including the financial aspects of such proposal, the form of consideration, the likelihood, ability to finance, conditionality and timing of consummation of such proposal, any break-up fees, expense reimbursement

71

provisions and any other aspects of the transaction described in such proposal, including the identity of the Person or "group" (as defined in or under Section 13(d) of the Exchange Act) making such proposal) and this Agreement (including any changes to the terms of this Agreement proposed in writing by Burgundy to Grizzly in response to such proposal or otherwise), and (y) would be reasonably likely to be completed on the terms proposed on a timely basis, taking into account all financial, legal, regulatory and other aspects of such proposal; an "Acceptable Confidentiality Agreement" means any customary confidentiality agreement that contains provisions that are no less restrictive to such Person, and no less favorable to Grizzly, than those contained in the Confidentiality Agreement.

(c) Grizzly will promptly (and in any event within one Business Day after receipt) notify Burgundy of the receipt by Grizzly of any Grizzly Acquisition Proposal, which notice shall include the identity of the Person(s) making such Grizzly Acquisition Proposal and copies of any written materials evidencing such Grizzly Acquisition Proposal. Grizzly will keep Burgundy reasonably informed of the status and material terms and conditions of any such Grizzly Acquisition Proposal. Without limitation of the foregoing, Grizzly will promptly provide to Burgundy (and in any event within one Business Day) any material modifications to the terms of any Grizzly Acquisition Proposal (including promptly furnishing copies of any written materials evidencing such material modifications) and will promptly notify Burgundy of any determination by the Grizzly Board that a Grizzly Acquisition Proposal constitutes a Grizzly Superior Proposal. Grizzly shall not, and shall cause Grizzly's Subsidiaries not to, enter into any Contract with any Person subsequent to the date of this Agreement, and neither Grizzly nor any of its Subsidiaries is party to any Contract, in each case, that prohibits Grizzly from complying with its obligations under this Section 8.10.

(d) Except as expressly permitted by this Section 8.10(d), Grizzly and the Grizzly Board shall not (i) fail to include the Grizzly Recommendation in the Proxy Statement/Prospectus, (ii) withhold, withdraw, amend, change, qualify or modify in a manner adverse to Burgundy, or publicly propose to withhold, withdraw, amend, change, qualify or modify in a manner adverse to Burgundy, the Grizzly Recommendation, (iii) approve, endorse, adopt or recommend to the stockholders of Grizzly any Grizzly Acquisition Proposal, or publicly propose to approve, adopt or recommend to the stockholders of Grizzly any Grizzly Acquisition Proposal or (iv) enter into any agreement, letter of intent, or agreement in principle requiring Grizzly to abandon, terminate or fail to consummate the transactions contemplated hereby or breach its obligations hereunder (any of (i), (ii), (iii) and (iv) above being referred to as a "Change in Recommendation"). Notwithstanding the foregoing, the Grizzly Board, at any time prior to obtaining the Grizzly Stockholder Approval, subject to Section 8.10(e), may effect a Change in Recommendation contemplated by clauses (i), (ii) or (iii) of the definition thereof, if the Grizzly Board has received a *bona fide* written Grizzly Acquisition Proposal that it determines in good faith (after consultation with outside legal counsel and a financial advisor) constitutes a Grizzly Superior Proposal, and the Grizzly Board has determined in good faith (after consultation with outside legal counsel) that the failure to effect a Change in Recommendation would be reasonably likely to constitute a breach of its fiduciary duties under applicable Law.

(e) Notwithstanding anything to the contrary contained in this Agreement, Grizzly and the Grizzly Board may not make a Change in Recommendation otherwise permitted by Section 8.10(d) unless (i) it notifies Burgundy in writing of its intention to take such action at least

72

five (5) Business Days prior to taking such action, identifying the Person(s) making such Grizzly Superior Proposal and providing copies of any written materials evidencing such Grizzly Superior Proposal, (ii) if requested by Burgundy, Grizzly and its Representatives shall have made themselves available to discuss with Burgundy and its Representatives any proposed modifications to the terms and conditions of this Agreement and shall have negotiated in good faith with Burgundy during such notice period to enable Burgundy to propose changes to the terms of this Agreement intended to cause such Grizzly Superior Proposal to no longer constitute a Grizzly Superior Proposal, (iii) the Grizzly Board shall have considered in good faith (after consultation with outside legal counsel and a financial advisor) any changes to this Agreement proposed in writing by Burgundy and determined that the Grizzly Superior Proposal would continue to constitute a Grizzly Superior Proposal if such changes were to be given effect, and (iv) in the event of any change to any of the financial terms (including the form or amount of consideration) or any material terms of such Grizzly Superior Proposal, Grizzly shall, in each case, have delivered to Burgundy an additional notice and copies of the relevant proposed transaction agreement and other material documents and a new three (3) Business Day notice period shall commence upon such delivery, during which time subsections (ii), (iii) and (iv) above shall apply; provided, that if any Grizzly Superior Proposal is received less than five (5) Business Days prior to the Grizzly Stockholders Meeting, or changes to the terms of a Grizzly Superior Proposal are proposed less than three (3) Business Days prior to the Grizzly Stockholders Meeting, then the, as applicable, five (5) Business Day or three (3) Business Day period contemplated above shall be shortened such that it will expire as of the close of business on the day preceding the Grizzly Stockholders Meeting, unless the Grizzly Stockholders Meeting is postponed.

(f) Nothing contained in this Section 8.10 shall prohibit Grizzly from (i) taking and disclosing to its stockholders a position contemplated by Rule 14d-9 or Rule 14e-2(a) promulgated under the Exchange Act or (ii) making any disclosure to its stockholders if the Grizzly Board determines in good faith (after consultation with its outside legal counsel) that failure to do so would be inconsistent with applicable Law, it being understood, however, that nothing in this Section 8.10(f) shall be deemed to permit the Grizzly Board to make a Change in Recommendation except to the extent permitted by Section 8.10(d).

Section 8.11 Financing.

(a) Grizzly shall not agree to any amendment or modification to be made to, or any waiver of any provision or remedy under, the Spinco Commitment Letter and the Spinco Related Letter without the prior written consent of Burgundy (and, to the extent Section 8.3 is applicable, such consent is subject to Burgundy's obligations in Section 8.3), if such amendments, modifications or waivers would reasonably be expected to (i) reduce the aggregate amount of the Spinco Financing below the Below Basis Amount, (ii) impose new or additional conditions to the receipt of the Spinco Financing that would reasonably be expected to (A) expand in any material respect the conditions precedent or contingencies to the funding at Closing, (B) prevent or materially delay the consummation of the transactions contemplated by this Agreement and the other Transaction Agreements, or (C) materially adversely impact the ability of Grizzly to enforce its rights against the other parties to the Spinco Commitment Letter (provided that for the avoidance of doubt, Grizzly may, without the consent of Burgundy, replace or amend the Spinco Commitment Letter and the Spinco Related Letter to add lenders, lead arrangers, bookrunners, syndication agents or similar entities, if the addition of such additional parties, individually or in the aggregate,

73

PPG102828

would not reasonably be expected to prevent or materially delay or impair the availability of financing under the Spinco Commitment Letter and the Spinco Related Letter, obtaining from the IRS the Private Letter Ruling (including the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling) or the consummation of the transactions contemplated by this Agreement and the other Transaction Agreements) or (iii) prevent or materially delay obtaining from the IRS the Private Letter Ruling (including the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling). Grizzly and Merger Sub shall each use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and obtain the Spinco Financing on the terms and conditions described in or contemplated by the Spinco Commitment Letter and the Spinco Related Letter, including using reasonable best efforts to (1) maintain in effect the Spinco Commitment Letter and the Spinco Related Letter, (2) satisfy on a timely basis (taking into account the expected timing of the Marketing Period) all conditions and covenants applicable to Grizzly in the Spinco Commitment Letter and the Spinco Related Letter and otherwise comply with its obligations thereunder, (3) enter into definitive agreements substantially concurrently with the Closing with respect thereto (the "Spinco Debt Financing Agreements") on the terms and conditions contemplated by the Spinco Commitment Letter and the Spinco Related Letter (or terms and conditions (including the flex provisions) no less favorable to Grizzly and Spinco (in the reasonable discretion of Grizzly) than the terms and conditions in the Spinco Commitment Letter and the Spinco Related Letter), (4) in the event that all conditions in the Spinco Commitment Letter and the Spinco Related Letter have been satisfied, consummate the Spinco Financing at or prior to Closing, (5) enforce its rights under the Spinco Commitment Letter and the Spinco Related Letter and (6) in the event that all conditions in the Spinco Commitment Letter and the Spinco Related Letter have been satisfied, cause the lenders providing the Spinco Financing to fund the Spinco Financing. Grizzly shall (x) furnish to Burgundy complete, correct and executed copies of the Spinco Debt Financing Agreements, (y) give Burgundy prompt notice of any material breach by any party of the Spinco Commitment Letter or the Spinco Related Letter or the Spinco Debt Financing Agreements of which Grizzly becomes aware or any termination thereof and (z) upon Burgundy's request, otherwise keep Burgundy reasonably informed of the status of Grizzly's efforts to arrange the Spinco Financing (or any replacement thereof) and the other financing transactions contemplated by this Agreement (or any replacement thereof). If any portion of the Spinco Financing becomes unavailable on the terms and conditions contemplated in the Spinco Commitment Letter and the Spinco Related Letter (including the flex provisions) from sources contemplated in the Spinco Commitment Letter and the Spinco Related Letter, Grizzly and Spinco shall use their reasonable best efforts to arrange and obtain alternative debt financing from alternative debt sources for the same purposes as the purposes of the Spinco Financing in an amount not less than the Below Basis Amount upon terms and conditions not less favorable, taken as a whole, to Grizzly and Spinco (in the reasonable discretion of Grizzly) than those in the Spinco Commitment Letter and the Spinco Related Letter as promptly as practicable following the occurrence of such event, including using reasonable best efforts to enter into definitive agreements with respect thereto. Further, Grizzly may, with the prior written consent of Burgundy (which consent shall not be unreasonably withheld, conditioned or delayed), if it so determines in its discretion, arrange for alternative financing for the Spinco Financing from a third party or parties (and, in such instance, references herein to the "Spinco Commitment Letter" shall mean and include the written commitment of such third party or parties in respect thereof), if such alternative financing does not (i) reduce the aggregate amount of the Spinco Financing below the Below Basis Amount,

74

(ii) impose new or additional conditions to the receipt of the Spinco Financing that would reasonably be expected to (A) expand in any material respect the conditions precedent or contingencies to the funding at Closing, (B) prevent or materially delay the consummation of the transactions contemplated by this Agreement and the other Transaction Agreements, or (C) materially adversely impact the ability of Grizzly to enforce its rights against the other parties thereto, or (iii) prevent or materially delay obtaining from the IRS the Private Letter Ruling (including the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling). As used herein, references to the "Spinco Financing" shall mean and include, if applicable, alternative financing arranged in accordance with the preceding sentence. Notwithstanding anything to the contrary, Spinco and Grizzly shall not and shall not permit their respective Affiliates to repay all or any part of the Spinco Financing, other than in accordance with Schedule 8.11(a).

(b) Burgundy shall not agree to any amendment or modification to be made to, or any waiver of any provision or remedy under, the Burgundy Commitment Letter or the Burgundy Related Letter without the prior written consent of Grizzly (and, to the extent Section 8.3 is applicable, such consent is subject to Grizzly's obligations in Section 8.3), if such amendments, modifications or waivers would reasonably be expected to (i) reduce the aggregate amount of the Burgundy Financing below the Above Basis Amount, (ii) impose new or additional conditions to the receipt of the Burgundy Financing that would reasonably be expected to (A) expand in any material respect the conditions precedent or contingencies to the funding at Closing, (B) prevent or materially delay the consummation of the transactions contemplated by this Agreement and the other Transaction Agreements, (C) materially adversely impact the ability of Burgundy to enforce its rights against the other parties to the Burgundy Commitment Letter and Burgundy Related Letter or (D) affect in any manner the terms of the Spinco Exchange Debt. Burgundy, Spinco and Grizzly shall use their respective reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to arrange and obtain the Burgundy Financing on the terms and conditions described in or contemplated by the Burgundy Commitment Letter and Burgundy Related Letter, including using reasonable best efforts to (1) maintain in effect the Burgundy Commitment Letter and the Burgundy Related Letter, (2) satisfy on a timely basis (taking into account the expected timing of the Marketing Period) all conditions and covenants applicable to Burgundy, Spinco and Grizzly in the Burgundy Commitment Letter and Burgundy Related Letter and otherwise comply with its obligations thereunder, (3) enter into definitive agreements with respect thereto (the "Burgundy Debt Financing Agreements") on the terms and conditions contemplated by the Burgundy Commitment Letter and Burgundy Related Letter (or terms and conditions no less favorable to Burgundy, Spinco and Grizzly (in the reasonable discretion of Burgundy and Grizzly, respectively) than the terms and conditions in the Burgundy Commitment Letter and Burgundy Related Letter), (4) in the case of Burgundy, enforce its rights under the Burgundy Commitment Letter, and (5) in the event that all conditions in the Burgundy Commitment Letter and the definitive documentation with respect thereto have been satisfied, cause the lenders providing the Burgundy Financing to fund the Burgundy Debt and, on the Closing Date, accept Spinco Exchange Debt in full satisfaction thereof. Notwithstanding the foregoing, (i) Burgundy shall have the primary responsibility, which will be exercised in consultation with Grizzly, with respect to the negotiation of the definitive documentation with respect to the Burgundy Debt in accordance with the Burgundy Commitment Letter and (ii) Grizzly shall have the sole responsibility and sole discretion with respect to the negotiation of the definitive documentation with respect to the Spinco Exchange Debt in accordance with the Burgundy Commitment Letter (it being understood that the Spinco

75

PPG102830

Exchange Debt may have an interest rate up to the Total Cap if required by the lenders under the Burgundy Commitment Letter). Grizzly and Burgundy shall (x) furnish to the other complete, correct and executed copies of the applicable Burgundy Debt Financing Agreements negotiated by them, (y) give the other prompt notice of any material breach by any party of the Burgundy Commitment Letter or the Burgundy Related Letter or any of the Burgundy Debt Financing Agreements of which either shall become aware or any termination thereof and (z) upon request, otherwise keep the other reasonably informed of the status of their respective efforts to arrange the Burgundy Financing (or any replacement thereof), including both the Burgundy Debt and the Spinco Exchange Debt. If any portion of the Burgundy Financing becomes unavailable on the terms and conditions contemplated in the Burgundy Commitment Letter or Burgundy Related Letter (including the flex provisions) or from sources contemplated in the Burgundy Commitment Letter, Grizzly and Burgundy shall use their reasonable best efforts to arrange and obtain alternative debt financing from alternative debt sources for the same purposes as the purposes of the Burgundy Financing in an amount not less than the Above Basis Amount upon terms and conditions not less favorable, taken as a whole, to Grizzly and Burgundy (each in their respective reasonable discretion) than those in the Burgundy Commitment Letter and Burgundy Related Letter as promptly as practicable following the occurrence of such event, including using reasonable best efforts to enter into definitive agreements with respect thereto.

(c) For purposes of this Agreement, "Marketing Period" shall mean the first period of twenty (20) consecutive Business Days (or fifteen (15) consecutive Business Days if commenced on or after January 2, 2013) throughout which (I) Grizzly shall have previously received from Spinco all of the Required Financial Information and during which period such information shall remain compliant in all material respects with the applicable provisions of Regulation S-X and S-K under the Securities Act and (II) the conditions set forth in Section 9.1 shall be satisfied or waived (other than those conditions that by their nature can only be satisfied at the Closing Date) and nothing has occurred and no condition exists that would cause any of the conditions set forth in Section 9.2 (other than those conditions that by their nature can only be satisfied at the Closing Date and other than the condition in Section 9.2(f)) to fail to be satisfied, assuming that the Closing Date were to be scheduled for any time during such twenty (20) consecutive Business Day period; provided that (i) for purposes of determining the Marketing Period, November 23, 2012 shall be deemed not to be a Business Day and (ii) the entirety of such Marketing Period must occur prior to December 19, 2012, or after January 2, 2013; provided that in the case of this clause (ii) the Marketing Period must be complete prior to February 14, 2013 or otherwise not commence until the audited financial statements of both Grizzly and Spinco for the fiscal year ended December 31, 2012 are available; provided, further, that the Marketing Period will not be deemed to have commenced if prior to the completion of the Marketing Period, (x) Spinco's auditors shall have withdrawn their audit opinion contained in the Required Financial Information in which case the Marketing Period shall not be deemed to commence unless and until a new unqualified audit opinion is issued with respect thereto by Spinco's auditors or another independent public accounting firm reasonably acceptable to Grizzly, (y) the financial statements included in the Required Financial Information that is available to Grizzly on the first day of the Marketing Period would not be sufficiently current on any day during such period to satisfy the requirements of Rule 3-12 of Regulation S-X to permit a registration statement using such financial statements to be declared effective by the SEC on the last day of such period, or not sufficient for the underwriters or initial purchasers to receive a customary comfort letter, including customary "negative assurance" comfort, in which case the Marketing Period shall not

76

be deemed to commence until the receipt by Grizzly of updated Required Financial Information that would be required under Rule 3-12 of Regulation S-X to permit a registration statement using such financial statements to be declared effective by the SEC on the last day of such new twenty (20) consecutive Business Day period, or (z) Burgundy or Spinco issues a public statement indicating its intent to restate any historical financial statements of Spinco or that any such restatement is under consideration or may be a possibility, in which case the Marketing Period shall not be deemed to commence unless and until such restatement has been completed and the relevant SEC Report or SEC Reports have been amended or Burgundy has announced that it has concluded that no restatement shall be required in accordance with GAAP; provided, further, that the Marketing Period shall end on any earlier date that is the date on which the Spinco Financing is funded.

(d) Prior to the Closing, each of Burgundy and Spinco shall and shall cause its Subsidiaries (including Spinco in the case of Burgundy) to, and shall use its reasonable best efforts to cause its respective Representatives to, provide to Grizzly all cooperation reasonably requested by Grizzly that is necessary in connection with the Spinco Financing and the Spinco Exchange Debt, and any other financing by Grizzly that is permitted or consented to under this Agreement (a "Permitted Grizzly Financing"), including (i) furnishing Grizzly and its financing sources the unaudited consolidated balance sheet of Spinco and its Subsidiaries and the related consolidated statements of income, shareholders' equity and cash flows as of the end of any quarterly period that ends between the execution of this Agreement and the forty-fifth (45th) day prior to the Closing Date, and all Spinco information, financial statements and financial data of a type and form customarily included in private placements pursuant to Rule 144A under the Securities Act for financings similar to the Spinco Exchange Debt and subject to exceptions customary for such financings and including audited financial statements for each of the three most recent fiscal years ending more than ninety (90) days prior to the Closing Date (the information required to be delivered pursuant to this clause (i) being referred to as the "Required Financial Information"), (ii) participating in a reasonable number of meetings (including customary one-on-one meetings with the parties acting as lead arrangers or agents for, and prospective lenders and purchasers of, the Spinco Financing, the Spinco Exchange Debt and any Permitted Grizzly Financing, and senior management and Representatives, with appropriate seniority and expertise, of Spinco), presentations, road shows, due diligence sessions, drafting sessions and sessions with rating agencies, and obtaining comfort letters from the independent auditors, in connection with the Spinco Financing and the Spinco Exchange Debt and any Permitted Grizzly Financing, (iii) assisting with the preparation of customary materials for rating agency presentations, bank information memoranda, offering documents, private placement memoranda and similar documents required in connection with the Spinco Financing and the Spinco Exchange Debt and any Permitted Grizzly Financing (including requesting any consents of accountants for use of their reports in any materials relating to the Spinco Exchange Debt and the delivery of one or more customary representation letters), (iv) causing the taking of corporate actions by Spinco and its Subsidiaries reasonably necessary to permit the completion of the Spinco Financing and the issuance of the Spinco Exchange Debt to Burgundy to be applied in satisfaction of the Burgundy Debt, (v) facilitating the execution and delivery at the Closing of definitive documents related to the Spinco Financing and the Spinco Exchange Debt on the terms contemplated by the Spinco Commitment Letter, the Spinco Related Letter, the Burgundy Commitment Letter and the Burgundy Related Letter, (vi) cooperating with consultants or others engaged to undertake field examinations and appraisals, including furnishing information to such persons in respect of

77

PPG102832

accounts receivable, inventory and other applicable assets, (vii) providing to the financing sources at least five (5) days prior to the Closing all documentation and other information required by bank regulatory authorities with respect to Spinco under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, that has been reasonably requested by such sources at least ten (10) days in advance of the Closing, and (viii) cooperating in procuring, prior to the date that is twenty (20) consecutive calendar days prior to the Closing Date, corporate and facilities ratings for the Spinco Financing and the Spinco Exchange Debt; provided, however, that nothing herein shall require such cooperation to the extent it would interfere unreasonably with the business or operations of Burgundy or Spinco or their Subsidiaries. None of Burgundy or Spinco or any of their Subsidiaries shall be required to take any action that would subject it to actual or potential liability, to bear any cost or expense or to pay any commitment or other similar fee or make any other payment or incur any other liability or provide or agree to provide any indemnity in connection with the Spinco Financing or any of the foregoing, unless, in the case of Spinco, such action is contingent upon the Closing. If the Closing does not occur, Grizzly shall indemnify and hold harmless Burgundy, Spinco, their respective Subsidiaries and their respective Representatives from and against any and all liabilities, losses, damages, claims, costs, expenses, interest, awards, judgments and penalties suffered or incurred by them in connection with any action, claim, arbitration, litigation or suit brought by a third party related to the arrangement of the Spinco Financing, the Burgundy Debt and the Spinco Exchange Debt (including any action taken in accordance with this Section 8.11(d)) and any information utilized in connection therewith (other than historical information relating to Spinco or its Subsidiaries or other information furnished by or on behalf of Spinco or its Subsidiaries). Spinco hereby consents to the reasonable use of Spinco's and its Subsidiaries' logos in connection with the Spinco Financing and the Spinco Exchange Debt, provided that such logos are used in a manner that is not intended to harm or disparage Spinco or any of its Subsidiaries or the reputation or goodwill of Spinco or any of its Subsidiaries. Grizzly agrees to provide reasonable cooperation and provide information reasonably required by the debt financing sources in connection with all syndication efforts related to the Exchange Loans.

(e) Grizzly shall be responsible for all out-of-pocket costs, third party fees and expenses related to the Spinco Financing and the Burgundy Financing (including all fees under the Spinco Related Letter and the Burgundy Related Letter and all indemnity claims under any of them), and all underwriting, sale, distribution, placement or other fees, and indemnity claims, in connection with the distribution of Spinco Exchange Debt, whether prior to or subsequent to Closing; provided, that each party shall be solely responsible for the fees and expenses of its respective counsel and other consultants in connection therewith.

(f) The parties hereto acknowledge that the Burgundy Commitment Letter contemplates, and Burgundy desires to enter into, arrangements providing for the exchange by Burgundy of Spinco Exchange Debt distributed to Burgundy as part of the Special Distribution pursuant to the Separation Agreement in full satisfaction of debt obligations of Burgundy borrowed pursuant to definitive documentation contemplated by the Burgundy Commitment Letter (the "Burgundy Debt") (such exchange, the "Debt Exchange"), which Burgundy Debt shall provide net proceeds equal to the Above Basis Amount. Spinco shall issue Spinco Exchange Debt to Burgundy immediately prior to the Effective Time with an interest rate up to the Total Cap if necessary to effectuate the Debt Exchange. Each of the parties agrees to use its reasonable best efforts to cause the Debt Exchange to be consummated with the holders of the Burgundy Debt (the "Burgundy Lenders"). Without limitation of the foregoing (and in furtherance, not in limitation, of the covenants set forth in Section 8.11(b)):

(i) Subject to the second sentence of this Section 8.11(f), Grizzly shall, in consultation with Burgundy, negotiate the terms and conditions of the Spinco Exchange Debt with the Burgundy Lenders and shall keep Burgundy reasonably informed of all material developments. Grizzly shall, in consultation with Burgundy, determine the final form of the Spinco Exchange Debt and related agreements (including registration rights arrangements and indenture). Burgundy shall, in consultation with Grizzly, determine the arrangements relating to the Debt Exchange; provided that Burgundy shall keep Grizzly reasonably informed regarding such arrangements. Spinco shall issue the Spinco Exchange Debt to Burgundy on the terms negotiated by Grizzly immediately prior to the Effective Time, and Grizzly shall accept and execute applicable documentation, if any, relating to the issuance of the Spinco Securities by Spinco and the transfer of the Spinco Exchange Debt by Burgundy in satisfaction of the Burgundy Debt.

78

(ii) Each of Burgundy, Spinco and Grizzly shall cooperate in connection with the preparation of all documents and the making of all filings required in connection with the issuance of the Spinco Exchange Debt and the Debt Exchange and shall use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all other things necessary, proper or advisable to consummate the issuance of the Spinco Exchange Debt and the Debt Exchange.

(iii) Grizzly shall, and shall use commercially reasonable efforts to cause its employees, accountants, counsel and other representatives to take the following actions by the date of the Debt Exchange: (A) participate in meetings, drafting sessions, due diligence sessions, management presentation sessions, "road shows" and sessions with ratings agencies in connection with the marketing of the Spinco Exchange Debt and the Debt Exchange, (B) prepare offering memoranda, private placement memoranda, prospectuses and similar documents (including all applicable pro forma and other financial information) reasonably required to consummate the issuance of the Spinco Exchange Debt and the Debt Exchange, (C) assist in the preparation of and execute and/or deliver, customary underwriting placement, credit, purchase, indemnification, registration rights and other definitive financing agreements and execute and deliver in a timely manner such other certificates and documents, including solvency certificates, comfort letters, consents, pledge and security documents and perfection certificates, as may be reasonably required in connection with the foregoing, and (D) take all other actions reasonably necessary in connection with the issuance of the Spinco Exchange Debt and the Debt Exchange.

(iv) Burgundy and Spinco shall, and shall use commercially reasonable efforts to cause its employees, accountants, counsel and other representatives to provide to Grizzly all cooperation reasonably requested by Grizzly that is necessary in connection with Grizzly's obligations pursuant to Section 8.11(f)(iii), including taking the following actions by the date of the Debt Exchange: (A) providing Grizzly with the Required Financial Information and (B) taking all other actions reasonably necessary in connection with the issuance of the Spinco Exchange Debt and the Debt Exchange.

79

PPG102834

(v) If despite the parties' use of reasonable best efforts in accordance with this Section 8.11(f), (A) the Debt Exchange does not occur (including in the event that the Burgundy Commitment Letter is modified in accordance with Section 8.3), and (B) the conditions set forth in Article IX (other than those that would be satisfied at the Closing Date and other than the condition in Section 9.2(f)) shall have been satisfied (or, to the extent permissible by law, waived by Burgundy), then either, as Burgundy shall elect, at its sole discretion, Burgundy shall (1) waive the condition in Section 9.2(f) and require Spinco to issue to Burgundy Spinco Securities with an interest rate equal to the Total Cap in satisfaction of the Special Above Basis Debt/Cash Distribution, or (2) (I) waive the condition in Section 9.2(f), (II) if the commitment for a bridge facility to Spinco is then in effect, require Spinco to borrow an amount no less than the Above Basis Amount under such bridge facility on the terms set forth in such commitment and (III) require Spinco to distribute to Burgundy an amount in cash equal to the Above Basis Amount in satisfaction of the Special Above Basis Debt/Cash Distribution. To the extent that Spinco issues to Burgundy Spinco Securities in satisfaction of the Special Above Basis Debt/Cash Distribution in accordance with clause (1) of the foregoing, Grizzly and Spinco shall following the Closing reasonably cooperate with Burgundy in connection with the preparation of all documents and the making of all filings required in connection with a subsequent sale of the Spinco Securities, including taking all such actions as are required of Grizzly pursuant to clauses (ii) and (iii) of this Section 8.11(f) with respect to the Spinco Exchange Debt.

(g) In the event that the Below Basis Amount is increased or decreased from $225,000,000 pursuant to the Separation Agreement, each party will use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable, pursuant to the Burgundy Commitment Letter and the Spinco Commitment Letter and all other financing arrangements contemplated hereby to take into account such increase in the Below Basis Amount.

Section 8.12 Public Announcements. Burgundy and Grizzly shall consult with each other and shall mutually agree upon any press release or public announcement relating to the transactions contemplated by this Agreement and neither of them shall issue any such press release or make any such public announcement prior to such consultation and agreement, except as may be required by applicable Law or by obligations pursuant to any listing agreement with any national securities exchange or automated inter-dealer quotation system, in which case the party proposing to issue such press release or make such public announcement shall use all reasonable best efforts to consult in good faith with the other party before issuing any such press release or making any such public announcement; provided that, subject to Section 8.10(e), Grizzly will not be required to obtain the prior agreement of or consult with Burgundy in connection with any such press release or public announcement in connection with the Grizzly Board effecting a Change in Recommendation.

Section 8.13 Defense of Litigation. Each of Burgundy, Spinco and Grizzly shall use all reasonable best efforts to defend against all actions, suits or proceedings in which such party is named as a defendant that challenge or otherwise seek to enjoin, restrain or prohibit the transactions contemplated by this Agreement or seek damages with respect to such transactions. None

80

PPG102835

of Burgundy, Spinco or Grizzly shall settle any such action, suit or proceeding or fail to perfect on a timely basis any right to appeal any judgment rendered or order entered against such party therein without having previously consulted with the other parties. Each of Burgundy, Spinco and Grizzly shall use all reasonable best efforts to cause each of its Affiliates, directors and officers to use all reasonable best efforts to defend any such action, suit or proceeding in which such Affiliate, director or officer is named as a defendant and which seeks any such relief to comply with this Section 8.13 to the same extent as if such Person was a party.

Section 8.14 <u>Advice of Changes</u>. Burgundy and Grizzly shall as promptly as reasonably practicable after becoming aware thereof advise the other of (a) any representation or warranty made by it contained in this Agreement becoming untrue or inaccurate in any material respect, or (b) the failure by it to comply with or satisfy in any material respect any covenant, condition or agreement that could be complied with or satisfied by it at such time under this Agreement, or which has resulted, or which, insofar as can reasonably be foreseen, would result, in any of the conditions that could be satisfied at such time set forth in Article IX not being satisfied; *provided*, *however*, that no such notification shall affect the representations, warranties, covenants or agreements of the parties or the conditions to the obligations of the parties under this Agreement. The failure to comply with the covenants, conditions or agreements contained in this Section 8.14 shall not be taken into account when determining whether the conditions set forth in Section 9.2(a) or Section 9.3(a) have been satisfied.

Section 8.15 <u>Section 16 Matters</u>. Prior to the Effective Time, Grizzly and Spinco shall take all such steps as may be required to cause any dispositions of Spinco Common Stock (including derivative securities with respect to Spinco Common Stock) or acquisitions of Grizzly Common Stock (including derivative securities with respect to Grizzly Common Stock) resulting from the transactions contemplated by this Agreement by each individual who is subject to the reporting requirements of Section 16(a) of the Exchange Act with respect to Grizzly or Spinco to be exempt under Rule 16b-3 promulgated under the Exchange Act, such steps to be taken in accordance with applicable SEC rules and regulations and interpretations of the SEC staff.

Section 8.16 <u>Control of Other Party's Business</u>. Nothing contained in this Agreement shall give Burgundy or Spinco, directly or indirectly, the right to control or direct Grizzly's operations prior to the Effective Time. Nothing contained in this Agreement shall give Grizzly, directly or indirectly, the right to control or direct the operations of the Eagle Business, or the business of Spinco and the Spinco Subsidiaries prior to the Effective Time. Prior to the Effective Time, each of Burgundy, Spinco and Grizzly shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over its respective operations.

Section 8.17 <u>Spinco Share Issuance</u>. Prior to the Effective Time, Spinco will authorize the issuance of a number of shares of Spinco Common Stock such that the total number of shares of Spinco Common Stock outstanding immediately prior to the Effective Time will equal the number of shares of Burgundy Common Stock outstanding immediately prior to the Effective Time.

Section 8.18 <u>Takeover Statutes</u>. If any "fair price," "moratorium," "control share acquisition" or other form of antitakeover statute or regulation shall become applicable to the transactions contemplated hereby, Grizzly and Merger Sub and their respective Boards of

81

Directors shall use all reasonable efforts to grant such approvals and take such actions as are reasonably necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to eliminate or minimize the effects of such statute or regulation on the transactions contemplated hereby.

Section 8.19 Financials.

(a) As soon as reasonably practicable after the date of this Agreement, but in no event later than the date that is one hundred twenty (120) days after the date of this Agreement, Burgundy will provide Grizzly with the audited combined financial statements of the Eagle Business, including the combined balance sheets of the Eagle Business as of December 31, 2010 and December 31, 2011, and the combined statements of income, equity and cash flows of the Eagle Business for the fiscal years ended December 31, 2009, December 31, 2010 and December 31, 2011 (collectively, the "Audited Financial Statements").

(b) Burgundy will prepare and furnish to Grizzly, as promptly as practicable after the end of the applicable fiscal period, copies of the combined financial statements of the Eagle Business as of and for any subsequent fiscal periods for which financial statements are required to be included in the documents referred to in Section 8.4 prepared in accordance with GAAP consistently applied, subject in the case of unaudited financial statements to normal year-end adjustments and the absence of footnotes.

(c) Burgundy will prepare and furnish to Grizzly, as promptly as practicable after the end of each calendar month the unaudited income statement, balance sheet and financial summary for the Eagle Business for such month, prepared in accordance with the income statement, balance sheet and financial summary attached as Schedule 8.19(c) of the Burgundy Disclosure Letter.

Section 8.20 Grizzly Stock Option Exercise Prohibition. On or prior to the date that is three (3) Business Days prior to the Closing Date, Grizzly shall prohibit the holders of options to purchase Grizzly Common Stock pursuant to the Grizzly Stock Plan from exercising such options until after the Closing and shall instruct Grizzly's transfer and other agent to prohibit the holders of options to purchase Grizzly Common Stock pursuant to the Grizzly Stock Plan from exercising such options until after the Closing.

Section 8.21 Agreement With Respect to Release of Burgundy Guarantees. To the extent required to obtain a Guarantee Release (as defined in the Separation Agreement) of any member of the Burgundy Group as contemplated by Section 2.10 of the Separation Agreement, Grizzly will use its reasonable best efforts to execute a guarantee agreement in the form of the existing agreement or guarantee or such other form as is agreed to by the relevant parties to such agreement or guarantee.

Section 8.22 Agreement With Respect to Other Transaction Agreements. Grizzly acknowledges and agrees that, notwithstanding anything in this or any other Transaction Agreement to the contrary, the provisions of the Separation Agreement and any other Transaction Agreements affecting Grizzly, including for the avoidance of doubt Sections 5.7 and 7.8 of the Separation Agreement, shall be binding upon Grizzly, and Grizzly shall be subject to the

82

obligations and restrictions imposed by those provisions, as if Grizzly were a party thereto. Burgundy acknowledges and agrees that, notwithstanding anything in this or any other Transaction Agreement to the contrary, the provisions of any of the Transaction Agreements affecting Burgundy shall be binding upon Burgundy, and Burgundy shall be subject to the obligations and restrictions imposed by those provisions, as if Burgundy were a party thereto.

Section 8.23 Dividend Policy. Grizzly intends to continue to pay quarterly dividends from and after the Closing at no less than the current rate of $0.32 per share of Grizzly Common Stock per annum, it being understood that the payment of dividends shall be subject to declaration by, and solely within the discretion of, the Grizzly Board.

Section 8.24 Covenant Not to Compete.

(a) In furtherance of the Merger and the transactions contemplated hereby, Burgundy covenants and agrees that, for a period beginning on the Effective Date and ending on the second (2nd) anniversary of the Effective Time, neither Burgundy nor any of its Subsidiaries shall, without the prior written consent of Grizzly, engage, directly or indirectly, in the Eagle Business as conducted as of the Effective Date (the "Grizzly Restricted Business") anywhere throughout the world. Notwithstanding anything to the contrary in the foregoing:

(i) nothing in this Section 8.24(a) shall prohibit Burgundy or its Subsidiaries from engaging in the businesses conducted by Burgundy or its Subsidiaries (excluding the Eagle Business) on the Effective Date;

(ii) nothing set forth in this Section 8.24(a) shall prohibit Burgundy or its Subsidiaries from owning not in excess of 5% in the aggregate of any class of capital stock or other equity interest of any Person engaged in the Grizzly Restricted Business;

(iii) in the event that Burgundy completes a business combination transaction with a Person, which transaction results in the holders of the voting securities of Burgundy outstanding immediately prior to the consummation of such transaction owning less than 50% of the voting power of the voting securities of Burgundy or the surviving entity in the transaction or any parent thereof (any such entity, an "Acquiror") outstanding immediately after the consummation of such transaction, such Acquiror or any of its Subsidiaries or Affiliates (but not Burgundy or any of its Subsidiaries) may engage in any Grizzly Restricted Business;

(iv) Burgundy may acquire interests in or securities of any Person as an investment by their pension funds or funds of any other benefit plan of Burgundy whether or not such Person is engaged in any Grizzly Restricted Business;

(v) Burgundy may acquire interests in or securities of any Person that derived 20% or less of its total revenues in its most recent fiscal year from activities that constitute Grizzly Restricted Businesses; provided that such Person may not use the Burgundy name in connection with the activities that constitute Grizzly Restricted Businesses; and

(vi) Burgundy may perform their obligations under this Agreement and the Transaction Agreements.

83

The parties hereto acknowledge and agree that nothing herein shall be deemed to require Burgundy to give notice to or obtain the consent of the Grizzly in order to engage in any activity or transaction of the types described in Section 8.24(a)(i) through Section 8.24(a)(vi) and that, in the event the TCI Interests are not transferred to Spinco at the Closing, nothing in this Section 8.24(a) shall prevent or limit in any way Burgundy's ability to hold the TCI Interests and to take any actions in connection with its ownership of the TCI Interests for so long as the TCI Interests are not transferred to Spinco.

(b) Burgundy acknowledges and agrees that the covenants included in this Section 8.24 are, taken as a whole, reasonable in their geographic and temporal coverage and Burgundy shall not raise any issue of geographic or temporal reasonableness in any proceeding to enforce such covenant; provided, however, that if the provisions of this Section 8.24 should ever be deemed to exceed the time or geographic limitations or any other limitations permitted by applicable Law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the minimum extent required by applicable Law to cure such problem. Burgundy acknowledges and agrees that in the event of a breach by Burgundy of the provisions of this Section 8.24, monetary damages shall not constitute a sufficient remedy. Consequently, in the event of any such breach, the Grizzly may, in addition to any other rights and remedies existing in its favor, apply to any court of law or equity of competent jurisdiction for specific performance and/or preliminary and final injunctive relief or other relief in order to enforce or prevent any violation of the provisions hereof, without the necessity of proving actual damages or posting a bond.

Section 8.25 Non-Solicitation of Employees.

(a) Burgundy and Grizzly each agree that, for a period of two (2) years from and after the Closing Date, they shall not, and they shall cause their respective Subsidiaries not to, without the prior written consent of the other party, directly or indirectly, solicit to hire or hire (or cause or seek to cause to leave the employ of the other party or the other party's Subsidiary), or enter into a consulting agreement with, any employee or category of employee of the other party or the other party's Subsidiaries listed in Schedule 8.25.

(b) The restrictions set forth in Section 8.25(a) shall not apply to (i) general solicitations (such as advertisements) for employment placed by a party or any party's Subsidiary and not specifically targeted at the other party's employees (or the employees of a Subsidiary of the other party) or (ii) responding to or hiring any employee of the other party (or of the other party's Subsidiary) who contacts a party without any prior solicitation (other than as permitted by clause (i) above).

Section 8.26 Certain Transaction Agreements. Between the date of this Agreement and the Business Transfer Time, Grizzly, Burgundy and Spinco shall negotiate in good faith to agree upon definitive agreements reflecting the forms of Transition Services Agreement; the Shared Facilities, Services and Supply Agreement; the Electric Generation, Distribution and Transmission Facilities Lease; Shared Facilities Agreement – Monroeville; and the Servitude Agreement attached as Exhibits B, D, C, L and E, respectively, to the Separation Agreement. The parties acknowledge that the current forms have been partially negotiated between the parties but the terms of the forms including the pricing and the scope of services provided therein remain subject to further review and revision after Grizzly is provided appropriate access to personnel and

84

information not available prior to the date hereof. The parties intend that the agreements shall allow the parties to operate in the ordinary course after the Business Transfer Time and facilitate the transition of the Eagle Business to Grizzly and the separation of the Eagle Business from Burgundy. The parties agree that all pricing for the services provided under such agreements shall be consistent with the economics in the financials of the Eagle Business provided by Burgundy to Grizzly prior to the date of this Agreement.

## ARTICLE IX

### CONDITIONS TO THE MERGER

Section 9.1 <u>Conditions to the Obligations of Spinco, Burgundy, Grizzly and Merger Sub to Effect the Merger</u>. The respective obligations of each party to consummate the Merger shall be subject to the fulfillment (or, to the extent permitted by applicable Law, written waiver by Burgundy and Grizzly) at or prior to the Effective Time of the following conditions:

(a) The Spinco Reorganization and the Distribution shall have been consummated in accordance with the Separation Agreement, the IRS D Reorganization Ruling, the IRS Debt Exchange Ruling, and the Distribution Tax Opinion.

(b) Any applicable waiting period under the HSR Act shall have expired or been terminated, and, if required, Competition Act Approval shall have been obtained.

(c) The Registration Statement and the Spinco Registration Statement, to the extent required, shall have become effective in accordance with the Securities Act and shall not be the subject of any stop order or proceedings seeking a stop order; all necessary permits and authorizations under state securities or "blue sky" laws, the Securities Act and the Exchange Act relating to the issuance and trading of shares of Grizzly Common Stock to be issued pursuant to the Merger shall have been obtained and shall be in effect; and such shares of Grizzly Common Stock and such other shares required to be reserved for issuance pursuant to the Merger shall have been Approved for Listing.

(d) The Grizzly Stockholder Approval shall have been obtained, in accordance with applicable Law and the rules and regulations of the NYSE.

(e) No court of competent jurisdiction or other Governmental Authority shall have enacted any Law or issued any Order, or taken any other action, that is still in effect restraining, enjoining or prohibiting the Spinco Reorganization, the Distribution or the Merger.

Section 9.2 <u>Additional Conditions to the Obligations of Burgundy and Spinco</u>. The obligation of Burgundy and Spinco to consummate the Merger shall be subject to the fulfillment (or, to the extent permitted by applicable Law, waiver by Burgundy) at or prior to the Effective Time of the following additional conditions:

(a) Grizzly shall have performed in all material respects all obligations and complied in all material respects with all covenants required by this Agreement to be performed or complied with by it prior to the Effective Time.

85

PPG102840

(b) Each of the representations and warranties of Grizzly (i) set forth in Section 7.2(a) and Section 7.3(a) shall be true and correct in all material respects as of the Closing Date as though made as of the Closing Date and (ii) otherwise set forth in Article VII (other than Section 7.2(a) and Section 7.3(a)) shall be true and correct as of the Closing Date as though made as of the Closing Date, except for representations and warranties that speak as of an earlier date or period which shall be true and correct as of such date or period, in each case without giving effect to any materiality qualifiers set forth therein, except in the case of this clause (ii) for such failures to be true and correct as do not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Grizzly.

(c) Grizzly shall have delivered to Burgundy a certificate, dated as of the Effective Time, of a senior officer of Grizzly certifying the satisfaction by Grizzly of the conditions set forth in subsection (a) and (b) of this Section 9.2.

(d) Burgundy and Spinco shall have received the Merger Tax Opinion from Burgundy Tax Counsel, dated the Closing Date.

(e) Burgundy and Spinco shall have received the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling, each in form and substance reasonably satisfactory to Burgundy and Spinco, and such rulings shall continue to be valid and in full force and effect (and, for the avoidance of doubt, such rulings shall not have been invalidated, modified or otherwise affected by any change in any Law on or after the date such rulings were issued by the IRS).

(f) The Debt Exchange shall have been consummated immediately before the Distribution in full satisfaction of the Burgundy Debt in an amount equal to the Above Basis Amount.

Section 9.3 Additional Conditions to the Obligations of Grizzly and Merger Sub. The obligation of Grizzly and Merger Sub to consummate the Merger shall be subject to the fulfillment (or, to the extent permitted by applicable Law waiver by Grizzly) at or prior to the Effective Time of the following additional conditions:

(a) Spinco and Burgundy shall have performed in all material respects and complied in all material respects with all covenants required by this Agreement to be performed or complied with at or prior to the Effective Time.

(b) Each of the representations and warranties of Burgundy and Spinco (i) set forth in Section 5.2(a), Section 6.2(a) and Section 6.3(a) shall be true and correct in all material respects as of the Closing Date as if made on the Closing Date and (ii) otherwise set forth in Article V and Article VI (other than Section 5.2(a), Section 6.2(a), and Section 6.3(a)) shall be true and correct as of the Closing Date as though made as of the Closing Date, except for representations and warranties that speak as of an earlier date or period which shall be true and correct as of such date or period, in each case without giving effect to any materiality qualifiers set forth therein, except in the case of this clause (ii) for such failures to be true and correct as do not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Spinco.

86

(c) Burgundy and Spinco shall have delivered to Grizzly a certificate, dated as of the Effective Time, of a senior officer of each of Burgundy and Spinco certifying the satisfaction of the conditions set forth in subsections (a) and (b) of this Section 9.3.

(d) Grizzly shall have received the Merger Tax Opinion from Grizzly Tax Counsel, dated the Closing Date.

(e) Spinco and Burgundy (or a Subsidiary thereof) shall have entered into the applicable Transaction Agreements, and to the extent applicable, performed the covenants to be performed prior to the Effective Time in all material respects, and each such agreement shall be in full force and effect.

(f) Income Before Income Taxes of the Eagle Business for the fiscal years 2010 and 2011 as reported in the Audited Financial Statements delivered pursuant to Section 8.19 shall not be less than the Income Before Income Taxes target amounts for each of such fiscal years as reported in the unaudited financial statements of the Eagle Business and indicated in Section 9.3(f) of the Burgundy Disclosure Letter.

## ARTICLE X

### TERMINATION, AMENDMENT AND WAIVERS

Section 10.1 Termination. Notwithstanding anything contained in this Agreement to the contrary, this Agreement may be terminated and the transactions contemplated hereby may be abandoned prior to the Effective Time, whether before or after Grizzly Stockholder Approval:

(a) by the mutual written consent of Burgundy and Grizzly;

(b) by either Burgundy or Grizzly, if the Effective Time shall not have occurred on or before May 18, 2013 (the "Termination Date"); provided, however, that the right to terminate this Agreement under this Section 10.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement (including such party's obligations set forth in Section 8.3, Section 8.7 or Section 8.11) or the Separation Agreement has been the cause of, or has resulted in, the failure of the Effective Time to occur on or before the Termination Date;

(c) by either Burgundy or Grizzly, if any Governmental Authority shall have issued an order, decree or ruling or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement, and such order, decree, ruling or other action shall have become final and nonappealable; provided, however, that the right to terminate this Agreement under this Section 10.1(c) shall not be available to any party whose failure to comply with Section 8.7 has been the cause of, or has resulted in, such action or inaction;

(d) by Grizzly, if either Burgundy or Spinco shall have breached or failed to perform in any material respect any of its respective representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and (ii) cannot be cured by the Termination Date; provided that Grizzly shall have given Burgundy written notice, delivered at least

87

thirty (30) days (or such lesser time remaining prior to the Termination Date) prior to such termination, stating Grizzly's intention to terminate this Agreement pursuant to this Section 10.1(d) and the basis for such termination;

(e) by Burgundy, if Grizzly shall have breached or failed to perform in any material respect any of its representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (i) would result in a failure of a condition set forth in Section 9.1 or Section 9.2 and (ii) cannot be cured by the Termination Date; provided that Burgundy shall have given Grizzly written notice, delivered at least thirty (30) days (or such lesser time remaining prior to the Termination Date) prior to such termination, stating Burgundy's intention to terminate the Agreement pursuant to this Section 10.1(e) and the basis for such termination;

(f) by Burgundy or Grizzly if, at the Grizzly Stockholders Meeting (including any adjournment, continuation or postponement thereof), the Grizzly Stockholder Approval shall not be obtained;

(g) by Burgundy, if the Grizzly Board shall have effected a Change in Recommendation; or

(h) by Grizzly, if Burgundy shall not have delivered the Audited Financial Statements by the date that is one hundred twenty (120) days after the date of this Agreement or, if upon delivery of the Audited Financial Statements, the condition in Section 9.3(f) is not met.

Section 10.2 Effect of Termination. In the event of termination of this Agreement pursuant to Section 10.1, this Agreement shall terminate (except for the Confidentiality Agreement referred to in Section 11.1, the provisions of this Section 10.2, Section 10.3 and Article XI), without any liability on the part of any Person other than Burgundy and Grizzly to the extent set forth in Section 10.3; provided that nothing in this Agreement shall relieve any party of liability for fraud or willful breach of this Agreement or the Separation Agreement prior to such termination.

Section 10.3 Termination Fee Payable in Certain Circumstances.

(a) Grizzly shall pay to Burgundy or its designee the Grizzly Termination Fee, by wire transfer of immediately available funds to an account or accounts designated in writing by Burgundy, as follows:

(i) (A) In the event that, after the date hereof, a Grizzly Acquisition Proposal shall have been made to Grizzly, or directly to the stockholders of Grizzly generally, or a Grizzly Acquisition Proposal shall have otherwise become publicly known or any Person shall have publicly announced an intention (whether or not conditional) to make a Grizzly Acquisition Proposal, and (B) thereafter this Agreement is terminated (1) by either party pursuant to Section 10.1(b), (2) by Burgundy pursuant to Section 10.1(e) due to breach by Grizzly of its covenants under this Agreement, or (3) by either party pursuant to Section 10.1(f) (and, in the case of this clause (3) only, such Grizzly Acquisition Proposal or such announcement of an intention to make a Grizzly Acquisition Proposal is publicly known and shall not have been irrevocably withdrawn at least five (5) days prior to the

88

Grizzly Stockholders Meeting), and (C) within twelve (12) months after such termination of this Agreement, any Grizzly Acquisition shall have been consummated or any definitive agreement with respect to any Grizzly Acquisition shall have been entered into (the earlier of entry into such agreement or the consummation thereof, the "Grizzly Termination Fee Date"), then, in any such case, Grizzly shall pay Burgundy a fee in the amount of $24,500,000 (the "Grizzly Termination Fee") (less any amounts paid by Grizzly to Burgundy pursuant to Section 10.3(a)(iii)) within two (2) Business Days of the Grizzly Termination Fee Date; provided that solely for purposes of this Section 10.3(a)(i), the term "Grizzly Acquisition Proposal" shall have the meaning ascribed thereto in Article I, except that all references in such definition to 25% shall be changed to 50%;

(ii) in the event that this Agreement is terminated by Burgundy pursuant to Section 10.1(g), Grizzly shall promptly, and in any event not more than two (2) Business Days following such termination, pay Burgundy the Grizzly Termination Fee by wire transfer of same day funds;

(iii) in the event that this Agreement is terminated by either Grizzly or Burgundy pursuant to Section 10.1(f), Grizzly shall pay Burgundy all out-of-pocket fees and expenses actually and reasonably incurred by Burgundy, Spinco and their respective Affiliates in connection with the transactions contemplated by this Agreement (the "Burgundy Expenses"), up to a maximum of the Burgundy Expense Limitation. In the event of a termination by Grizzly pursuant to Section 10.1(f), Grizzly shall pay the Burgundy Expenses concurrently with any such termination and, in the case of a termination by Burgundy pursuant to Section 10.1(f), Grizzly shall pay the Burgundy Expenses not more than two (2) Business Days following any such termination, in each case by wire transfer of same day funds. The payment of the Burgundy Expenses pursuant to this Section 10.3(a)(iii) shall not relieve Grizzly of any subsequent obligation to pay the Grizzly Termination Fee pursuant to Section 10.3(a)(i), less the amount paid pursuant to this Section 10.3(a)(iii); and

(iv) in the event that this Agreement is terminated by Grizzly pursuant to Section 10.1(h), Burgundy shall pay Grizzly all out-of-pocket fees and expenses actually and reasonably incurred by Grizzly and its Affiliates in connection with the transactions contemplated by this Agreement ("Grizzly Expenses"), up to a maximum of the Grizzly Expense Limitation, not more than two (2) Business Days following any such termination, by wire transfer of same day funds.

(b) The parties acknowledge and agree that in no event shall Grizzly be required to pay more than one Grizzly Termination Fee or to pay the Burgundy Expenses if it has paid the Grizzly Termination Fee. Notwithstanding anything in this Agreement to the contrary, upon payment of the Grizzly Termination Fee in accordance with Section 10.3(a), Grizzly shall have no further liability to Burgundy or Spinco or their respective stockholders with respect to this Agreement or the transactions contemplated hereby (other than the obligation to pay any amount payable pursuant to Section 10.3(c).

(c) In the event that Grizzly shall fail to pay when due the Grizzly Termination Fee or the Burgundy Expenses required to be paid by it pursuant to this Section 10.3, or Burgundy shall

89

fail to pay when due the Grizzly Expenses pursuant to Section 10.3(a)(iv), such Grizzly Termination Fee or Burgundy Expenses, or Grizzly Expenses, as the case may be, shall accrue interest for the period commencing on the date such Grizzly Termination Fee or Burgundy Expenses, or Grizzly Expenses, became past due, at a rate equal to the sum of (x) the prime lending rate prevailing during such period as published in *The Wall Street Journal* plus (y) 5%, calculated on a daily basis until the date of actual payment. In addition, if either party shall fail to pay the Grizzly Termination Fee or Burgundy Expenses, or Grizzly Expenses, as the case may be, when due, such defaulting party shall also pay to the other party all of the other party's costs and expenses (including reasonable attorneys' fees), as applicable, in connection with efforts to collect such amounts.

Section 10.4 Amendment. This Agreement may be amended by Burgundy, Spinco, Grizzly and Merger Sub at any time before or after adoption of this Agreement by the stockholders of Grizzly; provided, however, that after such adoption, no amendment shall be made that by Law or in accordance with the rules of any relevant stock exchange or automated inter-dealer quotation system requires further approval by such stockholders without such further approval. This Agreement may not be amended except by an instrument in writing signed by Burgundy, Spinco, Grizzly and Merger Sub.

Section 10.5 Waivers. At any time prior to the Effective Time, Burgundy, Spinco, Grizzly and Merger Sub may, to the extent legally allowed, (i) extend the time for the performance of any of the obligations or acts of the other parties; (ii) waive any inaccuracies in the representations and warranties of any of the other parties contained herein or in any document delivered pursuant to this Agreement; and (iii) waive compliance with any of the agreements or conditions of any of the other parties contained herein; provided, however, that no failure or delay by Burgundy, Spinco, Grizzly or Merger Sub in exercising any right hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right hereunder. Any agreement on the part of Burgundy, Spinco, Grizzly or Merger Sub to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

**ARTICLE XI**

**MISCELLANEOUS**

Section 11.1 Non-Survival of Representations, Warranties and Agreements. The covenants and agreements that by their terms are to be performed following the Closing pursuant to the Separation Agreement or this Agreement shall survive the Effective Time in accordance with their terms and all other covenants and agreements herein and therein shall terminate and shall not survive the Closing. None of the representations or warranties in this Agreement or in any certificate or instrument delivered pursuant to this Agreement or any other covenant or agreement set forth herein shall survive the Effective Time. The Confidentiality Agreement shall survive the execution and delivery of this Agreement and any termination of this Agreement, and the provisions of the Confidentiality Agreement shall apply to all information and material furnished by any party or its representatives thereunder or hereunder.

90

PPG102845

Section 11.2 <u>Expenses</u>. Except as otherwise specifically provided herein, including as provided in <u>Section 8.11</u> or <u>Section 10.3</u>, whether or not the Merger is consummated, all Expenses (as defined below) incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such Expenses, except (i) Expenses (other than fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto, which shall be borne by such party) incurred in connection with the filing, printing and mailing of the Spinco Registration Statement (if required), the Registration Statement and the Proxy Statement/Prospectus, and (ii) filing fees paid to Governmental Authorities with respect to the transactions contemplated hereby pursuant to the HSR Act and appropriate filings, if any are required, with foreign regulatory authorities in accordance with Foreign Competition Laws, including the Competition Act, each of which shall be shared equally by Grizzly and Burgundy. In addition, any fees and expenses incurred in connection with seeking third party Consents or in connection with Section 2.7 of the Separation Agreement, shall be paid as set forth in the Separation Agreement. As used in this Agreement, "<u>Expenses</u>" means all out-of-pocket expenses (including applicable filing and registration fees and all fees and expenses of counsel, accountants, investment bankers, experts and consultants to a party hereto and its affiliates) incurred by a party or on its behalf in connection with or related to the authorization, preparation, negotiation, execution and performance of this Agreement and the transactions contemplated hereby, including the preparation, printing, filing and mailing of the Spinco Registration Statement (if required), the Registration Statement and the Proxy Statement/Prospectus and the solicitation of stockholder approval and all other matters related to the transactions contemplated hereby.

Section 11.3 <u>Notices</u>. All notices, requests, permissions, waivers and other communications under this Agreement will be in writing and will be deemed to have been duly given (a) five (5) Business Days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient, and (d) one Business Day following sending by overnight delivery via a national courier service and, in each case, addressed to a party at the following address for such party:

> If to Spinco or Burgundy, to:
>
> PPG Industries, Inc.
> One PPG Place
> Pittsburgh, Pennsylvania 15272
> Fax:             (412) 434-2490
> Attention:      General Counsel
>
> with a copy (which shall not constitute notice) to
>
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> Fax:             (212) 403-2000
> Attention:      Steven A. Rosenblum

91

If to Grizzly or Merger Sub, to:

Georgia Gulf Corporation
115 Perimeter Center Place, Suite 460
Atlanta, Georgia 30346
Fax:              (770) 390-9673
Attention:     Chief Executive Officer

with a copy (which shall not constitute notice) to

Jones Day
1420 Peachtree Street, N.E.
Suite 800
Atlanta, GA 30309-3053
Attention:   John E. Zamer
Facsimile:   (404) 581-8330

or to such other address(es) as will be furnished in writing by any such party to the other party in accordance with the provisions of this Section 11.3.

     Section 11.4 Interpretation. (a) When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The descriptive headings herein are inserted for convenience of reference only and are not intended to be a substantive part of or to affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, including all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns. References to a date or time shall be deemed to be such date or time in New York City, unless otherwise specified. References to dollar amounts are to U.S. dollars, unless otherwise specified. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement. For avoidance of doubt, "consistent with past practice" when used with respect to Spinco or any of its Subsidiaries means the past practice of Burgundy with respect to the Eagle Business. Except as

92

otherwise expressly provided elsewhere in this Agreement, the Separation Agreement, or any other Transaction Agreement, any provision herein which contemplates the agreement, approval or consent of, or exercise of any right of, a party, such party may give or withhold such agreement, approval or consent, or exercise such right, in its sole and absolute discretion.

(b) Any matter disclosed in any particular Section or Subsection of the Burgundy Disclosure Letter, the Burgundy Disclosure Letter or the Grizzly Disclosure Letter shall be deemed to have been disclosed in any other Section or Subsection of this Agreement, with respect to which such matter is relevant so long as the applicability of such matter to such Section or Subsection is reasonably apparent on its face.

Section 11.5 Severability. If any provision of this Agreement, or the application of any provision to any Person or circumstance, shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the remainder of this Agreement, it being the intent and agreement of the parties hereto that this Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal and enforceable while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is legal and enforceable and that achieves the same objective.

Section 11.6 Assignment; Binding Effect. Neither this Agreement nor any of the rights, benefits or obligations hereunder may be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written consent of all of the other parties. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

Section 11.7 No Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to or shall confer upon any Person (other than Burgundy, Spinco and Grizzly and their respective successors and permitted assigns) any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, and no Person (other than as so specified) shall be deemed a third party beneficiary under or by reason of this Agreement. Notwithstanding the foregoing, each financing source under the Spinco Commitment Letter and Related Letters shall be an express third party beneficiary of and shall be entitled to rely upon Section 11.10, Section 11.12 and Section 11.14 hereof, and each such financing source and its successors and assigns may enforce such provisions.

Section 11.8 Limited Liability. Notwithstanding any other provision of this Agreement, no stockholder, director, officer, Affiliate, agent or representative of any of the parties hereto, in its capacity as such, shall have any liability in respect of or relating to the covenants, obligations, representations or warranties of such party under this Agreement or in respect of any certificate delivered with respect hereto or thereto and, to the fullest extent legally permissible, each of the parties hereto, for itself and its stockholders, directors, officers and Affiliates, waives and agrees not to seek to assert or enforce any such liability that any such Person otherwise might have pursuant to applicable Law.

Section 11.9 Entire Agreement. This Agreement (together with the other Transaction Agreements, the Confidentiality Agreement, the exhibits and the Disclosure Letters and the other documents delivered pursuant hereto) constitutes the entire agreement of all the parties hereto

93

PPG102848

and supersedes all prior and contemporaneous agreements and understandings, both written and oral, between the parties, or any of them, with respect to the subject matter hereof. All exhibits attached to this Agreement and the Disclosure Letters are expressly made a part of, and incorporated by reference into, this Agreement.

Section 11.10 Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to the conflicts of law principles thereof.

Section 11.11 Counterparts. This Agreement may be executed in multiple counterparts (any one of which need not contain the signatures of more than one party), each of which will be deemed to be an original but all of which taken together will constitute one and the same agreement. This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party, the other party will re-execute original forms thereof and deliver them to the requesting party. No party will raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or other electronic means as a defense to the formation of a Contract and each such party forever waives any such defense.

Section 11.12 Jurisdiction; Consent to Jurisdiction.

(a) Exclusive Jurisdiction. Each of the parties irrevocably agrees that any claim, dispute or controversy (of any and every kind or type, whether based on contract, tort, statute, regulation or otherwise, and whether based on state, federal, foreign or any other law), arising out of, relating to or in connection with this Agreement, or any of the transactions contemplated hereby, and including disputes relating to the existence, validity, breach or termination of this Agreement (any such claim being a "Covered Claim"), may be brought and determined in any federal or state court located in the State of Delaware, and each of the parties hereto hereby irrevocably submits in respect of Covered Claims for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts and agrees that it may be served with such legal process at the address and in the manner set forth in Section 11.3. Each of the parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any action or proceeding in respect of Covered Claims (i) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (ii) that it or its property is exempt or immune from jurisdiction of any court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii ) to the fullest extent permitted by applicable Laws, that (A) the suit, action or proceeding in any such court is brought in an inconvenient forum, (B) the venue of such suit, action or proceeding is improper and (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. The parties hereby further agree that New York state or United States Federal courts sitting in the borough of Manhattan, City of New York shall have exclusive jurisdiction over any action brought against any financing source under the Spinco Commitment Letter and the Spinco Related Letter in connection with the transactions contemplated under this Agreement.

94

PPG102849

(b) <u>Waiver of Jury Trial</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THE ANCILLARY AGREEMENTS. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 11.12 (b)</u>.

Section 11.13 <u>Specific Performance</u>. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement or any other Transaction Agreement, the party who is, or is to be, thereby aggrieved will have the right to specific performance of the transactions contemplated by this Agreement or such Transaction Agreement and injunctive or other equitable relief in respect of its rights under this Agreement or such Transaction Agreement, in addition to any and all other rights and remedies at law or in equity. The parties agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived by each of the parties to this Agreement.

Section 11.14 <u>Certain Lender Agreements</u>. Burgundy agrees, on behalf of itself and its Affiliates, stockholders and Representatives (collectively, the "<u>Burgundy Related Parties</u>"), that the financing sources under the Spinco Commitment Letter and Spinco Related Letter and their Affiliates, stockholders and Representatives and each of their successors and assigns (i) shall be subject to no liability or claims by the Burgundy Related Parties arising out of or relating to this Agreement, the Spinco Financing or the transactions contemplated hereby (except with respect to the enforcement of the Burgundy Commitment Letter) or in connection with the Spinco Financing, or the performance of services by such financing sources or their Affiliates or Representatives with respect to the foregoing and (ii) are express third party beneficiaries of this <u>Section 11.14</u> (which may not be changed as to any financing sources without its prior written consent).

*[Signature Page Follows]*

95

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

PPG INDUSTRIES, INC.

By: _____ /s/ Charles E. Bunch
Name: Charles E. Bunch
Title: Chairman and Chief Executive Officer

EAGLE SPINCO INC.

By: _____ /s/ Charles E. Bunch
Name: Charles E. Bunch
Title: Chairman of the Board of Directors

GEORGIA GULF CORPORATION

By: _____ /s/ Paul D. Carrico
Name: Paul D. Carrico
Title: President and Chief Executive Officer

GRIZZLY ACQUISITION SUB, INC.

By: _____ /s/ Paul D. Carrico
Name: Paul D. Carrico
Title: President

[Signature Page to the Merger Agreement]

PPG102851

# EXHIBIT FF

# Merger of PPG Commodity Chemicals Business with Georgia Gulf Corporation

July 19, 2012





**Charles E. Bunch**
**Chairman and CEO**
**PPG Industries, Inc.**

**Paul Carrico**
**President and CEO**
**Georgia Gulf Corporation**



Exhibit #

Davies 30(b)(6) 11

08/19/2020 - RG

PPG000807

# Forward-Looking Statements

**FORWARD LOOKING STATEMENTS**

This presentation contains certain statements about PPG Industries, Inc., PPG's commodity chemicals business and Georgia Gulf Corporation that are "forward-looking statements" within the meaning of the U.S. Private Securities Litigation Reform Act of 1995. These matters involve risks and uncertainties as discussed in PPG's and Georgia Gulf's periodic reports on Form 10-K and Form 10-Q, and their current reports on Form 8-K, filed from time to time with the Securities and Exchange Commission ("SEC"). The forward-looking statements contained in this presentation may include statements about the expected effects on PPG, PPG's commodity chemicals business and Georgia Gulf of the proposed separation of PPG's commodity chemicals business and merger of PPG's commodity chemicals business with Georgia Gulf or a subsidiary of Georgia Gulf (the "Transaction"), the anticipated timing and benefits of the Transaction, and PPG's and Georgia Gulf's anticipated financial results, and also include all other statements in this presentation that are not historical facts. Without limitation, any statements preceded or followed by or that include the words "targets", "plans", "believes", "expects", "intends", "will", "likely", "may", "anticipates", "estimates", "projects", "should", "would", "could", "positioned", "strategy", "future" or words, phrases or terms of similar substance or the negative thereof, are forward-looking statements. These statements are based on the current expectations of the management of PPG and Georgia Gulf (as the case may be) and are subject to uncertainty and to changes in circumstances, and involve risks and uncertainties that could cause actual results to differ materially from those expressed or implied in such forward-looking statements. In addition, these statements are based on a number of assumptions that are subject to change. Such risks, uncertainties and assumptions include: the satisfaction of the conditions to the Transaction and other risks related to the completion of the Transaction and actions related thereto; PPG's and Georgia Gulf's ability to complete the Transaction on the anticipated terms and schedule, including the ability to obtain shareholder and regulatory approvals and the anticipated tax treatment of the Transaction and related transactions; risks relating to any unforeseen liabilities, future capital expenditures, revenues, expenses, earnings, synergies, economic performance, indebtedness, financial condition, losses and future prospects; business and management strategies and the expansion and growth of Georgia Gulf's operations; Georgia Gulf's ability to integrate PPG's commodity chemicals business successfully after the closing of the Transaction and to achieve anticipated synergies; and the risk that disruptions from the Transaction will harm PPG's or Georgia Gulf's businesses. However, it is not possible to predict or identify all such factors. Consequently, while the list of factors presented here is considered representative, no such list should be considered to be a complete statement of all potential risks and uncertainties. Unlisted factors may present significant additional obstacles to the realization of forward-looking statements. Forward-looking statements included herein are made as of the date hereof, and neither PPG nor Georgia Gulf undertakes any obligation to update publicly such statements to reflect subsequent events or circumstances.

**ADDITIONAL INFORMATION**

This communication does not constitute an offer to buy, or solicitation of an offer to sell, any securities of Georgia Gulf, PPG's commodity chemicals business or PPG.  In connection with the Transaction, Georgia Gulf will file with the SEC a registration statement on Form S-4 that will include a proxy statement and prospectus of Georgia Gulf relating to the Transaction. INVESTORS AND SECURITY HOLDERS ARE URGED TO READ THE REGISTRATION STATEMENT AND PROXY STATEMENT/PROSPECTUS, AND ANY OTHER RELEVANT DOCUMENTS, WHEN THEY BECOME AVAILABLE, BECAUSE THEY WILL CONTAIN IMPORTANT INFORMATION ABOUT GEORGIA GULF, PPG'S COMMODITY CHEMICALS BUSINESS AND THE TRANSACTION. Investors and security holders will be able to obtain these materials (when they are available) and other documents filed with the SEC free of charge at the SEC's website, www.sec.gov. In addition, copies of the registration statement and proxy statement/prospectus (when they become available) may be obtained free of charge by accessing Georgia Gulf's website at www.ggc.com by clicking on the "Investors" link and then clicking on the "SEC Filings" link, or upon written request to Georgia Gulf, Georgia Gulf Corporation, 115 Perimeter Center Place, Suite 460, Atlanta, Georgia 30346, Attention: Investor Relations, or from PPG upon written request to PPG, PPG Industries, Inc., One PPG Place, Pittsburgh, Pennsylvania 15272, Attention: Investor Relations. Shareholders may also read and copy any reports, statements and other information filed by Georgia Gulf or PPG with the SEC, at the SEC public reference room at 100 F Street, N.E., Washington D.C. 20549. Please call the SEC at 1-800-SEC-0330 or visit the SEC's website for further information on its public reference room.

**PARTICIPANTS IN THE SOLICITATION**

Georgia Gulf, PPG, and certain of their respective directors, executive officers and other members of management and employees may be deemed to be participants in the solicitation of proxies from shareholders in respect of the Transaction under the rules of the SEC. Information regarding Georgia Gulf's directors and executive officers is available in its 2011 Annual Report on Form 10-K filed with the SEC on February 24, 2012, and in its definitive proxy statement filed with the SEC on April 16, 2012 in connection with its 2012 annual meeting of stockholders. Information regarding PPG's directors and executive officers is available in its 2011 Annual Report on Form 10-K filed with the SEC on February 16, 2012, and in its definitive proxy statement filed with the SEC on March 8, 2012 in connection with its 2012 annual meeting of stockholders. Other information regarding the participants in the proxy solicitation and a description of their direct and indirect interests, by security holdings or otherwise, will be contained in the registration statement and proxy statement/prospectus and other relevant materials to be filed with the SEC when they become available.

2

PPG000808





Charles E. Bunch
Chairman and CEO
PPG Industries, Inc.



3

PPG000809

A-729

# Strategic Benefits of Transaction

## Combination of PPG Commodity Chemicals Business with Georgia Gulf

**1** | Highly complementary to strategic objectives of both companies, with significant potential to enhance shareholder value of both companies

**2** | Another significant step in PPG's transformation to a more focused Coatings & Specialty Products company

**3** | Creates a leading, integrated chemicals and building products company with global annual revenues of approximately $5 billion

**4** | Newly merged company will have substantial cost synergies and greater scale to capitalize on cost advantaged North American natural gas

**5** | Newly merged company will also have strong capital structure and cash flow to support growth and return of capital to shareholders

**Significant Shareholder Value Creation Opportunity for Both Companies**

4

PPG000810

# PPG's Commodity Chemicals to Merge with Georgia Gulf
## *Transaction overview*

| | |
|---|---|
| **Structure and Consideration** | • Stock-for-stock exchange using Reverse Morris Trust structure<br>• PPG business will be distributed to PPG shareholders through a tax-free separation; then immediately merged with Georgia Gulf or a new subsidiary of Georgia Gulf<br>• Total consideration of $2.1 billion, including cash to PPG, issuance of approximately 35.2 million Georgia Gulf shares to PPG shareholders, and the assumption of debt and minority interest by the newly merged company<br>• The newly merged company assumes certain pension assets/liabilities and other related liabilities |
| **Ownership** (The Newly Merged Company) | • Approximately 50.5% PPG shareholders<br>• Approximately 49.5% Georgia Gulf shareholders<br>• ~ 70 million shares outstanding |
| **Governance** (The Newly Merged Company) | • Georgia Gulf's CEO and combined executive team to lead company<br>• Georgia Gulf's Board of Directors plus three additional directors designated by PPG |
| **Financial Benefits** (The Newly Merged Company) | • Expect $115 million in annual cost synergies with full realization in first 2 years<br>• Accretive to the company's earnings and free cash flow in 2013<br>• Strong capital structure and cash flows with enhanced financial flexibility |
| **Conditions and Expected Closing** | • Georgia Gulf shareholder vote<br>• Customary closing conditions, relevant tax rulings and regulatory authority approvals<br>• Expected closing in late 2012 or early 2013 |

5

PPG000811

# Significant PPG Shareholder Value Creation

- **Another significant step in PPG's transformation to a more focused coatings and specialty products company**

- **Reverse Morris Trust provides tax-efficient structure to capture full value of commodity chemicals business for PPG shareholders:**
  - Approximately 50.5% ownership of The Newly Merged Company
  - $900 million in cash proceeds
  - Benefits from cost synergies not available to PPG alone

- **Additional financial considerations:**
  - The Newly Merged Company's assumption of debt and minority interest and related environmental liabilities
  - The Newly Merged Company's assumption of related pension assets and liabilities and other post-retirement benefit (OPEB) costs

6

PPG000812



PPG000813

# Consideration for PPG Commodity Chemicals Business

Financial consideration prior to synergy capitalization:

| | |
|---|---|
| Value of Georgia Gulf Shares (as of July 18, 2012) | $1,016 |
| Cash | 900 |
| Assumed Debt and Minority Interest | 182 |
| **Total PPG Shareholder Value - Pre-Synergies** | **$2,098** |

Implied multiples:

| | |
|---|---|
| EBITDA Multiple (Last Year - 2011) | 5.1x |
| EBITDA Multiple (Prior 3-Year Average) | 7.6x |

Other balance sheet items assumed by merged company:

| | |
|---|---|
| Pension Assets | 466 |
| Pension Liabilities | -466 |
| Related Liabilities (OPEB, Environmental and Other) | -230 |

Assets and liabilities are shown based on PPG's 2011 10-K.
All numbers in USD Millions except multiples.
See Appendix for calculation variables and EBITDA reconciliation to PPG GAAP figures.

**Immediate Benefits for PPG and PPG Shareholders**

8

PPG000814

## PPG Summary

**Strategic:**

* Continued execution of ongoing PPG strategic objectives

**Creates shareholder value today:**

* Immediately enhances shareholder value through tax efficiency and ability to share in synergies and growth of the newly merged company

**Provides for further shareholder value creation in the future:**

* Supplements PPG's already strong cash position, providing further financial flexibility for shareholder-accretive cash deployment and dividends

**Significant Shareholder Valuation Creation and Enhanced Financial Flexibility**

9

PPG000815



# Georgia Gulf

Paul Carrico
President and CEO
Georgia Gulf Corporation

10

PPG000816

# Benefits of Transaction for Georgia Gulf

### Creates Global Chemicals and Building Products Leader with Increased Scale

- Fortune 500 company with pro forma sales of $5 billion and broad portfolio of leading positions in downstream chemicals and building products

### Enhanced Vertical Integration with Significant U.S. Natural Gas Driven Chlor-alkali Production

- Vertical integration enhances operating rates throughout the cycle
- Approximately 70% integration to natural gas fired cogeneration will make the combined company one of the lowest cost integrated chlor-alkali producers in the world

### Significant Cost Synergies and Well-Positioned to Capitalize on Growth Opportunities

- Expected ~$115 million of annualized cost synergies in the first two years
- Strong capital structure and cash flows enhance financial flexibility
- Well positioned to participate in North American ethylene expansion
- Return of cash to shareholders via dividends

**Scale and Integration of Combined Company Creates Value for Georgia Gulf Shareholders**

11

PPG000817

# Creates Integrated Leader Across the Chain



**North American ECU Capacity**

**North American VCM**

**North American PVC**

■ Georgia Gulf ■ PPG Commodity Chemicals

Source: CMAI
1. Occidental VCM capacity includes OXYMAR.
2. Reflects Dow's closure of VCM capacity at Oyster Creek, TX and Plaquemine, LA in 2011.
3. Total PVC capacity relates to Georgia Gulf capacity as PPG does not produce PVC.

12

PPG000818

# Diverse Product Portfolio Creates Opportunity

## Chlorine Downstream



- 60% internally consumed by a broad mix of chlorine derivatives
- Multiple downstream growth opportunities

## PVC Downstream



- Gulf Coast logistics provide excellent access to export markets
- Organic growth in Building Products as U.S. housing recovers

13

PPG000819

## Expected Cost Synergies to be Realized Over First 2 Years

| | | Expected Value |
|---|---|---|
| **Procurement & Logistics** | • Savings from combined ~$1 billion/year ethylene and natural gas purchases<br>• Freight and terminal optimization | ~$40M |
| **Operating Rate** | • Operating rate optimization through the chain of combined assets | ~$35M |
| **G&A Reduction** | • Reduced overhead charges<br>• Information Technology savings<br>• Impact of purchase accounting pension adjustments (~$15M) | ~$40M |
| **Annualized Cost Synergy Run Rate** | | ~$115M |
| **Total Cash to Achieve** | • Professional fees, consultants<br>• Information Technology implementation<br>• Relocation and Severance costs | ~$55M |

**$30 Million Achieved Immediately, $60 Million By End of First Year**

14

PPG000820

**A-740**

# Geographic and Product Fit with Major Facilities



**Lake Charles Assets Have Been Operationally Integrated for Nearly 30 years**

15

PPG000821

# Improves Combined Mid-Cycle EBITDA[1] to $850mm+



**Higher Integration Level Reduces EBITDA Cyclicality**

Source: Georgia Gulf Management
1.    Assumes corporate costs of $60 million.

16

PPG000822

# Merger Strengthens Cash Flow, Decreases Leverage



1. Free cash flow defined as EBITDA, less cash interest, less cash taxes, less capex, less change in working capital.
2. Newly merged company financials include run rate cost synergies of $115 million and calculated using PPG Commodity Chemicals FY 2011 D&A value of $41mm for calculation of LTM 3/31/12 EBITDA and PPG Commodity Chemicals FY 2011 capex value of $89mm for LTM 3/31/12 capex.  Excludes impact of pension accounting synergies.
3. Excludes Georgia Gulf's lease financing obligations. PF LTM 3/31/12 EBITDA calculated using PPG Commodity Chemicals FY 2011 D&A value of $41mm.

17

PPG000823

## Summary

**Combination of PPG Commodity Chemicals Business with Georgia Gulf**

**1** Highly complementary to strategic objectives of both companies, with significant potential to enhance shareholder value of both companies

**2** Another significant step in PPG's transformation to a more focused Coatings & Specialty Products company

**3** Creates a leading, integrated chemicals and building products company with global annual revenues of approximately $5 billion

**4** Newly merged company will have substantial cost synergies and greater scale to capitalize on cost advantaged North American natural gas

**5** Newly merged company will also have strong capital structure and cash flow to support growth and return of capital to shareholders

**Significant Shareholder Value Creation Opportunity for Both Companies**

18

PPG000824

A-744

## Company Contacts



**Georgia Gulf**

Investors:
Vince Morales
(412) 434-3740

Media:
Jeremy Neuhart
(412) 434-3046

Investors:
Martin Jarosick
(770) 395-4524

Media:
Alan Chapple
(770) 395-4538

19

PPG000825

# Appendix

20

PPG000826

# Business Overviews

| Georgia Gulf | PPG Commodity Chemicals |
|---|---|

**Georgia Gulf**

- Integrated North American Chemicals and Building Products company
- Manufacturer of custom and other vinyl-based products marketed under the Royal Building Products and Exterior Portfolio brands
- Well positioned for the future:
  - Shale gas positions North American producers at low end of the global cost curve
  - Demand growth from emerging markets presents strong export opportunities
  - North American housing demand and remodeling at historic lows
- 2011 Sales:  $3,223 million
- 2011 Adjusted EBITDA: $230 million

**PPG Commodity Chemicals**

- Global leader in the merchant supply of Chlor-alkali
- Attractive product portfolio including chlorine, caustic soda and downstream chlorine-based chemicals
  - Chlorinated solvents
  - VCM and EDC
  - HCl, calcium hypochlorite and phosgene derivatives
- World class integrated manufacturing facilities in North America
  - Broad North American presence, benefitting from structurally low natural gas cost and global export opportunities
- 2011 Sales: $1,741 million
- 2011 EBITDA: $411 million

21

PPG000827

## Combined Map of Facilities



- ● Georgia Gulf – Chemicals
- ● Georgia Gulf – Building Products
- ● PPG Commodity Chemicals
- ☆ Company Headquarters

22

PPG000828

# Financing Sequencing Overview



| Step 1: Above Basis Amount Funding Pre-Closing | Step 2: Spinoff / Debt Exchange |
|---|---|

| Transaction Steps Pre-Closing | Transaction Steps Concurrent with Closing |
|---|---|

**Transaction Steps Pre-Closing**

1. Funding of $660 million short-term debt by Initial Lender to PPG

2. PPG transfers assets and liabilities of the business to PPG Commodity Chemicals

**Transaction Steps Concurrent with Closing**

1. PPG Commodity Chemicals to issue $660 million of PPG Commodity Chemicals Notes and borrow $240 million under the PPG Commodity Chemicals Term Loan

   A. PPG Commodity Chemicals distributes the $240M of cash to PPG

   B. PPG Commodity Chemicals distributes the PPG Commodity Chemicals Notes to PPG

2. PPG delivers the PPG Commodity Chemicals Notes to the Initial Lender to retire the $660 million short-term PPG Commodity Chemicals debt incurred in step 1

3. Initial Lender sells the PPG Commodity Chemicals Notes to bond investors in the capital markets

4. PPG separates PPG Commodity Chemicals by distributing all shares of PPG Commodity Chemicals to PPG shareholders

23

PPG000829

# Pro Forma Capital Structure



- Immediately following the separation, Georgia Gulf or a merger subsidiary will merge into PPG Commodity Chemicals
  - PPG Commodity Chemicals to survive such merger as a wholly owned subsidiary of Georgia Gulf
  - PPG Shareholders will own approximately 50.5% of the newly merged Georgia Gulf and Georgia Gulf's existing shareholders will own approximately 49.5% upon the completion of the merger
- Georgia Gulf and PPG Commodity Chemicals to provide cross guarantees of the debt at both entities

24

PPG000830

A-750

# PPG Commodity Chemicals Business Financials and EBITDA Reconciliation

|  | 2009 | 2010 | 2011 | 3-Year Average |
|---|---|---|---|---|
| Total Net Sales | $1,282 | $1,441 | $1,741 | $1,488 |
|  |  |  |  |  |
| Earnings Before Interest and Taxes (EBIT) | 152 | 189 | 370 | 237 |
| Depreciation & Amortization (DA) | 40 | 39 | 41 | 40 |
| EBITDA (EBIT + DA) | 192 | 228 | 411 | 277 |
| *EBITDA % of Sales* | *15.0%* | *15.8%* | *23.6%* | *18.6%* |
|  |  |  |  |  |
| Segment Assets | 564 | 587 | 690 | 614 |
| Segment Capital Spending - (Note: 2011 includes $27MM acquisition of Equachlor) | 24 | 40 | 89 | 51 |

All numbers are in USD millions except percentages, and as reported in PPG's financial filings with the SEC.

25

PPG000831

# Calculation Details - Consideration For PPG Commodity Chemicals Business

Value of Georgia Gulf Shares:

| | |
|---|---|
| Georgia Gulf Closing Price (as of July 18, 2012) | $28.85 |
| Approximate Shares Delivered to PPG Shareholders | 35.2 |
| **Total Value Georgia Gulf Shares** | **$1,016** |

EBITDA Multiple Calculations:

| | |
|---|---|
| **Total PPG Shareholder Value - Pre-Synergies** | **$2,098** |
| EBITDA (Last Year - 2011) | 411 |
| EBITDA Multiple | 5.1x |

| | |
|---|---|
| **Total PPG Shareholder Value - Pre-Synergies** | **$2,098** |
| EBITDA (Prior 3-Year Average) | 277 |
| EBITDA Multiple | 7.6x |

All numbers are in millions except multiples, and share price.

26

PPG000832

# Pro Forma Financial Profile

| | LTM as of 3/31/12 | | |
|---|---|---|---|
| (Figures in $ millions) | Georgia Gulf | PPG Commodity Chemicals [1] | Newly Merged Company [2] |
| Total Net Sales | $3,295 | $1,741 | $5,036 |
| EBITDA | 241 | 414 | 655 |
| *% margin* | *7.3%* | *23.8%* | *13.0%* |
| Plus: Synergies | - | - | 115 |
| Pro forma EBITDA | - | - | 770 |
| *% margin* | - | - | *15.3%* |
| Pro Forma EBIT | 143 | 373 | 548 [2] |
| *% margin* | *4.3%* | *21.4%* | *10.9%* |
| Capex | 69 | 89 | 158 |
| *% of sales* | *2.1%* | *5.1%* | *3.1%* |
| Free Cash Flow [3] | 115 | 201 [4] | 381 [5] |

1.  Net Sales and EBIT reflect LTM numbers. Assumes FY 2011 D&A value of $41mm for calculation of LTM 3/31/12 EBITDA and FY 2011 capex value of $89mm for LTM 3/31/12 capex.
2.  Newly merged company EBIT includes increased D&A from purchase accounting adjustments of $82mm and $115 million of synergies.
3.  Free cash flow defined as EBITDA, less cash interest, less cash taxes, less capex, less change in working capital.
4.  Assumes FY 2011 D&A value of $41mm for calculation of LTM 3/31/12 EBITDA, FY 2011 capex value of $89mm for LTM 3/31/12, tax rate of 35%, and change in working capital as a % of sales held steady with Georgia Gulf's over the same period.
5.  Includes run-rate cost synergies of $115mm. Includes PF interest expense for new $240mm term loan and $660mm senior notes and tax rate of 32%.

27

PPG000833

# Pro Forma Capital Structure

| Pro Forma Capital Structure | | | | |
|---|---|---|---|---|
| ($ millions) | 3/31/2012 | Adj. | Pro Forma | Mult. Of LTM EBITDA |
| Cash | $39 | - | $39 | 0.1x |
| ABL Facility [1] | 29 | 61 | 90 | 0.1x |
| Existing Georgia Gulf Debt | 498 | - | 498 | 0.6x |
| New Term Loan | - | 240 | 240 | 0.3x |
| RS Cogen Debt (50%) | - | 95 | 95 | 0.1x |
| **Total Secured Debt** | **$527** | **$396** | **$922** | **1.2x** |
| New Senior Notes | - | 660 | 660 | 0.9x |
| **Total Debt** | **$527** | **$1,056** | **$1,582** | **2.1x** |
| LTM EBITDA | $241 | | $770 [2] | |
| **Credit Statistics** | | | | |
| Total Secured Debt/LTM EBITDA | 2.2x | | 1.2x [2] | |
| Total Debt/LTM EBITDA | 2.2x | | 2.1x [2] | |

1. Represents drawn amount.
2. Assumes PPG Commodity Chemicals FY 2011 D&A value of $41mm for calculation of PPG Commodity Chemicals LTM 3/31/12 EBITDA. Includes $115 million of pro forma run-rate cost synergies.

28

PPG000834

# Georgia Gulf Historical Financials

| ($ in millions) | 2009 | 2010 | 2011 | LTM 3/31/12 |
|---|---|---|---|---|
| Total Net Sales | $1,990 | $2,818 | $3,223 | $3,295 |
| EBITDA | 162 | 208 | 230 | 241 [1] |
| % margin | 8.1% | 7.4% | 7.1% | 7.3% |
| EBIT | 44 | 109 | 129 | 143 [1] |
| % margin | 2.2% | 3.9% | 4.0% | 4.3% |
| Capex | 30 | 46 | 66 | 69 |

1. Adjusted for lease financing obligation.

29

PPG000835

A-755

# PPG Commodity Chemicals Historical Financials

| ($ in millions) | 2009 | 2010 | 2011 | LTM 3/31/12 |
|---|---|---|---|---|
| Total Net Sales | $1,282 | $1,441 | $1,741 | $1,741 |
| EBITDA [3] | 192 | 228 | 411 | 414 [1] |
| % margin | 15.0% | 15.8% | 23.6% | 23.8% |
| EBIT | 152 | 189 | 370 | 373 |
| % margin | 11.9% | 13.1% | 21.3% | 21.4% |
| Capex [4] | 24 | 40 | 89 | 89 [2] |

1.  Assumes constant D&A value from FY 2011 ($41mm).
2.  Assumes constant capital expenditure value from FY 2011 ($89mm).
3.  Includes impact of hedge accounting that will not be part of newly merged company.
4.  2011 and LTM include $27MM acquisition of Equachlor.

30

PPG000836

# EXHIBIT GG

Exhibit 10.1

SEPARATION AGREEMENT

DATED AS OF JULY 18, 2012

BY AND BETWEEN

PPG INDUSTRIES, INC.

and

EAGLE SPINCO INC.

**Exhibit #**

**Davies 30(b)(6)  10**

08/19/2020 - RG

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **ARTICLE I DEFINITIONS** | | 3 |
| **ARTICLE II THE SPINCO REORGANIZATION** | | 15 |
| Section 2.1 | Transfer of Spinco Assets; Assumption of Spinco Liabilities | 15 |
| Section 2.2 | Transfer of Excluded Assets; Assumption of Excluded Liabilities | 16 |
| Section 2.3 | Misallocated Transfers | 16 |
| Section 2.4 | Spinco Assets; Excluded Assets | 17 |
| Section 2.5 | Spinco Liabilities | 21 |
| Section 2.6 | Termination of Intercompany Agreements; Settlement of Intercompany Accounts | 24 |
| Section 2.7 | Governmental Approvals and Third-Party Consents | 25 |
| Section 2.8 | No Representation or Warranty | 29 |
| Section 2.9 | Waiver of Bulk-Sales Laws | 30 |
| Section 2.10 | Guarantees | 30 |
| Section 2.11 | Bank Accounts; Cash Balances | 31 |
| **ARTICLE III CLOSING OF THE SPINCO REORGANIZATION; POST-CLOSING WORKING CAPITAL ADJUSTMENT** | | 32 |
| Section 3.1 | Business Transfer Time | 32 |
| Section 3.2 | Conditions to the Spinco Reorganization | 32 |
| Section 3.3 | Recapitalization of Spinco | 33 |
| Section 3.4 | Transfer of the Eagle Business | 34 |
| Section 3.5 | Transfer of Spinco Assets and Assumption of Spinco Liabilities | 36 |
| Section 3.6 | Transfer of Excluded Assets; Assumption of Excluded Liabilities | 36 |
| Section 3.7 | Working Capital Adjustment | 37 |
| **ARTICLE IV THE DISTRIBUTION** | | 39 |
| Section 4.1 | Form of Distribution | 39 |
| Section 4.2 | Manner of Distribution | 39 |
| Section 4.3 | Conditions to the Distribution | 40 |
| Section 4.4 | Actions Prior to Distribution | 41 |
| Section 4.5 | Additional Matters | 42 |

PPG102853

**ARTICLE V MUTUAL RELEASES; INDEMNIFICATION** 42

Section 5.1    Release of Pre-Business Transfer Time Claims    42

Section 5.2    Indemnification by the Spinco Group    44

Section 5.3    Indemnification by Burgundy    45

Section 5.4    Payments; Reductions for Insurance Proceeds and Other Recoveries    45

Section 5.5    Procedures for Defense, Settlement and Indemnification of Third-Party Claims    47

Section 5.6    Additional Matters    48

Section 5.7    Exclusive Remedy    50

Section 5.8    Survival of Indemnities    51

**ARTICLE VI ADDITIONAL AGREEMENTS** 51

Section 6.1    Further Assurances    51

Section 6.2    Agreement for Exchange of Information    51

Section 6.3    Privileged Matters    54

Section 6.4    Intellectual Property Assignment/Recordation    56

Section 6.5    Intellectual Property Matters    56

Section 6.6    Assigned Domain Names    57

Section 6.7    Unassigned Domain Names    57

Section 6.8    Unassigned Domain Name Content    57

Section 6.9    Shared IP Licenses    58

Section 6.10    Removal of Tangible Assets    59

Section 6.11    Insurance    59

Section 6.12    Right of First Refusal    60

**ARTICLE VII MISCELLANEOUS** 61

Section 7.1    Expenses    61

Section 7.2    Entire Agreement    61

Section 7.3    Governing Law    61

Section 7.4    Notices    62

Section 7.5    Priority of Agreements    62

Section 7.6    Amendments and Waivers    63

Section 7.7    Termination    63

Section 7.8    Parties in Interest    63

PPG102854

PPG102855

A-761

| Section 7.9 | Assignability | 63 |
| Section 7.10 | Interpretation | 64 |
| Section 7.11 | Severability | 64 |
| Section 7.12 | Counterparts | 64 |
| Section 7.13 | Survival of Covenants | 65 |
| Section 7.14 | Jurisdiction; Consent to Jurisdiction | 65 |
| Section 7.15 | Specific Performance | 66 |
| Section 7.16 | Limitations of Liability | 66 |

**SCHEDULES**

| Schedule 1.16 | – | Calcasieu Estuary |
| Schedule 1.45 | – | Natrium Excess Land |
| Schedule 1.63 | – | Shared Contracts |
| Schedule 1.87 | – | TCI Value |
| Schedule 2.1 | – | Plan of Reorganization |
| Schedule 2.4(a)(ii) | – | Schedule of Spinco Active Sites |
| Schedule 2.4(a)(iii)(1) | – | Schedule of Spinco Entity Interests |
| Schedule 2.4(a)(iii)(2) | – | Schedule of Third-Party Equity Interests |
| Schedule 2.4(a)(vi) | – | Schedule of Registrable IP |
| Schedule 2.4(a)(xiii) | – | Schedule of Actions |
| Schedule 2.4(a)(xiv) | – | Schedule of Tangible Personal Property |
| Schedule 2.4(b)(i) | – | Schedule of Excluded IP Assets |
| Schedule 2.4(b)(vi) | – | Schedule of Excluded Spinco Sites |
| Schedule 2.4(b)(ix) | – | Schedule of Excluded Assets |
| Schedule 2.5(a)(xix) | – | Schedule of Spinco Liabilities |
| Schedule 2.5(b)(ii) | – | Schedule of Ohio River/Calcasieu Estuary Liabilities |
| Schedule 2.5(b)(ix) | – | Schedule of Obligations relating to Asbestos |
| Schedule 2.5(b)(x) | – | Schedule Relating to Other Claims |
| Schedule 2.6(b)(i) | – | Schedule of Intercompany Agreements Not To Be Terminated |
| Schedule 2.6(c) | – | Plan for Intercompany Accounts |
| Schedule 2.7(c) | – | Transfer of TCI Interests |
| Schedule 3.4(a)(xv) | – | Schedule of Resigning Officers and Directors of Spinco |
| Schedule 3.4(b)(iii) | – | Schedule of Resigning Officers and Directors of the Burgundy Group |
| Schedule 3.7(a) | – | Working Capital Calculation |
| Schedule 3.7(b) | – | Working Capital of the Business Excluding TCI |
| Schedule 3.7(c) | – | TCI Working Capital |

PPG102856

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | – | Form of Tax Matters Agreement |
| Exhibit B | – | Form of Transition Services Agreement |
| Exhibit C | – | Form of Electric Generation, Distribution and Transmission Facilities Lease |
| Exhibit D | – | Form of Shared Facilities, Services and Supply Agreement |
| Exhibit E | – | Form of Servitude Agreement |
| Exhibit F | – | Form of Liquid Caustic Soda Sales Agreement - Fresno |
| Exhibit G | – | Form of Liquid Caustic Soda Sales Agreement - Strongsville |
| Exhibit H | – | Form of Hydrochloric Acid Sales Agreement - Lake Charles (Silica) |
| Exhibit I | – | Form of Chlorine and Liquid Caustic Soda Sales Agreement - Barberton |
| Exhibit J | – | Form of Liquid Caustic Soda Sales Agreement - Wichita Falls |
| Exhibit K | – | Form of Hydrochloric Acid Sales Agreement |
| Exhibit L | – | Form of Shared Facilities Agreement – Monroeville |
| Exhibit M | – | Form of Master Terminal Agreement |

PPG102857

**SEPARATION AGREEMENT**

THIS SEPARATION AGREEMENT, dated as of July 18, 2012 (this "Agreement"), is by and between PPG Industries, Inc., a Pennsylvania corporation ("Burgundy"), and Eagle Spinco Inc., a Delaware corporation and presently a wholly owned Subsidiary of Burgundy ("Spinco"). Capitalized terms used in this Agreement and not otherwise defined have the meanings ascribed to such terms in Article I of this Agreement.

WHEREAS, Burgundy is engaged, directly and indirectly, in the Eagle Business;

WHEREAS, the Board of Directors of Burgundy has determined that it would be in the best interests of Burgundy and its stockholders to separate the Eagle Business from the other businesses of Burgundy;

WHEREAS, Burgundy has caused Spinco, which currently conducts no business operations and has no assets or liabilities other than in connection with its formation, to be formed in order to facilitate such separation;

WHEREAS, Burgundy currently owns all of the issued and outstanding shares of common stock, par value $0.001 per share, of Spinco (the "Spinco Common Stock");

WHEREAS, Burgundy and Spinco have each determined that it would be appropriate and desirable for (a) Burgundy and its Subsidiaries to transfer or cause to be transferred, to Spinco, the equity of the Spinco Subsidiaries, and to one or more Spinco Subsidiaries, all of the other Spinco Assets (and, to pay in accordance with Section 6.2(d) of the Employee Matters Agreement, the Underfunding Amount (as defined therein), if any), (b) the transfer of certain Excluded Assets to (or the retention of such Excluded Assets by) Burgundy or one or more of its Subsidiaries, and (c) the assumption by Burgundy or one or more of its Subsidiaries of the Excluded Liabilities in exchange for (w) one or more Spinco Subsidiaries assuming the Spinco Liabilities, (x) Spinco issuing to Burgundy shares of Spinco Common Stock pursuant to the Spinco Stock Issuance, (y) Spinco distributing to Burgundy the Special Below Basis Cash Distribution (and, to pay in accordance with Section 6.2(d) of the Employee Matters Agreement, the Grizzly True Up Amount (as defined therein), if any) and (z) Spinco distributing to Burgundy the Special Above Basis Debt/Cash Distribution, as further described herein and in the Merger Agreement (the "Spinco Reorganization");

WHEREAS, Burgundy and Spinco contemplate that, substantially concurrently with or immediately prior to the Spinco Reorganization as further described herein, Spinco will enter into the definitive debt financing arrangements as contemplated by the Spinco Commitment Letter and the Spinco Related Letter and the Burgundy Commitment Letter and the Burgundy Related Letter, as further described herein and in the Merger Agreement (the "Spinco Financing Arrangements", together with the Spinco Stock Issuance and the Special Distribution, the "Recapitalization");

PPG102858

WHEREAS, Burgundy and Spinco contemplate that, following the Spinco Reorganization and Recapitalization as further described herein, Burgundy will either (a) distribute all of the shares of Spinco Common Stock to holders of Burgundy Common Stock without consideration on a pro rata basis (the "One-Step Spin-Off") or (b) consummate an offer to exchange (the "Exchange Offer") shares of Spinco Common Stock for currently outstanding shares of Burgundy's common stock, $1.66-2/3 par value per share ("Burgundy Common Stock") and, in the event that Burgundy's stockholders subscribe for less than all of the Spinco Common Stock in the Exchange Offer, Burgundy will distribute, pro rata to holders of Burgundy Common Stock, any unsubscribed Spinco Common Stock on the Distribution Date immediately following the consummation of the Exchange Offer so that Burgundy will be treated for U.S. federal income Tax purposes as having distributed all of the Spinco Common Stock to its stockholders (the "Clean-Up Spin-Off");

WHEREAS, the disposition by Burgundy of 100% of the Spinco Common Stock, whether by way of the One-Step Spin-Off or the Exchange Offer (followed by any Clean-Up Spin-Off), is referred to herein as the "Distribution";

WHEREAS, the Parties intend that, for U.S. federal income tax purposes, the contribution (as part of the Spinco Reorganization) by Burgundy to Spinco of all of the Spinco Assets held directly by Burgundy in exchange for (a) the assumption by Spinco Subsidiaries of Spinco Liabilities of Burgundy, (b) the issuance by Spinco to Burgundy of shares of Spinco Common Stock pursuant to the Spinco Stock Issuance, (c) the distribution by Spinco to Burgundy of the Special Below Basis Cash Distribution, and (d) the distribution by Spinco to Burgundy of the Special Above Basis Debt/Cash Distribution (the "Contribution") and the Distribution, taken together, will qualify as a "reorganization" within the meaning of Section 368(a)(1)(D) of the Code;

WHEREAS, Burgundy has requested a private letter ruling (the "Private Letter Ruling") from the IRS substantially to the effect that, among other things, (i) the Contribution and Distribution, taken together, will qualify as a "reorganization" within the meaning of Section 368(a)(1)(D) of the Code (the "IRS D Reorganization Ruling"), and (ii) Burgundy will not recognize gain or loss for U.S. federal income Tax purposes in connection with the receipt of the Spinco Exchange Debt in the Special Above Basis Debt/Cash Distribution or the consummation of the Debt Exchange (the "IRS Debt Exchange Ruling");

WHEREAS, pursuant to the Agreement and Plan of Merger, dated July 18, 2012 (the "Merger Agreement"), among Burgundy, Spinco, and Georgia Gulf Corporation, a Delaware corporation ("Grizzly"), immediately following the Distribution, a Subsidiary of Grizzly will merge with and into Spinco, subject to Schedule 8.3(e) to the Merger Agreement (the "Merger") and Spinco Common Stock will be converted into shares of common stock of Grizzly on the terms and subject to the conditions of the Merger Agreement;

WHEREAS, it is a condition to the Merger that, prior to the Effective Time, the Spinco Reorganization and the Distribution be completed;

- 2 -

PPG102859

WHEREAS, the Distribution will be carried out for the corporate business purpose of tailoring Spinco's corporate structure to facilitate the Merger (which, for U.S. federal income tax purposes, is intended to qualify as a "reorganization" within the meaning of Section 368(a) of the Code);

WHEREAS, Burgundy and Spinco have determined that (a) the Merger will not be undertaken unless the Distribution occurs, (b) the Merger cannot be accomplished by an alternative nontaxable transaction that does not involve the Distribution and is neither impractical nor unduly expensive, and (c) Grizzly is not related to Burgundy or Spinco;

WHEREAS, the Parties intend this Agreement to be, and hereby adopt as, a "plan of reorganization" within the meaning of Treasury Regulation Section 1.368-2(g); and

WHEREAS, the Parties intend in this Agreement to set forth the principal arrangements between them regarding the Spinco Reorganization, the Recapitalization and the Distribution, and certain other agreements that will, following the Distribution, govern certain matters relating to the Spinco Reorganization, the Recapitalization and the Distribution and the relationship of Burgundy, Spinco and their respective Subsidiaries.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

## ARTICLE I

### DEFINITIONS

For purposes of this Agreement, the following terms, when utilized in a capitalized form, will have the following meanings:

Section 1.1 "Above Basis Amount" means $900 million, minus the TCI Value to the extent the TCI Interests are not transferred at the Business Transfer Time, minus the Below Basis Amount, and *minus*, if the Estimated Adjustment Payment is negative, the absolute value of the Estimated Adjustment Payment, and *plus*, if the Estimated Adjustment Payment is positive, the Estimated Adjustment Payment (as such terms are used and defined in the Separation Agreement), subject to adjustment as set forth in Section 3.1(d) of the Merger Agreement.

Section 1.2 "Accounting Exhibit" means the exhibits set forth on Schedules 3.7(a), 3.7(b) and 3.7(c) attached hereto and the line items (such line items calculated in accordance with GAAP, consistently applied), methods, practices, categories, estimates, and assumptions reflected therein.

Section 1.3 "Action" means any demand, charge, claim, action, suit, counter suit, arbitration, hearing, inquiry, proceeding, audit, review, complaint, litigation or investigation, or proceeding of any nature whether administrative, civil, criminal, regulatory or otherwise, by or before any federal, state, local, foreign or international Governmental Authority or any arbitration or mediation tribunal.

- 3 -

PPG102860

Section 1.4 "<u>Affiliate</u>" means a Person that, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, a specified Person. The term "<u>control</u>" (including, with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, by Contract or otherwise; <u>provided</u>, <u>however</u>, that for purposes of this Agreement, from and after the Distribution Date, no member of either Group shall be deemed an Affiliate of any member of the other Group.

Section 1.5 "<u>Agent</u>" has the meaning set forth in the Merger Agreement.

Section 1.6 "<u>Ancillary Agreements</u>" means the Tax Matters Agreement, the Transition Services Agreement, the Employee Matters Agreement, the Shared Facilities, Services and Supply Agreement, the Electric Generation, Distribution and Transmission Facilities Lease, the Servitude Agreement, the Liquid Caustic Soda Sales Agreement (Fresno), the Liquid Caustic Soda Sales Agreement (Strongsville), the Hydrochloric Acid Sales Agreement - Lake Charles (Silica), the Chlorine and Liquid Caustic Soda Sales Agreement (Barberton), the Liquid Caustic Soda Sales Agreement (Wichita Falls), the Hydrochloric Acid Sales Agreement, the Shared Facilities Agreement (Monroeville) and the Master Terminal Agreement.

Section 1.7 "<u>Assets</u>" means assets, properties and rights (including goodwill), wherever located (including in the possession of vendors or other third parties or elsewhere), whether real, personal or mixed, tangible, intangible or contingent, in each case whether or not recorded or reflected or required to be recorded or reflected on the books and records or financial statements of any Person.

Section 1.8 "<u>Below Basis Amount</u>" means $225 million, *plus* the TCI Basis if the TCI Interests are transferred at the Business Transfer Time, (x) unless pursuant to a written notice delivered to Spinco prior to the commencement of the Marketing Period (as defined in the Merger Agreement) (i) Burgundy elects to reduce the Below Basis Amount by the amount specified in such notice; <u>provided</u>, <u>however</u>, that Burgundy shall under no circumstances reduce the Below Basis Amount to an amount that is less than $200 million (exclusive of the TCI Basis); or (ii) Burgundy elects to increase the Below Basis Amount by the amount specified in such notice after considering in good faith the estimated adjusted Tax bases of the assets to be transferred by Burgundy to Spinco and the estimated amount of liabilities to be assumed by Spinco; <u>provided</u> that in no event shall Burgundy increase the Below Basis Amount to more than $260 million (exclusive of the TCI Basis) without the written consent of Grizzly and (y) (A) if the Estimated Adjustment Payment is negative, *minus* the absolute value of the Estimated Adjustment Payment and (B) if the Estimated Adjustment Payment is positive, *plus* the Estimated Adjustment Payment.

Section 1.9 "<u>Burgundy Benefit Plan</u>" has the meaning set forth in the Merger Agreement.

Section 1.10 "<u>Burgundy Commitment Letter</u>" has the meaning set forth in the Merger Agreement.

- 4 -

PPG102861

Section 1.11 "<u>Burgundy Disqualifying Action</u>" has the meaning set forth in the Tax Matters Agreement.

Section 1.12 "<u>Burgundy Group</u>" means Burgundy and each of its Subsidiaries, but excluding any member of the Spinco Group.

Section 1.13 "<u>Burgundy Indemnitees</u>" means Burgundy, each member of the Burgundy Group, and all Persons who are or have been stockholders, directors, partners, managers, managing members, officers, agents or employees of any member of the Burgundy Group (in each case, in their respective capacities as such) or, in the event the TCI Interests are transferred to Spinco at or prior to the Business Transfer Time, TCI, in each case, together with their respective heirs, executors, administrators, successors and assigns.

Section 1.14 "<u>Burgundy Related Letter</u>" has the meaning set forth in the Merger Agreement.

Section 1.15 "<u>Business Day</u>" means any day, other than a Saturday, Sunday or another day on which commercial banking institutions in New York State are authorized or required by Law to be closed.

Section 1.16 "<u>Calcasieu Estuary</u>" means the entire area set forth in the map attached as Schedule 1.16.

Section 1.17 "<u>Claims-Made Policies</u>" means policies issued to Burgundy or its Affiliates by insurers on or after July 1, 1986, on a "claims made" or "occurrence reported" basis, that actually or potentially cover claims, lawsuits, or liabilities for which Burgundy seeks indemnification under this Agreement.

Section 1.18 "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

Section 1.19 "<u>Consent</u>" and "<u>Consents</u>" means any consents, waivers or approvals from, or notification requirements to, or authorizations by, any third parties.

Section 1.20 "<u>Contract</u>" or "<u>agreement</u>" means any loan or credit agreement, note, bond, indenture, mortgage, deed of trust, lease, sublease, franchise, permit, authorization, license, contract, instrument or other commitment, obligation or arrangement, whether written or oral, that is binding on any Person or any part of its property under applicable Law, other than any Burgundy Benefit Plan or Grizzly Benefit Plan, and the term "<u>Contractual</u>" shall have the correlative meaning.

Section 1.21 "<u>Debt Exchange</u>" has the meaning set forth in the Merger Agreement.

Section 1.22 "<u>Distribution Date</u>" means the date selected by the Board of Directors of Burgundy or its designee for the Distribution, through a One-Step Spin-Off or an Exchange Offer followed by the Clean-Up Spin-Off (if necessary).

- 5 -

PPG102862

Section 1.23 "Eagle Business" means the chlor-alkali, derivatives and other commodity or other chemicals business, as operated at, or at any time prior to, the Business Transfer Time, at or in respect of the Spinco Active Sites which business currently produces chlorine, caustic soda and related chemicals for use in chemical manufacturing, pulp and paper production, water treatment, plastics production, agricultural products, pharmaceuticals and other applications; provided that, notwithstanding the foregoing, the "Eagle Business" shall include any discontinued chlor-alkali, derivatives and other commodity or other chemical products manufactured by Burgundy or its Affiliates at any Spinco Active Site at any time prior to the Business Transfer Time. For the avoidance of doubt, the Eagle Business includes the production of any products manufactured at a Spinco Active Site and also at a Spinco Inactive Site, including the production of perchlorethylene or trichlorethylene by Burgundy and its Affiliates.

Section 1.24 "Effective Time" has the meaning set forth in the Merger Agreement.

Section 1.25 "Employee Matters Agreement" means the Employee Matters Agreement entered into on the date of this Agreement, by and among Burgundy, Grizzly and Spinco.

Section 1.26 "Environmental Conditions" means the presence in the environment, including the land surface or subsurface strata, groundwater, sediment, surface water or indoor and ambient air, of any Hazardous Materials.

Section 1.27 "Environmental Laws" means all Laws of any Governmental Authority that relate to pollution or the protection, clean up or restoration of the environment (including indoor and ambient air, surface water, ground water, sediment, land surface or subsurface strata) including the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("CERCLA"), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.) ("CWA"), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq., as amended) ("RCRA"), the Safe Drinking Water Act (21 U.S.C. § 349, 42 U.S.C. §§ 201, 300f) ("SDWA"), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) ("TSCA"), the Clean Air Act (42 U.S.C. § 7401 et seq.) ("CAA"), the Oil Pollution Act of 1990 ("OPA"), and any similar state or local Laws or any other binding legal obligation in effect now or in the future relating to the release of Hazardous Materials, or otherwise relating to the treatment, storage, disposal, transport or handling of Hazardous Materials, or to the exposure of any individual to a release of Hazardous Materials.

Section 1.28 "Exchange Act" has the meaning set forth in the Merger Agreement.

Section 1.29 "Final Determination" has the meaning set forth in the Tax Matters Agreement.

- 6 -

Section 1.30 "Governmental Approvals" means any notices, reports or other filings to be made to, or any Consents, registrations, permits or authorizations to be obtained from, any Governmental Authority.

Section 1.31 "Governmental Authority" means any federal, state, local or foreign court, administrative agency, official board, bureau, governmental or quasi-governmental entities having competent jurisdiction over Burgundy or Spinco, any of their respective Subsidiaries and any other tribunal or commission or other governmental department, authority or instrumentality or any subdivision, agency, mediator, commission or authority of competent jurisdiction.

Section 1.32 "Grizzly Benefit Plan" has the meaning set forth in the Merger Agreement.

Section 1.33 "Grizzly Group" means Grizzly and each of its Subsidiaries, including, after the Effective Time, the Spinco Group.

Section 1.34 "Group" means the Burgundy Group, the Spinco Group or the Grizzly Group, as the context requires.

Section 1.35 "Hazardous Material" means any substance that is listed, defined, designated or classified as, or otherwise determined to be, hazardous, radioactive, infectious, reactive, corrosive, ignitable, flammable or toxic or a pollutant or a contaminant or is otherwise subject to regulation, control or Remediation under any Environmental Law.

Section 1.36 "Indemnifying Party" means any Party that may be obligated to provide indemnification to an Indemnitee pursuant to Article V hereof or any other section of this Agreement or any Ancillary Agreement.

Section 1.37 "Indemnitee" means any Person that may be entitled to indemnification from an Indemnifying Party pursuant to Article V hereof or any other section of this Agreement or any Ancillary Agreement.

Section 1.38 "Information" means information in written, oral, electronic or other tangible or intangible form, stored in any medium, including studies, reports, records, books, Contracts, instruments, surveys, discoveries, ideas, concepts, know-how, techniques, designs, specifications, drawings, blueprints, diagrams, models, prototypes, samples, flow charts, data, computer data, disks, diskettes, tapes, computer programs or other software, marketing plans, customer names, communications by or to attorneys (including attorney-client privileged communications), memos and other materials prepared by attorneys or under their direction (including attorney work product), and other technical, financial, employee or business information or data, but in any case excluding back-up tapes.

Section 1.39 "Insurance Proceeds" means those monies: (i) received by an insured from an insurance carrier; or (ii) paid by an insurance carrier on behalf of the insured.

Section 1.40 "Intellectual Property Rights" means, in any and all jurisdictions throughout the world, all (i) inventions and discoveries (whether or not patentable or reduced to

- 7 -

PPG102864

practice), patents, patent applications, invention disclosures, and statutory invention registrations, including reissues, divisionals, provisionals, continuations, continuations-in-part, extensions, utility models, design patents and reexaminations thereof, (ii) trademarks, service marks, domain names, uniform resource locators, trade dress, slogans, logos, symbols, trade names, brand names and other identifiers of source or goodwill, including registrations and applications for registration thereof and including the goodwill symbolized thereby or associated therewith (the items in this clause (ii) being referred to collectively herein as "Trademarks"), (iii) published and unpublished works of authorship, whether copyrightable or not, copyrights therein and thereto, registrations, applications, renewals and extensions therefor, industrial designs, mask works, and any and all rights associated therewith, (iv) computer data, computer programs or other software, and databases, in each case whether in source code, object code or other form, and all related documentation, (v) all information to the extent not included in clauses (i)-(iv), such as data, trade secrets, processes, procedures, methods, techniques, compositions, formulas, ingredients, product specifications, mold specifications, drawings, sketches, designs, structural shaping, manufacturing techniques, material specifications, process specifications, engineering specifications, and the like, and all rights to limit the use or disclosure thereof, (vi) rights of privacy and publicity, (vii) any and all other proprietary rights or property similar to any of the foregoing in any jurisdiction, whether registered or not registered, together with the right to apply for the registration of any such rights, and all rights or forms of protection having equivalent or similar effect, in any jurisdiction, and (viii) any and all other intellectual property under the Laws of any country throughout the world.

Section 1.41 "IRS" means the U.S. Internal Revenue Service.

Section 1.42 "Law" means any federal, state, local or foreign law, statute, code, ordinance, rule, regulation, judgment, order, injunction, decree, arbitration award, agency requirement, license or permit of any Governmental Authority.

Section 1.43 "Liabilities" means all debts, liabilities, guarantees, assurances, commitments and obligations, whether fixed, contingent or absolute, asserted or unasserted, matured or unmatured, liquidated or unliquidated, accrued or not accrued, known or unknown, due or to become due, whenever or however arising (including whether arising out of any Contract or tort based on negligence or strict liability) and whether or not the same would be required by U.S. Generally Accepted Accounting Principles to be reflected in financial statements or disclosed in the notes thereto.

Section 1.44 "Losses" means liabilities, damages, penalties, judgments, assessments, losses, costs and expenses in any case, whether arising under strict liability or otherwise (including reasonable attorneys' fees); provided, however, that with respect to claims made hereunder by (i) any member of the Burgundy Group, on the one hand, against any member of the Spinco Group, on the other hand, or (ii) by any member of the Spinco Group, on the one hand, against any member of the Burgundy Group, on the other hand (collectively, "Direct Claims"), "Losses" will not include attorneys' fees or other arbitration or litigation expenses (including without limitation experts' fees and administrative costs) incurred in connection with the prosecution of such Direct Claim under the provisions set forth in Section 7.14 and (b) "Losses" will not include any punitive, exemplary, special, or similar damages in excess of compensatory damages, except to the extent awarded by a court of competent jurisdiction in connection with a Third-Party Claim.

- 8 -

PPG102865

Section 1.45 "Natrium Excess Land" means the area described in the map attached hereto as Schedule 1.45.

Section 1.46 "Natural Resource Damages" means damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which are recoverable by a United States Trustee, a State Trustee, an Indian tribe trustee, or a foreign trustee pursuant to CERCLA, CWA, OPA or a counterpart state statute.

Section 1.47 "Necessary Licenses" means those Intellectual Property Rights that are (i) licensed to the Burgundy Group pursuant to a Shared Contract; (ii) used to conduct the Spinco Business prior to the Business Transfer Time; and (iii) necessary to conduct the Spinco Business in substantially the same manner as conducted immediately prior to the Business Transfer Time.

Section 1.48 "Non-Spinco Business" means all businesses and operations (whether or not such businesses or operations are or have been terminated, divested or discontinued) conducted prior to the Business Transfer Time by Burgundy, the Burgundy Subsidiaries, Spinco or the Spinco Subsidiaries, in each case, that are not included in the Eagle Business.

Section 1.49 "Ohio River" means the river, riverbottom and riverbank of the Ohio River to the normal high water mark depicted on the maps attached to Schedule 2.5(b)(ii). For the avoidance of doubt, the maps attached to Schedule 2.5(b)(ii) are only for the purpose of delineating the normal high water mark for the portion of the Ohio River delineated thereon.

Section 1.50 "Order" means any order, judgment, injunction, award, decree, writ or other legally enforceable requirement handed down, adopted or imposed by, including any consent decree, settlement agreement or similar written agreement with, any Governmental Authority.

Section 1.51 "Parties" means Burgundy and Spinco and, for purposes of the obligations in Section 5.2, the Spinco Group.

Section 1.52 "Person" means a natural person, corporation, company, joint venture, individual business trust, trust association, partnership, limited partnership, limited liability company or other entity, including a Governmental Authority.

Section 1.53 "Policies" means all insurance policies, insurance Contracts and claim administration Contracts of any kind of Burgundy and its Subsidiaries (including members of the Spinco Group) and their predecessors which were or are in effect at any time at or prior to the Business Transfer Time, including commercial general liability, automobile liability, workers' compensation and employer's liability, excess and umbrella liability, aircraft hull and liability, commercial crime (including ERISA bond), property and business interruption, directors' and officers' liability, fiduciary liability, errors and omissions, special accident, environmental, inland and marine, and captive insurance company arrangements, together with all rights, benefits and privileges thereunder.

- 9 -

Section 1.54 "Real Estate Approvals" means all Governmental Approvals associated with the subdivision of any Real Property that is a Spinco Asset from Real Property that is an Excluded Asset and the Conveyance of such Real Property that is a Spinco Asset to Spinco as contemplated by this Agreement, including without limitation any zoning variances, approvals or other relief from the strict requirements of any applicable zoning, subdivision or land development ordinance associated therewith.

Section 1.55 "Real Property" means land together with all easements, rights and interests arising out of the ownership thereof or appurtenant thereto and improvements thereon.

Section 1.56 "Record Date" means the close of business on the date to be determined by Burgundy's Board of Directors as the record date for determining stockholders of Burgundy entitled to receive shares of Spinco Common Stock in the Distribution, to the extent the Distribution is effected through a One-Step Spin-Off, or in connection with any Clean-Up Spin-Off.

Section 1.57 "Record Holders" means the holders of record of Burgundy Common Stock as of the close of business on the Record Date.

Section 1.58 "Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment, including the abandonment or discarding of barrels, containers, and other closed receptacles containing Hazardous Materials.

Section 1.59 "Remediation" means Actions required by a Governmental Authority to clean up, abate, remove, or control Releases of Hazardous Materials into the environment in order to protect public health or the environment pursuant to applicable Environmental Laws, including Actions to study, investigate, monitor and assess such Releases but, for the avoidance of doubt, shall not include any Actions which may be required to address Natural Resource Damages with respect to the Calcasieu Estuary.

Section 1.60 "Securities Act" has the meaning set forth in the Merger Agreement.

Section 1.61 "Security Interest" means any mortgage, security interest, pledge, lien, charge, claim, option, indenture, right to acquire, right of first refusal, deed of trust, licenses to third parties, leases to third parties, security agreements, voting or other restriction, right-of-way, covenant, condition, easement, encroachment, restriction on transfer, or other encumbrance and other restrictions or limitations on use of real or personal property of any nature whatsoever.

Section 1.62 "Shared Burgundy IP" means all Intellectual Property Rights which are (i) owned or controlled by the Burgundy Group as of the Business Transfer Time and not included in the Spinco Assets; (ii) used to conduct the Spinco Business prior to the Business Transfer Time; and (iii) necessary to conduct the Spinco Business in substantially the same manner as conducted immediately prior to the Business Transfer Time; provided, however, that the Shared Burgundy IP will exclude any Trademarks, including the trademarks and domain names listed on Schedule 2.4(b)(i).

- 10 -

PPG102867

Section 1.63 "Shared Contracts" means the Contracts listed on Schedule 1.63 and any other Contract that relates to both (a) the Eagle Business and (b) the Non-Spinco Business.

Section 1.64 "Shared Information" means (a) all Information provided by any member of the Spinco Group to a member of the Burgundy Group prior to the Business Transfer Time, and (b) any Information in the possession or under the control of such respective Group that relates to the operation of the Eagle Business prior to the Business Transfer Time and that the requesting Party reasonably needs (i) to comply with reporting, disclosure, filing or other requirements imposed on the requesting Party (including under applicable securities and tax Laws) by a Governmental Authority having jurisdiction over the requesting Party, (ii) for use in any other judicial, regulatory, administrative or other proceeding or in order to satisfy audit, accounting, claims, regulatory, litigation or other similar requirements, in each case other than claims or allegations that one Party to this Agreement has against the other, (iii) subject to the foregoing clause (ii) above, to comply with its obligations under this Agreement, the Merger Agreement or any Ancillary Agreement, or (iv) to the extent such Information and cooperation is necessary to comply with such reporting, filing and disclosure obligations, for the preparation of financial statements or completing an audit, and as reasonably necessary to conduct the ongoing businesses of Burgundy or Spinco, as the case may be.

Section 1.65 "Shared Spinco IP" means all Intellectual Property Rights which are (i) included in the Spinco Assets; (ii) used to conduct the Burgundy Group's business prior to the Business Transfer Time; and (iii) necessary to conduct the Burgundy Group's business in substantially the same manner as conducted immediately prior to the Business Transfer Time; provided, however, that the Shared Spinco IP will exclude any Trademarks, including the trademarks and domain names listed on Schedule 2.4(b)(i).

Section 1.66 "Spinco Business" means the Eagle Business and also, with respect to events that take place after the Business Transfer Time, the Eagle Business as it is operated by the Spinco Group or the Grizzly Group after the Business Transfer Time, including any new activities, expansions, or other modifications made to the Spinco Assets acquired at the Business Transfer Time.

Section 1.67 "Spinco Commitment Letter" has the meaning set forth in the Merger Agreement.

Section 1.68 "Spinco Exchange Debt" has the meaning set forth in the Merger Agreement.

Section 1.69 "Spinco Employees" has the meaning set forth in the Employee Matters Agreement

Section 1.70 "Spinco Facility" means any facility located on a Spinco Active Site.

- 11 -

PPG102868

Section 1.71 "Spinco Group" means Spinco and each of its Subsidiaries. The Grizzly Group will be deemed to be members of the Spinco Group as of the Effective Time.

Section 1.72 "Spinco Inactive Sites" means any and all Real Property owned, leased or operated prior to the Business Transfer Time by Burgundy or its Affiliates (including the Spinco Group) relating to the Eagle Business, other than (i) the Spinco Active Sites and (ii) other Real Property expressly identified in this Agreement or any Ancillary Agreement as Assets to be acquired by any member of the Spinco Group.

Section 1.73 "Spinco Indemnitees" means Spinco, each member of the Spinco Group, and all Persons who are or have been stockholders, directors, partners, managers, managing members, officers, agents or employees of any member of the Spinco Group (in each case, in their respective capacities as such), in each case, together with their respective heirs, executors, administrators, successors and assigns.

Section 1.74 "Spinco Related Letter" has the meaning set forth in the Merger Agreement.

Section 1.75 "Spinco Securities" has the meaning set forth in the Merger Agreement.

Section 1.76 "Subsidiary" means, with respect to any Person, a corporation, partnership, association, limited liability company, trust or other form of legal entity in which such Person, a Subsidiary of such Person or such Person and one or more Subsidiaries of such Person, directly or indirectly, has either (i) a majority ownership in the equity thereof, (ii) the power, under ordinary circumstances, to elect, or to direct the election of, a majority of the board of directors or other analogous governing body of such entity, or (iii) the title or function of general partner or manager, or the right to designate the Person having such title or function; provided, however, that TCI shall not be deemed a Subsidiary of Burgundy.

Section 1.77 "Target Working Capital Amount" means the sum of the Target Working Capital Amount Excluding TCI *plus*, in the event the TCI Interests are Conveyed to Spinco at or prior to the Business Transfer Time, the TCI Target Working Capital Amount multiplied by 60%.

Section 1.78 "Target Working Capital Amount Excluding TCI" means 9.18% (as adjusted pursuant to Schedule 3.7(a)) of the annualized quarterly sales of the Eagle Business for the latest quarter ending on or before the Effective Time, excluding TCI, as calculated in accordance with Schedule 3.7(a).

Section 1.79 "Tax" or "Taxes" has the meaning set forth in the Tax Matters Agreement.

Section 1.80 "Tax Return" has the meaning set forth in the Tax Matters Agreement.

Section 1.81 "Taxing Authority" has the meaning set forth in the Merger Agreement.

- 12 -

PPG102869

Section 1.82 "TCI" means Taiwan Chlorine Industries, Ltd., a Taiwanese corporation.

Section 1.83 "TCI Agreement" means that certain Agreement, dated December 12, 1986 by and between Burgundy and China Petrochemical Development Corporation.

Section 1.84 "TCI Basis" means $12 million.

Section 1.85 "TCI Interests" means all shares of TCI owned by Burgundy as of immediately prior to the Business Transfer Time.

Section 1.86 "TCI Target Working Capital Amount" means $4.5 million.

Section 1.87 "TCI Value" has the meaning set forth in Schedule 1.87.

Section 1.88 "Transactions" has the meaning set forth in the Tax Matters Agreement.

Section 1.89 "Working Capital" means the sum of the "Adjusted Working Capital Before Normalization Adjustments" of the Eagle Business as set forth on and calculated in accordance with, Schedule 3.7(b) *plus*, in the event the TCI Interests are Conveyed to Spinco at or prior to the Business Transfer Time, 60% of the (a) sum of (i) the "Adjusted Working Capital" of TCI as set forth on and calculated in accordance with, Schedule 3.7(c) *plus* (ii) any cash or cash equivalents at TCI, *less* (b) any debt at TCI. Working capital will be comprised of the components set forth on and calculated in accordance with the Accounting Exhibit.

### TERMS DEFINED IN THIS AGREEMENT

| Defined Term | Section |
|---|---|
| Accounting Firm | Section 3.7(c) |
| Adjustment Payment | Section 3.7(e) |
| Agreement | Preamble |
| Asbestos Exposure Claim | Section 2.5(b)(ix) |
| Assigned Domains | Section 6.6 |
| Burgundy | Preamble |
| Burgundy Accounts | Section 2.11 |
| Burgundy Common Stock | Recitals |
| Burgundy Objection | Section 3.7(b) |
| Burgundy Transfer Documents | Section 3.5 |
| Business Transfer Date | Section 3.1 |
| Business Transfer Time | Section 3.1 |
| CAA | Section 1.27 |
| CERCLA | Section 1.27 |
| Chlorine and Liquid Caustic Soda Sales Agreement (Barberton) | Section 3.4(a)(ix) |
| Claims Notice | Section 5.5(b)(i) |
| Clean-Up Spin-Off | Recitals |
| Closing Adjustment Statement | Section 3.7(a) |

- 13 -

PPG102870

| | |
|---|---|
| Contribution | Recitals |
| Convey | Section 2.1(a) |
| Covered Claim | Section 7.14(a) |
| CWA | Section 1.27 |
| Direct Claims | Section 1.44 |
| Distribution | Recitals |
| Distribution Tax Opinion | Section 3.2(c) |
| Election Notice | Section 6.12(a) |
| Electric Generation, Distribution and Transmission Facilities Lease | Section 3.4(a)(iii) |
| Estimated Adjustment Payment | Section 3.7(a) |
| Estimated Closing Adjustment Statement | Section 3.7(a) |
| Exchange Offer | Recitals |
| Excluded Assets | Section 2.4(b) |
| Excluded Environmental Liabilities | Section 2.5(b)(iii) |
| Excluded IP Assets | Section 2.4(b)(i) |
| Excluded Liabilities | Section 2.5(b) |
| Excluded Spinco Sites | Section 2.4(b)(iv) |
| Final Closing Adjustment Statement | Section 3.7(d) |
| First Refusal Right | Section 6.12(a) |
| Grizzly | Recitals |
| Guarantee Release | Section 2.10(b) |
| Hydrochloric Acid Sales Agreement | Section 3.4(a)(xi) |
| Hydrochloric Acid Sales Agreement - Lake Charles (Silica) | Section 3.4(a)(viii) |
| Intercompany Accounts | Section 2.6(c) |
| IRS D Reorganization Ruling | Recitals |
| IRS Debt Exchange Ruling | Recitals |
| Liquid Caustic Soda Sales Agreement (Fresno) | Section 3.4(a)(vi) |
| Liquid Caustic Soda Sales Agreement (Strongsville) | Section 3.4(a)(vii) |
| Liquid Caustic Soda Sales Agreement (Wichita Falls) | Section 3.4(a)(x) |
| Litigation Conditions | Section 5.5(b)(ii) |
| Master Terminal Agreement | Section 3.4(a)(xi) |
| Merger | Recitals |
| Merger Agreement | Recitals |
| Natrium Excess Land Agreement | Section 6.12(b) |
| Offer Notice | Section 6.12(a) |
| Ohio River/Calcasieu Estuary Liabilities | Section 2.5(b)(ii) |
| One-Step Spin-Off | Recitals |
| OPA | Section 1.27 |
| Plan of Reorganization | Section 2.1 |
| Private Letter Ruling | Recitals |
| Privileged Information | Section 6.3(a) |
| Privileges | Section 6.3(a) |
| RCRA | Section 1.27 |
| Recapitalization | Recitals |
| Registrable IP | Section 2.4(a)(vi) |
| Response Period | Section 6.12(a) |

- 14 -

PPG102871

| | |
|---|---|
| SDWA | Section 1.27 |
| Servitude Agreement | Section 3.4(a)(v) |
| Shared Burgundy IP License | Section 6.9(b) |
| Shared Facilities Agreement (Monroeville) | Section 3.4(a)(xi) |
| Shared Facilities, Services and Supply Agreement | Section 3.4(a)(iv) |
| Shared Spinco IP License | Section 6.9(a) |
| Special Above Basis Debt/Cash Distribution | Section 3.3(a)(ii) |
| Special Below Basis Cash Distribution | Section 3.3(a)(ii) |
| Special Distribution | Section 3.3(a)(ii) |
| Spinco | Preamble |
| Spinco Accounts | Section 2.11(a) |
| Spinco Active Sites | Section 2.4(a)(ii) |
| Spinco Assets | Section 2.4(a) |
| Spinco Books and Records | Section 2.4(a)(vii) |
| Spinco Common Stock | Recitals |
| Spinco Contracts | Section 2.4(a)(iv) |
| Spinco Entities | Section 2.4(a)(iii) |
| Spinco Entity Interests, | Section 2.4(a)(iii) |
| Spinco Financing Arrangements | Recitals |
| Spinco Information | Section 6.3(b) |
| Spinco Inventory | Section 2.5(a) |
| Spinco Liabilities | Section 2.5(a) |
| Spinco Registration Statement | Section 4.4(a) |
| Spinco Reorganization | Recitals |
| Spinco Stock Issuance | Section 3.3(a)(i) |
| Spinco Transfer Documents | Section 3.6 |
| Tax Matters Agreement | Section 3.4(a)(i) |
| Temporary Lease Agreement | Section 2.7(f) |
| Third-Party Claim | Section 5.5(b)(i) |
| Trademarks | Section 1.40 |
| Transfer Documents | Section 3.6 |
| Transition Services Agreement | Section 3.4(a)(ii) |
| TSCA | Section 1.27 |
| Unassigned Domains | Section 6.7 |

## ARTICLE II

### THE SPINCO REORGANIZATION

Section 2.1 Transfer of Spinco Assets; Assumption of Spinco Liabilities. Except as provided in Section 2.7(b), subject to the terms of this Agreement and effective as of the Business Transfer Time, in accordance with the plan and structure set forth on Schedule 2.1 (such plan and structure being referred to herein as the "Plan of Reorganization") and to the extent not previously effected pursuant to the steps of the Plan of Reorganization:

(a) Burgundy will assign, transfer, convey and deliver ("Convey") (or will cause any applicable Subsidiary to Convey) to Spinco the equity interests in the Spinco Entities that are to be held directly by Spinco and, as set forth in the Plan of Reorganization, to the applicable Spinco Entity, the other Spinco Assets, and Spinco will accept from Burgundy (or the applicable Subsidiary of Burgundy) (or will cause any applicable Spinco Entity to accept) all of Burgundy's and its applicable Subsidiaries' respective direct or indirect right, title and interest in and to all Spinco Assets (other than any Spinco Assets that are already held as of the Business Transfer Time by a Spinco Entity, which Spinco Assets will continue to be held by such Spinco Entity); and

- 15 -

(b) Burgundy will Convey (or will cause any applicable Subsidiary to Convey) to a Spinco Entity other than Spinco, and such Spinco Entity will assume, perform, discharge and fulfill when due and, to the extent applicable, comply with all of the Spinco Liabilities, in accordance with their respective terms (other than any Spinco Liabilities that as of the Business Transfer Time are already Liabilities of a Spinco Entity, which Spinco Liabilities will continue to be Liabilities of such Spinco Entity).

Section 2.2 Transfer of Excluded Assets; Assumption of Excluded Liabilities. Except as provided in Section 2.7(b), subject to the terms of this Agreement and prior to the Business Transfer Time, in accordance with the Plan of Reorganization and to the extent not previously effected pursuant to the steps of the Plan of Reorganization:

(a) Burgundy will cause any applicable member or members of the Spinco Group to Convey to Burgundy or, to the extent set forth in the Plan of Reorganization, a Subsidiary of Burgundy, and Burgundy will accept from such applicable member or members of the Spinco Group (or will cause any applicable Subsidiary of Burgundy to accept) all of such member's or members' direct or indirect right, title and interest in and to all Excluded Assets; and

(b) Burgundy will cause any applicable member or members of the Spinco Group to Convey to Burgundy or, to the extent set forth in the Plan of Reorganization, a Subsidiary of Burgundy, and Burgundy will assume, perform, discharge and fulfill when due, and to the extent applicable, comply with (or will cause the applicable Subsidiary of Burgundy to assume, satisfy, perform, discharge and fulfill when due, and to the extent applicable, comply with) all of the Excluded Liabilities (including any Liabilities of a Spinco Subsidiary that are Excluded Liabilities), in accordance with their respective terms.

Section 2.3 Misallocated Transfers. Other than the TCI Interests, the treatment of which shall be governed by Section 2.7(e), in the event that at any time or from time to time (whether prior to, at or after the Business Transfer Time), either Party (or any member of the Burgundy Group or the Spinco Group, as applicable) is the owner of, receives or otherwise comes to possess any Asset (including the receipt of payments made pursuant to Contracts and proceeds from accounts receivable) or Liability that is allocated to any Person that is a member of the other Group pursuant to this Agreement or any Ancillary Agreement (except in the case of any acquisition of Assets from the other Party for value subsequent to the Business Transfer Time), such Party will promptly transfer, or cause to be transferred, such Asset or Liability to the Person so entitled thereto or responsible therefor. Prior to any such transfer, such Asset or Liability will be held in accordance with Section 2.7 (d).

- 16 -

PPG102873

Section 2.4 <u>Spinco Assets; Excluded Assets</u>.

(a) For purposes of this Agreement, "<u>Spinco Assets</u>" means in each case all of Burgundy's and its Affiliates' rights, title and interests in and to the following Assets except as otherwise set forth below and in each case subject to <u>Section 2.4(b)</u>:

(i) all inventories of materials, parts, raw materials, packaging materials, stores, supplies, work-in-process, goods in transit, and finished goods and products that are, in each case, used or held for use primarily in the Eagle Business (the "<u>Spinco Inventory</u>");

(ii) all Real Property listed or described on Schedule 2.4(a)(ii) (the "<u>Spinco Active Sites</u>");

(iii) all issued and outstanding capital stock of, or other equity interests in, the Subsidiaries of Burgundy listed or described on Schedule 2.4(a)(iii)(1) (such stock or other equity interests, the "<u>Spinco Entity Interests</u>," and such Subsidiaries, the "<u>Spinco Entities</u>") and, subject to <u>Section 2.7(e)</u> with respect to the TCI Interests, all capital stock or other equity interests owned by Burgundy that are listed on Schedule 2.4(a)(iii)(2);

(iv) (A) all Contracts that are related primarily to the Eagle Business (including Shared Contracts that are related primarily to the Eagle Business, subject to Section 2.7(c)) and all interests, rights, claims and benefits of Burgundy and any of its Subsidiaries pursuant to and associated therewith and (B) to the extent provided in <u>Section 2.7(c)</u>, the Contracts for the sole benefit of Spinco into which the Shared Contracts are separated (collectively, the "<u>Spinco Contracts</u>");

(v) Subject to Section 2.7, all approvals, consents, franchises, licenses, permits, registrations, authorizations and certificates or other rights issued or granted by any Governmental Authority and all pending applications therefor that are, in each case, used primarily in, or held primarily for the benefit of, the Eagle Business;

(vi) (A) all patents, patent applications, statutory invention registrations, registered trademarks, registered service marks, registered Internet domain names and copyright registrations (collectively, "<u>Registrable IP</u>") that are, in each case, used or held for use primarily in the Eagle Business, including the Registrable IP listed or described on Schedule 2.4(a)(vi), and (B) all Intellectual Property Rights, other than Registrable IP, that is used or held for use primarily in the Eagle Business;

- 17 -

PPG102874

(vii) (A) all business records related primarily to the Eagle Business, including the minute and other record books and related stock and equity interests records of the Spinco Entities and all employment records related primarily to the Spinco Employees, and (B) all other books, records, ledgers, files, documents, correspondence, lists, plats, drawings, photographs, product literature (including historical), advertising and promotional materials, distribution lists, customer lists, supplier lists, studies, market and product share data (including historical), reports, operating, production and other manuals, manufacturing and quality control records and procedures, research and development files, and accounting and business books, records, files, documentation and materials, in all cases whether in paper, microfilm, microfiche, computer tape or disc, magnetic tape or any other form, in each case that are related primarily to the Eagle Business (collectively, the "Spinco Books and Records"); provided, that (1) Burgundy will be entitled to retain a copy of the Spinco Books and Records, which will be subject to the provisions of Section 6.2(f); (2) neither clause (A) nor (B) will be deemed to include any books, records or other items with respect to which it is not reasonably practicable to identify and extract the portion thereof related primarily to the Eagle Business from the portions thereof that relate primarily to businesses of Burgundy other than the Eagle Business provided, however, that the portion of such books, records and other items that are retained by the Burgundy Group that are related primarily to the Eagle Business will be deemed to be Shared Information; (3) neither clause (A) nor (B) will be deemed to include any tangible copies of books, records or other items unless they are being kept at either a Spinco Facility or a third party storage facility covered by a Spinco Contract; provided, however, that such tangible books, records and other items related primarily to the Eagle Business that are retained by the Burgundy Group will be deemed to be Shared Information; (4) to the extent required to satisfy Burgundy's legal or other obligations, Burgundy will be entitled to retain original copies of the Spinco Books and Records, which will be subject to the provisions of Section 6.2(f), and will provide Spinco with a copy of all such retained Spinco Books and Records; and (5) the Transition Services Agreement will govern the delivery to Spinco of any such books, records or other items that are maintained in electronic form;

(viii) all rights in all telephone, mobile telephone and fax numbers and post office boxes, in each case, used or held for use primarily in the Eagle Business; all websites maintained primarily for the Eagle Business and the content, information and databases contained therein (other than any Excluded IP Assets contained therein); and all uniform product codes and other similar data identifiers used or held for use primarily in the Eagle Business;

(ix) all cash and cash equivalents in the Spinco Accounts not withdrawn prior to the Business Transfer Time;

(x) all trade accounts, notes receivable and other receivables arising from the sale or other disposition of goods, or the performance of services, by the Eagle Business;

- 18 -

PPG102875

(xi) all prepaid expenses, prepaid property taxes, security deposits, credits, deferred charges, advanced payments that are, in each case, related primarily to the Eagle Business (other than prepaid insurance premiums, deposits, security or other prepaid amounts in connection with workers' compensation and other Policies related to Excluded Liabilities);

(xii) all rights with respect to third party warranties and guaranties that are, in each case, related primarily to the Eagle Business and all related claims, credits, rights of recovery and other similar rights as to such third parties;

(xiii) all rights to causes of Action, lawsuits, judgments, claims and demands that are, in each case, related primarily to the Eagle Business, including those listed or described on Schedule 2.4(a)(xiii) but, for the avoidance of doubt, not including any counter-claims in connection with an underlying claim that is not related primarily to the Eagle Business;

(xiv) all computers and other electronic data processing equipment, fixtures, machinery, equipment, furniture, office equipment, motor vehicles and other transportation equipment, special and general tangible tools, prototypes, models, and other tangible personal property that are, in each case, used or held for use primarily in the Eagle Business, including those listed or described in Schedule 2.4 (a)(xiv);

(xv) Burgundy's fee and/or leasehold interest, as applicable, in and to the Starks and Sulphur Mines Salt Dome Facilities in Calcasieu Parish, Louisiana which service the Eagle Business at the Lake Charles site (including any and all personal property, pipelines and other equipment owned by Burgundy in connection therewith);

(xvi) Burgundy's fee and/or leasehold interest, as applicable, in and to the Orange Line ethylene pipeline which services the Eagle Business at the Lake Charles site (including the Real Property and equipment (including any and all personal property, pipelines and other equipment owned by Burgundy in connection therewith); the licenses retained by each member of the Spinco Group pursuant to Section 6.9(b); and

(xvii) all assets expressly identified in this Agreement or any Ancillary Agreement as assets to be acquired by any member of the Spinco Group hereunder or thereunder; and any and all other Assets (other than Excluded Assets) owned by Burgundy or any of its Subsidiaries that are used or held for use primarily in, or related primarily to, the Eagle Business. The intention of this clause (xvii) is only to rectify any inadvertent omission of Conveyance of any Assets that, had the Parties given specific consideration to such Asset as of the date of this Agreement, would have otherwise been classified as a Spinco Asset. No Asset will be deemed a Spinco Asset solely as a result of this clause (xvii) unless a claim with respect thereto is made by Spinco on or prior to the two-year anniversary of the Distribution Date.

- 19 -

PPG102876

A single Asset may fall within more than one of clauses (i) through (xviii) in this Section 2.4(a); such fact does not imply that (x) such Asset must be Conveyed more than once or (y) any duplication of such Asset is required. The fact that an Asset may be excluded under one clause does not imply that it is not intended to be included under another.

(b) Notwithstanding the foregoing clause (a), the Spinco Assets will not in any event include any of the following Assets (the "Excluded Assets"):

(i) any Intellectual Property Rights in which the Burgundy Group or the Spinco Group has any right, title or interest, other than Intellectual Property used or held for use primarily in the Eagle Business (the "Excluded IP Assets"). For the avoidance of doubt, the Excluded IP Assets include, but are not limited to, the registered and unregistered rights in the name(s), trademarks, and domain names listed on Schedule 2.4(b)(i) and any Intellectual Property Rights related to titanium dioxide or to the development, production, manufacture or finishing of titanium dioxide products;

(ii) any cash or cash equivalents withdrawn from any Spinco Accounts prior to the Business Transfer Time;

(iii) any dividends declared by TCI, PHH Monomers, LLC and RS Cogen, LLC prior to the Business Transfer Time but not yet paid as of the Business Transfer Time, except to the extent included as assets in Working Capital;

(iv) except to the extent provided in Section 6.11, all insurance policies, binders and claims and rights thereunder and all prepaid insurance premiums;

(v) all Spinco Inactive Sites;

(vi) the Real Property designated as being retained by Burgundy in the sites listed or described on Schedule 2.4(b)(vi) (the "Excluded Spinco Sites");

(vii) all Assets of any member of the Burgundy Group not included in any clauses of Section 2.4(a) above;

(viii) all Assets that are expressly contemplated by this Agreement or any Ancillary Agreement as Assets to be retained by any member of the Burgundy Group; and

(ix) the Assets listed or described on Schedule 2.4(b)(ix).

The Parties acknowledge and agree that neither Spinco nor any of its Subsidiaries will acquire or be permitted to retain any direct or indirect right, title and interest in any Excluded Assets through the Conveyance of the Spinco Entity Interests, and that if any of the Spinco Entities owns, leases or has the right to use any such Excluded Assets, such Excluded Assets must be Conveyed to Burgundy as contemplated by this Agreement.

- 20 -

PPG102877

Section 2.5 <u>Spinco Liabilities</u>. (a) For the purposes of this Agreement, "<u>Spinco Liabilities</u>" means (except as expressly set forth herein, regardless of (1) whether the facts on which such Liabilities are based occurred prior to, at or subsequent to the Business Transfer Time, (2) whether or not such Liabilities are asserted or determined prior to, at or subsequent to the Business Transfer Time, (3) where or against whom such Liabilities are asserted or determined (including any such Liabilities arising out of claims made by Burgundy's or Spinco respective directors, officers, employees, agents, Subsidiaries or Affiliates against any member of the Burgundy Group or the Spinco Group), and (4) whether or not such Liabilities arise from or are alleged to arise from negligence, recklessness, violation of Law, fraud or misrepresentation by any member of the Burgundy Group or the Spinco Group (including any of their respective directors, officers, employees, agents, Subsidiaries or Affiliates)) the following Liabilities except as otherwise set forth below and in each case subject to <u>Section 2.5(b)</u>:

(i) all Liabilities to the extent relating primarily to the Spinco Assets or the Eagle Business;

(ii) all trade and other accounts payable related primarily to the Eagle Business;

(iii) all operating expenses and other current Liabilities (including Liabilities for services and goods for which an invoice has not been received prior to the Business Transfer Time) related primarily to the Eagle Business;

(iv) all Liabilities under the Spinco Contracts including, to the extent provided in <u>Section 2.7(c)</u>, the Contracts for the sole benefit of Spinco into which the Shared Contracts are separated;

(v) all Liabilities arising from commitments (in the form of issued purchase orders or otherwise), quotations, proposals and bids to purchase or acquire raw materials, components, supplies or services related primarily to the Eagle Business;

(vi) all Liabilities arising from commitments (in the form of accepted purchase orders or otherwise), quotations, proposals and bids to sell products or provide services related primarily to the Eagle Business;

(vii) all Liabilities with respect to any return, rebate, discount, credit, recall warranty, customer program, or similar Liabilities relating primarily to products of the Eagle Business;

(viii) all Liabilities for death, personal injury, advertising injury, other injury to persons or property damage relating to past, current or future use of or exposure to any of the products (or any part or component) designed, manufactured, serviced or sold, or services performed, by, or on behalf of, the

- 21 -

Eagle Business, including any such Liabilities for negligence, strict liability, design or manufacturing defect, failure to warn, or breach of express or implied warranties of merchantability or fitness for any purpose or use;

(ix) all Liabilities relating primarily to the Eagle Business or any Spinco Assets to the extent that the same constitutes a past, current or future tort, breach of Contract or violation of, or non-compliance with, any Law or any approval, consent, franchise, license, permit, registration, authorization or certificate or other right issued or granted by any Governmental Authority;

(x) all Liabilities relating to workers' compensation, or claims for occupational health and safety, occupational disease, or occupational injury, or other claim relating to health, safety, disease or injury, with respect to any Spinco Employee or any other Person who is or was employed, hired or engaged by or to provide services to the Eagle Business;

(xi) all Liabilities relating to any Action related primarily to the Eagle Business;

(xii) all Liabilities under the Spinco Financing Arrangements and all other indebtedness for borrowed money of Spinco as of the Distribution Date;

(xiii) all indebtedness to which Burgundy is subject by virtue of its ownership interests in RS Cogen, LLC, PHH Monomers, LLC and, subject to Section 2.7(e), TCI;

(xiv) (A) all Liabilities, known or unknown, for Environmental Conditions relating primarily to activities or operations at any of the Spinco Active Sites, or otherwise existing on or under any of the Spinco Active Sites (including any Release of Hazardous Materials occurring before, at or after the Business Transfer Time that has migrated, is migrating or in the future migrates from any of the Spinco Active Sites) or any violation of Environmental Law arising out of the Eagle Business at any of the Spinco Active Sites; and (B) all Liabilities for Environmental Conditions at any third-party site relating primarily to Hazardous Materials generated by the Spinco Active Sites;

(xv) all Liabilities to the extent arising out of (A) the activities or operations of the Spinco Business or the ownership or use of the Spinco Assets after the Business Transfer Time by any member of the Spinco Group; (B) the activities or operations of any other business conducted by any member of the Spinco Group or the Grizzly Group at any time after the Business Transfer Time (including any Liability relating to, arising out of or resulting from any act or failure to act by any director, officer, employee, agent or representative of any member of the Spinco Group (whether or not such act or failure to act is or was within such Person's authority)) or (C) any of the terminated or discontinued businesses that were operated on Spinco Active Sites;

- 22 -

PPG102879

(xvi) all Liabilities that are expressly provided by this Agreement or any Ancillary Agreement as Liabilities to be assumed or retained by, or allocated to, any member of the Spinco Group;

(xvii) all Liabilities of any member of the Spinco Group or the Grizzly Group under this Agreement or any of the Ancillary Agreements;

(xviii) all Liabilities (including Shareholder Liabilities) relating to, arising out of or resulting from any Grizzly Disqualifying Action; and

(xix) all Liabilities listed or described on Schedule 2.5(a)(xix).

A single Liability may fall within more than one of clauses (i) through (xvii) in this Section 2.5(a); such fact does not imply that (x) such Liability must be Conveyed more than once or (y) any duplication of such Liability is required. The fact that a Liability may be excluded under one clause does not imply that it is not intended to be included under another.

(b) Notwithstanding the foregoing clause (a), the Spinco Liabilities will not in any event include any of the following Liabilities (the "Excluded Liabilities"):

(i) all Liabilities to the extent relating to, arising out of, or resulting from any Excluded Assets;

(ii) (A) all Liabilities relating to, arising out of or resulting from the contamination in the Ohio River which was the subject of or related to, directly or indirectly, sediment sampling conducted or to be conducted by or on behalf of Burgundy (along with any associated follow-up sampling or testing), as and to the extent set forth on Schedule 2.5(b)(ii), and (B) all Liabilities relating to, arising out of or resulting from Natural Resource Damages and other third party tort (only) damage claims related to the Calcasieu Estuary, other than (i) Liabilities in the Calcasieu Estuary related to Remediation, including contribution or similar claims for costs of Remediation and (ii) Liabilities arising out of any Release by the Spinco Group to the Ohio River or the Calcasieu Estuary after the Business Transfer Time (subparts (A) and (B), the "Ohio River/Calcasieu Estuary Liabilities");

(iii) all Liabilities relating to, arising out of, or resulting from any Spinco Inactive Site, Excluded Spinco Site or Non-Spinco Business, including (A) all Liabilities relating to, arising out of, or resulting from any Environmental Conditions or any violation of Environmental Law at any such locations, and (B) all Liabilities relating to, arising out of or resulting from any Environmental Conditions at any third-party site arising from, related to or resulting from Hazardous Materials from any Spinco Inactive Sites, Non-Spinco Business or Excluded Spinco Sites (collectively subpart (A) and (B) and, together with the Excluded Liabilities in Section 2.5(b) (ii), the "Excluded Environmental Liabilities");

- 23 -

PPG102880

(iv) all Liabilities that are expressly provided by this Agreement, the Merger Agreement or any Ancillary Agreement as Liabilities to be retained or assumed by Burgundy or any other member of the Burgundy Group;

(v) all Liabilities (including Shareholder Liabilities) relating to, arising out of or resulting from any Burgundy Disqualifying Action;

(vi) all Liabilities of the Burgundy Group constituting an obligation to defend, indemnify or hold harmless any third-party insurers that issued insurance policies to Burgundy (including without limitation any indemnity obligations that Burgundy has assumed or may assume in connection with the Chapter 11 bankruptcy reorganization of Pittsburgh Corning Corporation);

(vii) all Liabilities of the Spinco Entities that are unrelated to the Eagle Business (including Liabilities related to titanium dioxide or to the development, production, manufacture or finishing of titanium dioxide products);

(viii) all Liabilities relating to, arising out of or resulting from the indemnification of any director, officer, agent or employee of Burgundy or any of its Affiliates who was a director, officer, agent or employee of Burgundy or any of its Affiliates on or prior to the Effective Time to the extent such director, officer, agent or employee is or becomes a named defendant in (A) any shareholder derivative suit against Burgundy arising from the transactions contemplated by this Agreement or the Merger Agreement, including the One-Step Spin-Off, the Exchange Offer or the Clean-Up Spin-Off, with respect to which he or she was entitled to such indemnification pursuant to the then existing obligations or (B) any Action related to an Excluded Liability;

(ix) all Liabilities relating to, arising out of or resulting from claims for or relating to exposure to asbestos at any Real Property that is a Spinco Asset on or prior to the Business Transfer Time, whether such claim is made before or after the Business Transfer Time ("Asbestos Exposure Claim"), subject to the further terms and conditions provided in Schedule 2.5(b)(ix); and

(x) all Liabilities described on Schedule 2.5(b)(x).

The Parties acknowledge and agree that neither Spinco nor any other member of the Spinco Group will be required to assume or retain any Excluded Liabilities as a result of the Conveyance of the Spinco Entity Interests, and that if any of the Spinco Entities is liable for any Excluded Liabilities, such Excluded Liabilities will be assumed and satisfied by Burgundy as contemplated by this Agreement.

Section 2.6 Termination of Intercompany Agreements; Settlement of Intercompany Accounts.

(a) Termination of Intercompany Agreements. Except as set forth in Section 2.6(b) and Section 2.6(c), Spinco, on behalf of itself and each other member of the Spinco Group,

- 24 -

PPG102881

on the one hand, and Burgundy, on behalf of itself and each other member of the Burgundy Group, on the other hand, will terminate, effective as of the Business Transfer Time, any and all Contracts between or among Spinco or any member of the Spinco Group, on the one hand, and Burgundy or any member of the Burgundy Group, on the other hand. No such Contract (including any provision thereof which purports to survive termination) will be of any further force or effect after the Business Transfer Time and all parties will be released from all Liabilities thereunder. Each Party will, at the reasonable request of any other Party, take, or cause to be taken, such other actions as may be necessary to effect the foregoing.

(b) Exceptions to Termination of Intercompany Agreements. Notwithstanding Section 2.6(a), the provisions of Section 2.6(a) will not apply to any of the following Contracts (or to any of the provisions thereof):

(i) any Contracts listed or described on Schedule 2.6(b)(i);

(ii) this Agreement, the Merger Agreement and the Ancillary Agreements (and each other Contract expressly contemplated by this Agreement, the Merger Agreement or any Ancillary Agreement to be entered into or continued by any of the Parties or any of the members of their respective Groups);

(iii) any Contracts to which any Person other than the Parties and their respective Affiliates is a party (it being understood that to the extent that the rights and Liabilities of the Parties and the members of their respective Groups under any such Contracts constitute Spinco Assets or Spinco Liabilities, they will be Conveyed pursuant to Section 2.1(a) or Section 2.1(b), or allocated pursuant to Section 2.7(d)); and

(iv) any Contracts to which any non-wholly owned Subsidiary of Burgundy or Spinco, as the case may be, is a party (it being understood that directors' qualifying shares or similar interests will be disregarded for purposes of determining whether a Subsidiary is wholly owned) (it being understood that to the extent that the rights and Liabilities of the Parties and the members of their respective Groups under any such Contracts constitute Spinco Assets or Spinco Liabilities, they will be Conveyed pursuant to Section 2.1(a) or Section 2.1(b), or allocated pursuant to Section 2.7(d)).

(c) Settlement of Intercompany Accounts. All of the intercompany receivables, payables, loans and other accounts between Spinco or any member of the Spinco Group, on the one hand, and Burgundy or any member of the Burgundy Group, on the other hand, in existence as of immediately prior to the Business Transfer Time set forth on Schedule 2.6(c) (collectively, the "Intercompany Accounts") will be satisfied and/or settled at the Business Transfer Time.

Section 2.7 Governmental Approvals and Third-Party Consents.

(a) Obtaining Consents. To the extent that the consummation of the Spinco Reorganization or the Distribution requires any third-party Consents or Governmental Approvals (including Real Estate Approvals), the Parties will use their respective commercially reasonable

- 25 -

efforts to obtain such Consents or Governmental Approvals, as soon as reasonably practicable; provided, however, except with respect to the Necessary Licenses, that neither party will under any circumstance be required to or shall be required to cause any member of its Group to, make any payments or offer or grant any accommodation (financial or otherwise, regardless of any provision to the contrary in the underlying Contract, including any requirements for the securing or posting of any bonds, letters of credit or similar instruments, or the furnishing of any guarantees) to any third party to obtain any Consent or Governmental Approvals unless and to the extent that the member of the other Group agrees to reimburse and make whole, to such person's reasonable satisfaction, for any payment or other accommodation made by its request. Except with respect to the Necessary Licenses, Spinco agrees that in the event that any third party or Governmental Authority requests that Burgundy make a payment or offer or grant an accommodation to obtain any third-party Consents or Governmental Approvals and Spinco or Grizzly does not agree to reimburse or make whole Burgundy in connection therewith, Spinco shall not be entitled to the benefits of the provision in, and Burgundy will not be obligated to take any efforts under, Section 2.7(d) in respect of any Spinco Asset, Spinco Liability, Excluded Asset or Excluded Liability which Conveyance is subject to such third-party Consents or Governmental Approvals. With respect to the Necessary Licenses, Spinco and Burgundy shall share equally any costs related to obtaining Consents (including any remedies related thereto whether negotiated or the result of a judicial process) to separate the Shared Contracts or assign the Necessary License, as applicable; provided, however, that if any Prime Counterparty to a Necessary License requires any payment in the nature of a license fee to be made directly to the Prime Counterparty by a Spinco Group member pursuant to a new license agreement between such Spinco Group member and such Prime Counterparty that will grant rights to such Spinco Group member in complete or partial substitution for rights of a Burgundy Group member under the Shared Contract in question (as opposed to a payment in the nature of a transfer fee or fee for granting consent), such license fee will be borne entirely by such Spinco Group member. For the avoidance of doubt, the required efforts and responsibilities of the Parties (i) to seek the Consents necessary to provide the Services (as defined in the Transition Services Agreement) will be governed by Article 3 of the Transition Services Agreement and (ii) to seek approval pursuant to the HSR Act or Foreign Competition Laws (each as defined in the Merger Agreement) and the Grizzly Stockholder Approval (as defined in the Merger Agreement) will be governed by the Merger Agreement. The obligations set forth in this Section 2.7(a) will terminate on the two-year anniversary of the Distribution Date; provided, however, with respect to Real Estate Approvals, the obligations in this Section 2.7(a) will survive in perpetuity.

    (b) Transfer in Violation of Laws or Requiring Consent or Governmental Approval.

        (i) If and to the extent that the valid, complete and perfected Conveyance to the Spinco Group of any Spinco Asset or Spinco Liability, or to the Burgundy Group of any Excluded Asset or Excluded Liability, would be a violation of applicable Laws or require any Consent or Governmental Approval (including Real Estate Approvals) in connection with the Spinco Reorganization, the Recapitalization or the Distribution, then subject to subpart (ii) below, the Conveyance to the Spinco Group of any such Spinco Asset or Spinco Liability, or to the Burgundy Group of any such Excluded Asset or Excluded Liability, will automatically be deferred, and no Conveyance will occur until all legal or

- 26 -

PPG102883

Contractual impediments are removed or such Consents or Governmental Approvals have been obtained. Other than the TCI Interests, the treatment of which shall be governed by Section 2.7(e), any Asset or Liability with respect to which Conveyance has been so deferred will still be considered a Spinco Asset, a Spinco Liability, an Excluded Asset, or an Excluded Liability, as applicable, and will be subject to Section 2.7(d).

(ii) Notwithstanding subpart (i), other than the TCI Interests, the treatment of which shall be governed by Section 2.7(e), (A) Burgundy (subject to Spinco's rights under subpart (B)) or Spinco may elect to require the immediate Conveyance of any Spinco Asset, Spinco Liability, Excluded Asset or Excluded Liability notwithstanding any requirement that a Consent or Governmental Approval be obtained or (B) with respect to Real Property that includes both a Spinco Asset and an Excluded Asset, Spinco or Burgundy may elect to require the immediate Conveyance of all such Real Property that includes both the Spinco Asset and the Excluded Asset notwithstanding any requirement that a Consent or Governmental Approval (including any Real Estate Approvals) be obtained; provided, that (A) if Spinco so elects to require the immediate Conveyance of any such Asset or Liability, any Liabilities arising from such Conveyance relating to such violation of Law or failure to secure the requisite Consent or Governmental Approval will be deemed to be Spinco Liabilities, and (B) if Burgundy so elects to require the immediate Conveyance of any such Asset or Liability, any Liabilities arising from such Conveyance relating to such violation of Law or failure to secure the requisite Consent or Governmental Approval will be deemed to be Excluded Liabilities, and (C) if Spinco and Burgundy jointly agree to immediately Convey such Asset or Liability, any Liabilities arising from such Conveyance will be shared evenly between Spinco and Burgundy and, notwithstanding any provision in Section 5.5(b) to the contrary, the defense of any Third-Party Claim relating thereto will be jointly managed by Spinco and Burgundy. The Parties will use their commercially reasonable efforts promptly to obtain any Consents or Governmental Approvals as required by Section 2.7(a) and to take the actions required by Section 2.7(d) pending removal of legal or Contractual impediments or receipt of Consents or Governmental Approvals. If and when the legal or Contractual impediments the presence of which caused the deferral of transfer of any Asset or Liability pursuant to this Section 2.7(b) are removed or any Consents and/or Governmental Approvals the absence of which caused the deferral of transfer of any Asset or Liability pursuant to this Section 2.7(b) are obtained, the transfer of the applicable Asset or Liability will be effected promptly in accordance with the terms of this Agreement and/or the applicable Ancillary Agreement(s). The obligations set forth in this Section 2.7(b) will terminate on the two-year anniversary of the Distribution Date; provided, however, with respect to Real Estate Approvals and transfers of Assets and Liabilities in connection therewith, the obligations in this Section 2.7(b) will survive in perpetuity.

(c) Shared Contracts. The Parties will use their respective commercially reasonable efforts to separate the Shared Contracts into separate Contracts effective as of the

- 27 -

PPG102884

Business Transfer Time so that from and after the Business Transfer Time Spinco Group will be entitled to rights and benefits and shall assume the related portion of Liabilities with respect to each Shared Contract to the extent related to the Eagle Business and the Burgundy Group will have the rights and benefits and shall assume the related portion of Liabilities with respect to each Shared Contract to the extent not related to the Eagle Business. Upon such separation of a Shared Contract, the separated Contract will be a Spinco Asset or Excluded Asset, as applicable. If the counterparty to any Shared Contract that is entitled under the terms of the Shared Contract to Consent to the separation of the Shared Contract in the manner set forth in this Section 2.7(c) (a "Prime Counterparty") has not provided such Consent or if the separation of a Shared Contract has not been completed as of the Business Transfer Time for any other reason, then the Parties will use their respective commercially reasonable efforts promptly to develop and implement arrangements to make the portion of the Shared Contract related to the Eagle Business available for use by (and for the benefit of) Spinco Group and to make the portion of the Shared Contract not related to the Eagle Business available for use by (and for the benefit of) Burgundy Group, in each case in accordance with Section 2.7(d). If and when any such Consent is obtained, the Shared Contract will be separated in accordance with this Section 2.7(c). The obligations set forth in this Section 2.7(c) will terminate on the two-year anniversary of the Distribution Date. Spinco and Burgundy shall share equally any costs related to separating the Shared Contracts.

(d) Conveyances Not Consummated Prior To or At the Business Transfer Time. Other than (i) the TCI Interests, the treatment of which shall be governed by Section 2.7(e), and (ii) with respect to Real Property that requires Real Estate Approval that has not been secured or Conveyed to Spinco or a Spinco Subsidiary prior to the Business Transfer Time, the treatment of which shall be governed by Section 2.7(f), if the Conveyance of any Asset or Liability intended to be Conveyed is not consummated prior to or at the Business Transfer Time, whether as a result of the provisions of Section 2.7(b) or Section 2.7(c) or for any other reason (including any misallocated transfers subject to Section 2.3), then, insofar as reasonably possible (taking into account any applicable restrictions or considerations relating to the contemplated Tax treatment of the Transactions) and to the extent permitted by applicable Law, the Person retaining such Asset or Liability, as the case may be, (i) will thereafter hold such Asset or Liability, as the case may be, in trust for the use and benefit and burden of the Person entitled thereto (and at such Person's sole expense) until the consummation of the Conveyance thereof (or as otherwise determined by Burgundy and Spinco, as applicable, in accordance with Section 2.7(b) or Section 2.7(c)); and (ii) use commercially reasonable efforts to take such other actions as may be reasonably requested by the Person to whom such Asset or Liability is to be Conveyed (at the expense of the Person to whom such Asset or Liability is to be Conveyed) in order to place such Person in substantially the same position as if such Asset or Liability had been Conveyed as contemplated hereby and so that all the benefits and burdens relating to such Asset or Liability, as the case may be, including possession, use, risk of loss, potential for gain, any Tax liabilities in respect thereof and dominion, control and command over such Asset or Liability, as the case may be, are to inure from and after the Business Transfer Time to the Person to whom such Asset or Liability is to be Conveyed. Any Person retaining an Asset or a Liability due to the deferral of the Conveyance of such Asset or Liability, as the case may be, will not be required, in connection with the foregoing, to make any payments or offer or grant any accommodation (financial or otherwise, regardless of any provision to the contrary in the underlying Contract, including any requirements for the securing or posting of any bonds, letters of credit or similar instruments, or the furnishing of any guarantees) to any third party, except to

- 28 -

the extent that the Person entitled to the Asset or responsible for the Liability, as applicable, agrees to reimburse and make whole the Person retaining an Asset or a Liability, to such Person's reasonable satisfaction, for any payment or other accommodation made by the Person retaining an Asset or a Liability at the request of the Person entitled to the Asset or responsible for the Liability. The obligations set forth in this Section 2.7 (d) will terminate on the two-year anniversary of the Distribution Date.

(e) Transfer of TCI Interests. Subject to the terms set forth in Schedule 2.7(e), promptly after the date of this Agreement, Burgundy shall use its commercially reasonable efforts to take such steps as may be necessary to permit the Conveyance of the TCI Interests to Spinco at or prior to the Business Transfer Time. In the event that Burgundy does not Convey the TCI Interests at or prior to the Business Transfer Time to Spinco, the Above Basis Amount shall be reduced by the TCI Value and the TCI Interests (and any Assets relating to the TCI Interests) shall be deemed to be Excluded Assets.

(f) Failure to Secure Real Property Approvals Prior to Transfer. Notwithstanding anything to the contrary set forth herein, in the event that (i) Burgundy shall have failed to obtain a Real Estate Approval to transfer one or more Spinco Assets (whether individually or as part of Real Property that includes Excluded Assets) on or prior to the Business Transfer Date or (ii) the Parties have not exercised their respective rights under Section 2.7(b)(ii) to transfer certain Spinco Assets to Spinco or a Spinco Entity, Burgundy and the applicable Spinco Entity shall enter into a lease agreement effective as of the Business Transfer Time in a commercially reasonable form acceptable to Burgundy and such Spinco Entity (a "Temporary Lease Agreement"), pursuant to which, inter alia, such Spinco Entity shall lease from Burgundy the applicable Real Property from and after the Business Transfer Date through and until such time, if any, as Burgundy shall have received the applicable Real Estate Approval with respect to such Real Property. Upon receipt of such Real Estate Approval, the Temporary Lease Agreement shall terminate and Burgundy shall Convey the applicable Spinco Active Site to the Spinco, or its designated Subsidiary or Affiliate, pursuant to one or more applicable Burgundy Transfer Documents in the manner provided in Section 3.5 hereof. For the term of the Temporary Lease Assignment, notwithstanding any term to the contrary herein, (i) rent shall be payable in a nominal amount but the Spinco Entity that is party to the Temporary Lease Agreement shall be responsible for the payment of all taxes, insurance premiums and maintenance and operating charges with respect to the applicable Real Property thereunder from and after the Business Transfer Date, (ii) such Spinco Entity shall be allowed to continue to operate such Real Property as it has been operated prior to the Business Transfer Time in the ordinary course, and (iii) such Spinco Entity shall have the right to assign the Temporary Lease Agreement or sublet the applicable Real Property to Spinco or another Spinco Entity without Burgundy's consent.

Section 2.8 No Representation or Warranty. EXCEPT TO THE EXTENT OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE MERGER AGREEMENT OR ANY ANCILLARY AGREEMENT, SPINCO (ON BEHALF OF ITSELF AND MEMBERS OF THE SPINCO GROUP) ACKNOWLEDGES THAT NEITHER BURGUNDY NOR ANY MEMBER OF THE BURGUNDY GROUP MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY HEREIN AS TO ANY MATTER WHATSOEVER, INCLUDING ANY REPRESENTATION OR WARRANTY

- 29 -

WITH RESPECT TO: (A) THE CONDITION OR THE VALUE OF ANY SPINCO ASSET OR THE AMOUNT OF ANY SPINCO LIABILITY; (B) THE FREEDOM FROM ANY SECURITY INTEREST OF ANY SPINCO ASSET; (C) THE ABSENCE OF DEFENSES OR FREEDOM FROM COUNTERCLAIMS WITH RESPECT TO ANY CLAIM TO BE CONVEYED TO SPINCO OR HELD BY A MEMBER OF THE SPINCO GROUP; OR (D) ANY IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR TITLE. EXCEPT TO THE EXTENT OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE MERGER AGREEMENT OR ANY ANCILLARY AGREEMENT, SPINCO (ON BEHALF OF ITSELF AND MEMBERS OF THE SPINCO GROUP) FURTHER ACKNOWLEDGES THAT ALL OTHER WARRANTIES THAT BURGUNDY OR ANY MEMBER OF THE BURGUNDY GROUP GAVE OR MIGHT HAVE GIVEN, OR WHICH MIGHT BE PROVIDED OR IMPLIED BY APPLICABLE LAW OR COMMERCIAL PRACTICE, ARE HEREBY EXPRESSLY EXCLUDED. EXCEPT TO THE EXTENT OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, THE MERGER AGREEMENT OR ANY ANCILLARY AGREEMENT, ALL ASSETS TO BE TRANSFERRED TO SPINCO (AND ALL OF THE SPINCO ASSETS HELD BY THE SPINCO ENTITIES) WILL BE TRANSFERRED WITHOUT ANY COVENANT, REPRESENTATION OR WARRANTY (WHETHER EXPRESS OR IMPLIED) AND ARE HELD "AS IS, WHERE IS" AND FROM AND AFTER THE CLOSING SPINCO WILL BEAR THE ECONOMIC AND LEGAL RISK THAT ANY CONVEYANCE WILL PROVE TO BE INSUFFICIENT TO VEST IN SPINCO GOOD AND MARKETABLE TITLE, FREE AND CLEAR OF ANY SECURITY INTEREST OR ANY NECESSARY CONSENTS OR GOVERNMENTAL APPROVALS THAT ARE NOT OBTAINED OR THAT ANY REQUIREMENTS OF LAWS ARE NOT COMPLIED WITH.

Section 2.9 Waiver of Bulk-Sales Laws. Each Party hereby waives compliance by each member of its Group with the requirements and provisions of the "bulk-sale" or "bulk-transfer" Laws of any jurisdiction that may otherwise be applicable with respect to the transfer or sale of any or all of the Assets to any member of the Burgundy Group or Spinco Group, as applicable.

Section 2.10 Guarantees.

(a) On or prior to the Business Transfer Time or as soon as practicable thereafter, Spinco will (with the reasonable cooperation of the applicable member(s) of the Burgundy Group) use its reasonable best efforts to have any member(s) of the Burgundy Group removed as guarantor of or obligor for any Spinco Liability to the extent that they relate to Spinco Liabilities.

(b) On or prior to the Business Transfer Time, to the extent required to obtain a release from an agreement (including any lease of a Real Property) or a guarantee (a "Guarantee Release") of any member of the Burgundy Group, a Spinco Subsidiary will execute a guarantee agreement in the form of the existing agreement or guarantee or such other form as is reasonably agreed to by such Spinco Subsidiary and the relevant parties to such agreement or guarantee.

- 30 -

PPG102887

(c) If the Parties are unable to obtain, or to cause to be obtained, any such required removal as set forth in clauses (a) and (b) of this Section 2.10, (i) Spinco will, and will cause the other members of the Spinco Group (including after the Effective Time, Grizzly) to indemnify, defend and hold harmless each of the Burgundy Indemnitees for any Liability arising from or relating to such guarantee and will, as agent or subcontractor for the applicable Burgundy Group guarantor or obligor, pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor thereunder, and (ii) Spinco will not, and will cause the other members of the Spinco Group not to, agree to renew or extend the term of, increase any obligations under, or transfer to a third Person, any loan, guarantee, lease, Contract or other obligation for which a member of the Burgundy Group is or may be liable unless all obligations of the members of the Burgundy Group with respect thereto are thereupon terminated by documentation satisfactory in form and substance to Burgundy in its sole discretion.

(d) On or prior to the Business Transfer Time or as soon as practicable thereafter, Burgundy will, at its expense, use its reasonable best efforts to have any member(s) of the Spinco Group removed as guarantor of or obligor for any Excluded Liability to the extent that they relate to Excluded Liabilities (with the reasonable cooperation of the applicable member(s) of the Spinco Group).

(e) On or prior to the Business Transfer Time, to the extent required to obtain a Guarantee Release of any member of the Spinco Group, Burgundy will execute a guarantee agreement in the form of the existing agreement or guarantee or such other form as is reasonably agreed to by Burgundy and the relevant parties to such guarantee agreement or guarantee.

(f) If the Parties are unable to obtain, or to cause to be obtained, any such required removal as set forth in clauses (d) and (e) of this Section 2.10, (i) Burgundy will, and will cause the other members of the Burgundy Group to, indemnify, defend and hold harmless each of the Spinco Indemnitees for any Liability arising from or relating to such agreement or guarantee and will, as agent or subcontractor for the applicable Spinco Group guarantor or obligor, pay, perform and discharge fully all the obligations or other Liabilities of such guarantor or obligor thereunder, and (ii) Burgundy will not, and will cause the other members of the Burgundy Group not to, agree to renew or extend the term of, increase any obligations under, or transfer to a third Person, any loan, guarantee, lease, Contract or other obligation for which a member of the Spinco Group is or may be liable unless all obligations of the members of the Spinco Group with respect thereto are thereupon terminated by documentation satisfactory in form and substance to Spinco in its sole discretion.

Section 2.11 Bank Accounts; Cash Balances. Burgundy and Spinco each agrees to take, or cause the respective members of their respective Groups to take, from and after the Business Transfer Time (or such earlier time as Burgundy and Spinco may agree), all actions necessary to amend all Contracts or agreements governing each bank and brokerage account owned by Spinco or any other member of the Spinco Group and used exclusively for the Eagle Business (collectively, the "Spinco Accounts") so that such Spinco Accounts, if currently linked (whether by automatic withdrawal, automatic deposit or any other authorization to transfer funds from or to, hereinafter "linked") to any bank or brokerage account owned by (i) Burgundy or any other member of the Burgundy Group or (ii) Spinco or any other member of the Spinco Group that is not used exclusively for the Eagle Business (the

- 31 -

accounts described in (i) or (ii), collectively, the "Burgundy Accounts"), are delinked from the Burgundy Accounts. Burgundy and Spinco each agrees to take, or cause the respective members of their respective Groups to take, from and after the Business Transfer Time (or such earlier time as Burgundy and Spinco may agree), all actions necessary to amend all Contracts or agreements governing the Burgundy Accounts so that such Burgundy Accounts, if currently linked to a Spinco Account, are de-linked from the Spinco Accounts.

## ARTICLE III

### CLOSING OF THE SPINCO REORGANIZATION;
### POST-CLOSING WORKING CAPITAL ADJUSTMENT

Section 3.1 <u>Business Transfer Time</u>. Unless otherwise provided in this Agreement or in any Ancillary Agreement, and subject to the satisfaction and waiver of the conditions set forth in <u>Section 3.2</u>, the effective time and date of each Conveyance and assumption of any Asset or Liability in accordance with Article II in connection with the Spinco Reorganization will be 12:01 a.m., Eastern Time on the date that is no less than two (2) days prior to the Distribution Date (such time, the "<u>Business Transfer Time</u>," and such date the "<u>Business Transfer Date</u>").

Section 3.2 <u>Conditions to the Spinco Reorganization</u>. The obligations of Burgundy pursuant to this Agreement to effect the Spinco Reorganization are subject to the fulfillment (or waiver by Burgundy) at or prior to the Business Transfer Time of the following conditions:

(a) each of the parties to the Merger Agreement has irrevocably confirmed to each other that each condition in Article IX of the Merger Agreement to such party's respective obligations to effect the Merger (i) has been fulfilled, (ii) will be fulfilled at the Effective Time, or (iii) is or has been waived by such party, as the case may be;

(b) Burgundy shall have received the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling, each in form and substance reasonably satisfactory to Burgundy, and such rulings shall continue to be valid and in full force and effect (and, for the avoidance of doubt, such rulings shall not have been invalidated, modified or otherwise affected by any change in any Law on or after the date such rulings were issued by the IRS);

(c) Burgundy shall have received an opinion from Wachtell, Lipton, Rosen & Katz, counsel to Burgundy, to the effect that (i) the Distribution will be treated as satisfying the business purpose requirement described in Treasury Regulation Section 1.355-2(b)(1); (ii) the Distribution will not be treated as being used principally as a device for the distribution of earnings and profits of the distributing corporation or the controlled corporation or both under Section 355(a)(1)(B); (iii) the stock of Spinco distributed in the Distribution will not be treated as other than "qualified property" by reason of the application of Section 355(e)(1); and (iv) the Spinco Securities will constitute "securities" for purposes of the application of Section 361(a) of the Code (together with clauses (i), (ii), and (iii), the "Distribution Tax Opinion"); and

- 32 -

(d) Burgundy and Spinco shall have received any necessary permits and authorizations under state securities or "blue sky" laws, the Securities Act and the Exchange Act in connection with the Distribution and such permits and authorizations shall be in effect.

Section 3.3 <u>Recapitalization of Spinco</u>. Burgundy and Spinco shall cause the following to occur at the Business Transfer Time:

(a) In consideration for the transfer of Assets contemplated by <u>Section 2.1</u>, Spinco shall:

(i) issue to Burgundy shares of Spinco Common Stock as set forth in Section 8.17 of the Merger Agreement (the "<u>Spinco Stock Issuance</u>"), which Spinco Common Stock, together with the 100 shares of Spinco Common Stock owned by Burgundy as of the date hereof, will constitute all of the issued and outstanding common stock of Spinco outstanding as of the Business Transfer Time;

(ii) declare a special distribution, which will be payable no later than immediately prior to the Distribution, and will be comprised of (A) an amount in cash equal to the Below Basis Amount (the "<u>Special Below Basis Cash Distribution</u>"), and (B) Spinco Exchange Debt in an amount equal to the Above Basis Amount, subject to adjustment as set forth in <u>Section 2.7(e)</u> and <u>Section 3.7(a)</u> or an amount in cash determined in accordance with and to the extent provided in Section 8.11(f)(v) of the Merger Agreement (the "<u>Special Above Basis Debt/Cash Distribution</u>," and together with the Special Below Basis Cash Distribution, the "<u>Special Distribution</u>");

(iii) pay, in accordance with Section 6.2(d) of the Employee Matter Agreement, the Grizzly True Up Amount, if any; and

(iv) assume the Spinco Liabilities in accordance with <u>Section 2.1</u>.

(b) <u>Financing Arrangements</u>. Prior to or concurrently with the Spinco Reorganization, Spinco, together with the other members of the Spinco Group, will enter into the Spinco Financing Arrangements and incur the debt contemplated thereby, all on such terms and conditions as are contemplated by the Spinco Commitment Letter and Spinco Related Letter and the Burgundy Commitment Letter and the Burgundy Related Letter, as further described in the Merger Agreement.

- 33 -

Section 3.4 Transfer of the Eagle Business.

(a) Agreements to be Delivered by Burgundy. On the Business Transfer Date, Burgundy will deliver, or will cause its appropriate Subsidiaries to deliver, to Spinco all of the following instruments:

(i) a Tax Matters Agreement in substantially the form attached hereto as Exhibit A (the "Tax Matters Agreement"), duly executed by the members of the Burgundy Group party thereto;

(ii) a Transition Services Agreement negotiated in good faith reflecting the form attached hereto as Exhibit B (the "Transition Services Agreement") in accordance with Section 8.26 of the Merger Agreement, duly executed by the members of the Burgundy Group party thereto;

(iii) an Electric Generation, Distribution and Transmission Facilities Lease negotiated in good faith reflecting the form attached hereto as Exhibit C (the "Electric Generation, Distribution and Transmission Facilities Lease") in accordance with Section 8.26 of the Merger Agreement, duly executed by the members of the Burgundy Group party thereto;

(iv) a Shared Facilities, Services and Supply Agreement negotiated in good faith reflecting the form attached hereto as Exhibit D (the "Shared Facilities, Services and Supply Agreement") in accordance with Section 8.26 of the Merger Agreement, duly executed by the members of the Burgundy Group party thereto;

(v) a Servitude Agreement negotiated in good faith reflecting the form attached hereto as Exhibit E (the "Servitude Agreement") in accordance with Section 8.26 of the Merger Agreement, duly executed by the members of the Burgundy Group party thereto;

(vi) a Liquid Caustic Soda Sales Agreement (Fresno) in substantially the form attached hereto as Exhibit F (the "Liquid Caustic Soda Sales Agreement (Fresno)"), duly executed by the members of the Burgundy Group party thereto;

(vii) a Liquid Caustic Soda Sales Agreement (Strongsville) in substantially the form attached hereto as Exhibit G (the "Liquid Caustic Soda Sales Agreement (Strongsville)"), duly executed by the members of the Burgundy Group party thereto;

(viii) a Hydrochloric Acid Sales Agreement - Lake Charles (Silica) in substantially the form attached hereto as Exhibit H (the "Hydrochloric Acid Sales

- 34 -

PPG102891

Agreement - Lake Charles (Silica)"), duly executed by the members of the Burgundy Group party thereto;

(ix) a Chlorine and Liquid Caustic Soda Sales Agreement (Barberton) in substantially the form attached hereto as Exhibit I (the "Chlorine and Liquid Caustic Soda Sales Agreement (Barberton)"), duly executed by the members of the Burgundy Group party thereto;

(x) a Liquid Caustic Soda Sales Agreement (Wichita Falls) in substantially the form attached hereto as Exhibit J (the "Liquid Caustic Soda Sales Agreement (Wichita Falls)"), duly executed by the members of the Burgundy Group party thereto;

(xi) a Hydrochloric Acid Sales Agreement in substantially the form attached hereto as Exhibit K (the "Hydrochloric Acid Sales Agreement"), duly executed by the members of the Burgundy Group party thereto;

(xii) a Shared Facilities Agreement (Monroeville) negotiated in good faith reflecting the form attached hereto as Exhibit L (the "Shared Facilities Agreement (Monroeville)") in accordance with Section 8.26 of the Merger Agreement, duly executed by the members of the Burgundy Group party thereto;

(xiii) a Master Terminal Agreement in substantially the form attached hereto as Exhibit M (the "Master Terminal Agreement"), duly executed by the members of the Burgundy Group party thereto;

(xiv) all necessary Transfer Documents as described in Section 3.5 and Section 3.6; and

(xv) resignations of each of the individuals who serves as an officer or director of members of the Spinco Group as set forth on Schedule 3.4(a)(xv) in his or her capacity as such and the resignation of any other Person who will be an employee of any member of the Burgundy Group after the Business Transfer Time and who is a director or officer of any member of the Spinco Group, to the extent requested by Spinco.

(b) Agreements to be Delivered by Spinco. On the Business Transfer Date, Spinco will deliver, or will cause its Subsidiaries to deliver, as appropriate, to Burgundy all of the following instruments:

(i) in each case where any member of the Spinco Group is a party to any Ancillary Agreement, a counterpart of such Ancillary Agreement duly executed by the member of the Spinco Group party thereto;

- 35 -

(ii) all necessary Transfer Documents as described in Section 3.5 and Section 3.6; and

(iii) resignations of each of the individuals who serve as an officer or director of members of the Burgundy Group as set forth on Schedule 3.4(b)(iii) in their capacity as such and the resignations of any other Persons that will be employees of any member of the Spinco Group after the Business Transfer Time and that are directors or officers of any member of the Burgundy Group, to the extent requested by Burgundy.

Section 3.5 Transfer of Spinco Assets and Assumption of Spinco Liabilities. In furtherance of the Conveyance of Spinco Assets and the assumption of Spinco Liabilities provided in Section 2.1: (a) Burgundy will execute and deliver, and will cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of Contracts and other instruments of transfer, Conveyance and assignment, as and to the extent reasonably necessary to evidence the Conveyance of all of Burgundy's and its Subsidiaries' (other than Spinco and its Subsidiaries) right, title and interest in and to the Spinco Assets to Spinco and its Subsidiaries and (b) a Spinco Subsidiary will execute and deliver such assumptions of Contracts and other instruments of assumption as and to the extent reasonably necessary to evidence the valid and effective assumption of the Spinco Liabilities by the applicable Spinco Subsidiary. All of the foregoing documents contemplated by this Section 3.5 will be referred to collectively herein as the "Burgundy Transfer Documents." For the avoidance of doubt, the obligations with respect to the Conveyance of Spinco Assets and the assumption of Spinco Liabilities provided in Section 2.1, and the execution and delivery of documents provided in this Section 3.5, does not extend to the Conveyance of, or execution of delivery of documents with respect to, any Spinco Assets that are already held as of the Business Transfer Time by a Spinco Entity (which Spinco Asset will continue to be held by such Spinco Entity) or any Spinco Liabilities that as of the Business Transfer Time are already a Liability of a Spinco Entity (which Spinco Liability will continue to be a Liability of such Spinco Entity).

Section 3.6 Transfer of Excluded Assets; Assumption of Excluded Liabilities. In furtherance of the Conveyance of Excluded Assets and the assumption of Excluded Liabilities provided in Section 2.2: (a) Spinco will execute and deliver, and will cause its Subsidiaries to execute and deliver, such bills of sale, quitclaim deeds, stock powers, certificates of title, assignments of Contracts and other instruments of transfer, Conveyance and assignment as and to the extent reasonably necessary to evidence the Conveyance of all of Spinco's and its Subsidiaries' right, title and interest in and to the Excluded Assets to Burgundy and its Subsidiaries and (b) Burgundy will execute and deliver such assumptions of Contracts and other instruments of assumption as and to the extent reasonably necessary to evidence the valid and effective assumption of the Excluded Liabilities by Burgundy. All of the foregoing documents contemplated by this Section 3.6 will be referred to collectively herein as the "Spinco Transfer Documents" and, together with the Burgundy Transfer Documents, the "Transfer Documents."

- 36 -

PPG102893

Section 3.7 <u>Working Capital Adjustment</u>. (a) At least five (5) Business Days prior to the Business Transfer Date, Spinco, in consultation with Grizzly, will prepare and deliver to Burgundy a statement setting forth a good-faith estimate of the amount of Working Capital as of the Business Transfer Date, calculated in accordance with the Accounting Exhibit (such estimate, the "<u>Estimated Closing Adjustment Statement</u>"). On the Business Transfer Date, (i) if the Estimated Adjustment Payment, if any, is positive, Spinco shall pay to Burgundy the Estimated Adjustment Payment by increasing both the Below Basis Amount and the Above Basis Amount by the absolute value of the Estimated Adjustment Payment and (ii) if the Estimated Adjustment Payment, if any, is negative, Burgundy shall pay to Spinco the absolute value of the Estimated Adjustment Payment by reducing both the Below Basis Amount and the Above Basis Amount by the absolute value of the Estimated Adjustment Payment. For example, on the Business Transfer Date, if the Above Basis Amount, before adjusting for any Estimated Adjustment Payment, is $675 million and (i) the Estimated Adjustment Payment is *positive* $10 million, then Spinco shall pay to Burgundy the Estimated Adjustment Payment by increasing the Below Basis Amount by the absolute value of the Estimated Adjustment Payment, such that the Below Basis Amount shall be equal to $235 million (or $225 million *plus* $10 million), before any further adjustments in respect of the TCI Basis or any elective reduction of increase in the Below Basis Amount as provided in Section 1.8, and the Above Basis Amount shall remain equal to $675 million (or $900 million, *minus* $235 million, *plus* $10 million), before any further adjustments in respect of the TCI Value as provided in this Agreement or (ii) the Estimated Adjustment Payment is *negative* $10 million, then Burgundy shall pay to Spinco the absolute value of the Estimated Adjustment Payment by reducing both the Below Basis Amount and the Above Basis Amount by the absolute value of the Estimated Adjustment Payment, such that the Below Basis Amount shall be equal to $215 million (or $225 million *less* $10 million), before any further adjustments in respect of the TCI Basis or any elective reduction or increase in the Below Basis Amount as provided in Section 1.8, and the Above Basis Amount shall remain equal to $675 million (or $900 million, *minus* $215 million, *minus* $10 million), before any further adjustments in respect of the TCI Value as provided in this Agreement. The "<u>Estimated Adjustment Payment</u>" will be equal to the Working Capital as reflected on the Estimated Closing Adjustment Statement (after satisfaction of the intercompany accounts pursuant to Section 2.6(c)), *minus* the Target Working Capital Amount. Within 180 days following the Distribution Date, Spinco will prepare and deliver to Burgundy a statement setting forth the amount of Working Capital, as of the Business Transfer Date, calculated in accordance with the Accounting Exhibit (the "<u>Closing Adjustment Statement</u>"). Upon the reasonable request of Spinco, Burgundy will provide (or will cause a member of the Burgundy Group to provide) to Spinco and its accountants reasonable access to the books and records, any other information, including working papers of its accountants, and to any employees of Burgundy or any other member of the Burgundy Group necessary for Spinco to prepare the Closing Adjustment Statement, to respond to the Burgundy Objection (if any) and to prepare materials for presentation to the Accounting Firm in connection with this Section 3.7 and Burgundy will otherwise cooperate with and assist Spinco as may be reasonably necessary to carry out the purposes of this Section 3.7.

- 37 -

PPG102894

(b) For a period of sixty (60) days after delivery of the Closing Adjustment Statement, Spinco will make available to Burgundy, as reasonably requested by Burgundy, all books, records, work papers, personnel (including their accountants and employees) and other materials and sources used by Spinco to prepare the Closing Adjustment Statement and not already in the possession or under the control of Burgundy. The Closing Adjustment Statement will be binding and conclusive upon, and deemed accepted (including a waiver of objection with respect to) by, Burgundy unless Burgundy has notified Spinco in writing within sixty (60) days after delivery of the Closing Adjustment Statement of any good faith objection thereto (the "Burgundy Objection"). Any Burgundy Objection will set forth a reasonably specific description of the basis of the Burgundy Objection and the adjustments to the line items reflected on the Closing Adjustment Statement which Burgundy believes should be made. Any items not disputed during the foregoing sixty (60) day period will be deemed to have been accepted (including a waiver of objection with respect to) by Burgundy.

(c) If Burgundy and Spinco are unable to resolve any of their disputes with respect to the Closing Adjustment Statement within 30 days following Spinco's receipt of the Burgundy Objection to such Closing Adjustment Statement pursuant to Section 3.7(b), they will refer their remaining differences to a nationally recognized firm of independent public accountants to which Burgundy and Spinco mutually agree (the "Accounting Firm") for a decision, which decision will be final and binding and unappealable absent fraud or willful misconduct on the Parties. The Accounting Firm will act as an expert and not an arbitrator and will address only those items in dispute, in accordance with any provisions or policies set forth herein and in accordance with the Accounting Exhibit, and for each item may not assign a value greater than the greatest value for such item claimed by either Party or smaller than the smallest value for such item claimed by either Party. Any expenses relating to the engagement of the Accounting Firm will be shared equally by Burgundy, on the one hand, and Spinco, on the other hand.

(d) The Closing Adjustment Statement will become final and binding on the Parties upon the earliest of (i) if no Burgundy Objection has been given, the expiration of the period within which Burgundy must make its objection pursuant to Section 3.7(b), (ii) agreement in writing by Burgundy and Spinco that the Closing Adjustment Statement, together with any modifications thereto agreed by Burgundy and Spinco and (iii) the date on which the Accounting Firm issues its written determination with respect to any dispute relating to such Closing Adjustment Statement. The Closing Adjustment Statement, as submitted by Spinco if no timely Burgundy Objection has been given, as adjusted pursuant to any agreement between the Parties or as determined pursuant to the decision of the Accounting Firm, when final and binding on all Parties and upon which a judgment may be entered by a court of competent jurisdiction, is herein referred to as the "Final Closing Adjustment Statement."

(e) Within five (5) Business Days following issuance of the Final Closing Adjustment Statement, the Adjustment Payment and interest thereon will be paid by wire transfer of immediately available funds to a bank account designated by Burgundy or Spinco, as the case may be. The "Adjustment Payment" will be equal to the amount of the Working Capital as reflected on the Final Closing Adjustment Statement, *minus* the Target Working Capital Amount, *minus* the amount paid pursuant to Section 3.7(a) if

- 38 -

PPG102895

the Estimated Adjustment Payment was paid by Spinco to Burgundy or *plus* the amount paid pursuant to Section 3.7(a) if the Estimated Adjustment Payment was made by Burgundy to Spinco. The Adjustment Payment, if any, will be payable by Spinco to Burgundy, if positive, and if the Adjustment Payment is negative, an amount equal to the absolute value of such Adjustment Payment will be payable by Burgundy to Spinco. The Adjustment Payment will bear interest from the Distribution Date to the date of payment at the prime rate (as published in the Wall Street Journal, Northeastern Edition) in effect on the Distribution Date, which interest will be calculated on the basis of a 365-day year and the actual number of days elapsed and such interest will be paid on the same date and in the same manner as such Adjustment Payment.

**ARTICLE IV**

**THE DISTRIBUTION**

Section 4.1 Form of Distribution. (a) Burgundy may elect, in its sole discretion, to effect the Distribution in the form of either (i) a One-Step Spin-Off or (ii) an Exchange Offer (including any Clean-Up Spin-Off, as set forth below).

(b) If Burgundy elects to effect the Distribution in the form of a One-Step Spin-Off, the Board of Directors of Burgundy, in accordance with applicable Law, will establish (or designate Persons to establish) a Record Date and the Distribution Date and Burgundy will establish appropriate procedures in connection with, and to effectuate in accordance with applicable Law, the Distribution. All shares of Spinco Common Stock held by Burgundy on the Distribution Date will be distributed to the Record Holders in the manner determined by Burgundy and in accordance with Section 4.5(b).

(c) If Burgundy elects to effect the Distribution as an Exchange Offer, Burgundy will determine the terms of such Exchange Offer, including the number of shares of Spinco Common Stock that will be offered for each validly tendered share of Burgundy Common Stock, the period during which such Exchange Offer will remain open, the procedures for the tender and exchange of shares and all other terms and conditions of such Exchange Offer, which terms and conditions will comply with all securities Law requirements applicable to such Exchange Offer. In the event that Burgundy's stockholders subscribe for less than all of the Spinco Common Stock in the Exchange Offer, Burgundy will consummate the Clean-Up Spin-Off on the Distribution Date immediately following the consummation of the Exchange Offer and the Record Date for the Clean-Up Spin-Off shall be established as of such date in the same manner as provided in Section 4.1(b). The terms and conditions of any Clean-Up Spin-Off shall be as determined by Burgundy and will comply with the requirements of all applicable Laws; provided, however, that any shares of Spinco Common Stock that are not subscribed for in the Exchange Offer must be distributed to Burgundy's stockholders in the Clean-Up Spin-Off.

Section 4.2 Manner of Distribution. (a) To the extent the Distribution is effected as a One-Step Spin-Off, subject to the terms thereof, in accordance with Section 4.5(b), each Record Holder will be entitled to receive for each share of Burgundy Common Stock held by such Record Holder a number of shares of Spinco Common Stock equal to the total number of shares of Spinco Common Stock held by Burgundy on the Distribution Date, multiplied by a fraction, the numerator of which is number of shares of Burgundy Common Stock held by such Record Holder and the denominator of which is the total number of shares of Burgundy Common Stock outstanding on the Distribution Date.

- 39 -

PPG102896

(b) To the extent the Distribution is effected as an Exchange Offer, subject to the terms thereof, in accordance with Section 4.5(b), each Burgundy stockholder may elect in the Exchange Offer to exchange a number of shares of Burgundy Common Stock held by such Burgundy stockholder for shares of Spinco Common Stock in such quantities, at such an exchange ratio and subject to such other terms and conditions as may be determined by Burgundy and set forth in the Spinco Registration Statement; provided, however, the completion of the Exchange Offer shall be subject to a condition (which condition Burgundy may not amend or waive without the written consent of Grizzly) that no one stockholder of Spinco (individually or together with all members of any "group" as defined in the Exchange Act) after giving effect to the Exchange Offer and the Merger, hold greater than 20% of the outstanding common stock of Grizzly; provided further, however, that Burgundy may, in its sole discretion, revise the terms of the Exchange Offer, including the number of shares of Spinco Common Stock that will be offered for each validly tendered share of Burgundy Common Stock, and the Clean-Up Spin Off, such that no one stockholder of Spinco (individually or together with all members of any "group" as defined in the Exchange Act) after giving effect to the Exchange Offer and the Merger, will hold greater than 20% of the outstanding common stock of Grizzly. The terms and conditions of any Clean-Up Spin-Off will be as determined by Burgundy, subject to the provisions of Section 4.2(a), *mutatis mutandis*.

(c) None of the Parties, nor any of their Affiliates hereto will be liable to any Person in respect of any shares of Spinco Common Stock (or dividends or distributions with respect thereto) that are properly delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

Section 4.3 Conditions to the Distribution. The obligations of Burgundy pursuant to this Agreement to effect the Distribution will be subject to the fulfillment (or waiver by Burgundy) at or prior to the Distribution Date of the following conditions:

(a) the Spinco Reorganization has been consummated;

(b) the Recapitalization shall have occurred on the terms contemplated by this Agreement and the Merger Agreement and Burgundy shall have received the Special Distribution;

(c) Burgundy and Spinco shall have received the IRS D Reorganization Ruling and the IRS Debt Exchange Ruling, each in form and substance reasonably satisfactory to Burgundy and Spinco, and such rulings shall continue to be valid and in full force and effect (and, for the avoidance of doubt, such rulings shall not have been invalidated, modified or otherwise affected by any change in any Law on or after the date such rulings were issued by the IRS);

(d) Burgundy shall have received the Distribution Tax Opinion;

(e) Burgundy and Spinco shall have prepared and mailed to the holders of record of Burgundy Common Stock such information concerning Spinco, its business, operations and management, the Distribution and such other matters as Burgundy shall determine and as may otherwise be required by Law; and

- 40 -

PPG102897

(f) each of the conditions to Burgundy's obligation to effect the transactions contemplated in the Merger Agreement shall have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Distribution Date and other than the conditions set forth in Section 9.1(a) of the Merger Agreement).

Section 4.4 <u>Actions Prior to Distribution</u>. (a) Spinco will cooperate with Burgundy to accomplish the Distribution, including in connection with the preparation of all documents and the making of all filings required in connection with the Distribution. Burgundy will be permitted to reasonably direct and control the efforts of the Parties in connection with the Distribution (including the selection of investment bank or manager in connection with the Distribution, as well as any financial printer, solicitation and/or exchange agent and financial, legal, accounting and other advisors for Burgundy), and Spinco will use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all other things reasonably necessary to facilitate the Distribution as reasonably directed by Burgundy in good faith. Without limiting the generality of the foregoing, Spinco will and will cause its employees, advisors, agents, accountants, counsel and other representatives to, as reasonably directed by Burgundy in good faith, reasonably cooperate in and take the following actions: (i) preparing and filing the registration under the Securities Act or the Exchange Act of Spinco Common Stock on an appropriate registration form or forms to be designated by Burgundy (the "<u>Spinco Registration Statement</u>"), (ii) participating in meetings, drafting sessions, due diligence sessions, management presentation sessions, and "road shows" in connection with the Distribution (including any marketing efforts), which participation shall be subject to, and may be concurrent with, any such activities required with respect to the Exchange Offer, (iii) furnishing to any dealer manager or other similar agent participating in the Distribution (A) "cold comfort" letters from independent public accountants in customary form and covering such matters as are customary for an underwritten public offering (including with respect to events subsequent to the date of financial statements included in any offering document) and (B) opinions and negative assurance letters of counsel in customary form and covering such matters as may be reasonably requested, and (iv) furnishing all historical and forward-looking financial and other pertinent financial and other information that is available to Spinco and is reasonably required in connection with the Distribution. Without limiting the foregoing, the Parties will perform the marketing activities set forth in Schedule 4.4 as provided therein.

(b) Burgundy and Spinco will prepare and mail, prior to any Distribution Date, to the holders of Burgundy Common Stock, such information concerning Spinco, Grizzly, their respective businesses, operations and management, the Distribution and such other matters as Burgundy will reasonably determine and as may be required by Law. Burgundy and Spinco will prepare, and Spinco will, to the extent required under applicable Law, file with the SEC any such documentation and any requisite no-action letters which Burgundy determines are necessary or desirable to effectuate the Distribution and Burgundy and Spinco will each use its reasonable best efforts to obtain all necessary approvals from the SEC with respect thereto as soon as practicable.

- 41 -

(c) Burgundy and Spinco will take all such action as may be necessary or appropriate under the securities or blue sky Laws of the United States (and any comparable Laws under any foreign jurisdiction) in connection with the Distribution.

(d) Burgundy and Spinco will take all reasonable steps necessary and appropriate to cause the conditions set forth in Section 4.3 to be satisfied and to effect the Distribution on any Distribution Date.

Section 4.5 Additional Matters.

(a) Tax Withholding. Burgundy, Spinco, or the transfer agent or the exchange agent in the Distribution, as applicable, shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement such amounts as are required to be deducted and withheld with respect to the making of such payments under the Code or any provision of local or foreign Tax Law. Any withheld amounts will be treated for all purposes of this Agreement as having been paid to the Persons otherwise entitled thereto.

(b) Delivery of Certificate. Upon the consummation of the One-Step Spin-Off or the Exchange Offer, Burgundy will deliver to the Agent, a global certificate representing the Spinco Common Stock being distributed in the One-Step Spin-Off or exchanged in the Exchange Offer, as the case may be, for the account of the Burgundy stockholders that are entitled thereto. Upon a Clean-Up Spin-Off, if any, Burgundy will deliver to the Agent an additional global certificate representing the Spinco Common Stock being distributed in the Clean-Up Spin-Off for the account of the Burgundy stockholders that are entitled thereto. The Agent will hold such certificate or certificates, as the case may be, for the account of the Burgundy stockholders pending the Merger, as provided in Section 3.2 of the Merger Agreement. Immediately after the time of the Distribution and prior to the Effective Time, the shares of Spinco Common Stock will not be transferable and the transfer agent for the Spinco Common Stock will not transfer any shares of Spinco Common Stock. The Distribution will be deemed to be effective upon written authorization from Burgundy to the transfer agent or the exchange agent in the Distribution to proceed as set forth in Section 4.2.

**ARTICLE V**

**MUTUAL RELEASES; INDEMNIFICATION**

Section 5.1 Release of Pre-Business Transfer Time Claims.

(a) Spinco Release. Except as provided in Section 5.1(c), effective as of the Business Transfer Time, Spinco will, for itself and each other member of the Spinco Group, and their respective successors and assigns, remise, release and forever discharge the Burgundy Indemnitees from any and all Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur at or before the Business Transfer Time or any conditions existing or alleged to have existed at or before the Business Transfer Time, including in connection with the transactions and all other activities to implement the Spinco Reorganization,

- 42 -

PPG102899

the Recapitalization and the Distribution. Without limitation, the foregoing release includes a release of any rights and benefits with respect to such Liabilities that Spinco and each member of the Spinco Group, and their respective successors and assigns, now has or in the future may have conferred upon them by virtue of any statute or common law principle which provides that a general release does not extend to claims which a party does not know or suspect to exist in its favor at the time of executing the release, if knowledge of such claims would have materially affected such party's settlement with the obligor. In this connection, Spinco hereby acknowledges that it is aware that factual matters now unknown to it may have given or may hereafter give rise to Liabilities that are presently unknown, unanticipated and unsuspected, and it further agrees that this release has been negotiated and agreed upon in light of that awareness and it nevertheless hereby intends to release the Burgundy Indemnitees from the Liabilities described in the first sentence of this Section 5.1(a).

(b) <u>Burgundy Release</u>. Except as provided in Section 5.1(c), effective as of the Business Transfer Time, Burgundy will, for itself and each other member of the Burgundy Group, and their respective successors and assigns, remise, release and forever discharge the Spinco Indemnitees from any and all Liabilities whatsoever, whether at Law or in equity (including any right of contribution), whether arising under any Contract, by operation of Law or otherwise, existing or arising from any acts or events occurring or failing to occur or alleged to have occurred or to have failed to occur at or before the Business Transfer Time or any conditions existing or alleged to have existed at or before the Business Transfer Time, including in connection with the transactions and all other activities to implement any of the Spinco Reorganization, the Recapitalization and the Distribution. Without limitation, the foregoing release includes a release of any rights and benefits with respect to such Liabilities that Burgundy and each member of the Burgundy Group, and their respective successors and assigns, now has or in the future may have conferred upon them by virtue of any statute or common law principle which provides that a general release does not extend to claims which a party does not know or suspect to exist in its favor at the time of executing the release, if knowledge of such claims would have materially affected such party's settlement with the obligor. In this connection, Burgundy hereby acknowledges that it is aware that factual matters now unknown to it may have given or may hereafter give rise to Liabilities that are presently unknown, unanticipated and unsuspected, and it further agrees that this release has been negotiated and agreed upon in light of that awareness and it nevertheless hereby intends to release the Spinco Indemnitees from the Liabilities described in the first sentence of this Section 5.1(b).

(c) <u>No Impairment</u>. Nothing contained in Section 5.1(a) or 5.1(b) releases or will release any Person from (nor impairs or will impair any right of any Person to enforce the applicable agreements, arrangements, commitments or understandings relating thereto) the obligations under this Agreement, the Merger Agreement or any Ancillary Agreement, in each case in accordance with its terms. In addition, nothing in Section 5.1 (a) or 5.1(b) shall release any Person from:

(i) any Liability provided in or resulting from any agreement or obligation among any members of the Burgundy Group or the Spinco Group that is specified in this Agreement, the Merger Agreement or any Ancillary Agreement as not terminating on or before Distribution Date;

- 43 -

(ii) any Liability assumed, transferred, assigned or allocated to the Group of which such Person is a member in accordance with this Agreement, the Merger Agreement or any other Ancillary Agreement, or any other Liability of any member of any Group under this Agreement, the Merger Agreement or any other Ancillary Agreement;

(iii) any Liability for unpaid amounts for products or services or refunds owing on products or services due on a value-received basis for work done by a member of one Group at the request or on behalf of a member of the other Group;

(iv) any Liability that the Parties may have with respect to indemnification or contribution pursuant to this Agreement for claims brought against the Parties by third Persons, and, if applicable, the appropriate provisions of the Merger Agreement and Ancillary Agreements;

(v) any Liability the release of which would result in the release of any Person other than a Person released pursuant to Section 5.1; or

(vi) any Liability for fraud or willful misconduct.

(d) No Actions as to Released Pre-Business Transfer Time Claims. Following the Business Transfer Time, Spinco will not, and will cause its Affiliates not to, make any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against Burgundy or any member of the Burgundy Group, or any other Person released pursuant to Section 5.1(a), with respect to any Liabilities released pursuant to Section 5.1(a). Following the Business Transfer Time, Burgundy will not, and will cause each other member of the Burgundy Group not to, make any claim or demand, or commence any Action asserting any claim or demand, including any claim of contribution or any indemnification, against Spinco or any member of the Spinco Group, or any other Person released pursuant to Section 5.1(b), with respect to any Liabilities released pursuant to Section 5.1(b).

(e) General Intent. It is the intent of each of Burgundy and Spinco, by virtue of the provisions of this Section 5.1, to provide for a full and complete release and discharge of all Liabilities existing or arising from all acts and events occurring or failing to occur or alleged to have occurred or to have failed to occur and all conditions existing or alleged to have existed on or before the Business Transfer Time, between or among Spinco or any member of the Spinco Group, on the one hand, and Burgundy or any member of the Burgundy Group, on the other hand (including any Contractual agreements or arrangements existing or alleged to exist between or among any such members on or before the Business Transfer Time), except as expressly set forth in Section 5.1(c). At any time, at the request of any other Party, each Party will cause each member of its Group to execute and deliver releases reflecting the provisions hereof.

Section 5.2 Indemnification by the Spinco Group. Without limiting or otherwise affecting the indemnity provisions of the Ancillary Agreements, from and after the Business Transfer Time, Spinco, and each member of the Spinco Group will, on a joint and several basis,

- 44 -

indemnify, defend (or, where applicable, pay the defense costs for) and hold harmless the Burgundy Indemnitees from and against, and will reimburse such Burgundy Indemnitees with respect to, any and all Losses that result from, relate to or arise, whether prior to, at or following the Business Transfer Time, out of any of the following items (without duplication):

(a) any failure of Spinco or any other member of the Spinco Group or any other Person to pay, perform, fulfill, discharge and, to the extent applicable, comply with, in due course and in full, any Spinco Liabilities;

(b) any breach by Spinco or any other member of the Spinco Group of any agreement or obligation to be performed by such Persons pursuant to this Agreement or any Ancillary Agreement unless such Ancillary Agreement expressly provides for separate indemnification therein (which shall be controlling); and

(c) the enforcement by the Burgundy Indemnitees of their rights to be indemnified, defended and held harmless under this Section 5.2.

Section 5.3 Indemnification by Burgundy. Without limiting or otherwise affecting the indemnity provisions of the Ancillary Agreements, from and after the Business Transfer Time, Burgundy, and each member of the Burgundy Group will, on a joint and several basis, indemnify, defend (or, where applicable, pay the defense costs for) and hold harmless the Spinco Indemnitees from and against, and will reimburse such Spinco Indemnitee with respect to, any and all Losses that result from, relate to or arise, whether prior to or following the Business Transfer Time, out of any of the following items (without duplication):

(a) any failure of Burgundy or any other member of the Burgundy Group or any other Person to pay, perform, fulfill, discharge and, to the extent applicable, comply with, in due course and in full the Excluded Liabilities, whether prior to or after the Business Transfer Date or the date hereof;

(b) any breach by Burgundy or any other member of the Burgundy Group of any agreement or obligation to be performed by such Persons pursuant to this Agreement or any Ancillary Agreement unless such Ancillary Agreement expressly provides for separate indemnification therein (which, including any limitations on liability contained therein, shall be controlling); and

(c) the enforcement by the Spinco Indemnitees of their rights to be indemnified, defended and held harmless under this Section 5.3.

Section 5.4 Payments; Reductions for Insurance Proceeds and Other Recoveries.

(a) Payments. Indemnification payments in respect of any Liabilities for which an Indemnitee is entitled to indemnification under this Article V will be paid by the Indemnifying Party to the Indemnitee as such Liabilities are incurred upon demand by the Indemnitee, including reasonably satisfactory documentation setting forth the basis for the amount of such indemnification payment, including documentation with respect to calculations made and consideration of any Insurance Proceeds that actually reduce the amount of such

- 45 -

PPG102902

Liabilities. The indemnity agreements contained in this Article V will remain operative and in full force and effect, regardless of (i) any investigation made by or on behalf of any Indemnitee, (ii) the knowledge by the Indemnitee of Liabilities for which it might be entitled to indemnification hereunder and (iii) any termination of this Agreement.

(b) Insurance Proceeds. The amount that any Indemnifying Party is or may be required to provide indemnification to or on behalf of any Indemnitee pursuant to Section 5.2 or Section 5.3 as applicable, will be reduced (retroactively or prospectively) by any Insurance Proceeds or other amounts actually recovered from unaffiliated third parties (and excluding any captive insurance companies of the Indemnitee or its Affiliates or any Taxing Authority) by or on behalf of such Indemnitee in respect of the related Loss (net of increased insurance premiums and charges related directly and solely to the related indemnifiable Losses and costs and expenses (including reasonable legal fees and expenses) incurred by such Indemnitee in connection with seeking to collect and collecting such amounts). The existence of a claim by an Indemnitee for monies from an insurer or against a third party in respect of any indemnifiable Loss will not, however, delay any payment pursuant to the indemnification provisions contained herein and otherwise determined to be due and owing by an Indemnifying Party. Rather, the Indemnifying Party will make payment in full of the amount determined to be due and owing by it against an assignment by the Indemnitee to the Indemnifying Party of the entire claim of the Indemnitee for Insurance Proceeds or against such third party. Notwithstanding any other provisions of this Agreement, it is the intention of the Parties that no insurer or any other third party will be (i) entitled to a "windfall" or other benefit it would not be entitled to receive in the absence of the foregoing indemnification provisions or otherwise have any subrogation rights with respect thereto, or (ii) relieved of the responsibility to pay any claims for which it is obligated. The Indemnitee will use and will cause its Affiliates to use commercially reasonable efforts to pursue claims against applicable insurers for coverage of such Loss under such policies, subject to Section 6.11.

(c) Tax Treatment; Adjustments for Tax Benefits and Cost.

(i) In the absence of a Final Determination to the contrary and except for any interest for any period beginning after the Distribution Date, any amount payable by Spinco to Burgundy or by Burgundy to Spinco under this Agreement shall be treated for Tax purposes as a distribution or capital contribution, respectively, occurring immediately prior to the Distribution.

(ii) Notwithstanding the foregoing, the amount that any Indemnifying Party is or may be required to provide indemnification to or on behalf of any Indemnitee pursuant to Section 5.2 or Section 5.3 as applicable, will be (i) decreased to take into account the present value of any Tax benefit made allowable to the Indemnitee (or an Affiliate thereof) arising from the incurrence or payment of the relevant indemnified item, and (ii) increased to take into account any Tax cost of the Indemnitee (or an Affiliate thereof) arising from the receipt of the relevant indemnity payment. For purposes of this Section 5.4(c)(ii), any Tax benefit or Tax cost, as applicable, shall be determined (i) using the highest marginal rates in effect at the time of the determination, (ii) assuming the Indemnitee will be liable for such Taxes at such rate and has no Tax attributes at

- 46 -

the time of the determination, and (iii) assuming that any such Tax benefit is used at the earliest date allowable by applicable Law. The present value referred to in the first sentence of this Section 5.4(c)(ii) shall be determined using a discount rate equal to the mid term applicable federal rate in effect at the time of the payment of the relevant indemnity payment.

Section 5.5 Procedures for Defense, Settlement and Indemnification of Third-Party Claims.

(a) Direct Claims. All claims made hereunder on account of indemnifiable Losses that do not involve Third-Party Claims shall be asserted by reasonably prompt written notice given by the Indemnitee to the Indemnifying Party from whom such indemnification is sought. Notwithstanding the foregoing, the delay or failure of any Indemnitee to give notice as provided in this Section 5.5(a) will not relieve the relevant Indemnifying Party of its obligations under this Article V, except to the extent that such Indemnifying Party is actually prejudiced by such delay or failure to give notice.

(b) Third-Party Claims.

(i) Notice of Claims. If an Indemnitee receives notice or otherwise learns of the assertion by a Person (including any Governmental Authority) who is not a member of the Burgundy Group or Grizzly or any of its Affiliates (including after the Spinco Reorganization, the Spinco Group) of any claim or of the commencement by any such Person of any Action with respect to which an Indemnifying Party may be obligated to provide indemnification under this Agreement (collectively, a "Third-Party Claim"), such Indemnitee will give such Indemnifying Party prompt written notice (a "Claims Notice") thereof but in any event within 15 calendar days after becoming aware of such Third-Party Claim. Any such notice will describe the Third-Party Claim in reasonable detail and include copies of all notices and documents (including court papers) received by the Indemnitee relating to the Third-Party Claim. Notwithstanding the foregoing, the delay or failure of any Indemnitee or other Person to give notice as provided in this Section 5.5 will not relieve the related Indemnifying Party of its obligations under this Article V, except to the extent that such Indemnifying Party is actually prejudiced by such delay or failure to give notice.

(ii) Opportunity to Defend. The Indemnifying Party shall have the right, exercisable by written notice to the Indemnitee within 30 days after receipt of a Claims Notice from the Indemnitee of the commencement or assertion of any Third-Party Claim in respect of which indemnity may be sought under this Article V, to assume and conduct the defense of such Third-Party Claim in accordance with the limits set forth in this Agreement with counsel selected by the Indemnifying Party and reasonably acceptable to the Indemnitee; provided, however, that the (A) defense of such Third-Party Claim by the Indemnifying Party will not, in the reasonable judgment of the Indemnitee, (1) if Burgundy or

- 47 -

PPG102904

any member of the Burgundy Group is the Indemnifying Party, reasonably be expected to affect Grizzly or any of its controlled Affiliates (including after the Merger, any member of the Spinco Group) in a materially adverse manner (for the avoidance of doubt, any Third Party Claim relating to or arising in connection with any criminal proceeding, Action, indictment, allocation or investigation against Grizzly or its Affiliates shall be deemed materially adverse), and (2) if Spinco or any member of the Spinco Group is the Indemnifying Party, reasonably be expected to affect Burgundy or any of its controlled Affiliates in a materially adverse manner (for the avoidance of doubt, any Third Party Claim relating to or arising in connection with any criminal proceeding, Action, indictment, allocation or investigation against Burgundy or its Affiliates shall be deemed materially adverse) and (B) the Third-Party Claim solely seeks (and continues to seek) monetary damages (the conditions set forth in clauses (A) and (B) are, collectively, the "Litigation Conditions"). If the Indemnifying Party does not assume the defense of a Third-Party Claim in accordance with this Section 5.5, the Indemnitee may continue to defend the Third-Party Claim. If the Indemnifying Party has assumed the defense of a Third-Party Claim as provided in this Section 5.5, the Indemnifying Party will not be liable for any legal expenses subsequently incurred by the Indemnitee in connection with the defense of the Third-Party Claim; provided, however, that if (x) either of the Litigation Conditions ceases to be met or (y) the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third-Party Claim, the Indemnitee may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense. The Indemnifying Party or the Indemnitee, as the case may be, has the right to participate in (but, subject to the prior sentence, not control), at its own expense, the defense of any Third-Party Claim that the other is defending as provided in this Agreement. The Indemnifying Party, if it has assumed the defense of any Third-Party Claim as provided in this Agreement, may not, without the prior written consent of the Indemnitee, consent to a settlement of, or the entry of any judgment arising from, any such Third-Party Claim that (I) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnitee of a complete release from all liability in respect of such Third-Party Claim, (II) provides for injunctive or other nonmonetary relief affecting the Indemnitee or any of its Affiliates, or (III) in the reasonable opinion of the Indemnitee, would otherwise materially adversely affect the Indemnitee or any of its Affiliates. The Indemnitee may settle any Third-Party Claim, the defense of which has not been assumed by the Indemnifying Party, only with the prior written consent of the Indemnifying Party, not to be unreasonably withheld, conditioned or delayed.

Section 5.6 Additional Matters.

(a) Cooperation in Defense and Settlement. With respect to any Third-Party Claim for which Spinco, on the one hand, and Burgundy, on the other hand, may have Liability under this Agreement or any of the Ancillary Agreements, the Parties agree to cooperate fully and maintain a joint defense (in a manner that will preserve the attorney-client privilege, joint

- 48 -

defense or other privilege with respect thereto) so as to seek to minimize such Liabilities and defense costs associated therewith. The Party that is not responsible for managing the defense of such Third-Party Claims will, upon reasonable request, be consulted with respect to significant matters relating thereto and may retain counsel to monitor or assist in the defense of such claims at its own cost.

(b) <u>Certain Actions</u>.

(i) Notwithstanding anything to the contrary set forth in <u>Section 5.5</u>, Burgundy may elect to have exclusive authority and control over the investigation, prosecution, defense and appeal of all Actions (excluding any Actions relating to the Ohio River/Calcesieu Liabilities, which are subject to <u>Section 5.6(e)</u>) pending at the Business Transfer Time which relate to or arise out of the Eagle Business, the Spinco Assets or the Spinco Liabilities if such Action primarily relates to the Excluded Assets and Excluded Liabilities and a member of the Burgundy Group is also named as a target or defendant thereunder; <u>provided</u> that (i) Burgundy will consult with Spinco on a regular basis with respect to strategy and developments with respect to any such Action, (ii) if Burgundy fails to take reasonable steps necessary to defend diligently such Action, Spinco may assume such defense, and Burgundy will be liable for all reasonable costs or expenses paid or incurred in connection with such defense, (iii) Spinco has the right to participate in (but, subject to clause (ii) above, not control) the defense of such Action, and (iv) Burgundy obtains the written consent of Spinco, such consent not to be unreasonably withheld or delayed, to settle or compromise or consent to the entry of judgment with respect to such Action if such settlement, consent or judgment would (x) provide for injunctive or other nonmonetary relief affecting Spinco or any of its Affiliates, or (y) in the reasonable opinion of Spinco, would otherwise materially adversely affect Spinco or any of its Affiliates or reasonably expected to result in a payment by Spinco Group in excess of $2 million. After any such compromise, settlement, consent to entry of judgment or entry of judgment, Burgundy and Spinco will agree upon a reasonable allocation to Spinco and Spinco will be responsible for or receive, as the case may be, Spinco' proportionate share of any such compromise, settlement, consent or judgment attributable to the Spinco Business, the Spinco Assets or the Spinco Liabilities, including its proportionate share of the reasonable costs and expenses associated with defending same.

(ii) Notwithstanding anything to the contrary set forth in <u>Section 5.5</u>, Burgundy shall have exclusive authority and control over the investigation, prosecution, defense and appeal of all Actions relating to the matters set forth on Schedule 2.5(b)(ix).

(c) <u>Substitution</u>. In the event of an Action that involves solely matters that are indemnifiable and in which the Indemnifying Party is not a named defendant, if either the Indemnitee or the Indemnifying Party so requests, the Parties will endeavor to substitute the Indemnifying Party for the named defendant. If such substitution or addition cannot be achieved

- 49 -

PPG102906

for any reason or is not requested, the rights and obligations of the Parties regarding indemnification and the management of the defense of claims as set forth in this Article V will not be affected.

(d) Subrogation. In the event of payment by or on behalf of any Indemnifying Party to or on behalf of any Indemnitee in connection with any Third-Party Claim, such Indemnifying Party will be subrogated to and will stand in the place of such Indemnitee, in whole or in part based upon whether the Indemnifying Party has paid all or only part of the Indemnitee's Liability, as to any events or circumstances in respect of which such Indemnitee may have any right, defense or claim relating to such Third-Party Claim against any claimant or plaintiff asserting such Third-Party Claim or against any other Person. Such Indemnitee will cooperate with such Indemnifying Party in a reasonable manner, and at the cost and expense of such Indemnifying Party, in prosecuting any subrogated right, defense or claim.

(e) Special Provisions Related to Environmental Matters. Without limiting Section 2.5(b), but subject to the Parties entering into a written agreement with respect thereto, Spinco shall provide reasonable cooperation to enable Burgundy to satisfy its obligations relating to the Ohio River/Calcesieu Estuary Liabilities including providing reasonable access to, through and over the Natrium and Lake Charles sites that are Spinco Active Sites for Burgundy, its employees, contractors, and consultants. In the event that Spinco brings a claim for indemnification for the Ohio River/Calcesieu Estuary Liabilities against Burgundy related to the Ohio River sediments, Burgundy shall have the right, but not the obligation, to control any such Remediation; provided, however, Burgundy (i) keeps Spinco apprised of the status of the Remediation; (ii) provides drafts of any significant workplan, report, study or other deliverable before submission to a Governmental Authority or interested third party for review and comment by Spinco; and (iii) promptly provides Spinco with copies of any and all data, analyses, reports, or other documents and significant communications generated in connection with the Remediation. Burgundy shall elect to either control the Remediation of the Ohio River sediments set forth in such notice or not to control the Remediation of the Ohio River sediments in writing within thirty (30) days of receiving written notice of the Claim. Should Burgundy elect not to assume control of the Remediation of the Ohio River sediments pursuant to this section, then Spinco shall (i) keep Burgundy apprised of the status of the Remediation; (ii) provide drafts of any significant workplan, report, study or other deliverable before submission to a Governmental Authority or interested third party for review and comment by Burgundy; and (iii) promptly provide Burgundy with copies of any and all data, analyses, reports, or other documents and significant communications generated in connection with the Remediation. Subject to the satisfaction of the terms and conditions of Section 5.5(b), Burgundy may take control of all negotiations and proceedings with Governmental Agencies and relevant third parties relating to the Ohio River/Calcasieu Estuary Liabilities.

Section 5.7 Exclusive Remedy. Each of Grizzly and Burgundy is an established business entity that has been represented by experienced counsel in connection with the execution and delivery of this Agreement and the Ancillary Agreements, and intends and hereby agrees that this Article V sets forth the exclusive remedy and rights of the Parties following the Business Transfer Time in respect of the matters indemnified under this Article V, except that nothing contained in this Section 5.7 will impair any right of any Person (a) to exercise all of their rights and seek all damages available to them under Law in the event of claims or causes of action

- 50 -

PPG102907

arising from fraud or willful misconduct; (b) to specific performance under this Agreement; and (c) to equitable relief as provided in Section 7.15 hereof. In furtherance of the foregoing, each of the Parties hereto hereby waives, to the fullest extent permitted under applicable Law, any and all rights, claims and causes of action it may have against the other Party in connection herewith, arising under or based upon any Law other than the right to seek indemnity pursuant to this Article V and the right to seek the relief described in clauses (a), (b) and (c) of the preceding sentence.

Section 5.8 Survival of Indemnities. The rights and obligations of Burgundy and Spinco and its Indemnitees under this Article V will survive the sale or other transfer by any Party of any Assets or businesses or the assignment by any Party of any Liabilities.

## ARTICLE VI

### ADDITIONAL AGREEMENTS

Section 6.1 Further Assurances. Subject to the limitations of Section 2.7:

(a) In addition to the actions specifically provided for elsewhere in this Agreement, the Merger Agreement or in any Ancillary Agreement, each of the Parties hereto will cooperate with each other and use (and will cause its Subsidiaries and Affiliates to use) commercially reasonable efforts, prior to, at and after the Business Transfer Time, to take, or to cause to be taken, all actions, and to do, or to cause to be done, all things reasonably necessary, proper or advisable on its part under applicable Law or Contractual obligations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as reasonably practicable.

(b) Without limiting the generality of Section 6.1(a), where the cooperation of third parties such as insurers or trustees would be necessary in order for a Party to completely fulfill its obligations under this Agreement or the Ancillary Agreements, such Party will use commercially reasonable efforts to cause such third Parties to provide such cooperation. If any Affiliate of Burgundy or Spinco is not a party to this Agreement or, as applicable, any Ancillary Agreement, and it becomes necessary or desirable for such Affiliate to be a party hereto or thereto to carry out the purpose hereof or thereof, then Burgundy or Spinco, as applicable, will cause such Affiliate to become a party hereto or thereto or cause such Affiliate to undertake such actions as if such Affiliate were such a party.

Section 6.2 Agreement for Exchange of Information.

(a) Generally. Except as otherwise provided in the Transition Services Agreement, each Party, on behalf of its Group, will provide, or cause to be provided, to the other Party's Group, at any time after the Business Transfer Time and until the later of (x) the sixth anniversary of the Business Transfer Time and (y) the expiration of the relevant statute of limitations period, if applicable, as soon as reasonably practicable after written request therefor, any Shared Information in its possession or under its control. Each of Burgundy and Spinco agree to make its personnel available during regular business hours to discuss the Information exchanged pursuant to this Section 6.2. The obligations set forth in this Section 6.2 with respect

- 51 -

PPG102908

to the data required for worker's compensation claim handling and filings will survive the sixth anniversary time period herein and will instead survive indefinitely. The parties agree that, after Closing, Shared Information will be subject to the confidentiality obligations in the Confidentiality Agreement as if such Information were provided prior to the Business Transfer Time.

(b) <u>Financial Information for Burgundy</u>. Without limitation to <u>Section 6.2(a)</u>, until the end of the first full fiscal year occurring after the Distribution Date (and for a reasonable period of time afterwards as required by Law for Burgundy to prepare consolidated financial statements or complete a financial statement audit for any period during which the financial results of the Spinco Group were consolidated with those of Burgundy), Spinco will use its reasonable best efforts to enable Burgundy to meet its timetable for dissemination of its financial statements and to enable Burgundy's auditors to timely complete their annual audit and quarterly reviews of financial statements. As part of such efforts, to the extent reasonably necessary for the preparation of financial statements or completing an audit or review of financial statements or an audit of internal control over financial reporting, (i) Spinco will authorize and direct its auditors to make available to Burgundy's auditors, within a reasonable time prior to the date of Burgundy's auditors' opinion or review report, both (x) the personnel who performed or will perform the annual audits and quarterly reviews of Spinco and (y) work papers related to such annual audits and quarterly reviews, to enable Burgundy's auditors to perform any procedures they consider reasonably necessary to take responsibility for the work of Spinco's auditors as it relates to Burgundy's auditors' opinion or report and (ii) until all governmental audits are complete, Spinco will provide reasonable access during normal business hours for Burgundy's internal auditors, counsel and other designated representatives to (x) the premises of Spinco and its Subsidiaries and all Information (and duplicating rights) within the knowledge, possession or control of Spinco and its Subsidiaries and (y) the officers and employees of Spinco and its Subsidiaries, so that Burgundy may conduct reasonable audits relating to the financial statements provided by Spinco and its Subsidiaries; <u>provided</u>, <u>however</u>, that such access will not be unreasonably disruptive to the business and affairs of the Spinco Group.

(c) <u>Financial Information for Spinco</u>. Without limitation to <u>Section 6.2(a)</u>, until the end of the first full fiscal year occurring after the Distribution Date (and for a reasonable period of time afterwards or as required by Law), Burgundy will use its reasonable best efforts to enable Spinco to meet its timetable for dissemination of its financial statements and to enable Spinco's auditors to timely complete their annual audit and quarterly reviews of financial statements. As part of such efforts, to the extent reasonably necessary for the preparation of financial statements or completing an audit or review of financial statements or an audit of internal control over financial reporting, (i) Burgundy will authorize and direct its auditors to make available to Spinco's auditors, within a reasonable time prior to the date of Spinco's auditors' opinion or review report, both (x) the personnel who performed or will perform the annual audits and quarterly reviews of Burgundy and (y) work papers related to such annual audits and quarterly reviews, to enable Spinco's auditors to perform any procedures they consider reasonably necessary to take responsibility for the work of Burgundy's auditors as it relates to Spinco's auditors' opinion or report and (ii) until all governmental audits are complete, Burgundy will provide reasonable access during normal business hours for Spinco's internal auditors, counsel and other designated representatives to (x) the premises of Burgundy and its Subsidiaries and all Information (and duplicating rights) within the knowledge, possession or

- 52 -

control of Burgundy and its Subsidiaries and (y) the officers and employees of Burgundy and its Subsidiaries, so that Spinco may conduct reasonable audits relating to the financial statements provided by Burgundy and its Subsidiaries; provided, however, that such access will not be unreasonably disruptive to the business and affairs of the Burgundy Group.

(d) Limitations of Liability. Neither Party will have any Liability to the other Party in the event that any Information exchanged or provided pursuant to this Agreement that is an estimate or forecast, or that is based on an estimate or forecast, is found to be inaccurate in the absence of fraud or willful misconduct by the providing Person.

(e) Ownership of Information. Any Information owned by a Party that is provided to the other Party pursuant to this Section 6.2(e) remains the property of the Party that owned and provided such Information. Each Party will, and will cause members of its Group to, remove and destroy any hard drives or other electronic data storage devices from any computer or server that is reasonably likely to contain Information that is protected by this Section 6.2(e) and that is transferred or sold to a third-party or otherwise disposed of in accordance with this Section 6.2(e), unless required by Law to retain such materials.

(f) Record Retention. Each Party agrees to use its commercially reasonable efforts to retain all Information that relates to the operations of the Eagle Business in its possession or control at the Business Transfer Time in accordance with the policies of such Person as in effect on the Business Transfer Time or such other policies as may be adopted by such Person thereafter (provided, in the case of Spinco, that Burgundy notify Spinco of any such change). No Party will destroy, or permit any of its Subsidiaries to destroy, any Information which the other Party may have the right to obtain pursuant to this Agreement without notifying the other Party of the proposed destruction and giving the other Party the reasonable opportunity to take possession or make copies of such Information prior to such destruction. Notwithstanding the foregoing, Section 7.02 of the Tax Matters Agreement will govern the retention of Tax Returns, schedules and work papers and all material records or other documents relating thereto.

(g) Other Agreements Providing for Exchange of Information. The rights and obligations granted under this Section 6.2 are subject to any specific limitations, qualifications or additional provisions on the sharing, exchange or confidential treatment of Information set forth in this Agreement, the Confidentiality Agreement and any Ancillary Agreement.

(h) Compensation for Providing Information. The Party requesting Information agrees to reimburse the other Party for the reasonable out-of-pocket costs, if any, actually incurred in creating, gathering and copying such Information, to the extent that such costs are incurred for the benefit of the requesting Party.

(i) Production of Witnesses; Records; Cooperation.

(i) After the Business Transfer Time, except in the case of any Action by one Party or its Affiliates against another Party or its Affiliates, each Party will use its commercially reasonable efforts to make available to each other Party, upon written request, the former, current and future directors, officers, employees,

- 53 -

PPG102910

other personnel and agents of the members of its Group as witnesses and any books, records or other documents within its control or which it otherwise has the ability to make available, to the extent that any such person (giving consideration to business demands of such directors, officers, employees, other personnel and agents) or books, records or other documents may reasonably be required in connection with any Action in which the requesting Party may from time to time be involved, regardless of whether such Action is a matter with respect to which indemnification may be sought hereunder. The requesting Party agrees to reimburse the other Party for the reasonable out-of-pocket costs, if any, incurred in connection therewith.

(ii) If an Indemnifying Party chooses to defend or to seek to compromise or settle any Third-Party Claim, the other Party will make available to such Indemnifying Party, upon written request, the former, current and future directors, officers, employees, other personnel and agents of the members of its Group as witnesses and any books, records or other documents within its control or which it otherwise has the ability to make available, to the extent that any such person (giving consideration to business demands of such directors, officers, employees, other personnel and agents) or books, records or other documents may reasonably be required in connection with such defense, settlement or compromise, or the prosecution, evaluation or pursuit thereof, as the case may be, and will otherwise cooperate in such defense, settlement or compromise, or such prosecution, evaluation or pursuit, as the case may be.

(iii) Without limiting the foregoing, the Parties will cooperate and consult to the extent reasonably necessary with respect to Third-Party Claims.

(iv) The obligation of the Parties to provide witnesses pursuant to this Section 6.2(i) is intended to be interpreted in a manner so as to facilitate cooperation and will include the obligation to provide witnesses without regard to whether the witness or the employer of the witness could assert a possible business conflict.

(v) In connection with any matter contemplated by this Section 6.2(i), the Parties will enter into a mutually acceptable joint defense agreement so as to maintain to the extent practicable any applicable attorney-client privilege or work product immunity of any member of any Group.

(j) Restrictions. Except as expressly provided in this Agreement or the Ancillary Agreements, no Party or member of such Party's Group hereunder grants or confers rights of license in any Information owned by any member of such Party's Group to any member of the other Party's Group hereunder.

Section 6.3 Privileged Matters.

(a) The respective rights and obligations of the Parties to maintain, preserve, assert or waive any or all privileges belonging to either Party or its Subsidiaries with respect to

- 54 -

the Spinco Business or the Non-Spinco Business, including the attorney-client and work product privileges (collectively, "<u>Privileges</u>"), will be governed by the provisions of this <u>Section 6.3</u>. With respect to Privileged Information of Burgundy, Burgundy will have sole authority in perpetuity to determine whether to assert or waive any or all Privileges, and Spinco will not take any action (or permit any member of its Group to take action) without the prior written consent of Burgundy that could result in any waiver of any Privilege that could be asserted by Burgundy or any member of its Group under applicable Law and this Agreement. With respect to Privileged Information of Spinco arising after the Business Transfer Time, Spinco will have sole authority in perpetuity to determine whether to assert or waive any or all Privileges, and Burgundy will take no action (nor permit any member of its Group to take action) without the prior written consent of Spinco that could result in any waiver of any Privilege that could be asserted by Spinco or any member of its Group under applicable Law and this Agreement. The rights and obligations created by this <u>Section 6.3</u> will apply to all Information as to which a Party or its Group would be entitled to assert or have asserted a Privilege without regard to the effect, if any, of the Spinco Reorganization, the Recapitalization or the Distribution ("<u>Privileged Information</u>").

(b) Privileged Information of Burgundy and its Group includes (i) any and all Information regarding the Non-Spinco Business and the Burgundy Group (other than Information relating to the Eagle Business ("<u>Spinco Information</u>")), whether or not such Information (other than Spinco Information) is in the possession of Spinco or any Affiliate thereof, (ii) all communications subject to a Privilege between counsel for Burgundy (other than counsel for the Eagle Business) (including any person who, at the time of the communication, was an employee of Burgundy or its Group in the capacity of in-house counsel, regardless of whether such employee is or becomes an employee of Grizzly, Spinco or any Affiliate thereof) and any person who, at the time of the communication, was an employee of Burgundy, regardless of whether such employee is or becomes an employee of Spinco or any Affiliate thereof, and (iii) all Information generated, received or arising after the Business Transfer Time that refers or relates to and discloses Privileged Information of Burgundy or its Group generated, received or arising prior to the Business Transfer Time.

(c) Privileged Information of Spinco and its Group includes (i) any and all Spinco Information, whether or not it is in the possession of Burgundy or any member of its Group, (ii) all communications subject to a Privilege between counsel for the Eagle Business (including any person who, at the time of the communication, was an employee of Burgundy or its Group in the capacity of in-house counsel, regardless of whether such employee is or remains an employee of Burgundy or any Affiliate thereof) and any person who, at the time of the communication, was an employee of Burgundy, Spinco or any member of either Group or the Eagle Business regardless of whether such employee was, is or becomes an employee of Burgundy or any of its Subsidiaries, and (iii) all Information generated, received or arising after the Business Transfer Time that refers to and discloses Privileged Information of Spinco or its Group generated, received or arising after the Business Transfer Time.

(d) Upon receipt by Burgundy or Spinco, or any of their respective Affiliates, as the case may be, of any subpoena, discovery or other request from any third-party that actually or arguably calls for the production or disclosure of Privileged Information of the other or if Burgundy or Spinco, or any of their respective Affiliates, as the case may be, obtains knowledge

- 55 -

that any current or former employee of Burgundy or Spinco, or any of their respective Affiliates, as the case may be, receives any subpoena, discovery or other request from any third-party that actually or arguably calls for the production or disclosure of Privileged Information of the other, Burgundy or Spinco, as the case may be, will promptly notify the relevant other Party of the existence of the request and will provide such other Party a reasonable opportunity to review the Information and to assert any rights it may have under this Section 6.3 or otherwise to prevent the production or disclosure of Privileged Information. Burgundy or Spinco, as the case may be, will not, and will cause their respective Affiliates not to, produce or disclose to any third-party any of the other Party's Privileged Information under this Section 6.3 unless (i) the other Party has provided its express written consent to such production or disclosure or (ii) a court of competent jurisdiction has entered an Order not subject to interlocutory appeal or review finding that the Information is not entitled to protection from disclosure under any applicable privilege, doctrine or rule.

(e) Burgundy's transfer of books and records pertaining to the Eagle Business and other Information to Spinco, Burgundy's agreement to permit Spinco to obtain Information existing prior to the Spinco Reorganization, Spinco's transfer of books and records pertaining to Burgundy, if any, and other Information to Burgundy and Spinco's agreement to permit Burgundy to obtain Information existing prior to the Spinco Reorganization are made in reliance on Burgundy's and Spinco's respective agreements, as set forth in Section 6.2 and this Section 6.3, to maintain the confidentiality of such Information and to take the steps provided herein for the preservation of all Privileges that may belong to or be asserted by Burgundy or Spinco, as the case may be. The access to Information, witnesses and individuals being granted pursuant to Section 6.2 and the disclosure to Spinco and Burgundy of Privileged Information relating to the Spinco Business or the Non-Spinco Business pursuant to this Agreement in connection with the Spinco Reorganization will not be asserted by Burgundy or Spinco to constitute, or otherwise deemed, a waiver of any Privilege that has been or may be asserted under this Section 6.3 or otherwise. Nothing in this Agreement will operate to reduce, minimize or condition the rights granted to Burgundy and Spinco in, or the obligations imposed upon Burgundy and Spinco by, this Section 6.3.

Section 6.4 Intellectual Property Assignment/Recordation. Each Party will be responsible for, and will pay all expenses (whether incurred before, at or after the Business Transfer Time) involved in notarization, authentication, legalization and/or consularization of the signatures of any representatives of its Group on any of the Transfer Documents relating to the transfer of Intellectual Property Rights. Spinco will be responsible for, and will pay all expenses (whether incurred before or after the Business Transfer Time) relating to, the recording of any such Transfer Documents relating to the transfer of Intellectual Property Rights to any member of the Spinco Group with any Governmental Authorities as may be necessary or appropriate.

Section 6.5 Intellectual Property Matters. Except as specifically set forth in this Section 6.5, from and after the Effective Time, Spinco will take all actions necessary to assure that no member of the Spinco Group operates the Spinco Business utilizing, based on or taking advantage of the name, reputation, Trademarks or goodwill of any member of the Burgundy Group, provided that Grizzly and members of the Spinco Group may refer to the Burgundy Group and Trademarks of the Burgundy Group in connection with describing the historical relationship of the Spinco Group to the Burgundy Group. In addition, Spinco and each member of

- 56 -

PPG102913

the Spinco Group may use labeling, packaging, advertising, sale and promotional materials, printed stationery, brochures and literature bearing any of the corporate names, Trademarks, product identification numbers or consumer information telephone numbers of the Burgundy Group after the Business Transfer Time; provided, that Spinco will, and will cause each member of the Spinco Group to, cease use of the labeling, packaging, advertising, sale and promotional materials, printed stationery, brochures and literature bearing any of the corporate names, Trademarks, product identification numbers or consumer information telephone numbers beginning on the six (6) month anniversary of the Effective Time; provided, further, that there will be no time limit with respect to Spinco's sale of products bearing the corporate name, Trademarks or consumer information telephone numbers or that use any packaging bearing the same included in the Spinco Inventory. The Spinco Group will use commercially reasonable efforts to cease the sale or use of such products, product labeling or packaging as promptly as reasonably practicable following the Business Transfer Time, consistent with their ordinary course of business. Spinco will, and will cause each member of the Spinco Group to, maintain quality standards for products of the Spinco Business not materially different from those maintained by the Eagle business prior to the Business Transfer Time for so long as any member of the Spinco Group continues to use any labeling, packaging, advertising, sales or promotional materials, printed stationery, brochures or literature bearing the corporate names, Trademarks, product identification numbers or consumer information telephone numbers of any member of the Burgundy Group.

Section 6.6 Assigned Domain Names. At the Business Transfer Time, the domain name registrations set forth on Schedule 2.4(a)(vi), including all content, text, descriptions, photographs, drawings, or other work comprising the associated web pages (collectively the "Assigned Domains"), shall be assigned to, and subsequently owned and maintained by, the Spinco Group. The Burgundy Group will take commercially reasonable steps to effectuate the assignment of the Assigned Domains. On or before the three (3) month anniversary of the Business Transfer Time, the Spinco Group will be required to remove any and all references to any name, Trademarks, or goodwill owned by any member of the Burgundy Group that exist on the Assigned Domain Names.

Section 6.7 Unassigned Domain Names. The domain names and web pages set forth on Schedule 2.4(b)(i) include a Trademark owned by the Burgundy Group and were used primarily for the Eagle Business prior to the Business Transfer Time ("Unassigned Domains"). The Unassigned Domains are registered in the name of the Burgundy Group and will not be assigned to the Spinco Group. However, from and after the Business Transfer Time, each member of the Spinco Group may coordinate with the Burgundy Group to redirect Internet traffic and site visits from the Unassigned Domains to a domain name or web page of its choosing. On or before the three (3) month anniversary of the Business Transfer Time, the Unassigned Domains will be disabled and the registrations will be permitted to lapse. From and after the Business Transfer Time, no member of the Spinco Group will take steps to register or utilize the Unassigned Domains or any other domain name or web page that includes a Trademark owned by the Burgundy Group.

Section 6.8 Unassigned Domain Name Content. From and after the Business Transfer Time, all right, title, and interest, including any copyrights, related to the content, text, descriptions, photographs, drawings, or other work included on the Unassigned Domains prior to the Business Transfer Time shall be the sole and exclusive property of the Spinco Group, except

- 57 -

PPG102914

for any text, descriptions, photographs, drawings, or other work that primarily relates to any name, reputation, Trademarks or goodwill primarily associated with any member of the Burgundy Group.

Section 6.9 Shared IP Licenses.

(a) Notwithstanding anything in this Agreement to the contrary, each member of the Burgundy Group shall retain an irrevocable, non-terminable, perpetual, worldwide, nonexclusive, royalty-free, fully paid-up license to use the Shared Spinco IP solely and exclusively for the purpose of conducting the Burgundy Group's business in substantially the same manner as it was conducted immediately prior to the Effective Date (the "Shared Spinco IP License"). No member of the Burgundy Group may assign or sublicense its rights under the Shared Spinco IP License to any Person other than an Affiliate thereof without Spinco's prior written consent; provided, however, that without consent any member of the Burgundy Group may (a) assign its rights under the Shared Spinco IP License to any entity that acquires all or substantially all of the assets of such Burgundy Group member's business; (b) assign its rights under the Shared Spinco IP License to any successor by merger, consolidation, or acquisition to a member of the Burgundy Group for the purpose of conducting such Burgundy Group member's business; (c) sublicense its rights under the Shared Spinco IP License to any purchaser of substantially all the assets of one of the plants used in the Burgundy Business only to the extent reasonably necessary to enable such purchaser to operate such plant in the same manner as the licensed member of the Burgundy Group operated the same; and (d) assign its rights under the Shared Spinco IP License to any lender (or agent for any lender) to the owner of any such assets for collateral purposes only. Following the grant of any sublicense permitted hereinabove to the transferee of any such plant, the sublicensee may further sublicense the Shared Spinco IP to which it has been sublicensed but only together with a transfer of substantially all the assets of such plant and only to the extent reasonably necessary to enable the transferee to operate such plant in the same manner as the sublicensing Person operated the same. Any attempted assignment or sublicense in breach of this Section 6.9(a) will be null and void.

(b) At the Business Transfer Time, each member of the Burgundy Group hereby grants each member of the Spinco Group an irrevocable, non-terminable, perpetual, worldwide, nonexclusive, royalty-free, fully paid-up license to use the Shared Burgundy IP solely and exclusively for the purpose of conducting the Spinco Group's business in substantially the same manner as it was conducted immediately prior to the Effective Date (the "Shared Burgundy IP License"). No member of the Spinco Group may assign or sublicense its rights under the Shared Burgundy IP License to any Person other than an Affiliate thereof without Burgundy's prior written consent; provided, however, that without consent any member of the Spinco Group may (a) assign its rights under the Shared Burgundy IP License to any entity that acquires all or substantially all of the assets of such Spinco Group member's business; (b) assign its rights under the Shared Burgundy IP License to any successor by merger, consolidation, or acquisition to a member of the Spinco Group for the purpose of conducting such Spinco Group member's business; (c) sublicense its rights under the Shared Burgundy IP License to any purchaser of substantially all the assets of one of the plants used in the Spinco Business only to the extent reasonably necessary to enable such purchaser to operate such plant in the same manner as the licensed member of the Spinco

- 58 -

Group operated the same; and (d) assign its rights under the Shared Burgundy IP License to any lender (or agent for any lender) to the owner of any such assets for collateral purposes only. Following the grant of any sublicense permitted hereinabove to the transferee of any such plant, the sublicensee may further sublicense the Shared Burgundy IP to which it has been sublicensed but only together with a transfer of substantially all the assets of such plant and only to the extent reasonably necessary to enable the transferee to operate such plant in the same manner as the sublicensing Person operated the same. Any attempted assignment or sublicense in breach of this Section 6.9(b) will be null and void.

Section 6.10 Removal of Tangible Assets. (a) Except as may be otherwise provided in the Transition Services Agreement, or otherwise agreed to by the Parties, all tangible Spinco Assets that are located at any sites of Burgundy or its Subsidiaries that are not Spinco Active Sites will be moved as promptly as practicable after the Business Transfer Time from such sites, at Spinco's expense and in a manner so as not to unreasonably interfere with the operations of any member of the Burgundy Group and to not cause damage to such facility, and such member of the Burgundy Group will provide reasonable access to such facility to effectuate same. Spinco will remove any Spinco Assets that remain at any such sites in connection with the performance of services under the Transition Services Agreement as promptly as practicable after the termination of such service pursuant to the same terms and conditions stated in the immediately preceding sentence.

(b) Except as may be otherwise provided in the Transition Services Agreement or otherwise agreed to by the Parties, all tangible Excluded Assets that are located at any of the Spinco Active Sites will be moved as promptly as practicable after the Business Transfer Time from such facilities, at Burgundy's expense and in a manner so as not to unreasonably interfere with the operations of any member of the Spinco Group and to not cause damage to such Spinco Facility, and such member of the Spinco Group will provide reasonable access to such Spinco Facility to effectuate such movement. Burgundy will remove any Excluded Assets that remain at any such Spinco Active Sites in connection with the performance of services under the Transition Services Agreement as promptly as practicable after the termination of such service pursuant to the same terms and conditions stated in the immediately preceding sentence.

Section 6.11 Insurance.

(a) Rights Under Policies. Notwithstanding any other provision of this Agreement, from and after the Business Transfer Date, none of Spinco nor any other member of the Spinco Group will have any rights whatsoever with respect to any Policies, except that Burgundy will, if requested by Spinco, use commercially reasonable efforts (as set forth in Section 5.4 above) to pursue Insurance Proceeds under Claims-Made Policies for any liabilities for which indemnification is sought from Spinco pursuant to this Agreement (to the extent such Claims-Made Policies provide coverage for such liabilities); provided that all of Burgundy's and each member of the Burgundy Group's reasonable costs and expenses incurred in connection with the foregoing shall be promptly paid by Spinco. All claims for Insurance Proceeds under Claims-Made Policies pursued by Burgundy will be subject to all of the terms and conditions of the applicable Claims Made Policy and Spinco shall promptly pay to Burgundy any applicable deductible or retention that applies to the Claim subject to indemnification.

- 59 -

(b) Commutations or Buyouts of Claims-Made Policies. Burgundy may, at any time, without Liability or obligation to Spinco (other than as set forth in this Section 6.11(b)), amend, commute, terminate, buy-out, extinguish liability under or otherwise modify or reduce the amount of coverage available under any Claims-Made Policies after the Distribution Date. In the event that any such transaction would affect or reduce the amount of Insurance Proceeds that otherwise would be available to Spinco for a claim that is subject to indemnification under this Agreement, Burgundy will give Spinco prior written notice thereof. In the event of an insurance transaction described in this section, Burgundy will pay to Spinco its equitable share (which must be determined in good faith based on the amount of premiums paid or allocated to the Eagle Business in respect of the applicable Claims-Made Policies and the effect the insurance transaction would have on Spinco's actual or potential indemnification obligations) of any net proceeds actually received by Burgundy from the insurer under the applicable Claims-Made Policy as a result of such transaction (after deducting Burgundy's reasonable costs and expenses incurred in connection with such action). The Tax treatment of any such payments to Spinco by Burgundy will be handled in accordance with Section 5.4(c).

(c) No Limitation to Indemnity. Nothing in this Section 6.11 will be construed to limit or otherwise alter in any way the indemnity obligations of the parties to this Agreement, including those created by this Agreement.

Section 6.12 Right of First Refusal.

(a) If at any time and each time prior to the twenty (20) year anniversary of the Business Transfer Time, Burgundy desires to sell all or a portion of the Natrium Excess Land to a third party, Burgundy shall give notice (the "Offer Notice") thereof to Spinco, together with the price and a summary of the other material terms and conditions pursuant to which Burgundy desires to sell all or a portion of the Natrium Excess Land. Spinco shall have the right (the "First Refusal Right") to give to Burgundy a notice (the "Election Notice"), which shall specify that Spinco elects to purchase, as applicable, all or the portion of Natrium Excess Land proposed to be sold upon the same material terms and conditions (subject to the execution of a mutually satisfactory Contract of sale as hereinafter provided) as set forth in the Offer Notice. Spinco and Burgundy shall record in the appropriate public land records an instrument setting forth the foregoing First Refusal Right. The Election Notice must be delivered within 15 Business Days following Burgundy's delivery to Spinco of the Offer Notice (such period is hereinafter referred to as the "Response Period"). Notwithstanding anything to the contrary in this Agreement, the First Refusal Right described in this Section 6.12 shall not be applicable to any sale of the Natrium Excess Land by Burgundy to a Subsidiary or Affiliate of Burgundy, provided, that following any such sale, such Subsidiary or Affiliate of Burgundy shall be subject in all respects to this Agreement.

(b) If Spinco shall give the Election Notice within the Response Period, Spinco and Burgundy shall promptly proceed to negotiate an agreement (the "Natrium Excess Land Agreement") to purchase the Natrium Excess Land at the price and otherwise on all of the material terms and conditions set forth in the Offer Notice and otherwise on such other customary terms for the purchase of comparable properties, as Spinco and Burgundy may mutually agree upon.

- 60 -

(c) If Spinco shall fail to give an Election Notice within the Response Period, (i) Burgundy shall have the right to sell the Natrium Excess Land at the price and on other terms and conditions no less advantageous in any material respect to Burgundy than that set forth in the Offer Notice, free and clear of any rights or claims of Spinco under this Section 6.12, and (ii) provided Burgundy has not materially breached its obligations under this Section 6.12, this Section 6.12 shall terminate and be null, void and of no further force or effect; provided, that Spinco shall again have the right to exercise the First Refusal Right pursuant to the provisions of this Section 6.12 if any of the following conditions occurs: (a) the terms and conditions of sale to the third party are less advantageous in any material respect to Burgundy than set forth in the Offer Notice, or (b) the definitive agreement(s) providing for the sale are not executed and delivered with a purchaser within 120 days after the giving of the applicable Offer Notice and subsequently consummated with such purchaser within six (6) months of execution of the definitive agreements.

### ARTICLE VII

### MISCELLANEOUS

Section 7.1 Expenses. Except as otherwise provided in this Agreement, each Party will be responsible for the fees and expenses of the Parties as provided in the Merger Agreement.

Section 7.2 Entire Agreement. This Agreement, the Merger Agreement and the Ancillary Agreements and the Confidentiality Agreement, including any related annexes, schedules and exhibits, as well as any other agreements and documents referred to herein and therein, will together constitute the entire agreement between the Parties with respect to the subject matter hereof and thereof and will supersede all prior negotiations, agreements and understandings of the Parties of any nature, whether oral or written, with respect to such subject matter.

Section 7.3 Governing Law. This Agreement and, unless expressly provided therein, each Ancillary Agreement (and any claims or disputes arising out of or related hereto or thereto or to the transactions contemplated hereby and thereby or to the inducement of any Party to enter herein and therein, whether for breach of Contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise) is governed by and construed and interpreted in accordance with the Laws of the State of Delaware irrespective of the choice of laws principles of the State of Delaware, including all matters of validity, construction, effect, enforceability, performance and remedies.

- 61 -

Section 7.4 <u>Notices</u>. All notices, requests, permissions, waivers and other communications under this Agreement will be in writing and will be deemed to have been duly given (a) five (5) Business Days following sending by registered or certified mail, postage prepaid, (b) when sent, if sent by facsimile, provided that the facsimile transmission is promptly confirmed by telephone, (c) when delivered, if delivered personally to the intended recipient, and (d) one Business Day following sending by overnight delivery via a national courier service and, in each case, addressed to a Party at the following address for such Party:

If to Burgundy or, prior to the Effective Time, Spinco:

> PPG Industries, Inc.
> One PPG Place
> Pittsburgh, PA 15272
> Attention:   General Counsel
> Facsimile:   (412) 434-2490

with a copy (which shall not constitute notice) to:

> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, New York 10019
> Attention:   Steven A. Rosenblum
> Facsimile:   (212) 403-2000

> If to Spinco, a]fter the Effective Time:

> Georgia Gulf Corporation
> 115 Perimeter Center Place, Suite 460
> Atlanta, GA 30346
> Attention:   Chief Executive Officer
> Facsimile:   (770) 390-9673

with a copy (which shall not constitute notice) to:

> Jones Day
> 1420 Peachtree St., N.E.
> Suite 800
> Atlanta, GA 30309-3053
> Attention:   John E. Zamer
> Facsimile:   404-581-8330

or to such other address(es) as will be furnished in writing by any such party to the other party in accordance with the provisions of this <u>Section 7.4</u>.

Section 7.5 <u>Priority of Agreements</u>. If there is a conflict between any provision of this Agreement and a provision in any of the Ancillary Agreements (other than the Tax Matters Agreement and Employee Matters Agreement), the provision of this Agreement shall control unless specifically provided otherwise in this Agreement or in the Ancillary Agreement. Except as otherwise specifically provided herein, this Agreement will not apply to matters relating to Taxes or employees, employee benefits plans, and related assets and liabilities including pension and other post-employment benefit assets and liabilities, which shall be exclusively governed by the Tax Matters Agreement and Employee Matters Agreement, respectively. In the case of any conflict between this Agreement and the Tax Matters Agreement or Employee Matters Agreement, respectively, in relation to any matters addressed by the Tax Matters Agreement or Employee Matters Agreement, the Tax Matters Agreement or Employee Matters Agreement, as applicable, will prevail.

- 62 -

PPG102919

Section 7.6 <u>Amendments and Waivers</u>. (a) This Agreement may be amended and any provision of this Agreement may be waived; <u>provided</u> that any such amendment or waiver will be binding upon a Party only if such amendment or waiver is set forth in a writing executed by such Party. In addition, unless the Merger Agreement shall have been terminated in accordance with its terms, any such amendment or waiver shall be subject to the written consent of Grizzly. No course of dealing between or among any Persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party hereto under or by reason of this Agreement.

(b) No delay or failure in exercising any right, power or remedy hereunder will affect or operate as a waiver thereof; nor will any single or partial exercise thereof or any abandonment or discontinuance of steps to enforce such a right, power or remedy preclude any further exercise thereof or of any other right, power or remedy. Any waiver, permit, consent or approval of any kind or character of any breach or default under this Agreement or any such waiver of any provision of this Agreement must satisfy the conditions set forth in <u>Section 7.6(a)</u> and will be effective only to the extent in such writing specifically set forth.

Section 7.7 <u>Termination</u>. This Agreement will terminate without further action at any time before the Effective Time upon termination of the Merger Agreement. If terminated, no Party will have any Liability of any kind to the other Party or any other Person on account of this Agreement, except as provided in the Merger Agreement.

Section 7.8 <u>Parties in Interest</u>. This Agreement is binding upon and is for the benefit of the Parties hereto and their respective successors and permitted assigns. Grizzly shall be a third party beneficiary of the rights of Spinco under this Agreement and of the provisions of <u>Section 4.2(b)</u>. As of the Effective Time, this Agreement shall be binding on Grizzly and Grizzly shall, as between Burgundy and Grizzly, be subject to the obligations and restrictions imposed on, and shall be the beneficiary of the rights of, Spinco under this Agreement. This Agreement is not made for the benefit of any Person not a Party hereto, and no Person other than the Parties hereto or their respective successors and permitted assigns will acquire or have any benefit, right, remedy or claim under or by reason of this Agreement, except (i) as contemplated in the preceding sentence and (ii) for the provisions of <u>Article V</u> with respect to indemnification of Indemnitees.

Section 7.9 <u>Assignability</u>. No Party may assign its rights or delegate its duties under this Agreement without the written consent of the other Party, except that a Party may assign its rights or delegate its duties under this Agreement to a member of its Group and a Party may assign or sublicense the rights granted in <u>Section 6.9</u> as provided therein; provided that the member agrees in writing to be bound by the terms and conditions contained in this Agreement; provided, further, that the assignment or delegation will not relieve any Party of its indemnification obligations or obligations in the event of a breach of this Agreement; and provided, further, that Spinco may assign this agreement, without obtaining the prior written consent of Burgundy, to any lender (or agent for any lender) for collateral purposes only (and upon any assignment permitted by this proviso, the references to Spinco Group shall also apply to any such assignee unless the context otherwise acquires). Any attempted assignment or delegation in breach of this <u>Section 7.9</u> will be null and void.

- 63 -

PPG102920

Section 7.10 <u>Interpretation</u>. When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. The table of contents to this Agreement is for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. The descriptive headings herein are inserted for convenience of reference only and are not intended to be a substantive part of or to affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The words "hereof," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant thereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes, including all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns. References to a date or time shall be deemed to be such date or time in New York City, unless otherwise specified. References to dollar amounts are to U.S. dollars, unless otherwise specified. Each of the parties has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement. Except as otherwise expressly provided elsewhere in this Agreement, the Merger Agreement, or any Ancillary Agreement, any provision herein which contemplates the agreement, approval or consent of, or exercise of any right of, a Party, such Party may give or withhold such agreement, approval or consent, or exercise such right, in its sole and absolute discretion, the Parties hereto hereby expressly disclaim any implied duty of good faith and fair dealing or similar concept.

Section 7.11 <u>Severability</u>. If any provision of this Agreement or any Ancillary Agreement, or the application of any provision to any Person or circumstance, shall be declared judicially to be invalid, unenforceable or void, such decision shall not have the effect of invalidating or voiding the remainder of this Agreement or such Ancillary Agreement, it being the intent and agreement of the parties hereto that this Agreement and any Ancillary Agreement shall be deemed amended by modifying such provision to the extent necessary to render it valid, legal and enforceable while preserving its intent or, if such modification is not possible, by substituting therefor another provision that is legal and enforceable and that achieves the same objective.

Section 7.12 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts (any one of which need not contain the signatures of more than one Party), each of which will be deemed to be an original but all of which taken together will constitute one and the same agreement. This Agreement, and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, will be treated in all manner and respects as an original agreement and will be considered to have the same binding legal effects as

- 64 -

if it were the original signed version thereof delivered in person. At the request of a Party, the other Party will re-execute original forms thereof and deliver them to the requesting Party. No Party will raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or other electronic means as a defense to the formation of a Contract and each such Party forever waives any such defense.

Section 7.13 <u>Survival of Covenants</u>. Except as expressly set forth in any Ancillary Agreement, the covenants, representations and warranties contained in this Agreement and each Ancillary Agreement, and liability for the breach of any obligations contained herein, will survive each of the Spinco Reorganization, the Recapitalization and the Distribution and will remain in full force and effect.

Section 7.14 <u>Jurisdiction; Consent to Jurisdiction</u>.

(a) <u>Exclusive Jurisdiction</u>. Except as otherwise expressly provided in any Ancillary Agreement, each of the Parties irrevocably agrees that any claim, dispute or controversy (of any and every kind or type, whether based on Contract, tort, statute, regulation or otherwise, and whether based on state, federal, foreign or any other law), arising out of, relating to or in connection with this Agreement, the Ancillary Agreements, the documents referred to in this Agreement, or any of the transactions contemplated thereby, and including disputes relating to the existence, validity, breach or termination of this Agreement (any such claim being a "<u>Covered Claim</u>") will be brought and determined in any federal or state court located in the State of Delaware, and each of the Parties hereto hereby irrevocably submits and consents in respect of Covered Claims for itself and in respect to its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts and agrees that it may be served with such legal process at the address and in the manner set forth in <u>Section 7.4</u>. Each of the Parties hereto hereby irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim or otherwise, in any Action in respect of Covered Claims (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason other than the failure to lawfully serve process, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) to the fullest extent permitted by applicable Laws, that (i) the Action in any such court is brought in an inconvenient forum, (ii) the venue of such Action is improper and (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

(b) <u>Waiver of Jury Trial</u>. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY AGREEMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THE ANCILLARY AGREEMENTS. EACH PARTY CERTIFIES AND

- 65 -

ACKNOWLEDGES THAT (i) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF ANY LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (ii) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (iii) EACH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (iv) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.14(b).

Section 7.15 Specific Performance. In the event of any actual or threatened default in, or breach of, any of the terms, conditions and provisions of this Agreement or any other Ancillary Agreement, the Party who is, or is to be, thereby aggrieved will have the right to specific performance and injunctive or other equitable relief in respect of its rights under this Agreement or such Ancillary Agreement, in addition to any and all other rights and remedies at law or in equity, subject to Section 5.7. The Parties agree that the remedies at law for any breach or threatened breach, including monetary damages, are inadequate compensation for any loss and that any defense in any Action for specific performance that a remedy at law would be adequate is waived. Any requirements for the securing or posting of any bond with such remedy are waived by each of the Parties to this Agreement.

Section 7.16 Limitations of Liability. Notwithstanding anything in this Agreement to the contrary, neither Spinco or its Affiliates, on the one hand, nor Burgundy or its Affiliates, on the other hand, will be liable under this Agreement to the other for any punitive, exemplary, special or similar damages in excess of compensatory damages, except to the extent awarded by a court of competent jurisdiction in connection with a Third-Party Claim.

*[Signature Page Follows]*

- 66 -

PPG102923

IN WITNESS WHEREOF, each of the Parties has caused this Separation Agreement to be executed on its behalf by its officers hereunto duly authorized effective on the day and year first above written.

PPG INDUSTRIES, INC.

By: _____   /s/ Charles E. Bunch
Name: Charles E. Bunch
Title: Chairman and Chief Executive Officer

EAGLE SPINCO INC.

By: _____   /s/ Charles E. Bunch
Name: Charles E. Bunch
Title: Chairman of the Board of Directors

[Signature Page to Separation Agreement]

PPG102924

# EXHIBIT HH

# Transcript of Jeffrey Davies

**Date:** August 19, 2020
**Case:** Bellon, et al. -v- The PPG Employee Life and Other Benefits Plan, et al.

**Planet Depos**
**Phone:** 888-433-3767
**Fax:** 888-503-3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
 3     ----------------------------------x
 4  CHARLES W. BELLON, ROBERT E. EAKIN, :  Case No.
 5  JUDY GAY BURKE, LOUISE NICHOLS,     :  5:18-cv-00114
 6  WILTON G. WALLACE, BERNADOT F.      :
 7  VEILLON, BARBARA BROWN, and ROBERT  :
 8  E. WILLIAMS, on behalf of themselves:
 9  and others similarly situated,      :
10              Plaintiffs,             :
11        -v-                           :
12  THE PPG EMPLOYEE LIFE AND OTHER     :
13  BENEFITS PLAN, PPG INDUSTRIES, INC.,:
14  and THE PPG PLAN ADMINISTRATOR,     :
15              Defendants.             :
16     ----------------------------------x
17
18        Videotape Deposition of JEFFREY DAVIES
19                 CONDUCTED REMOTELY
20             Wednesday, August 19, 2020
21                  9:11 a.m. EST
22  Job No.: 316211
23  Pages: 1 - 108
24  Reported by: Keith G. Shreckengast, RPR
```

**2**

```
 1        Videotape Deposition of JEFFREY DAVIES,
 2  held at the offices of:
 3
 4
 5             ALL PARTIES ATTENDED REMOTELY
 6
 7
 8
 9  Pursuant to Notice, before Keith G. Shreckengast,
10  Registered Professional Reporter and Notary Public
11  in and for the Commonwealth of Pennsylvania.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF PLAINTIFFS:
 4        JAMES T. CARNEY, ESQUIRE
 5        845 Northridge Drive
 6        Pittsburgh, Pennsylvania 15216
 7        (412) 561-0533
 8           - and -
 9        MICHAEL A. ADAMS, ESQUIRE, R.Ph
10        LEWIS BRISBOIS BISGAARD & SMITH, LLP
11        3054 Pennsylvania Avenue
12        Weirton, West Virginia 26062
13        (304) 491-4728
14
15
16  ON BEHALF OF DEFENDANTS:
17        JOSEPH J. TORRES, ESQUIRE
18        JENNER & BLOCK
19        353 N Clark Street
20        Chicago, Illinois 60654-3456
21        (312) 222-9358
22           - and -
23        BILL ADAMS, ESQUIRE (PPG)
24
```

**4**

```
 1  A P P E A R A N C E S   C O N T I N U E D
 2
 3  ON BEHALF OF DEFENDANTS:
 4        LINDSAY GAINER, ESQUIRE
 5        LITTLER MENDELSON, P.C.
 6        707 Virginia Street East
 7        Suite 1010
 8        Charleston, West Virginia 25301
 9        (304) 599-4600
10
11
12  ALSO PRESENT:
13        Ryan Grzelak (AV Technician)
14        Justin Murray (Videographer)
15
16
17
18
19
20
21
22
23
24
```

Video Deposition of Jeffrey Davies
Conducted on August 19, 2020

6 (21 to 24)

---

21

1   Q    Well, was PPG selling twice as much as
2   Georgia Gulf and Commodity Chemicals, or vice-versa?
3   **A    I mean again, I think PPG was bigger. I**
4   **don't know if it was twice as big. And the word**
5   **Commodity Chemicals is a pretty broad statement.**
6   Q    Well, the Commodity Chemicals business
7   was what PPG sold to Georgia Gulf, let's define it
8   that way.
9   **A    Yeah. So again, I think we were bigger**
10  **than them. But the word Commodity Chemicals, in our**
11  **case, meant a certain group of products, and I think**
12  **Georgia Gulf was in perhaps some overlaps, but also**
13  **in different products.**
14  Q    Why did Georgia Gulf want to acquire PPG
15  Commodity Chemicals business?
16  MR. TORRES: Object to the form of the
17  question, to the extent it calls for speculation.
18  But go ahead and answer if you can, Jeff.
19  **A    I guess they thought it made sense for**
20  **their shareholders?**
21  Q    Did Georgia Gulf representatives ever
22  tell you why they wanted to acquire PPG Commodity
23  Chemicals business?
24  **A    I'm sorry, I couldn't hear what you said.**

---

22

1   Q    Did the Georgia Gulf negotiators ever
2   tell you why they wanted to acquire PPG Chemicals
3   business?
4   **A    I don't recall specific discussions about**
5   **why. I imagine they said they viewed it as an**
6   **attractive fit for their company.**
7   Q    Did Georgia Gulf merge its operations
8   with the PPG Commodity Chemicals operations?
9   **A    Who merged what into whom is a technical**
10  **question. So putting aside who merged what into**
11  **whom, I would say the businesses were combined,**
12  **certainly.**
13  Q    Now what was the economic benefits of
14  such a merger to the extent they were combined?
15  MR. TORRES: Object to the form of the
16  question as vague. Go ahead and answer if you can,
17  Jeff.
18  **A    The economic benefits, again I think it**
19  **pursued an economic -- yeah, I'm trying to remember**
20  **what the -- I would say the economic benefits were**
21  **that they put the companies together, and they could**
22  **grow faster, and they could achieve some benefits of**
23  **scale.**
24  Q    What was the role of synergies in the

---

23

1   merger?
2   **A    Synergies are a part of the economic**
3   **benefits of scale creation.**
4   Q    And by synergies, how would you define
5   synergies?
6   MR. TORRES: In relation to what?
7   MR. CARNEY: In relation to the benefits
8   of a merger?
9   MR. TORRES: This merger, or any merger?
10  MR. CARNEY: This merger.
11  **A    Yeah, again, I don't recall. I think**
12  **there's some materials that were put forward that**
13  **talked about two different categories. Selling more**
14  **products to more customers, eliminating some**
15  **duplicate costs, things of that nature.**
16  Q    Isn't the main benefits of mergers in
17  general, synergies which allow elimination of
18  duplicate functions?
19  MR. TORRES: Object to the form of the
20  question. It calls for speculation, and it's vague,
21  to the extent you want to ask him to speculate about
22  mergers generally. Go ahead and answer if you can.
23  **A    Yeah, would I say no, or -- I don't know.**
24  **Mergers are all different.**

---

24

1   Q    But you've been working in the area of
2   mergers and acquisitions for a number of years,
3   haven't you?
4   **A    I have, yes.**
5   Q    How many years?
6   **A    A long time. 2006, and some time before**
7   **that, so 20 years.**
8   Q    And you don't know whether synergies are
9   one of the major benefits of mergers?
10  **A    No, I'm not sure that's what you asked**
11  **me.**
12  MR. TORRES: It's been asked and
13  answered. It's also argumentative. Go ahead and
14  answer if you can, Jeff.
15  THE WITNESS: I just -- I don't think --
16  I'm not sure that's what he asked me, so --
17  Q    What about in terms of the PPG Commodity
18  Chemicals and Georgia Gulf merger?
19  MR. TORRES: Well, he's already answered
20  that question, so you're asking the same question
21  again. But go ahead and answer it again, Jeff.
22  **A    Well, again the view of the benefits of**
23  **the merger were articulated by both parties. And I**
24  **think it's in the documents that you've seen. So I**

---

---

25

1 won't try to remember exactly what they all say.
2 But creating a bigger, stronger company, and selling
3 more, and eliminating some duplicate costs.
4    Q    What was the advantage of the merger to
5 PPG?
6    A    It helped us progress on our strategic
7 transformation.  We were able to get a good value
8 for the business.
9    Q    Would you have gotten the same benefits
10 just by selling the Commodity Chemicals business?
11        MR. TORRES:  Object to the form of the
12 question.  Go ahead and answer if you can.
13   A    I don't know.
14   Q    Did PPG consider selling the business?
15   A    We did.
16   Q    Did you ever -- well, without having the
17 merger, excuse me.  Would PPG consider selling the
18 business without a merger being involved?
19   A    Did we, you said?
20   Q    Could PPG consider selling the business
21 to someone who would not merge the business?
22   A    Yeah, we looked at that as an
23 alternative.
24   Q    And were the advantages to PPG doing that

26

1 the same as selling it to a company which would
2 merge the business?
3    A    Well, I would say at the time we didn't
4 think so, which is why we chose to do the
5 transaction we did.
6        MR. CARNEY:  Now, Mr. Videographer, could
7 you pull up Exhibit 2.  And that should be PPG
8 917091.
9        (There was a discussion off the record.)
10       MR. CARNEY:  9170.
11       (Exhibit 2 was marked for
12 identification.)
13   Q    Now, again, Mr. Davies, I'll ask you to
14 scroll through this document.
15   A    Okay, next page.  Okay.  Next page.
16 Okay.  Okay.  Okay.  Okay.  Okay.
17   Q    Now, Mr. Davies, have you seen this
18 exhibit before?
19   A    I do not specifically recall seeing this
20 before.
21   Q    Would this have been something created by
22 your group?
23   A    Well, again, I don't know what the
24 document is, so I'm not -- it could have been.

27

1        MR. TORRES:  Don't guess, Jeff.  Just
2 testify as to what you recall.
3    Q    Does this document indicate that both PPG
4 and Georgia Gulf were interested in the synergies
5 from the merger?
6        MR. TORRES:  Hold on, Jeff.  I'm going to
7 object to the form of the question as assuming
8 facts.  Go ahead and answer if you can.
9    A    It looks like a document that's outlining
10 potential areas of synergies.
11       MR. CARNEY:  Excuse me, would the court
12 reporter read back his answer?
13       (The record was read back by the
14 Reporter.)
15   Q    Now would you look at a document which
16 would be part of Exhibit 2, 9173.
17       MR. CARNEY:  I'll ask the videographer to
18 pull that up.
19       (Exhibit 2(part 2) was marked for
20 identification.)
21   Q    Again, Mr. Davies, could you have the
22 videographer scroll through this document for you.
23   A    Okay.  Yes.  Okay.  Okay.  Okay.  Okay.
24 All right.  Okay.  Are you waiting for me?

28

1    Q    Have you seen this document before,
2 Mr. Davies?
3    A    I don't recall.
4    Q    And you don't know who prepared it, then?
5    A    I can speculate, but I don't recall.
6    Q    Would it be the type of document that
7 your group would have prepared?
8        MR. TORRES:  Object to the form of the
9 question as vague.  Go ahead and answer if you can,
10 Jeff.
11   A    Yeah, I mean it could have been prepared
12 by my group, or could have been prepared by other
13 groups.  I don't remember who put this document
14 together.
15   Q    Do you remember seeing it at the time of
16 the negotiation?
17   A    No.
18   Q    Was it one of PPG's main tactics in
19 negotiation to try to convince Georgia Gulf that
20 there would be great synergies in the merger, and
21 that, ergo, Georgia Gulf could pay more for the
22 Commodity Chemicals operation?
23       MR. TORRES:  Objection to the form of the
24 question as argumentative.  Go ahead and answer if

Case 5:18-cv-00114-GMG-RWT   Document 171-3   Filed 09/29/20   Page 155 of 220  PageID #:
2204
Video Deposition of Jeffrey Davies
Conducted on August 19, 2020

14 (53 to 56)



53

1  OPEB liability for current PPG retirees?
2      A   Well, it's -- I'd have to go back and
3  look again and see what it says.  So maybe scroll
4  down, please.  I mean if you think it says that,
5  then you can point me to where it says that.
6      Q   I suggest it doesn't include that, but
7  you have to verify it by reading it.
8      A   Okay.  Okay.  So what was your question
9  again?
10     Q   Did the offer include assumption of OPEB
11 liabilities for current retirees?
12     A   The letter says that they would assume
13 pension and post retirement OPEB for active
14 employees.  It does not mention anything about
15 retirees.
16     Q   Okay.  Now do you know if the PPG Board
17 of Directors had meetings to consider this proposal?
18     A   What was the date of this proposal?
19     Q   The proposal date, February 10th.
20     A   Well, I would say we have -- we typically
21 have a Board meeting in February, after the 10th.  I
22 would not characterize it as a meeting to consider
23 this proposal.  I would characterize it as a normal
24 Board meeting where we discuss -- we likely updated

54

1  them on this proposal.
2      Q   Did you attend such meeting?
3      A   I don't remember if I was there or not.
4      Q   Do you remember anyone, a discussion,
5  whether this proposal -- do you remember anyone
6  discussing with you whether this proposal was
7  adequate or inadequate?
8      MR. TORRES:  Object to the form of the
9  question as vague.  Go ahead and answer if you can.
10     A   Well, I recall that we didn't accept this
11 offer, and we therefore didn't view it as
12 acceptable.
13     Q   And who told you that?
14     MR. TORRES:  Object to the form of the
15 question.  Go ahead and answer.
16     A   I mean no one told me that.  It was a
17 decision that ultimately was made by Mr. Bunch.
18     Q   And who informed you of Mr. Bunch's
19 decision?
20     A   I don't remember.  I may have been in the
21 room when it was discussed, or I may have been told.
22     Q   Do you remember being told in what way
23 the proposal was inadequate or unsatisfactory?
24     A   I don't remember specifically that that

55

1  was communicated to me, no.
2      MR. CARNEY:  Court reporter, could you
3  read back the answer.
4      (The record was read back by the
5  Reporter.)
6      Q   How did you learn that this offer was not
7  acceptable?
8      A   Well, I don't remember -- again, we
9  decided it was not acceptable.  Ultimately that
10 decision rested on the CEO.  And we -- there was a
11 letter sent back to Georgia Gulf, I believe.
12     Q   Excuse me, go on.
13     A   I can't remember what you asked
14 specifically again, but --
15     Q   How did you find out that the CEO
16 determined it was unacceptable?
17     A   I don't remember.
18     Q   Now did you attend any further
19 discussions between PPG and Georgia Gulf after this
20 offer was rejected?
21     MR. TORRES:  Object to the form of the
22 question as vague, compound as phrased.  Go ahead
23 and answer if you can, Jeff.
24     A   Yeah, again, we had a meeting.  I recall

56

1  at least one meeting in Pittsburgh.  And I don't
2  recall whether it was before or after this document.
3      Q   Do you remember what was said in that
4  meeting?
5      A   No.
6      Q   Do you remember participating in any
7  negotiating meetings other than the one in
8  Pittsburgh you just described?
9      MR. TORRES:  Objection, it's been asked
10 and answered.  Go ahead and answer it again.
11     A   Yeah, again, I don't remember how many
12 meetings we had.  I remember a meeting.
13     Q   Do you remember discussion at any point
14 that this offer did not involve assumption of OPEB
15 liability for retirees?
16     A   I don't remember specific discussions.
17 But I remember that that was one of the elements
18 that we thought that would be acceptable to us,
19 ultimately, that if they would pay more money and
20 accept more of the liability relating to the
21 business.  I don't recall specific discussions or
22 dates, but I recall that that was generally our
23 frame of mind.
24     Q   Who was responsible, or who came up with

Video Deposition of Jeffrey Davies
Conducted on August 19, 2020

15 (57 to 60)

57

1  the idea that they should assume responsibility for
2  the OPEB liability for retirees, current retirees?
3      A    Again, I don't know whose specific idea
4  that was.
5      Q    And do you know when that idea -- you
6  first heard about that idea?
7      A    I don't remember.
8      Q    What was the basis for PPG wanting to get
9  Georgia Gulf to assume these liabilities?
10         MR. TORRES:  Objection, I think it's
11 asked and answered.  But go ahead and answer it
12 again, Jeff.
13     A    Well, I'd say the theory is that if we're
14 selling the business that's generating the cash
15 flow, then we should get rid of all the liabilities
16 relating to the business.
17     Q    So are you saying that since Commodity
18 Chemicals would no longer be generating cash flow to
19 finance benefits for these retirees, you didn't want
20 to still have the liabilities?
21         MR. TORRES:  Object to the form of the
22 question.  It's also asked and answered.  But go
23 ahead and answer again if you can, Jeff.
24     A    Well, I didn't say that Commodity

58

1  business was not going to be generating cash flow.
2  I said if we're disposing of the business that's
3  generating the cash flow, that our general thesis is
4  that we should pass on all the other assets and
5  liabilities relating to the business.
6      Q    Okay.  How many divestitures of
7  businesses have you been involved with while you
8  worked for PPG?
9      A    Several.
10     Q    Can you be more definitive than several?
11     A    Yeah, (inaudible) chemicals, flat glass,
12 fiberglass, auto glass, optical.  Drywall business
13 in Mexico.  That's six.  Is that enough?
14     Q    If those are all you remember, that's
15 fine.
16     A    That's all I can think of off the top of
17 my head here.
18     Q    Okay.  Did PPG transfer OPEB liability
19 for current retirees from these operations to the
20 new buyer?
21     A    Could you be more specific?  You said
22 current retirees.  I assume you mean retirees?
23     Q    Okay, past retirees, as opposed to
24 current employees.

59

1      A    You said did we.  Well, we did clearly in
2  this transaction.  Are you asking about -- What are
3  you asking me?
4      Q    I'm asking you any other sales other than
5  this one, did PPG transfer retirees and OPEB
6  liabilities relating to retirees?
7      A    Yes, I believe we did.
8      Q    What one?
9      A    I believe we did in fiberglass.
10     Q    Fiberglass.  Any other ones?
11     A    I believe we did in flat glass.
12     Q    Flat grass.  Flat glass, right?
13     A    Flat glass, yes.
14     Q    Any others?
15     A    Optical, I don't remember.  Automotive
16 glass, I don't believe we did.  The one in Mexico, I
17 don't know that it's -- I don't know that there even
18 are retirees in that business, so I don't know the
19 answer there.  Is that all six?  So I don't --
20     Q    Do you remember if any -- in any of the
21 sales where PPG did not transfer such liability, if
22 PPG proposed such transfer?
23     A    I don't recall if we proposed to transfer
24 them in the automotive deal or not.

60

1      Q    Okay.  Now were there any other reasons
2  besides the ones you just mentioned, for
3  transferring a retiree with the business from which
4  they came?
5          MR. TORRES:  Which prior testimony are
6  you referring to?  Your question is vague.
7      Q    Retirees from the business -- I'll
8  rephrase it.  Do you remember if any other reason,
9  besides what was testified to, for PPG wanting to
10 transfer retirees from the business when they sold
11 the business?
12         MR. TORRES:  Same objection.  Go ahead
13 and answer if you can, Jeff.
14     A    I mean it goes back to my point, is that
15 if we're selling a business, we will look to sell or
16 include the liabilities with the business we're
17 selling.
18     Q    Did PPG's internal accounting system
19 allocate the liabilities for retirees from a
20 business to a particular business?
21         MR. TORRES:  The question is vague as to
22 time.  Go ahead and answer if you can.
23     A    I'm not -- I don't know the answer to
24 that question.

61

1    Q    Now did PPG ever propose to Georgia Gulf
2  that it guaranteed payment of retiree benefits to
3  the PPG retirees?
4    **A    I don't recall.**
5    Q    Did Georgia Gulf ever express any
6  willingness to guarantee a payment of a retiree
7  benefit to PPG retirees?
8        MR. TORRES:  Objection, the question
9  assumes facts.  Go ahead and answer if you can.
10   **A    Again, I don't recall that they did or**
11 **didn't.**
12   Q    Do you recall any discussion about what
13 Georgia Gulf would be doing in terms of retiree
14 benefits for PPG retirees?
15   **A    No.**
16   Q    Did any PPG representatives ever express
17 to you any concern that Georgia Gulf might not be
18 able to afford to provide retiree benefits to PPG
19 retirees?
20   **A    No.**
21   Q    Did you ever discuss with any PPG
22 representative the ability of Georgia Gulf to afford
23 to provide such benefits?
24   **A    No, not -- no.**

62

1    Q    Did you have any discussion with any PPG
2  representative about the Georgia Gulf willingness to
3  provide such benefits?
4    **A    No.**
5    Q    Did you have any discussion with any PPG
6  representative about what would happen to the
7  retiree benefits when the people were transferred to
8  Georgia Gulf?
9    **A    No.**
10   Q    Do you know what authority PPG had to
11 transfer the benefits to Georgia -- transfer
12 retirees to Georgia Gulf?
13       MR. TORRES:  Objection to the extent the
14 question calls for a legal conclusion.  Go ahead and
15 answer if you can, Jeff.
16   **A    We transferred the liability, so I'm**
17 **assuming we had the authority to do so.**
18   Q    But you don't know, though?
19   **A    That's not my area of expertise.**
20   Q    Did anyone from PPG obtain a legal
21 opinion about its right to transfer the retirees and
22 related liabilities?
23       MR. TORRES:  Object.  Before you answer,
24 I mean if you know if they obtained a legal opinion,

63

1  you can certainly testify to that.  But I would
2  caution you not to disclose any legal advice that
3  you may be aware of regarding the question that's
4  being asked.
5    **A    Yeah, I don't remember that we got a**
6  **legal opinion, but that doesn't mean that we didn't.**
7    Q    Okay.  And did anyone raise any question
8  in your presence about the legal right of PPG to
9  transfer retirees and liabilities?
10       MR. TORRES:  Asked and answered.  Go
11 ahead and answer it again.
12   **A    No.**
13   Q    Now did PPG transfer all the liabilities
14 related to Commodity Chemicals to Georgia Gulf?
15       MR. TORRES:  Objection, lack of
16 foundation.  Go ahead and answer if you can.
17   **A    No.  I think we retained some**
18 **liabilities.**
19   Q    Why would you retain liabilities?
20       MR. TORRES:  Objection, the question is
21 vague, calls for speculation.  Go ahead and answer
22 if you can.
23   **A    Because they didn't want to take them.**
24   Q    And would you have transferred the OPEB

64

1  liabilities if George Gulf did not want to take
2  them?
3        MR. TORRES:  Object to the form of the
4  question.  Go ahead and answer if you can.  It's
5  argumentative.
6    **A    Well, I mean the construct of the deal,**
7  **they agreed to take them, so -- I don't know that**
8  **they wanted to or not, but they agreed to.**
9    Q    As a matter of bargaining?
10   **A    I mean I think the track record of the**
11 **letter shows that that was a negotiating topic, yes.**
12       MR. CARNEY:  Now could we call up Exhibit
13 5, which is PPG 01900 to 101905.
14       (Exhibit 5 was marked for
15 identification.)
16   Q    And again, Mr. Davies --
17       MR. TORRES:  I think he's frozen again.
18       THE VIDEOGRAPHER:  We're going off the
19 record at 10:53 a.m.
20       (There was a recess in the proceedings.)
21       THE VIDEOGRAPHER:  We are back on the
22 record at 11:09 a.m.
23 BY MR. CARNEY:
24   Q    Mr. Davies, are you testifying that you

---

89

1     A    I don't remember any commitments being
2  made.  The transaction documents say what the
3  transaction documents say.
4     Q    And do you remember any commitment to
5  representation to PPG about Georgia Gulf's ability
6  to provide such benefits?
7        MR. TORRES:  Asked and answered.  Go
8  ahead and answer again, Jeff.
9     A    Again, I don't remember Georgia Gulf
10  making any commitments.
11     Q    And did Axiall ever notify you, in 2012
12  or thereafter, about its intent to reduce, terminate
13  retiree benefits for current retirees?
14        MR. TORRES:  Asked and answered.  Go
15  ahead and answer it again, Jeff.
16     A    I don't recall that I've ever talked to
17  Axiall after 2012, so no.
18     Q    And did you ever learn that Axiall had
19  eliminated retiree life insurance benefits for PPG
20  retirees?
21        MR. TORRES:  Asked and answered.  Go
22  ahead and answer again, Jeff.
23     A    I only learned of that, this issue came
24  to my attention in the past several months.

---

90

1     Q    Now did you communicate with --
2        MR. CARNEY:  Mr. Videographer, you can
3  take down this exhibit.
4     Q    Did you communicate with Karen Rathburn
5  or Craig Jordan in doing the negotiations?
6     A    I imagine I did, but I don't recall
7  specifically.
8     Q    You have no recollection of specific
9  communication.
10     A    Correct.
11        MR. TORRES:  Asked and answered.
12     Q    Do you remember any -- what the subject
13  of those communications would have been?
14        MR. TORRES:  If you want to ask him about
15  the subject of the communications he doesn't
16  remember, that's your question?
17        MR. CARNEY:  Yes, I'm asking him that.
18        MR. TORRES:  Go ahead and give that one a
19  shot, Jeff.
20     A    No, I don't remember what the
21  discussions --
22     Q    How did you communicate with them?
23        MR. TORRES:  Why don't you let him finish
24  his answer before you go on to the next one.

---

91

1     Q    Excuse me, Mr. Davies, I interrupted you.
2  Go on.
3     A    No problem.  As I said, I don't remember
4  whether I discussed anything with them or not.
5     Q    How did you normally communicate with
6  them?
7     A    I would have communicated with them by
8  in-person discussion, telephone call, or email.
9        MR. CARNEY:  We have maybe a little bit
10  less than an hour to go.  Why don't we take another
11  ten minute break.  I assume, Mr. Torres, we don't
12  want to break for lunch at this point?
13        MR. TORRES:  It's up to Mr. Davies and
14  what he wants to do.
15        THE WITNESS:  If Mr. Carney says he
16  thinks we have another hour to go, then I don't
17  think we need to break for lunch.
18        MR. CARNEY:  Now, Mr. Davies, just so
19  you're aware, after I'm done with your deposition --
20        MR. TORRES:  He understands what's going
21  on.  You don't need to explain it to him.
22        MR. CARNEY:  Okay, I'm just trying to be
23  cooperative, in terms of making sure he recognizes
24  that we're -- when I'm done, Ms. Davidson will be

---

92

1  doing a further deposition.
2        THE WITNESS:  Well, perhaps we'll break
3  for lunch before that one.  We'll see.
4        MR. CARNEY:  Okay.
5        MR. TORRES:  Off the record.
6        THE VIDEOGRAPHER:  We are off the record
7  at 12 p.m.
8        (There was a recess in the proceedings.)
9        THE VIDEOGRAPHER:  We are back on the
10  record at 12:05 p.m.
11  BY MR. CARNEY:
12     Q    Mr. Davies, did you or PPG ever suggest
13  to Axiall or to Gulf that synergies could be
14  achieved by reducing or eliminating PPG benefits?
15        MR. TORRES:  Asked and answered.  Go
16  ahead and answer it again, Jeff.
17     A    No.
18     Q    Now I want to ask next of the
19  negotiations between PPG and Georgia Gulf involving
20  the amount of tax consideration to be paid to PPG.
21  Right?
22     A    Yes.
23     Q    Okay.  Wasn't the amount initially
24  offered by Georgia Gulf $500 million?

---

93

1    A    Again, I can go look at the letter, but
2 if that's what the letter says, then that was what
3 it was.
4    Q    And was this ultimately increased to
5 900 million?
6    A    Again, I think that was the final number.
7 But if the record shows that it was, then yes.
8    Q    Now didn't Georgia Gulf have to borrow to
9 finance this payment?
10         MR. TORRES: Objection, lack of
11 foundation. Go ahead and answer if you can.
12    A    I don't recall specifically. But
13 potentially they may have had to borrow, yes.
14    Q    And if they borrowed 900 million,
15 wouldn't they be heavily leveraged?
16         MR. TORRES: Objection, calls for
17 speculation. Go ahead and answer if you can.
18    A    Well, I recall -- the answer is, I don't
19 know. But I do recall yesterday looking at a
20 document, and that their credit statistics were
21 actually better after they combined with our
22 business.
23    Q    Now was PPG's expectation that Georgia
24 Gulf or Axiall would be successful financially?

94

1         MR. TORRES: Object to the form of the
2 question. Go ahead and answer if you can, Jeff.
3    A    What was the question?
4    Q    Did PPG expect that the new company,
5 Axiall, would be financially successful?
6    A    I think we thought that they were -- they
7 had stronger credit metrics after they made the deal
8 than they did before. And that they were in good
9 shape.
10    Q    Did PPG expect Axiall would be able to
11 afford the retiree benefits?
12         MR. TORRES: Objection, it's been asked
13 and answered. Go ahead and answer it again.
14    A    Again, we thought that they were well
15 positioned as a new entity financial.
16         MR. CARNEY: Mr. Videographer, could you
17 bring up Exhibit 9.
18    Q    And, Mr. Davies, you recognize Exhibit 9
19 from before?
20    A    Yes.
21    Q    Okay. When we look at pages 102254 to
22 102255. Maybe we can scroll up to the top of page
23 254. Maybe you have to go to 253. We can read down
24 through these pages till 22 -- we hit 2255, the end

95

1 of the section dealing with OPEB benefits.
2    A    Okay, keep going.
3    Q    Do you see the words in italics, Georgia
4 Gulf will assume certain material, and read that
5 section to yourself.
6    A    Can you scroll up a little bit, please.
7 Whoop! What happened? We lost -- I lost the
8 graphic.
9    Q    I did, too.
10    A    There it is. Could you go back to the
11 top of this paragraph that Mr. Carney was -- you can
12 go down from here. Down some more, please. And
13 some more. Little more. Okay, if you scroll down a
14 little bit more, please. Okay, scroll down some
15 more, please. Okay, I've read the paragraph.
16    Mr. Davies, was this section dealing with
17 OPEB liabilities one of the sections that you
18 reviewed in this document?
19    A    I don't recall whether I reviewed this
20 section.
21    Q    Does this section state that while the
22 possibilities may occur, that Axiall will not be
23 able to fund the PPG retiree benefits?
24    A    I think that's the gist of what it says,

96

1 is that -- I believe this is a risk factor section,
2 and it's communicating the risk that that could
3 happen, yes.
4    Q    Do you have any reason to disagree with
5 the statements made in this section?
6    A    It was the risk that was identified.
7    Q    Yeah, but do you have any reason to
8 disagree with the statements made here?
9    A    I have no reason to disagree.
10    Q    Now did -- were you aware at the time of
11 negotiations that Georgia Gulf did not provide
12 retiree life and retiree medical for its employees,
13 and retirees?
14    A    I don't recall being aware of that, no.
15    Q    Did anybody from Georgia Gulf ever tell
16 you, or tell somebody in your presence, that it
17 would have to harmonize the benefits which PPG
18 people were receiving with the benefits that Georgia
19 Gulf people were receiving?
20    A    I don't believe anyone said that in my
21 presence, no, or told me that.
22    Q    Did you see any letter from Georgia Gulf
23 saying that, or any other document saying that?
24    A    Not that I recall, no.

Video Deposition of Jeffrey Davies
Conducted on August 19, 2020

26 (101 to 104)

---

101

1  Okay.  Can you read the question back, please.
2      Q     I think you need to go to the top of the
3  first page.
4          (The record was read back by the
5  Reporter.)
6          MR. TORRES:  Object to the form, to this
7  question, to the extent it relates to populations
8  that are not at issue in this litigation.  Subject
9  to that objection, go ahead and answer if you can,
10 Jeff.
11     A     Yeah, I see that it says that there --
12 again, scroll down, please.  I see the sentence that
13 it says that they are -- retiree life insurance
14 benefits will end effective December 31st.  I see
15 that, yes.
16     Q     And do you see that there are replacing
17 medical insurance, retiree medical insurance, with
18 $100 per month per eligible retiree, dependent,
19 spouse?
20         MR. TORRES:  Objection to the form of the
21 question.  Also to the extent it relates to
22 populations and issues not relevant to this
23 litigation.  Go ahead and answer, Jeff, if you can.
24     A     Well, you used words that they're

102

1  replacing.  I don't see it says that.  To me it says
2  they're continuing current retiree health benefits,
3  and then they list a subsidy of $100 a month and
4  some other things.  I don't know if that's
5  replacing, or enhancing, or whatever they're doing.
6      Q     Well, look at the sentence down,
7  Assistance in finding healthcare on the individual
8  market.
9          MR. TORRES:  Objection.  This lawsuit is
10 not about retiree medical insurance.  And it's not
11 even entirely clear that this document relates to
12 the salary population at issue in this litigation.
13 But if you want to waste a man's time in asking him
14 what this document says, go ahead and answer if you
15 can, Jeff.
16     A     Yes, I see the bullet that says:
17 Assistance in finding healthcare on the individual
18 market.
19     Q     Which means that they are not being
20 offered group healthcare?
21         MR. TORRES:  Same objection.  Go ahead
22 and answer.  Calls for speculation, also.  But go
23 ahead and answer if you can, Jeff.
24     A     I don't know what it means.  I haven't

---

103

1  seen this document before, and nor am I a benefits
2  expert.
3      Q     Now do you see justification for these
4  changes?
5          MR. TORRES:  Same objection.  It doesn't
6  relate to the issue in this litigation.  But go
7  ahead and answer if you can, Jeff.
8      A     Just -- I don't see the justification.  I
9  don't know what you're referring to.
10     Q     If you look at the paragraph that starts
11 off:  As a necessary cost-saving measure to allow
12 Axiall to continue providing the subsidy and
13 OneExchange service, retiree life insurance benefits
14 will end effective December 31, 2015.
15     A     Yes, I see that paragraph.
16     Q     Is that the -- did you anticipate when
17 PPG sold the Commodity Chemical operation to Axiall,
18 that Axiall would not be able to afford to provide
19 retiree life insurance?
20         MR. TORRES:  Objection, that's been asked
21 and answered.  Go ahead and answer it again, Jeff.
22     A     No.
23     Q     Did you anticipate that they would
24 terminate retiree life insurance at any point?

104

1          MR. TORRES:  Same objection.  It's been
2  asked and answered.  Go ahead and answer it again.
3      A     No.
4          MR. CARNEY:  We'll take a few minutes and
5  I'll see about if there's anything more I need to
6  ask.  And we'll see about getting ready for the next
7  deposition.
8          MR. TORRES:  Let's just go off the
9  record.  Okay?
10         THE VIDEOGRAPHER:  We are now off the
11 record at 12:28 p.m.
12         (There was a recess in the proceedings.)
13         THE VIDEOGRAPHER:  We are back on the
14 record at 12:33 p.m.
15 BY MR. CARNEY:
16     Q     In any of the negotiating meetings that
17 you attended, were there representatives of PPG's
18 law department present?
19     A     Yes, I believe one would have been
20 present.
21     Q     Who would have been present, to your
22 recollection?
23         MR. TORRES:  The question is compound as
24 phrased.  You're asking for multiple -- you're

# EXHIBIT II

**SUBJECT TO COMPLETION DATED SEPTEMBER 5, 2012**

PRELIMINARY PROSPECTUS—OFFER TO EXCHANGE

# PPG INDUSTRIES, INC.
### Offer to Exchange All Shares of Common Stock of

# EAGLE SPINCO INC.
### which are owned by PPG Industries, Inc.
### and will be converted into Shares of Common Stock of

# GEORGIA GULF CORPORATION
### for
### Shares of Common Stock of PPG Industries, Inc.

*PPG Industries, Inc. ("PPG") is offering to exchange all shares of common stock of Eagle Spinco Inc. ("Splitco common stock") which are owned by PPG for shares of common stock of PPG ("PPG common stock") that are validly tendered and not properly withdrawn. The terms and conditions of this exchange offer are described in this document, which you should read carefully. None of PPG, Eagle Spinco Inc. ("Splitco"), any of their respective directors or officers or any of their respective representatives makes any recommendation as to whether you should participate in this exchange offer. You must make your own decision after reading this document and consulting with your advisors.*

*Immediately following consummation of this exchange offer, a special purpose merger subsidiary of Georgia Gulf Corporation ("Georgia Gulf") named Grizzly Acquisition Sub, Inc., a Delaware corporation ("Merger Sub"), will be merged with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf (the "Merger"). In the Merger, each share of Splitco common stock (except shares of Splitco common stock held by Splitco as treasury stock) will be converted into the right to receive a number of shares of common stock of Georgia Gulf ("Georgia Gulf common stock") equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger (subject to adjustment in certain circumstances). Accordingly, shares of Splitco common stock will not be transferred to participants in this exchange offer; such participants will instead receive shares of Georgia Gulf common stock in the Merger. No trading market currently exists or will ever exist for shares of Splitco common stock. You will not be able to trade the shares of Splitco common stock before they are exchanged for shares of Georgia Gulf common stock in the Merger. There can be no assurance, however, that shares of Georgia Gulf common stock when issued in the Merger will trade at the same prices as shares of Georgia Gulf common stock are traded prior to the Merger.*

*The value of PPG common stock and Splitco common stock will be determined by PPG by reference to the simple arithmetic average of the daily volume-weighted average prices ("VWAP") on each of the Valuation Dates (as defined below), of PPG common stock and the Georgia Gulf common stock on the New York Stock Exchange ("NYSE") on each of the last three trading days ("Valuation Dates") of the exchange offer period (including the expiration date), as it may be voluntarily extended, but not including the last two trading days that are part of any Mandatory Extension (as described below) or any voluntary extension following a Mandatory Extension. Based on an expiration date of          , 2012, the Valuation Dates are expected to be          , 2012,          , 2012, and          , 2012. See "This Exchange Offer—Terms of this Exchange Offer."*

*For each $1.00 of PPG common stock accepted in this exchange offer, you will receive approximately $          of Splitco common stock, subject to an upper limit of          shares of Splitco common stock per share of PPG common stock. This exchange offer does not provide for a minimum exchange ratio. See "This Exchange Offer—Terms of this Exchange Offer." If the upper limit is in effect, then the exchange ratio will be fixed at that limit and this exchange offer will be automatically extended (a "Mandatory Extension") until 12:00 midnight New York City time, on the second trading day following the originally contemplated expiration date to permit shareholders to tender or withdraw their PPG common stock during that period. IF THE UPPER LIMIT IS IN EFFECT, AND UNLESS YOU PROPERLY WITHDRAW YOUR SHARES, YOU WILL RECEIVE LESS THAN $          OF SPLITCO COMMON STOCK FOR EACH $1.00 OF PPG COMMON STOCK THAT YOU TENDER, AND YOU COULD RECEIVE MUCH LESS.*

*The indicative exchange ratio that would have been in effect following the official close of trading on the NYSE on          , 2012 (the day before the date of this document), based on the daily VWAPs of PPG common stock and Georgia Gulf common stock on          , 2012,          , 2012, and          , 2012, would have provided for          shares of Splitco common stock to be exchanged for every share of PPG common stock accepted. The value of Splitco common stock received and, following the Merger, the value of Georgia Gulf common stock received may not remain above the value of PPG common stock tendered following the expiration date of this exchange offer.*

*THIS EXCHANGE OFFER AND WITHDRAWAL RIGHTS WILL EXPIRE AT 12:00 MIDNIGHT, NEW YORK CITY TIME, ON          , 2012, UNLESS THE OFFER IS EXTENDED OR TERMINATED. SHARES OF PPG COMMON STOCK TENDERED PURSUANT TO THIS EXCHANGE OFFER MAY BE WITHDRAWN AT ANY TIME PRIOR TO THE EXPIRATION OF THIS EXCHANGE OFFER.*

*In reviewing this document, you should carefully consider the risk factors beginning on page 37 of this document.*

Neither the Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of these securities or determined if this Prospectus—Offer to Exchange is truthful or complete. Any representation to the contrary is a criminal offense.

The date of this Prospectus—Offer to Exchange is          , 2012.

The information in this document may change. The exchange offer and issuance of securities being registered pursuant to the registration statement of which this document forms a part may not be completed until the registration statement is effective. This document is not an offer to sell these securities, and it is not soliciting an offer to buy these securities, in any state where such offer or sale is not permitted.

Exhibit #

9

08/19/2020 - RG

PPG102211

A-843

*Unless there is a Mandatory Extension, the final exchange ratio used to determine the number of shares of Splitco common stock that you will receive for each share of PPG common stock accepted in this exchange offer will be announced by press release no later than 4:30 p.m., New York City time, on the expiration date. At such time, the final exchange ratio will be available at www.          .com/          / and from the information agent at the toll–free number provided on the back cover of this document. PPG will announce whether the upper limit on the number of shares that can be received for each share of PPG common stock tendered will be in effect at the expiration of the exchange offer period, through www.          .com/          / and by press release, no later than 4:30 p.m., New York City time, on the expiration date. Throughout this exchange offer, indicative exchange ratios (calculated in the manner described in this document) will also be available from the information agent at the toll–free number provided on the back cover of this document.*

*This document provides information regarding PPG, Splitco, Georgia Gulf, the exchange offer and the Merger in which shares of PPG common stock may be exchanged for shares of Splitco common stock which will then be immediately exchanged for shares of Georgia Gulf common stock and distributed to participating PPG shareholders as described herein. PPG common stock is listed on the NYSE under the symbol "PPG." Georgia Gulf common stock is listed on the NYSE under the symbol "GGC." On          , 2012, the last reported sale price of PPG common stock on the NYSE was $          , and the last reported sale price of Georgia Gulf common stock on the NYSE was $          . The market prices of PPG common stock and of Georgia Gulf common stock will fluctuate prior to the completion of this exchange offer and thereafter and may be higher or lower at the expiration date than the prices set forth above. No trading market currently exists for shares of Splitco common stock, and no such market will exist in the future. Splitco has not applied for listing of its common stock on any exchange.*

*If this exchange offer is consummated but this exchange offer is not fully subscribed because less than all the shares of Splitco common stock owned by PPG are exchanged, the remaining shares of Splitco common stock owned by PPG will be distributed to PPG shareholders whose shares of PPG common stock remain outstanding after the consummation of the exchange offer pursuant to a pro rata distribution (a "spin–off") that would also be consummated on the closing date of the Merger. This document covers all shares of Splitco common stock offered by PPG in this exchange offer and all shares of Splitco common stock that may be distributed by PPG as a spin–off to holders of PPG common stock. If this exchange offer is terminated by PPG without the exchange of shares (but the conditions for consummation of the Transactions have otherwise been satisfied), all shares of Splitco common stock owned by PPG will be distributed in a spin–off to holders of PPG. See "This Exchange Offer—Dividend and Distribution of Any Shares of Splitco Common Stock Remaining After This Exchange Offer."*

*Immediately following consummation of this exchange offer, in the Merger, Merger Sub will be merged with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf. Each share of Splitco common stock (except shares of Splitco common stock held by Splitco as treasury stock) will be converted into the right to receive a number of shares of Georgia Gulf common stock equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger (subject to adjustment in certain circumstances). Immediately after the Merger, at least 50.5% of the shares of Georgia Gulf common stock are expected to be held by pre-Merger holders of PPG common stock and no more than 49.5% of the shares of Georgia Gulf common stock are expected to be held by pre-Merger Georgia Gulf stockholders.*

*PPG's obligation to exchange shares of Splitco common stock for Georgia Gulf common stock is subject to the conditions listed under "This Exchange Offer—Conditions for Consummation of this Exchange Offer," including the satisfaction of conditions to the Merger, which include the Georgia Gulf stockholder approval of the issuance of Georgia Gulf common stock in connection with the Merger, and other conditions.*

**PPG102212**

**TABLE OF CONTENTS**

*Page*

HELPFUL INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
QUESTIONS AND ANSWERS ABOUT THIS EXCHANGE OFFER AND THE TRANSACTIONS . . . .   4
   Questions and Answers About This Exchange Offer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4
   Questions and Answers about the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
   The Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16
   The Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17
   Number of Shares of Splitco Common Stock to Be Distributed to PPG Shareholders . . . . . . . . . . . . . .   21
   Terms of this Exchange Offer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
   Debt Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   Board of Directors and Management of Splitco Following the Transactions . . . . . . . . . . . . . . . . . . . . .   26
   Georgia Gulf Stockholder Vote . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   Accounting Treatment and Considerations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26
   Material U.S. Federal Income Tax Consequences of the Distribution and the Merger . . . . . . . . . . . . . .   27
SUMMARY HISTORICAL AND PRO FORMA FINANCIAL DATA . . . . . . . . . . . . . . . . . . . . . . . . . .   29
   Summary Historical Financial Data of the PPG Chlor-alkali and Derivatives Business . . . . . . . . . . . .   29
   Summary Historical Consolidated Financial Data of PPG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30
   Summary Historical Financial Data of Georgia Gulf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   31
   Summary Unaudited Pro Forma Condensed Combined Financial Data of Georgia Gulf and the
      PPG Chlor-alkali and Derivatives Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32
   Summary Comparative Historical and Pro Forma Per Share Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   35
   Historical Common Stock Market Price and Dividend Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
RISK FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
   Risks Related to the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37
   Other Risks that Relate to Georgia Gulf, Including the PPG Chlor-alkali and Derivatives Business
      After the Transactions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   44
CAUTIONARY STATEMENT ON FORWARD-LOOKING STATEMENTS . . . . . . . . . . . . . . . . . . . . .   56
THIS EXCHANGE OFFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
   Terms of this Exchange Offer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   57
   Conditions for Consummation of this Exchange Offer  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   70
   Material U.S. Federal Income Tax Consequences of the Distribution and the Merger . . . . . . . . . . . . . .   72
   Treatment of Specified PPG Compensatory Equity-Based Awards Held by Current Splitco
      Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   75
   Fees and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76
   Legal Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76
   Certain Matters Relating to Non-U.S. Jurisdictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   76
   Distribution of Any Shares of Splitco Common Stock Remaining After This Exchange Offer . . . . . . .   77
INFORMATION ON GEORGIA GULF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78
   Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78
   Georgia Gulf's Business After the Transactions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   78
   Georgia Gulf's Liquidity and Capital Resources After the Transactions . . . . . . . . . . . . . . . . . . . . . . . .   79
   Directors and Officers of Georgia Gulf Before and After the Transactions  . . . . . . . . . . . . . . . . . . . . .   80
INFORMATION ON PPG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   83
   Performance Coatings, Industrial Coatings and Architectural Coatings—EMEA  . . . . . . . . . . . . . . . .   83
   Optical and Specialty Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84
   Commodity Chemicals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84
   Glass . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   84
INFORMATION ON THE PPG CHLOR-ALKALI AND DERIVATIVES BUSINESS . . . . . . . . . . . . . . .   85
   General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

i

**PPG102213**

Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85
Manufacturing and Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85
Sales and Distribution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Raw Materials and Energy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Research and Development . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Seasonality  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88
Regulation and Environmental Matters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   88
Legal Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90
Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90
Board of Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   90
MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS
  OF OPERATIONS FOR THE PPG CHLOR-ALKALI AND DERIVATIVES BUSINESS . . . . . . . . . . .   92
    Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92
    Separation of the PPG Chlor-alkali and Derivatives Business from PPG Industries, Inc. . . . . . . . . . . .   92
    Results of Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   92
    Performance Overview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   93
    Performance in 2011 Compared with 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
    Performance Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94
    Performance in 2010 Compared with 2009 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95
    Performance Overview  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   95
    Liquidity and Capital Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   96
    Off-Balance Sheet Arrangements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97
    Quantitative and Qualitative Disclosures About Market Risk  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97
    Contractual Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97
    Critical Accounting Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98
SELECTED HISTORICAL AND PRO FORMA FINANCIAL DATA  . . . . . . . . . . . . . . . . . . . . . . . . . . .   100
    Selected Historical Combined Financial Data of the PPG Chlor-alkali and Derivatives Business  . . . . .   100
    Selected Consolidated Historical Financial Data of PPG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   100
    Selected Historical Consolidated Financial Data of Georgia Gulf . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   101
    Retroactive Presentation for Change in Accounting Principles  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   105
    Unaudited Pro Forma Condensed Combined Financial Statements of Georgia Gulf and the PPG
      Chlor-alkali and Derivatives Business  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   105
HISTORICAL PER SHARE DATA, MARKET PRICE AND DIVIDEND DATA  . . . . . . . . . . . . . . . . . . .   117
    Comparative Historical and Pro Forma Per Share Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   117
    Historical Common Stock Market Price and Dividend Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   117
    Georgia Gulf Dividend Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   118
    PPG Dividend Policy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   118
THE TRANSACTIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   119
    Determination of Number of Shares of Splitco Common Stock to be Distributed to PPG
      Shareholders  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   122
    Background of the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   123
    Georgia Gulf's Reasons for the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   128
    Georgia Gulf's Stockholder Meeting  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   130
    PPG's Reasons for the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   130
    Interests of Certain Persons in the Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   132
    Accounting Treatment of the Merger  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   132
    Regulatory Approvals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133
    Federal Securities Law Consequences; Resale Restrictions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133
    No Appraisal or Dissenters' Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   133
THE MERGER AGREEMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   134

**PPG102214**

The Merger ............................................................... 134
Closing; Effective Time ................................................... 134
Merger Consideration ..................................................... 135
Issuance of Splitco Common Stock to PPG ................................... 136
Distribution Per Share Merger Consideration ............................... 136
Treatment of PPG Equity Awards ........................................... 136
Distribution with Respect to Shares of Georgia Gulf Common Stock After the
   Effective Time of the Merger ........................................... 137
Termination of the Distribution Fund ...................................... 137
Post-Closing Georgia Gulf Board of Directors and Officers .................. 137
Stockholders Meeting ..................................................... 138
Representations and Warranties ............................................ 138
Conduct of Business Pending Closing ....................................... 141
Tax Matters .............................................................. 145
SEC Filings .............................................................. 145
Regulatory Matters ....................................................... 145
No Solicitation .......................................................... 146
Board Recommendation ..................................................... 148
Financing ................................................................ 149
Covenant Not to Compete .................................................. 151
Non-Solicitation of Employees ............................................ 152
Certain Other Covenants and Agreements .................................... 152
Conditions to the Merger ................................................. 153
Termination .............................................................. 154
Termination Fee Payable in Certain Circumstances .......................... 155
Expenses ................................................................. 156
Specific Performance ..................................................... 156
Other Transaction Agreements ............................................. 156
Amendments ............................................................... 156
THE SEPARATION AGREEMENT ................................................. 157
Overview ................................................................. 157
Issuance of Splitco Common Stock to PPG Shareholders ...................... 157
Transfer of the Assets and Assumption of Liabilities ...................... 157
Transfer of the PPG Chlor-alkali and Derivatives Business ................. 162
Intercompany Arrangements and Guarantees .................................. 162
Consents and Delayed Transfers ........................................... 163
Shared Contracts ......................................................... 163
Transfer of the TCI Interests ............................................ 164
No Representations or Warranties .......................................... 164
Mutual Releases and Indemnification ....................................... 164
Post-Closing Working Capital Adjustment ................................... 166
Covenants ................................................................ 166
Conditions to the Separation and Distribution ............................. 167
Termination .............................................................. 167
Parties in Interest ...................................................... 167
DEBT FINANCING ........................................................... 168
Senior Secured Term Loan Facility ........................................ 168
Splitco Debt Securities .................................................. 170
PPG Bridge Facility ...................................................... 170
Debt Exchange ............................................................ 170
Exchange Loans and Exchange Notes ........................................ 171
New ABL Revolver ......................................................... 172

iii

OTHER AGREEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  173
    Employee Matters Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  173
    Tax Matters Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  175
    Transition Services Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  176
    Shared Facilities, Services and Supply Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177
    Servitude Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  177
    The Electric Generation, Distribution and Transmission Facilities Lease . . . . . . . . . . . . . . . . . . . . . .  177
    Chlorine, Liquid Caustic Soda and Hydrochloric Acid Sales Agreements . . . . . . . . . . . . . . . . . . .  178
    Monroeville Shared Facilities Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  178
    Master Terminal Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  178
    Chlorine Supply Agreement Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  178
DESCRIPTION OF GEORGIA GULF CAPITAL STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  180
COMPARISON OF RIGHTS OF HOLDERS OF PPG COMMON STOCK AND GEORGIA GULF
    COMMON STOCK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  184
    Authorized Capital Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  184
    Certain Anti-Takeover Effects of Provisions of Georgia Gulf's Certificate of Incorporation, Bylaws
        and Delaware Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  192
CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  192
LEGAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  192
EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  192
WHERE YOU CAN FIND MORE INFORMATION; INCORPORATION BY REFERENCE . . . . . . . . . . .  193
INDEX TO FINANCIAL STATEMENTS OF THE PPG CHLOR-ALKALI AND DERIVATIVES
    BUSINESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  F-1

**This document incorporates by reference important business and financial information about PPG and Georgia Gulf from documents filed with the U.S. Securities and Exchange Commission ("SEC") that have not been included in or delivered with this document. This information is available at the website that the SEC maintains at www.sec.gov, as well as from other sources. See "Where You Can Find More Information; Incorporation By Reference." You also may ask any questions about this exchange offer or request copies of the exchange offer documents from PPG, without charge, upon written or oral request to PPG's information agent,          , located at          or at telephone number          . In order to receive timely delivery of the documents, you must make your requests no later than          , 2012.**

All information contained or incorporated by reference in this document with respect to Georgia Gulf and Merger Sub and their respective subsidiaries, as well as information on Georgia Gulf after the consummation of the Transactions, has been provided by Georgia Gulf. All other information contained or incorporated by reference in this document with respect to PPG, Splitco or their respective subsidiaries, or the PPG Chlor-alkali and Derivatives Business, and with respect to the terms and conditions of the exchange offer has been provided by PPG. This document contains or incorporates by reference references to trademarks, trade names and service marks, including tri-ethane®, VersaTrans® and Accu-Tab®, that are owned by PPG and its related entities. Transitions® is a registered trademark of Transitions Optical, Inc.

This prospectus is not an offer to sell or exchange and it is not a solicitation of an offer to buy any shares of PPG common stock, Splitco common stock or Georgia Gulf common stock in any jurisdiction in which the offer, sale or exchange is not permitted. Non-U.S. shareholders should consult their advisors in considering whether they may participate in the exchange offer in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the shares of Splitco common stock that may apply in their home countries. PPG, Splitco and Georgia Gulf cannot provide any assurance about whether such limitations may exist. See "The Exchange Offer—Certain Matters Relating to Non-U.S. Jurisdictions" for additional information about limitations on the exchange offer outside the United States.

iv

PPG102216

**HELPFUL INFORMATION**

In this document:

- "Additional Agreements" means the Employee Matters Agreement, the Tax Matters Agreement, the Shared Facilities, Services and Supply Agreement, the Transition Services Agreement, the Servitude Agreement, the Electric Generation, Distribution and Transmission Facilities Lease, and the Chlorine, Liquid Caustic Soda and Hydrochloric Acid Sales Agreements;

- "ASC" means the Financial Accounting Standards Board Accounting Standards Codification;

- "Chlorine, Liquid Caustic Soda and Hydrochloric Acid Sales Agreements" means those certain agreements to be entered into at the date of the Separation between PPG and Georgia Gulf;

- "Chlorine Sales Agreement Amendment" means the Amendment, dated as of July 18, 2012, to the Chlorine Sales Contract, dated as of January 1, 1985, as amended, between PPG and a subsidiary of Georgia Gulf;

- "Code" means the Internal Revenue Code of 1986, as amended;

- "Debt Exchange" means the distribution of the Debt Securities by PPG on or about the closing date of the Merger to investment banks and/or commercial banks in satisfaction of the debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility";

- "Debt Securities" means the $675.0 million in senior notes, subject to increase or decrease by PPG within certain parameters set forth in the Merger Agreement, that Splitco will issue to PPG, that PPG thereafter expects to exchange for debt obligations of PPG in the Debt Exchange, and that will be the debt obligations of Splitco, guaranteed by Georgia Gulf and certain of its subsidiaries, following consummation of the Transactions;

- "Distribution" means the distribution by PPG of its shares of Splitco common stock to the holders of shares of PPG common stock by way of an exchange offer and, with respect to any shares of Splitco common stock that are not subscribed for in the exchange offer, a pro rata distribution to the holders of shares of PPG common stock;

- "Distribution Tax Opinion" means an opinion from Wachtell, Lipton, Rosen & Katz, tax counsel to PPG, substantially to the effect that (i) the Distribution will be treated as satisfying the business purpose requirement described in Treasury Regulation § 1.355-2(b)(1), (ii) the Distribution will not be treated as being used principally as a device for the distribution of earnings and profits of PPG or Splitco or both under Section 355(a)(1)(B) of the Code, (iii) the stock of Splitco distributed in the Distribution will not be treated as other "qualified property" by reason of the application of Section 355(e)(1) of the Code; and (iv) the Splitco securities will constitute "securities" for purposes of the application of Section 361(a) of the Code;

- "The Electric Generation, Distribution and Transmission Facilities Lease" means the Generation, Distribution and Transmission Facilities Lease to be entered into at the date of the Separation, between PPG and Splitco;

- "Employee Matters Agreement" means the Employee Matters Agreement, dated as of July 18, 2012, by and among Georgia Gulf, PPG and Splitco;

- "Exchange Act" means the Securities Exchange Act of 1934, as amended;

- "Exchange Loans" means the unsecured loans to be issued by Splitco at the closing of the Merger if certain conditions are satisfied and the debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility" have not been repaid in full prior to the closing of the Merger;

- "Exchange Notes" means unsecured senior exchange notes of Splitco (1) for which the Exchange Loans (if any) may be exchanged in whole or in part at any time after the first anniversary of the date

1

the Exchange Loans (if any) are first exchanged for the debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility" or (2) which may be issued at the closing of the Merger upon the demand of certain financial institutions if certain conditions are satisfied and the debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility" have not been repaid in full prior to the closing of the Merger;

- "GAAP" means generally accepted accounting principles in the United States;

- "Georgia Gulf" means Georgia Gulf Corporation, a Delaware corporation, and, unless the context otherwise requires, its subsidiaries;

- "Georgia Gulf common stock" means the common stock, par value $0.01 per share, of Georgia Gulf;

- "Georgia Gulf Group" means Georgia Gulf and each of its consolidated subsidiaries including, after consummation of the Merger, Splitco;

- "Group" means the Georgia Gulf Group, PPG Group, or Splitco Group, as the case may be.

- "Master Terminal Agreement" means the Master Terminal Agreement to be entered into at the date of the Separation between PPG and Splitco;

- "Merger" means the combination of Georgia Gulf's business and the PPG Chlor-alkali and Derivatives Business through the merger of Merger Sub with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and as a wholly-owned subsidiary of Georgia Gulf, as contemplated by the Merger Agreement;

- "Merger Agreement" means the Agreement and Plan of Merger, dated as of July 18, 2012, by and among PPG, Splitco, Georgia Gulf and Merger Sub, as amended by Amendment No. 1 to the Merger Agreement, dated as of August 31, 2012;

- "Merger Sub" means Grizzly Acquisition Sub, Inc., a Delaware corporation and a wholly-owned subsidiary of Georgia Gulf, and, unless the context otherwise requires, its subsidiaries;

- "Monroeville Shared Facilities Agreement" means the Monroeville Shared Facilities Agreement to be entered into at the date of the Separation between PPG and Splitco;

- "NYSE" means the New York Stock Exchange;

- "PPG" means PPG Industries, Inc., a Pennsylvania corporation, and, unless the context otherwise requires, its subsidiaries, other than Splitco and any of its subsidiaries;

- "PPG Chlor-alkali and Derivatives Business" means substantially all of the assets and liabilities of the business of PPG relating to the production of chlorine, caustic soda and related chemicals as further described in the section of this document entitled "Information on the PPG Chlor-alkali and Derivatives Business" and to be transferred to Splitco pursuant to the terms and conditions contained in the Separation Agreement;

- "PPG common stock" means the common stock, par value $1.66 2/3 per share, of PPG;

- "PPG Group" means PPG and each of its consolidated subsidiaries which, after consummation of the Merger, will not include the PPG Chlor-alkali and Derivatives Business;

- "PPG shareholders" means the holders of PPG common stock;

- "SEC" means the United States Securities and Exchange Commission;

- "Securities Act" means the Securities Act of 1933, as amended;

- "Separation" means the transfer by PPG of the assets and liabilities related to the PPG Chlor-alkali and Derivatives Business, including certain subsidiaries of PPG, to Splitco;

- "Separation Agreement" means the Separation Agreement, dated as of July 18, 2012, between PPG and Splitco;

2

**PPG102218**

- "Servitude Agreement" means the Servitude Agreement to be entered into at the date of the Separation between PPG and Splitco;

- "Shared Facilities, Services and Supply Agreement" means the Shared Facilities, Services and Supply Agreement to be entered into at the date of the Separation between PPG and Splitco;

- "Special Distribution" means the distribution to be made in connection with the Transactions by Splitco to PPG consisting of (1) approximately $225.0 million in cash, subject to increase or decrease by PPG within certain parameters set forth in the Merger Agreement, and (2) the Debt Securities in an amount that would satisfy the debt obligations of PPG described in the section entitled "Debt Financing—PPG Bridge Facility";

- "Splitco" means Eagle Spinco, Inc., a Delaware corporation, and, prior to the Merger, a wholly-owned subsidiary of PPG, and, unless the context otherwise requires, its subsidiaries;

- "Splitco Group" means Splitco and each of its consolidated subsidiaries (including, after consummation of the Merger, Georgia Gulf and each of its subsidiaries);

- "Tax Matters Agreement" means the Tax Matters Agreement to be entered into at the date of the Separation by and among Georgia Gulf, PPG and Splitco;

- "TCI" means Taiwan Chlorine Industries, Ltd., a joint venture between PPG and China Petrochemical Development Corporation, in which PPG owns a 60 percent interest. For more information about the transfer of PPG's interest in TCI to Splitco, see "The Merger Agreement—Financing";

- "TCI Interests" means the shares of TCI owned by PPG immediately prior to the effective time of the Merger;

- "Term Facility" means $225.0 million in new bank debt, subject to increase or decrease by PPG within certain parameters set forth in the Merger Agreement, to be incurred by Splitco under a senior secured term loan facility, which debt will be obligations of Splitco and, upon consummation of the Transactions, guaranteed by Georgia Gulf and certain of its subsidiaries;

- "Transactions" means the transactions contemplated by the Merger Agreement and the Separation Agreement, which provide for, among other things, the Separation, the Term Facility, the Debt Securities, the Debt Exchange, the Distribution and the Merger, as described in the section of this document entitled "The Transactions";

- "Transition Services Agreement" means the Transition Services Agreement to be entered into at the date of the Separation between PPG and Splitco; and

- "VWAP" means volume-weighted average price.

3

PPG102219

## QUESTIONS AND ANSWERS ABOUT THIS EXCHANGE OFFER AND THE TRANSACTIONS

**Questions and Answers About This Exchange Offer**

The following are some of the questions that PPG shareholders may have, and answers to those questions. These questions and answers, as well as the following summary, are not meant to be a substitute for the information contained in the remainder of this document, and this information is qualified in its entirety by the more detailed descriptions and explanations contained elsewhere in this document. You are urged to read this document in its entirety prior to making any decision.

**Q: Who may participate in this Exchange Offer?**

A: Any U.S. holders of PPG common stock during the exchange offer period may participate in this exchange offer. Although PPG has mailed this prospectus to its shareholders to the extent required by U.S. law, including shareholders located outside the United States, this prospectus is not an offer to sell or exchange and it is not a solicitation of an offer to buy any shares of PPG common stock or shares of Splitco common stock in any jurisdiction in which such offer, sale or exchange is not permitted.

Countries outside the United States generally have their own legal requirements that govern securities offerings made to persons resident in those countries and often impose stringent requirements about the form and content of offers made to the general public. PPG has not taken any action under non-U.S. regulations to facilitate a public offer to exchange the shares of PPG common stock outside the United States. Accordingly, the ability of any non-U.S. person to tender shares of PPG common stock in the exchange offer will depend on whether there is an exemption available under the laws of such person's home country that would permit the person to participate in the exchange offer without the need for PPG to take any action to facilitate a public offering in that country. For example, some countries exempt transactions from the rules governing public offerings if they involve persons who meet certain eligibility requirements relating to their status as sophisticated or professional investors.

Non-U.S. shareholders should consult their advisors in considering whether they may participate in the exchange offer in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the shares of PPG common stock, Splitco common stock or Georgia Gulf common stock that may apply in their home countries. PPG, Splitco and Georgia Gulf cannot provide any assurance about whether such limitations may exist. See "The Exchange Offer—Certain Matters Relating to Non-U.S. Jurisdictions" for additional information about limitations on the exchange offer outside the United States.

**Q: How many shares of Splitco common stock will I receive for each share of PPG common stock that I tender?**

A: This exchange offer is designed to permit you to exchange your shares of PPG common stock for shares of Splitco common stock at a       % discount to the per-share value of Georgia Gulf common stock, calculated as set forth in this document. Stated another way, for each $1.00 of your PPG common stock accepted in this exchange offer, you will receive approximately $       of Splitco common stock. The value of the PPG common stock will be based on the calculated per-share value for the PPG common stock on the NYSE and the value of the Splitco common stock will be based on the calculated per-share value for Georgia Gulf common stock on the NYSE, in each case determined by reference to the simple arithmetic average of the daily VWAP on each of the Valuation Dates. Please note, however, that:

- The number of shares you can receive is subject to an upper limit of an aggregate of       shares of Splitco common stock for each share of PPG common stock accepted in this exchange offer. The next question and answer below describes how this limit may impact the value you receive.

- This exchange offer does not provide for a minimum exchange ratio. See "This Exchange Offer— Terms of this Exchange Offer."

4

- Because this exchange offer is subject to proration, PPG may accept for exchange only a portion of the PPG common stock tendered by you.

**Q:   Is there a limit on the number of shares of Splitco common stock I can receive for each share of PPG common stock that I tender?**

A:   The number of shares you can receive is subject to an upper limit of          shares of Splitco common stock for each share of PPG common stock accepted in this exchange offer. **If the upper limit is in effect, you will receive less than $          of Splitco common stock for each $1.00 of PPG common stock that you tender, and you could receive much less.** For example, if the calculated per-share value of PPG common stock was $          (the highest closing price for PPG common stock on the NYSE during the three-month period prior to commencement of this exchange offer) and the calculated per-share value of Splitco common stock was $          (the lowest closing price for Georgia Gulf common stock on the NYSE during that three-month period), the value of Splitco common stock, based on the Georgia Gulf common stock price, received for PPG common stock accepted for exchange would be approximately $          for each $1.00 of PPG common stock accepted for exchange.

The upper limit represents a          % discount for Splitco common stock based on the closing prices of PPG common stock and Georgia Gulf common stock on the NYSE on          , 2012 (the day before the commencement of this exchange offer). PPG set this upper limit to ensure that an unusual or unexpected drop in the trading price of Georgia Gulf common stock, relative to the trading price of PPG common stock, would not result in an unduly high number of shares of Splitco common stock being exchanged for each share of PPG common stock accepted in this exchange offer.

**Q:   What will happen if the upper limit is in effect?**

A:   PPG will announce whether the upper limit on the number of shares that can be received for each share of PPG common stock tendered will be in effect at the expiration of the exchange offer period, through *www.          .com/          / and by press release, no later than 4:30 p.m., New York City time, on the expiration date. If the upper limit is in effect at that time, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension of this exchange offer will be made until 12:00 midnight, New York City time, on the second trading day following the originally contemplated expiration date to permit shareholders to tender or withdraw their PPG common stock during those days. The daily VWAP and trading prices of PPG common stock and Georgia Gulf common stock during this Mandatory Extension will not, however, affect the exchange ratio, which will be fixed at          . See "This Exchange Offer—Terms of this Exchange Offer—Extension; Termination; Amendment—Mandatory Extension."

**Q:   How are the calculated per-share values of PPG common stock and Georgia Gulf common stock determined for purposes of calculating the number of shares of Splitco common stock to be received in this exchange offer?**

A:   The calculated per-share value of PPG common stock and Georgia Gulf common stock for purposes of this exchange offer will equal the simple arithmetic average of the daily VWAP of PPG common stock and Georgia Gulf common stock, as the case may be, on the NYSE on each of the Valuation Dates. PPG will determine such calculations of the per-share values of PPG common stock and Georgia Gulf common stock and such determination will be final.

**Q:   What is the "daily volume–weighted average price" or "daily VWAP?"**

A:   The "daily volume–weighted average price" for PPG common stock and Georgia Gulf common stock will be the volume-weighted average price of PPG common stock and Georgia Gulf common stock on the NYSE during the period beginning at 9:30 a.m., New York City time (or such other time as is the official open of trading on the NYSE), and ending at 4:00 p.m., New York City time (or such other time as is the official close of trading on the NYSE and in no event later than 4:10 p.m., New York City time), as reported to PPG

5

PPG102221

**A-853**

by Bloomberg L.P. for the equity ticker pages PPG, in the case of PPG common stock, and GGC, in the case of Georgia Gulf common stock. The daily VWAPs provided by Bloomberg L.P. may be different from other sources of volume–weighted average prices or investors' or security holders' own calculations of volume–weighted average prices.

**Q:   Where can I find the daily VWAP of PPG common stock and Georgia Gulf common stock during the exchange offer period?**

A:   The daily VWAP of both PPG common stock and Georgia Gulf common stock, together with indicative exchange ratios, for each day during this exchange offer will be available by contacting the information agent at the toll–free number provided on the back cover of this document. During the period of the Valuation Dates, when the values of PPG common stock and Georgia Gulf common stock are calculated for the purposes of this exchange offer, the indicative exchange ratios based on indicative calculated per–share values calculated by PPG will equal (i) on the first Valuation Date, the intra–day VWAP during the elapsed portion of that day, (ii) on the second Valuation Date, the intra–day VWAP during the elapsed portion of that day averaged with the actual daily VWAP on the first Valuation Date and (iii) on the third Valuation Date, the intra–day VWAP during the elapsed portion of that day averaged with the actual daily VWAP on the first Valuation Date and with the actual daily VWAP on the second Valuation Date.

**Q:   Why is the calculated per–share value for Splitco common stock based on the trading prices for Georgia Gulf common stock?**

A:   There is currently no trading market for Splitco common stock and no such trading market will be established in the future. PPG believes, however, that the trading prices for Georgia Gulf common stock are an appropriate proxy for the trading prices of Splitco common stock because (i) in the Merger each share of Splitco common stock will be converted into the right to receive a number of shares of Georgia Gulf common stock equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger (subject to adjustment in certain circumstances) and (ii) at the Valuation Dates, it is expected that all the major conditions to the consummation of the Merger will have been satisfied and the Merger will be expected to be consummated shortly, such that investors should be expected to be valuing Georgia Gulf common stock based on the expected value of such Georgia Gulf common stock after the Merger. There can be no assurance, however, that Georgia Gulf common stock after the Merger will trade on the same basis as Georgia Gulf common stock trades prior to the Merger. See "Risk Factors—Risks Related to the Transactions—The trading prices of Georgia Gulf common stock may not be an appropriate proxy for the prices of Splitco common stock."

**Q:   How and when will I know the final exchange ratio?**

A:   Subject to the possible Mandatory Extension of this exchange offer described below, the final exchange ratio showing the number of shares of Splitco common stock that you will receive for each share of PPG common stock accepted in this exchange offer will be available at *www.     .com/     /* no later than 4:30 p.m., New York City time, on the expiration date and separately announced by press release. In addition, as described below, you may also contact the information agent to obtain these indicative exchange ratios and the final exchange ratio at its toll–free number provided on the back cover of this document.

PPG will announce whether the upper limit on the number of shares that can be received for each share of PPG common stock tendered is in effect at *www.     .com/     /* and separately by press release, no later than 4:30 p.m., New York City time, on the expiration date. If the upper limit is in effect at that time, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension until 12:00 midnight, New York City time, on the second trading day following the originally contemplated expiration date will be made to permit shareholders to tender or withdraw their PPG common stock during those days.

6

**PPG102222**

**A-854**

**Q:   Will indicative exchange ratios be provided during the tender offer period?**

A:   Yes. Indicative exchange ratios will be available by contacting the information agent at the toll-free number provided on the back cover of this prospectus on each day during the exchange offer period, calculated as though that day were the expiration date of this exchange offer. The indicative exchange ratio will also reflect whether the upper limit on the exchange ratio, described above, would have been in effect. You may also contact the information agent at its toll–free number to obtain these indicative exchange ratios.

In addition, for purposes of illustration, a table that indicates the number of shares of Splitco common stock that you would receive per share of PPG common stock, calculated on the basis described above and taking into account the upper limit, assuming a range of averages of the daily VWAP of PPG common stock and Georgia Gulf common stock on the Valuation Dates is provided under "This Exchange Offer—Terms of this Exchange Offer."

**Q:   What if PPG common stock or Georgia Gulf common stock does not trade on any of the Valuation Dates?**

A:   If a market disruption event occurs with respect to PPG common stock or Georgia Gulf common stock on any of the Valuation Dates, the calculated per–share value of PPG common stock and Splitco common stock will be determined using the daily VWAP of shares of PPG common stock and shares of Georgia Gulf common stock on the preceding trading day or days, as the case may be, on which no market disruption event occurred with respect to both PPG common stock and Georgia Gulf common stock. If, however, a market disruption event occurs as specified above, PPG may terminate this exchange offer if, in its reasonable judgment, the market disruption event has impaired the benefits of this exchange offer. For specific information as to what would constitute a market disruption event, see "This Exchange Offer—Conditions for Consummation of this Exchange Offer."

**Q:   Are there circumstances under which I would receive fewer shares of Splitco common stock than I would have received if the exchange ratio were determined using the closing prices of PPG common stock and Georgia Gulf common stock on the expiration date of this exchange offer?**

A:   Yes. For example, if the trading price of PPG common stock were to increase during the period of the Valuation Dates, the calculated per–share value of PPG common stock would likely be lower than the closing price of PPG common stock on the expiration date of this exchange offer. As a result, you may receive fewer shares of Splitco common stock for each $1.00 of PPG common stock than you would have if that per–share value were calculated on the basis of the closing price of PPG common stock on the expiration date. Similarly, if the trading price of Georgia Gulf common stock were to decrease during the period of the Valuation Dates, the calculated per–share value of Splitco common stock would likely be higher than the closing price of Georgia Gulf common stock on the expiration date. This could also result in your receiving fewer shares of Splitco common stock for each $1.00 of PPG common stock than you would otherwise receive if that per–share value were calculated on the basis of the closing price of Georgia Gulf common stock on the expiration date of this exchange offer. See "This Exchange Offer—Terms of this Exchange Offer."

**Q:   Will PPG distribute fractional shares?**

A:   Upon consummation of this exchange offer, the exchange offer agent will hold the shares of Splitco common stock in trust for the holders of PPG common stock who validly tendered their shares and, in case of a pro rata distribution, for the holders of record of PPG common stock for the pro rata distribution. Immediately following the consummation of this exchange offer and by means of the Merger, each share of Splitco common stock will be converted into the right to receive a number of shares of Georgia Gulf common stock equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares

7

of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger. In the Merger, no fractional shares of Georgia Gulf common stock will be delivered to holders of Splitco common stock. All fractional shares of Georgia Gulf common stock that a holder of shares of Splitco common stock would otherwise be entitled to receive as a result of the Merger will be aggregated by the transfer agent. The transfer agent will cause the whole shares obtained thereby to be sold on behalf of such holders of shares of Splitco common stock that would otherwise be entitled to receive such fractional shares of Georgia Gulf common stock in the Merger, in the open market or otherwise as reasonably directed by PPG, and in no case later than five business days after the Merger. The transfer agent will make available the net proceeds thereof, after deducting any required withholding taxes and brokerage charges, commissions and transfer taxes, on a pro rata basis, without interest, as soon as practicable to the holders of Splitco common stock that would otherwise be entitled to receive such fractional shares of Georgia Gulf common stock in the Merger.

**Q: What is the aggregate number of shares of Splitco common stock being offered in this exchange offer?**

A: In this exchange offer, PPG is offering a number of shares of Splitco common stock equal to the greater of (i) 35,200,000 shares or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, subject to adjustment under certain circumstances. In this exchange offer, PPG is offering all the shares of Splitco common stock it holds on the date of consummation of this exchange offer.

**Q: What happens if not enough shares of PPG common stock are tendered to allow PPG to exchange all of the shares of Splitco common stock it holds?**

A: If this exchange offer is consummated but less than all shares of Splitco common stock owned by PPG are exchanged because this exchange offer is not fully subscribed, the additional shares of Splitco common stock owned by PPG will be distributed on a pro rata basis to the holders of shares of PPG common stock.

Upon consummation of this exchange offer, PPG will deliver to the exchange offer agent a global certificate representing all of the Splitco common stock being distributed in this exchange offer, with instructions to hold the shares of Splitco common stock in trust for holders of shares of PPG common stock validly tendered and not withdrawn and holders of shares of PPG common stock as of the distribution date of a pro rata distribution, if any. If there is a pro rata distribution, the exchange offer agent will calculate the exact number of shares of Splitco common stock not exchanged in this exchange offer and to be distributed on a pro rata basis, and that number of shares of Splitco common stock will be held in trust for the holders of shares of PPG common stock. See "This Exchange Offer—Dividend and Distribution of Any Shares of Splitco Common Stock Remaining After This Exchange Offer.

**Q: Will all shares of PPG common stock that I tender be accepted in this exchange offer?**

A: Not necessarily. Depending on the number of shares of PPG common stock validly tendered in this exchange offer and not properly withdrawn, and the calculated per-share values of PPG common stock and Splitco common stock determined as described above, PPG may have to limit the number of shares of PPG common stock that it accepts in this exchange offer through a proration process. Any proration of the number of shares accepted in this exchange offer will be determined on the basis of the proration mechanics described under "Summary—Terms of this Exchange Offer—Proration; Odd-Lots."

An exception to proration can apply to shareholders who beneficially own "odd-lots," that is, fewer than 100 shares of PPG common stock. Beneficial holders of less than 100 shares of PPG common stock who validly tender all of their shares will not to be subject to proration.

In all other cases, proration for each tendering shareholder will be based on (i) the proportion that the total number of shares of PPG common stock to be accepted bears to the total number of shares of PPG common stock validly tendered and not properly withdrawn and (ii) the number of shares of PPG common stock

8

validly tendered and not properly withdrawn by that shareholder (and not on that shareholder's aggregate ownership of shares of PPG common stock). Any shares of PPG common stock not accepted for exchange as a result of proration will be returned to tendering shareholders promptly after the final proration factor is determined.

**Q: Will I be able to sell my shares of Splitco common stock after this exchange offer is completed?**

A: No. There currently is no trading market for shares of Splitco common stock and no such trading market will be established in the future.

**Q: How many shares of PPG common stock will PPG accept if this exchange offer is completed?**

A: The number of shares of PPG common stock that will be accepted if this exchange offer is completed will depend on the final exchange ratio, the number of shares of Splitco common stock offered and the number of shares of PPG common stock tendered. Assuming PPG offers 35,200,000 shares of Splitco common stock in this exchange offer, the largest possible number of shares of PPG common stock that will be accepted would equal 35,200,000 divided by the final exchange ratio. For example, assuming that the final exchange ratio is          (the maximum number of shares of Splitco common stock that could be exchanged for one share of PPG common stock), then PPG would accept up to a total of approximately          shares of PPG common stock.

**Q: Are there any conditions to PPG's obligation to complete this exchange offer?**

A: Yes. This exchange offer is subject to various conditions listed under "This Exchange Offer—Conditions for Consummation of this Exchange Offer." If any of these conditions are not satisfied or waived prior to the expiration of this exchange offer, PPG will not be required to accept shares for exchange and may extend or terminate this exchange offer.

PPG may waive any of the conditions to this exchange offer. For a description of the material conditions precedent to this exchange offer, including satisfaction or waiver of the conditions to the Transactions, the receipt of Georgia Gulf stockholder approval of the issuance of shares of Georgia Gulf common stock in connection with Merger and other conditions, see "This Exchange Offer—Conditions for Consummation of this Exchange Offer." Georgia Gulf has no right to waive any of the conditions to this exchange offer.

**Q: When does this exchange offer expire?**

A: The period during which you are permitted to tender your shares of PPG common stock in this exchange offer will expire at 12:00 midnight, New York City time, on          , 2012, unless PPG extends this exchange offer. See "This Exchange Offer—Terms of this Exchange Offer—Extension; Termination; Amendment."

**Q: Can this exchange offer be extended and under what circumstances?**

A: Yes. PPG can extend this exchange offer, in its sole discretion, at any time and from time to time. For instance, this exchange offer may be extended if any of the conditions for consummation of this exchange offer listed under "This Exchange Offer—Conditions for Consummation of this Exchange Offer" are not satisfied or waived prior to the expiration of this exchange offer. In case of an extension of this exchange offer, PPG will publicly announce the extension at *www.          .com/          /* and separately by press release no later than 9:00 a.m., New York City time, on the next business day following the previously scheduled expiration date. In addition, if the upper limit on the number of shares that can be received for each share of PPG common stock tendered is in effect at the expiration of the exchange offer period, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension of this exchange offer will be made until 12:00 midnight, New York City time, on the second following trading day.

9

**PPG102225**

**A-857**

**Q:   How do I participate in this exchange offer?**

A:   The procedures you must follow to participate in this exchange offer will depend on whether you hold your shares of PPG common stock in certificated form, through a bank or trust company or broker, or if your PPG common shares are held in book-entry via the Direct Registration System ("DRS"). For specific instructions about how to participate, see "This Exchange Offer—Terms of This Exchange Offer—Procedures for Tendering."

**Q:   How do I tender my shares of PPG common stock after the final exchange ratio has been determined?**

A:   If you wish to tender your shares after the final exchange ratio has been determined, you will generally need to do so by means of delivering a notice of guaranteed delivery and complying with the guaranteed delivery procedures described in the section entitled "This Exchange Offer—Terms of This Exchange Offer—Procedures for Tendering—Guaranteed Delivery Procedures." If you hold shares of PPG common stock through a broker, dealer, commercial bank, trust company or similar institution, that institution must tender your shares on your behalf.

If your shares of PPG common stock are held through an institution and you wish to tender your PPG common stock after The Depository Trust Company has closed, the institution must deliver a notice of guaranteed delivery to the exchange offer agent via facsimile prior to 12:00 midnight, New York City time, on the expiration date.

**Q:   Can I tender only a portion of my shares of PPG common stock in this exchange offer?**

A:   Yes. You may tender all, some or none of your shares of PPG common stock.

**Q:   What do I do if I want to retain all of my shares of PPG common stock?**

A:   If you want to retain all of your shares of PPG common stock, you do not need to take any action. However, after the Transactions, the PPG Chlor-alkali and Derivatives Business will no longer be owned by PPG, and as a holder of PPG common stock you will no longer hold shares in a company that owns the PPG Chlor-alkali and Derivatives Business (unless the exchange offer is consummated but is not fully subscribed and the remaining shares of Splitco common stock are distributed on a pro rata basis to PPG shareholders whose shares of PPG common stock remain outstanding after consummation of the exchange offer).

**Q:   Can I change my mind after I tender my shares of PPG common stock?**

A:   Yes. You may withdraw your tendered shares at any time before this exchange offer expires. See "This Exchange Offer—Terms of this Exchange Offer—Withdrawal Rights." If you change your mind again, you can re-tender your shares of PPG common stock by following the tender procedures again prior to the expiration of this exchange offer.

**Q:   Will I be able to withdraw the shares of PPG common stock I tender after the final exchange ratio has been determined?**

A:   Yes. The final exchange ratio used to determine the number of shares of Splitco common stock that you will receive for each share of PPG common stock accepted in this exchange offer will be announced no later than 4:30 p.m., New York City time, on the expiration date of this exchange offer, which is          , 2012, unless this exchange offer is extended or terminated. You have the right to withdraw shares of PPG common stock you have tendered at any time before 12:00 midnight, New York City time, on the expiration date, which is          , 2012. See "This Exchange Offer—Terms of this Exchange Offer."

If the upper limit on the number of shares of Splitco common stock that can be received for each share of PPG common stock tendered is in effect at the expiration of the exchange offer period, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension of this exchange offer until 12:00 midnight,

10

PPG102226

New York City time, on the second trading day following the originally contemplated expiration date will be made to permit you to tender or withdraw your PPG common stock during those days, either directly or by acting through a broker, dealer, commercial bank, trust company or similar institution on your behalf.

**Q: How do I withdraw my tendered PPG common stock after the final exchange ratio has been determined?**

A: If you are a registered shareholder of PPG common stock (which includes persons holding certificated shares and book-entry shares held through DRS) and you wish to withdraw your shares after the final exchange ratio has been determined, then you must deliver a written notice of withdrawal or a facsimile transmission notice of withdrawal to the exchange offer agent prior to 12:00 midnight, New York City time, on the expiration date. The information that must be included in that notice is specified under "This Exchange Offer—Terms of this Exchange Offer—Withdrawal Rights."

If you hold your shares through a broker, dealer, commercial bank, trust company or similar institution, you should consult that institution on the procedures you must comply with and the time by which such procedures must be completed in order for that institution to provide a written notice of withdrawal or facsimile notice of withdrawal to the exchange offer agent on your behalf before 12:00 midnight, New York City time, on the expiration date. If you hold your shares through such an institution, that institution must deliver the notice of withdrawal with respect to any shares you wish to withdraw. In such a case, as a beneficial owner and not a registered shareholder, you will not be able to provide a notice of withdrawal for such shares directly to the exchange offer agent.

If your shares of PPG common stock are held through an institution and you wish to withdraw shares of PPG common stock after The Depository Trust Company has closed, the institution must deliver a written notice of withdrawal to the exchange offer agent prior to 12:00 midnight, New York City time, on the expiration date, in the form of The Depository Trust Company's notice of withdrawal and you must specify the name and number of the account at The Depository Trust Company to be credited with the withdrawn shares and must otherwise comply with The Depository Trust Company's procedures. See "This Exchange Offer—Terms of this Exchange Offer—Withdrawal Rights—Withdrawing Your Shares After the Final Exchange Ratio Has Been Determined."

**Q: Will I be subject to U.S. federal income tax on the shares of Splitco common stock that I receive in this exchange offer or on the shares of Georgia Gulf common stock that I receive in the Merger?**

A: Shareholders of PPG generally will not recognize any gain or loss for U.S. federal income tax purposes as a result of this exchange offer or the Merger, except for any gain or loss attributable to the receipt of cash in lieu of fractional shares of Georgia Gulf common stock received in the Merger.

The material U.S. federal income tax consequences of the exchange offer and the Merger are described in more detail under "This Exchange Offer—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger."

**Q: Are there any appraisal rights for holders of shares of PPG common stock?**

A: There are no appraisal rights available to holders of shares of PPG common stock in connection with this exchange offer.

**Q: Whom do I contact for information regarding this exchange offer?**

A: You may call the information agent,              , at             (for shareholders) and             (for banks and brokers), to ask any questions about this exchange offer or to request additional documents, including copies of this document and the letter of transmittal (including the instructions thereto).

11

**PPG102227**

**Questions and Answers about the Transactions**

**Q:   What are the key steps of the Transactions?**

**A:**   Below is a summary of the key steps of the Transactions. A step-by-step description of material events relating to the Transactions is set forth under "The Transactions."

- PPG will transfer to Splitco the PPG Chlor-alkali and Derivatives Business;

- prior to the Distribution, Splitco will incur new indebtedness in the form of the Term Facility in the amount of approximately $225.0 million and issue approximately $675.0 million in aggregate principal amount of Debt Securities to PPG. PPG will ultimately receive the cash proceeds from the approximately $225.0 million term loan under the Term Facility through a distribution in connection with the Separation and prior to the consummation of the Merger. PPG is then expected to transfer the Debt Securities on or about the closing date of the Merger to investment banks and/or commercial banks in satisfaction of the debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility." The Debt Securities are subsequently expected to be sold by the investment banks and/or commercial banks to third-party investors as described below. PPG is expected to receive approximately $900.0 million in cash from the Term Facility and Debt Securities;

- PPG will offer to PPG shareholders the right to exchange all or a portion of their shares of PPG common stock for shares of Splitco common stock in an exchange offer. If the exchange offer is consummated but is not fully subscribed, PPG will distribute the remaining shares of Splitco common stock on a pro rata basis to PPG shareholders whose shares of PPG common stock remain outstanding after consummation of the exchange offer. If there is a pro rata distribution, the exchange agent will calculate the exact number of shares of Splitco common stock not exchanged in the exchange offer and to be distributed on a pro rata basis, and the number of shares of Georgia Gulf common stock into which the remaining shares of Splitco common stock will be converted in the Merger will be transferred to PPG shareholders (after giving effect to the consummation of the exchange offer) as promptly as practicable thereafter;

- immediately after the Distribution, and on the closing date of the Merger, Merger Sub will merge with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf. In the Merger, each share of Splitco common stock will be converted into the right to receive Georgia Gulf common stock based on the exchange ratio set forth in the Merger Agreement, as described in the section of this document entitled "The Merger Agreement—Merger Consideration." Following the consummation of the Merger, Georgia Gulf and certain of its subsidiaries will guarantee the Term Facility and the Debt Securities;

- immediately after consummation of the Merger, at least 50.5% of Georgia Gulf common stock is expected to be held by pre-Merger holders of PPG common stock and no more than 49.5% of Georgia Gulf common stock is expected to be held by pre-Merger Georgia Gulf stockholders; and

- as described in the second bullet point above, Georgia Gulf and PPG expect the Debt Securities to be transferred by PPG on or about the closing date of the Merger to investment banks and/or commercial banks in the Debt Exchange in exchange for debt obligations of PPG described in the section of this document entitled "Debt Financing—PPG Bridge Facility." The Debt Securities will then be sold by the investment banks and/or commercial banks to third-party investors pursuant to an exemption from registration under the Securities Act in either a private placement or a "Rule 144A" transaction.

**Q:   What are the material U.S. federal income tax consequences to Georgia Gulf and Georgia Gulf's stockholders resulting from the Transactions?**

**A:**   Georgia Gulf will not recognize any gain or loss for U.S. federal income tax purposes as a result of the Merger. Because Georgia Gulf stockholders will not participate in the Distribution or the Merger, Georgia Gulf stockholders will generally not recognize gain or loss upon either the Distribution (including this exchange offer) or the Merger.

PPG102228

**Q: What will Georgia Gulf stockholders receive in the Merger?**

A: Georgia Gulf stockholders will not directly receive any consideration in the Merger. All shares of Georgia Gulf common stock issued and outstanding immediately before the Merger will remain issued and outstanding after consummation of the Merger. Immediately after the Merger, Georgia Gulf stockholders will continue to own shares in Georgia Gulf, which will include the PPG Chlor-alkali and Derivatives Business. Splitco, as a wholly-owned subsidiary of Georgia Gulf, will be responsible for repaying the approximately $900.0 million of debt that will be incurred in connection with the Transactions, and these debt obligations will be guaranteed by Georgia Gulf and certain of its subsidiaries after the consummation of the Merger.

**Q: Are there possible adverse effects on the value of Georgia Gulf common stock to be received by PPG shareholders who participate in the exchange offer?**

A: PPG shareholders that participate in the exchange offer will be exchanging their shares of PPG common stock for shares of Splitco common stock at a discount to the per-share value of Georgia Gulf common stock. The existence of a discount, along with the issuance of shares of Georgia Gulf common stock pursuant to the Merger, may negatively affect the market price of Georgia Gulf common stock. Further, Splitco will be the obligor on approximately $900.0 million of debt, consisting of approximately $225.0 million under the Term Facility and approximately $675.0 million in Debt Securities, which, after the consummation of the Merger, will be guaranteed by Georgia Gulf and certain of its subsidiaries. This additional indebtedness could adversely affect the operations and financial condition of Georgia Gulf. Georgia Gulf also expects to incur significant one-time costs in connection with the Transactions, including financial, legal, accounting and other professional fees and costs, and the other costs necessary to achieve the benefits that may result from the realization of approximately $115.0 million of annualized cost synergies Georgia Gulf management believes are achievable in the Merger; and the incurrence of these costs may have an adverse impact on Georgia Gulf's liquidity or operating results in the periods in which they are incurred. Finally, Georgia Gulf's management will be required to devote a significant amount of time and attention to the process of integrating the operations of Georgia Gulf and the PPG Chlor-alkali and Derivatives Business. If Georgia Gulf management is not able to effectively manage the process, Georgia Gulf's business could suffer and its stock price may decline. See "Risk Factors" for a further discussion of the material risks associated with the Transactions.

**Q: How will the Transactions impact the future liquidity and capital resources of Georgia Gulf?**

A: The approximately $225.0 million under the Term Facility and approximately $675.0 million in Debt Securities will be the debt obligations of Splitco, and, after consummation of the Merger, will be guaranteed by Georgia Gulf and certain of its subsidiaries. In the Transactions, Georgia Gulf expects to incur significant one-time financial, legal, accounting and other professional fees and costs, as well as other costs necessary to achieve the benefits that may result from the realization of approximately $115.0 million of annualized cost synergies Georgia Gulf's management believes are achievable in the Merger. Georgia Gulf anticipates that its primary sources of liquidity for working capital and operating activities, including any future acquisitions, after the Transactions will be cash provided by operations and additional availability under its current or any future credit facilities. Georgia Gulf expects to enter into the New ABL Revolver (as defined and described in the section entitled "Debt Financing—New ABL Revolver"), which is expected to, among other things, increase Georgia Gulf's availability to $500.0 million, subject to applicable borrowing base limitations and certain other conditions. There can be no assurance that Georgia Gulf will be able to enter into the New ABL Revolver on acceptable terms, at an appropriate time, or at all.

**Q: How do the Transactions impact Georgia Gulf's dividend policy?**

A: On May 21, 2012, Georgia Gulf declared a cash dividend of $0.08 per share, Georgia Gulf's first dividend since 2008. This dividend was paid on July 10, 2012. Pursuant to the Merger Agreement, Georgia Gulf has agreed not to pay a quarterly dividend of greater than $0.08 per share until after the consummation of the

13

PPG102229

Merger and indicated its intent to pay quarterly dividends from and after the closing of the Merger at no less than the current rate of $0.32 per share per annum, although the payment of cash dividends in the future will be at the discretion of Georgia Gulf's board of directors. The declaration of any cash dividends, and the amount thereof, will depend on many factors, including Georgia Gulf's financial condition, capital requirements, funds from operations, the dividend taxation level, Georgia Gulf's stock price, future business prospects, and any other factors, as Georgia Gulf's board of directors may deem relevant. Additionally, the ABL Revolver and the indenture governing the 9 percent notes place significant restrictions on Georgia Gulf's ability to pay dividends, and other indebtedness Georgia Gulf may incur in the future, including the New ABL Revolver, may contain similar restrictions.

**Q: What will PPG receive in the Transactions?**

A: PPG will receive the cash proceeds of the Term Facility, and will receive the Debt Securities. The Debt Securities are expected to be issued by Splitco to PPG prior to the Distribution. The Term Facility and Debt Securities will be the debt obligations of Splitco and, following the consummation of the Merger, will be guaranteed by Georgia Gulf and certain of its subsidiaries. As a result, PPG will receive total cash proceeds of approximately $900.0 million in connection with the Separation and the Distribution, subject to adjustments.

**Q: What will you receive in the Transactions?**

A: In the exchange offer, PPG will offer to you the right to exchange all or a portion of their shares of PPG common stock for shares of Splitco common stock. If the exchange offer is consummated but is not fully subscribed, PPG will distribute the remaining shares of Splitco common stock on a pro rata basis to PPG shareholders whose shares of PPG common stock remain outstanding after consummation of this exchange offer. In the Merger, each share of Splitco common stock will be converted into the right to receive Georgia Gulf common stock based on the exchange ratio set forth in the Merger Agreement, as described in the section of this document entitled "The Merger Agreement—Merger Consideration."

**Q: Are there any conditions to the consummation of the Transactions?**

A: Yes. Consummation of the Transactions is subject to a number of conditions, including:

- the approval of Georgia Gulf's stockholders of the issuance of shares of Georgia Gulf common stock in the Merger;
- the receipt of certain rulings from the Internal Revenue Service (the "IRS");
- the receipt by PPG of the Distribution Tax Opinion;
- the completion of the various transaction steps contemplated by the Merger Agreement and the Separation Agreement, including the Separation and the Distribution;
- clearance of the Merger under applicable antitrust or competition laws in Canada and the United States; and
- other customary conditions.

If Georgia Gulf waives the satisfaction of a material condition to the consummation of the Transactions, Georgia Gulf will evaluate the appropriate facts and circumstances at that time and resolicit stockholder approval of the issuance of shares of Georgia Gulf common stock in the Merger if required to do so by law.

This document describes these conditions in more detail under "The Merger Agreement—Conditions to the Merger."

**Q: When will the Transactions be completed?**

A: The Transactions are expected to be completed in late 2012 or early 2013. However, it is possible that the Transactions could be completed at a later time or not at all. For a discussion of the conditions to the Transactions, see "The Merger Agreement—Conditions to the Merger."

14

PPG102230

**Q: Are there risks associated with the Transactions?**

A:   Yes. The material risks associated with the Transactions are discussed in the section of this document entitled "Risk Factors." Those risks include, among others, the possibility that Georgia Gulf may fail to realize the anticipated benefits of the Merger, the uncertainty that Georgia Gulf will be able to integrate the PPG Chlor-alkali and Derivatives Business successfully, the possibility that Georgia Gulf may be unable to provide benefits and services or access to equivalent financial strength and resources to the PPG Chlor-alkali and Derivatives Business that historically have been provided by PPG, the additional long-term indebtedness and liabilities that Georgia Gulf will have following the consummation of the Transactions and the substantial dilution to the ownership interest of current Georgia Gulf stockholders following the consummation of the Merger.

**Q: What stockholder approvals are needed in connection with the Transactions?**

A:   Georgia Gulf cannot complete the Transactions unless the proposal relating to the issuance of shares of Georgia Gulf common stock in the Merger is approved by the affirmative vote of a majority of the shares of Georgia Gulf common stock represented and voting at the special meeting, either in person or by proxy (provided that the total votes cast on the proposal represent over 50% in interest of all shares entitled to vote on the proposal).

**Q: Where will the Georgia Gulf shares to be issued in the Merger be listed?**

A:   Georgia Gulf common stock is listed on the NYSE under "GGC." After the consummation of the Transactions, all shares of Georgia Gulf common stock issued in the Merger, and all other outstanding shares of Georgia Gulf common stock, will continue to be listed on the NYSE.

PPG102231

## SUMMARY

*The following summary contains certain information described in more detail elsewhere in this document. It does not contain all the details concerning the Transactions, including information that may be important to you. To better understand the Transactions, you should carefully review this entire document and the documents it refers to. See "Where You Can Find More Information; Incorporation by Reference."*

### The Companies

*Georgia Gulf Corporation*

Georgia Gulf Corporation
115 Perimeter Center Place, Suite 460
Atlanta, Georgia 30346
Telephone: (770) 395-4500

Georgia Gulf Corporation is a leading, integrated North American manufacturer and international marketer of chemicals and building products. Georgia Gulf manufactures two chemical lines, chlorovinyls and aromatics, as well as vinyl-based building and home improvement products. Georgia Gulf's vinyl-based building and home improvement products, marketed under the Royal Building Products and Exterior Portfolio brands, include window and door profiles, mouldings, siding, pipe and pipe fittings and deck products. Georgia Gulf, headquartered in Atlanta, Georgia, has manufacturing facilities located throughout North America to provide industry-leading service to customers.

*Grizzly Acquisition Sub, Inc.*

Grizzly Acquisition Sub, Inc.
c/o Georgia Gulf Corporation
115 Perimeter Center Place, Suite 460
Atlanta, Georgia 30346
Telephone: (770) 395-4500

Grizzly Acquisition Sub, Inc., a Delaware corporation referred to in this document as Merger Sub, is a newly formed, direct wholly-owned subsidiary of Georgia Gulf that was organized specifically for the purpose of completing the Merger. Merger Sub has engaged in no business activities to date and it has no material assets or liabilities of any kind, other than those incident to its formation and in connection with the Transactions.

*PPG Industries, Inc.*

PPG Industries, Inc.
One PPG Place
Pittsburgh, Pennsylvania 15272
Telephone: (412) 434-3131

PPG Industries, Inc., incorporated in Pennsylvania in 1883, is a leading coatings and specialty products company. PPG's net sales in 2011 totaled $14,885 million and 2011 net income was $1,095 million. PPG's corporate headquarters is located in Pittsburgh, Pennsylvania. PPG has manufacturing facilities, sales offices, research and development centers and distribution centers located throughout the world. At December 31, 2011 PPG operated 128 manufacturing facilities in 45 countries.

16

PPG102232

*Eagle Spinco Inc.*

Eagle Spinco Inc.
c/o PPG Industries, Inc.
One PPG Place
Pittsburgh, Pennsylvania 15272
Telephone: (412) 434-3131

Eagle Spinco Inc., a Delaware corporation referred to in this document as Splitco, is a newly formed, direct wholly-owned subsidiary of PPG that was organized specifically for the purpose of effecting the Separation. Splitco has engaged in no business activities to date and it has no material assets or liabilities of any kind, other than those incident to its formation and those incurred in connection with the Transactions.

## The Transactions

On July 19, 2012, Georgia Gulf and PPG announced that they, along with Splitco and Merger Sub, had entered into the Merger Agreement, and that PPG and Splitco had entered into the Separation Agreement, which together provide for the combination of Georgia Gulf's business and the PPG Chlor-alkali and Derivatives Business. In the Transactions, PPG will transfer the PPG Chlor-alkali and Derivatives Business to Splitco. Prior to the Distribution, PPG will receive the cash proceeds of approximately $225.0 million from borrowings under the Term Facility through a distribution in connection with the Separation and prior to the consummation of the Merger. PPG will also receive approximately $675.0 million in Debt Securities, which are expected to be issued by Splitco to PPG prior to the Distribution, and then transferred on or about the closing date of the Merger to investment banks and/or commercial banks in satisfaction of the debt obligations of PPG described in the section entitled "Debt Financing—PPG Bridge Facility."

On the closing date of the Merger, PPG will distribute shares of Splitco common stock to its participating shareholders in an exchange offer. If the exchange offer is consummated but is not fully subscribed, PPG will distribute the remaining shares of Splitco common stock on a pro rata basis to PPG shareholders whose shares of PPG common stock remain outstanding after consummation of the exchange offer. If there is a pro rata distribution, the exchange agent will calculate the exact number of shares of Splitco common stock not exchanged in the exchange offer and to be distributed on a pro rata basis, and the number of shares of Georgia Gulf common stock into which the remaining shares of Splitco common stock will be converted in the Merger will be transferred to PPG shareholders (after giving effect to the consummation of the exchange offer) as promptly as practicable thereafter. Immediately after the Distribution and on the closing date of the Merger, Merger Sub will merge with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf. In the Merger, each share of Splitco common stock will be converted into the right to receive Georgia Gulf common stock based on the exchange ratio set forth in the Merger Agreement, as described in the section of this document entitled "The Merger Agreement—Merger Consideration."

Georgia Gulf expects to issue 35,200,000 million shares of Georgia Gulf common stock in the Merger, although the exact number of shares to be issued in the Merger will not be known until the closing date. Based upon the reported closing sale price of $          per share for Georgia Gulf common stock on the NYSE on          , 2012, the total value of the shares to be issued by Georgia Gulf and the amount of cash received by PPG in the Transactions, including the Term Facility and the Debt Securities, which will be the obligations of Splitco and, following the consummation of the Merger, will be guaranteed by Georgia Gulf, would have been approximately $          million. The value of the consideration to be paid by Georgia Gulf will depend on the market price of shares of Georgia Gulf common stock at the time of determination.

17

PPG102233

**A-865**

After the Merger, Georgia Gulf will own and operate the PPG Chlor-alkali and Derivatives Business through Splitco, which will be Georgia Gulf's wholly-owned subsidiary, and will also continue its current businesses. All shares of Georgia Gulf common stock, including those issued in the Merger, will be listed on the NYSE under Georgia Gulf's current trading symbol "GGC."

Below is a step-by-step description of the sequence of material events relating to the Transactions.

Step 1   *Separation*

PPG will transfer to Splitco, a newly formed, direct wholly-owned subsidiary of PPG, the PPG Chlor-alkali and Derivatives Business.

Step 2   *Incurrence of Debt*

Prior to the Distribution, Splitco will incur new indebtedness in the form of the Term Facility in the amount of approximately $225.0 million and issue approximately $675.0 million in aggregate principal amount of Debt Securities to PPG. PPG will ultimately receive the cash proceeds from the approximately $225.0 million term loan under the Term Facility through a distribution in connection with the Separation and prior to the consummation of the Merger. PPG is then expected to transfer the Debt Securities on or about the closing date of the Merger to investment banks and/or commercial banks in satisfaction of the debt obligations of PPG described in the section entitled "Debt Financing— PPG Bridge Facility." The Debt Securities are subsequently expected to be sold by the investment banks and/or commercial banks to third-party investors as described below. PPG is expected to receive approximately $900.0 million in cash from the Term Facility and Debt Securities.

Step 3   *Distribution—Exchange Offer*

PPG will offer to PPG shareholders the right to exchange all or a portion of their shares of PPG common stock for shares of Splitco common stock in an exchange offer.

If the exchange offer is consummated but is not fully subscribed, PPG will distribute the remaining shares of Splitco common stock on a pro rata basis to PPG shareholders whose shares of PPG common stock remain outstanding after consummation of the exchange offer. If there is a pro rata distribution, the exchange agent will calculate the exact number of shares of Splitco common stock not exchanged in the exchange offer and to be distributed on a pro rata basis, and the number of shares of Georgia Gulf common stock into which the remaining shares of Splitco common stock will be converted in the Merger will be transferred to PPG shareholders (after giving effect to the consummation of the exchange offer) as promptly as practicable thereafter.

The exchange agent will hold, for the account of the relevant PPG shareholders, the global certificate(s) representing all of the outstanding shares of Splitco common stock, pending the consummation of the Merger. Shares of Splitco common stock will not be able to be traded during this period.

As previously noted, Splitco has prepared this document under the assumption that the shares of Splitco will be distributed to PPG shareholders pursuant to a split-off. Based on market conditions prior to closing, PPG will determine whether the Splitco shares will be distributed to PPG's shareholders in a spin-off or a split-off and, once a final decision is made, this document will be amended to reflect that decision, if necessary.

18

PPG102234

**A-866**

Step 4  *Merger*

Immediately after the Distribution, and on the closing date of the Merger, Merger Sub will merge with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and as a wholly-owned subsidiary of Georgia Gulf. In the Merger, each share of Splitco common stock will be converted into the right to receive Georgia Gulf common stock based on the exchange ratio set forth in the Merger Agreement, as described in the section of this document entitled "The Merger Agreement—Merger Consideration." Following the consummation of the Merger, Georgia Gulf and certain of its subsidiaries will guarantee the Term Facility and the Debt Securities.

Immediately after consummation of the Merger, at least 50.5% of Georgia Gulf common stock is expected to be held by pre-Merger holders of PPG common stock and no more than 49.5% of Georgia Gulf common stock is expected to be held by pre-Merger Georgia Gulf stockholders.

Step 5  *Sale of Debt Securities to Third-Party Investors*

As described in Step 2 above, Georgia Gulf and PPG expect the Debt Securities to be transferred by PPG on or about the closing date of the Merger to investment banks and/or commercial banks in the Debt Exchange in exchange for debt obligations of PPG described in this document entitled "Debt Financing—PPG Bridge Facility." The Debt Securities will then be sold by the investment banks and/or commercial banks to third-party investors pursuant to an exemption from registration under the Securities Act in either a private placement or a "Rule 144A" transaction.

Set forth below are diagrams that graphically illustrate, in simplified form, the existing corporate structure, the corporate structure immediately following the Distribution, and the corporate structure immediately following the consummation of the Transactions contemplated by the Merger Agreement.





19

PPG102235



After completion of all of the steps described above:

- Georgia Gulf's wholly-owned subsidiary, Splitco, will hold the PPG Chlor-alkali and Derivatives Business and will be the obligor under the Term Facility and the Debt Securities, which will be guaranteed by Georgia Gulf and certain of its subsidiaries; and

- PPG will receive the approximately $225.0 million in cash proceeds from the Term Facility and will exchange the approximately $675.0 million in Debt Securities for debt obligations of PPG in the Debt Exchange (and the Debt Securities will then be sold to third-party investors), resulting in PPG receiving approximately $900.0 million in cash from the Transactions.

Immediately after consummation of the Merger, at least 50.5% of Georgia Gulf common stock is expected to be held by pre-Merger holders of PPG common stock and no more than 49.5% of Georgia Gulf common stock is expected to be held by pre-Merger Georgia Gulf stockholders. In connection with the Transactions, Georgia Gulf, Merger Sub, PPG and/or Splitco have entered into or will enter into the Additional Agreements relating to, among other things, certain tax matters, certain employee matters, the provision of certain transition services during a transition period following the consummation of the Transactions and the sharing of facilities, services and supplies. See "Other Agreements."

Various factors were considered by Georgia Gulf and PPG in negotiating the terms of the Transactions, including the equity ownership levels of Georgia Gulf stockholders and the PPG shareholders receiving shares of Georgia Gulf common stock in the Distribution. The principal factors considered by the parties negotiating the terms of the Transactions were the strategic and financial benefits that could be expected to be achieved by combining Georgia Gulf and the PPG Chlor-alkali and Derivatives Business relative to the future prospects of Georgia Gulf on a standalone basis, the relative actual results of operations and prospects of Georgia Gulf and of

PPG102236

the PPG Chlor-alkali and Derivatives Business, synergies expected to be realized in the combination, as well as other alternatives that may be available to Georgia Gulf, and the risks and uncertainties associated with the Transactions and with such alternatives, and the other factors identified in the sections of this document entitled "The Transactions—Background of the Transactions" and "The Transactions—Georgia Gulf's Reasons for the Transactions." PPG also considered, among other things, the value to PPG and PPG's shareholders that could be realized in the Transactions as compared to the value to PPG and PPG's shareholders that could be realized if the Transactions did not occur, the proposed tax treatment of the Transactions, and the other factors identified in the section of this document entitled "The Transactions—PPG's Reasons for the Transactions."

**Number of Shares of Splitco Common Stock to Be Distributed to PPG Shareholders**

PPG is offering to exchange all shares of Splitco common stock for shares of PPG common stock validly tendered and not properly withdrawn. Splitco will authorize the issuance of a number of shares of Splitco common stock such that the total number of shares of Splitco common stock outstanding immediately prior to the effective time of the Merger will equal the greater of (i) 35,200,000 shares or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, subject to adjustment in certain circumstances.

**Terms of this Exchange Offer**

PPG is offering holders of shares of PPG common stock the opportunity to exchange their shares for shares of Splitco common stock. You may tender all, some or none of your shares of PPG common stock. This document and related documents are being sent to persons who directly held shares of PPG common stock on       , 2012 and brokers, banks and similar persons whose names or the names of whose nominees appear on PPG's shareholder list or, if applicable, who are listed as participants in a clearing agency's security position listing for subsequent transmittal to beneficial owners of PPG's common stock.

PPG common stock validly tendered and not properly withdrawn will be accepted for exchange at the exchange ratio determined as described under "This Exchange Offer—Terms of this Exchange Offer," on the terms and conditions of this exchange offer and subject to the limitations described below, including the proration provisions. PPG will promptly return any shares of PPG common stock that are not accepted for exchange following the expiration of this exchange offer and the determination of the final proration factor, if any, described below.

PPG102237

For the purposes of illustration, the table below indicates the number of shares of Splitco common stock that you would receive per share of PPG common stock you validly tender, calculated on the basis described under "This Exchange Offer—Terms of this Exchange Offer" and taking into account the upper limit, assuming a range of averages of the daily VWAP of PPG common stock and Georgia Gulf common stock on the Valuation Dates. The first row of the table below shows the indicative calculated per–share values of PPG common stock and Splitco common stock and the indicative exchange ratio that would have been in effect following the official close of trading on the NYSE on         , 2012, based on the daily VWAPs of PPG common stock and Georgia Gulf common stock on         , 2012,         , 2012 and         , 2012. The table also shows the effects of a         % increase or decrease in either or both the calculated per–share values of PPG common stock and Splitco common stock based on changes relative to the values as of         , 2012.

| PPG common stock | | Georgia Gulf common stock | | Calculated per–share value of PPG common stock | Calculated per–share value of Splitco common stock | Shares of Splitco common stock per PPG common stock tendered | Calculated Value Ratio(1) |
|---|---|---|---|---|---|---|---|
| As of | , 2012 | As of | , 2012 | | | | |
| Down | % | Up | % | | | | |
| Down | % | Unchanged | | | | | |
| Down | % | Down | % | | | | |
| Unchanged | | Up | % | | | | |
| Unchanged | | Down | % | | | | |
| Up | % | Up | % | | | | |
| Up | % | Unchanged | | | | | |
| Up | % | Down | %(2) | | | | |

(1) The Calculated Value Ratio equals (i) the calculated per–share value of Splitco common stock multiplied by the exchange ratio, divided by (ii) the calculated per–share value of PPG common stock.

(2) In this scenario, the upper limit is in effect. Absent the upper limit, the exchange ratio would have been         shares of Splitco common stock per share of PPG common stock tendered. In this scenario, PPG would announce that the upper limit on the number of shares that can be received for each share of PPG common stock tendered is in effect at the expiration of the exchange offer period no later than 4:30 p.m., New York City time, on the expiration date, that the exchange ratio will be fixed at the upper limit and this exchange offer will be extended until 12:00 midnight, New York City time, on the second trading day following the originally contemplated expiration date.

During the three–month period of         , 2012 through         , 2012, the highest closing price of PPG common stock on the NYSE was $         and the lowest closing price of Georgia Gulf common stock on the NYSE was $         . If the calculated per–share values of PPG common stock and Splitco common stock equaled these closing prices, you would have received only the limit of         shares of Splitco common stock for each share of PPG common stock tendered, and the value of such shares of Splitco common stock, based on the Georgia Gulf common stock price, would have been less than the value of PPG common stock accepted for exchange (approximately $         of Splitco common stock for each $1.00 of PPG common stock accepted for exchange).

*Extension; Termination*

This exchange offer, and your withdrawal rights, will expire at 12:00 midnight, New York City time, on         , 2012, unless this exchange offer is extended. You must tender your shares of PPG common stock prior to this time if you want to participate in this exchange offer. PPG may extend or terminate this exchange offer as described in this document.

22

PPG102238

A-870

*Mandatory Extension*

If the upper limit on the number of shares that can be received for each share of PPG common stock tendered is in effect at the expiration of the exchange offer period, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension of this exchange offer will be made until 12:00 midnight, New York City time, on the second trading day following the originally contemplated expiration date.

In case of an extension of this exchange offer (mandatory or otherwise), PPG will publicly announce the extension by press release no later than 9:00 a.m., New York City time, on the previously scheduled expiration date.

*Conditions for Consummation of this Exchange Offer*

PPG's obligation to exchange shares of Splitco common stock for shares of PPG common stock is subject to the conditions listed under "This Exchange Offer—Conditions for Consummation of this Exchange Offer," including the satisfaction of conditions to the Transactions and other conditions. These conditions include:

- the absence of a market disruption event;
- the approval of Georgia Gulf's stockholders of the issuance of shares of Georgia Gulf common stock in the Merger;
- PPG's receipt of a private letter ruling from the Internal Revenue Service (the "IRS") regarding the tax-free treatment of certain aspects of the Transactions;
- the receipt by PPG of a tax opinion from counsel to PPG;
- the requirement that no one shareholder of Splitco (individually or together with all members of any "group," as defined in the Exchange Act) after giving effect to this exchange offer and the Merger hold greater than 20% of the outstanding common stock of Georgia Gulf;
- the completion of various transaction steps; and
- other customary conditions.

For a description of the material conditions precedent to the Transactions, see "The Merger Agreement—Conditions to the Merger."

PPG may waive any of the conditions to this exchange offer prior to the expiration of this exchange offer. Splitco has no right to waive any of the conditions to this exchange offer.

*Proration; Odd-Lots*

If, upon the expiration of this exchange offer, PPG shareholders have validly tendered more shares of PPG common stock than PPG is able to accept for exchange (taking into account the exchange ratio and the total number of shares of Splitco common stock owned by PPG), PPG will accept for exchange the shares of PPG common stock validly tendered and not properly withdrawn by each tendering shareholder on a pro rata basis, based on the proportion that the total number of shares of PPG common stock to be accepted bears to the total number of shares of PPG common stock validly tendered and not properly withdrawn (rounded to the nearest whole number of shares of PPG common stock, and subject to any adjustment necessary to ensure the exchange of all shares of Splitco common stock owned by PPG), except for tenders of odd-lots, as described below.

PPG will announce the proration factor at *www. .com/ /* and separately by press release as promptly as practicable after the expiration date. Upon determining the number of shares of PPG common stock validly tendered for exchange and not properly withdrawn, PPG will announce the final results of the exchange offer, including the final proration factor.

23

PPG102239

**A-871**

Beneficial holders of less than 100 shares of PPG common stock who validly tender all of their shares may elect not to be subject to proration by completing the box in the applicable letter of transmittal entitled "Odd-Lot Shares." If your odd-lot shares are held by a broker for your account, you can contact the broker and request this preferential treatment. All of your odd-lot shares will be accepted for exchange without proration if PPG completes this exchange offer.

*Fractional Shares*

Immediately following the consummation of this exchange offer, Merger Sub will be merged with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf. Each outstanding share of Splitco common stock will be converted into the right to receive a number of shares of Georgia Gulf common stock equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger. In this conversion of shares of Splitco common stock into shares of Georgia Gulf common stock, no fractional shares of Georgia Gulf common stock will be delivered to holders of Splitco common stock. All fractional shares of Georgia Gulf common stock that a holder of Splitco common stock would otherwise be entitled to receive as a result of the Merger will be aggregated by Georgia Gulf's transfer agent. The transfer agent will cause the whole shares obtained thereby to be sold on behalf of such holders of shares of Splitco common stock that would otherwise be entitled to receive such fractional shares of Georgia Gulf common stock in the Merger, in the open market or otherwise as reasonably directed by PPG, and in no case later than five business days after the Merger. The transfer agent will make available the net proceeds thereof, after deducting any required withholding taxes and brokerage charges, commissions and transfer taxes, on a pro rata basis, without interest, as soon as practicable to the holders of Splitco common stock that would otherwise be entitled to receive such fractional shares of Georgia Gulf common stock in the Merger.

*Procedures for Tendering*

For you to validly tender your shares of PPG common stock pursuant to this exchange offer, prior to the expiration of this exchange offer:

- If you hold shares of PPG common stock, you must deliver to the exchange offer agent at an address listed on the letter of transmittal for PPG common stock you will receive, a properly completed and duly executed letter of transmittal (or a manually executed facsimile of that document), along with any required signature guarantees and any other required documents, and in the case of shares held in certificated form, book-entry via DRS, the certificates representing the shares of PPG common stock tendered.

- If you hold shares of PPG common stock through a broker, you should receive instructions from your broker on how to participate in this exchange offer. In this situation, do not complete a letter of transmittal to tender your PPG common stock. Please contact your broker directly if you have not yet received instructions. Some financial institutions may also effect tenders by book-entry transfer through The Depository Trust Company.

*Delivery of Shares of Splitco Common Stock*

Upon consummation of this exchange offer, PPG will irrevocably deliver to the exchange offer agent a global certificate representing all of the Splitco common stock being exchanged in this exchange offer, with irrevocable instructions to hold the shares of Splitco common stock in trust for the holders of shares of PPG common stock

24

**PPG102240**

**A-872**

validly tendered and not properly withdrawn in the exchange offer and, in the case of a pro rata distribution, if any, PPG shareholders whose shares of PPG common stock remain outstanding after the consummation of the exchange offer. Georgia Gulf will deposit with the transfer agent for the benefit of persons who received shares of Splitco common stock in this exchange offer certificates or book-entry authorizations representing shares of Georgia Gulf common stock, with irrevocable instructions to hold the shares of Georgia Gulf common stock in trust for the holders of Splitco common stock. Shares of Georgia Gulf common stock will be delivered immediately following the expiration of this exchange offer, the acceptance of PPG common stock for exchange, the determination of the final proration factor, if any, and the effectiveness of the Merger, pursuant to the procedures determined by the exchange offer agent and PPG's transfer agent. See "This Exchange Offer—Terms of this Exchange Offer—Exchange of Shares of PPG Common Stock."

### Withdrawal Rights

You may withdraw your tendered PPG common stock at any time prior to the expiration of this exchange offer by following the procedures described herein. If you change your mind again, you may re-tender your PPG common stock by again following the exchange offer procedures prior to the expiration of this exchange offer.

### No Appraisal Rights

No appraisal rights are available to holders of PPG common stock in connection with this exchange offer or any pro rata distribution of shares of Splitco common stock.

### Distribution of Any Shares of Splitco Common Stock Remaining After this Exchange Offer

All shares of Splitco common stock owned by PPG that are not exchanged in this exchange offer will be distributed on a pro rata basis to the holders of shares of PPG common stock immediately following the consummation of this exchange offer, with a record date to be announced by PPG on such date.

If this exchange offer is consummated, the exchange offer agent will calculate the exact number of shares of Splitco common stock not exchanged in this exchange offer to be distributed on a pro rata basis, and that number of shares of Splitco common stock will be held in trust for holders of PPG common stock entitled thereto.

If this exchange offer is terminated by PPG without the exchange of shares, but the conditions for consummation of the Transactions have otherwise been satisfied, PPG intends to distribute all shares of Splitco common stock owned by PPG on a pro rata basis to the holders of PPG common stock and deferred stock awards, with a record date to be announced by PPG.

### Legal Limitations; Certain Matters Relating to Non-U.S. Jurisdictions

This document is not an offer to sell or exchange and it is not a solicitation of an offer to buy any shares of Splitco common stock in any jurisdiction in which the offer, sale or exchange is not permitted. Countries outside the United States generally have their own legal requirements that govern securities offerings made to persons resident in those countries and often impose stringent requirements about the form and content of offers made to the general public. None of PPG, Splitco or Georgia Gulf have taken any action under non-U.S. regulations to facilitate a public offer to exchange the shares of Splitco common stock outside the United States. Accordingly, the ability of any non-U.S. person to tender shares of PPG common stock in the exchange offer will depend on whether there is an exemption available under the laws of such person's home country that would permit the person to participate in the exchange offer without the need for PPG to take any action to facilitate a public offering in that country. For example, some countries exempt transactions from the rules governing public offerings if they involve persons who meet certain eligibility requirements relating to their status as sophisticated or professional investors.

25

Non-U.S. shareholders should consult their advisors in considering whether they may participate in the exchange offer in accordance with the laws of their home countries and, if they do participate, whether there are any restrictions or limitations on transactions in the shares of Splitco common stock (or Georgia Gulf common stock) that may apply in their home countries. PPG, Georgia Gulf and Splitco cannot provide any assurance about whether such limitations may exist. See "The Exchange Offer—Certain Matters Relating to Non-U.S. Jurisdictions" for additional information about limitations on the exchange offer outside the United States.

### *Risk Factors*

In deciding whether to tender your shares of PPG common stock in this exchange offer, you should carefully consider the matters described in the section "Risk Factors," as well as other information included in this document and the other documents to which you have been referred.

### Debt Financing

In connection with the entry into the Merger Agreement, PPG and Georgia Gulf entered into certain commitment letters with other parties thereto pursuant to which those parties agreed to provide various financing in connection with the Transactions. The terms of the debt financing, including any conditions thereto and covenants thereunder, will be set out in various definitive documentation to be entered into by the respective parties. See "Debt Financing".

### Board of Directors and Management of Georgia Gulf Following the Transactions

Following the consummation of the exchange offer, Merger Sub will merge with and into Splitco, whereby the separate corporate existence of Merger Sub will cease and Splitco will continue as the surviving company and a wholly owned subsidiary of Georgia Gulf. In connection with the Merger, Georgia Gulf will increase the size of its board of directors by three members, and three individuals selected by PPG and approved by the Nominating and Governance Committee of the board of directors of Georgia Gulf will be appointed to fill the vacancies. In accordance with the Merger Agreement, these individuals will also be nominated for re-election to the board of directors of Georgia Gulf at Georgia Gulf's 2013 annual meeting of stockholders. The executive officers of Georgia Gulf immediately prior to the consummation of the Merger are expected to be the executive officers of Georgia Gulf immediately following the consummation of the Merger.

### Georgia Gulf Stockholder Vote

Georgia Gulf cannot complete the Transactions unless the proposal relating to the issuance of shares of Georgia Gulf common stock in the Merger is approved by the affirmative vote of a majority of the shares of Georgia Gulf common stock represented and voting at the special meeting, either in person or by proxy (provided that the total votes cast on the proposal represent over 50% in interest of all shares entitled to vote on the proposal).

### Accounting Treatment and Considerations

ASC 805, *Business Combinations*, requires the use of the acquisition method of accounting for business combinations. In applying the acquisition method, it is necessary to identify both the accounting acquiree and the accounting acquiror. In a business combination effected through an exchange of equity interests, such as the Merger, the entity that issues the interests (Georgia Gulf in this case) is generally the acquiring entity. In identifying the acquiring entity in a combination effected through an exchange of equity interests, however, all pertinent facts and circumstances must be considered, including the following:

- *The relative voting interests of Georgia Gulf after the Transactions.* In this case, PPG shareholders participating in the exchange offer (and pro rata distribution, if any) are expected to receive at least 50.5% of the equity ownership and associated voting rights in Georgia Gulf after the Transactions.

26

PPG102242

- *The composition of the governing body of Georgia Gulf after the Transactions.* In this case, the board of directors of Georgia Gulf immediately following the Merger will consist of the members of the board of directors of Georgia Gulf immediately prior to the consummation of the Merger. In addition, as of the consummation of the Merger, Georgia Gulf will increase the size of its board of directors by three members, and three individuals selected by PPG and approved by the Nominating and Governance Committee of the board of directors of Georgia Gulf will be appointed to fill the vacancies.

- *The composition of the senior management of Georgia Gulf after the Transactions.* In this case, Georgia Gulf's executive officers following the Merger will consist of Georgia Gulf's executive officers immediately prior to the Merger.

Georgia Gulf's management has determined that Georgia Gulf will be the accounting acquiror in the Merger based on the facts and circumstances outlined above and the detailed analysis of the relevant GAAP guidance. Consequently, Georgia Gulf will apply acquisition accounting to the assets acquired and liabilities assumed of Splitco upon consummation of the Merger. Upon consummation of the Merger, the historical financial statements will reflect only the operations and financial condition of Georgia Gulf.

### Material U.S. Federal Income Tax Consequences of the Distribution and the Merger

The consummation of the Distribution (which includes this exchange offer) and related transactions is conditioned upon the receipt of the Private Letter Ruling (as defined below under the heading "The Transactions—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger—The Distribution") and the Distribution Tax Opinion (as defined below under the heading "The Transactions— Material U.S. Federal Income Tax Consequences of the Distribution and the Merger—The Distribution"). On the basis that the Distribution, together with certain related transactions, qualifies as a "reorganization" for U.S. federal income tax purposes under Sections 355 and 368(a)(1)(D) of the Code, in general, for U.S. federal income tax purposes, no gain or loss will be recognized by, and no amount will be included in the income of, U.S. holders of PPG common stock upon the receipt of Splitco common stock in this exchange offer or in any pro rata distribution of Splitco common stock distributed to holders of PPG common stock if this exchange offer is undersubscribed (or if PPG determines not to consummate the exchange offer).

The consummation of the Merger is conditioned upon the receipt of the Private Letter Ruling and the Distribution Tax Opinion described above, as well as the Merger Tax Opinions (as defined below under the heading "The Transactions—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger—The Merger"). On the basis that the Merger qualifies as a "reorganization" within the meaning of Section 368(a) of the Code, in general, for U.S. federal income tax purposes, no gain or loss will be recognized by, and no amount will be included in the income of, U.S. holders of Splitco common stock upon the receipt of shares of Georgia Gulf common stock in the Merger, except for any gain or loss recognized with respect to cash received in lieu of a fractional share of Georgia Gulf common stock.

Although a Private Letter Ruling from the IRS generally is binding on the IRS, PPG and Splitco will not be able to rely on the ruling if the factual representations made to the IRS in connection with the private letter ruling request are untrue or incomplete in any material respect, or if undertakings made to the IRS in connection with the request for the Private Letter Ruling have been violated. If the Distribution and/or the Merger fails to qualify for tax–free treatment, PPG and/or its shareholders will be subject to tax. See "Risk Factors—Risks Related to the Transactions—If the Distribution, including the Debt Exchange, does not qualify as a tax-free transaction under Section 368(a)(1)(D) or 355 of the Code or the Merger does not qualify as a tax-free "reorganization" under section 368(a) of the Code, including as a result of actions taken in connection with the Distribution or the Merger or as a result of subsequent acquisitions of shares of PPG, Georgia Gulf or Splitco stock, then PPG and/or

27

PPG102243

PPG shareholders may be required to pay substantial U.S. federal income taxes, and in certain circumstances and subject to certain conditions, Splitco and Georgia Gulf may be required to indemnify PPG for any such tax liability."

Tax matters are complicated and the tax consequences of the Transactions to you will depend on the facts of your own situation. You should read the summary in the section of this document entitled "This Exchange Offer— Material U.S. Federal Income Tax Consequences of the Distribution and the Merger" and consult your own tax advisor for a full understanding of the tax consequences to you of the Transactions.

PPG102244

A-876

## SUMMARY HISTORICAL AND PRO FORMA FINANCIAL DATA

The following summary combined financial data of the PPG Chlor-alkali and Derivatives Business and summary consolidated financial data of PPG and Georgia Gulf are being provided to help you in your analysis of the financial aspects of the Transactions. You should read this information in conjunction with the financial information included elsewhere and incorporated by reference into this document. See "Management's Discussion and Analysis of Financial Condition and Results of Operations for the PPG Chlor-alkali and Derivatives Business," "Where You Can Find More Information; Incorporation by Reference," "Information on the PPG Chlor-alkali and Derivatives Business," "Information on PPG," "Information on Georgia Gulf," and "Selected Historical and Pro Forma Financial Data."

### Summary Historical Combined Financial Data of the PPG Chlor-alkali and Derivatives Business

The following summary historical combined financial data of the PPG Chlor-alkali and Derivatives Business for the years ended December 31, 2011, December 31, 2010 and December 31, 2009 and as of December 31, 2011 and December 31, 2010 has been derived from the audited combined financial statements of the PPG Chlor-alkali and Derivatives Business. The following summary historical condensed combined financial data of the PPG Chlor-alkali and Derivatives Business for the six-month periods ended June 30, 2012 and June 30, 2011, and as of June 30, 2012, June 30, 2011 and December 31, 2009, has been derived from the unaudited condensed combined financial statements of the PPG Chlor-alkali and Derivatives Business, but is not necessarily indicative of the results or the financial condition to be expected for the remainder of the year or any future date or period. The management of the PPG Chlor-alkali and Derivatives Business believes that the unaudited condensed combined financial statements reflect all normal and recurring adjustments necessary for a fair presentation of the results as of and for the interim periods presented. This information is only a summary and should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations for the PPG Chlor-alkali and Derivatives Business" and the financial statements of the PPG Chlor-alkali and Derivatives Business and the notes thereto included elsewhere in this document.

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 |
| *(In Millions)* | | | | | |
| **Statement of Income Data:** | | | | | |
| Net sales | $851 | $893 | $1,741 | $1,441 | $1,282 |
| Cost of sales, exclusive of depreciation and amortization | 574 | 613 | 1,224 | 1,117 | 1,001 |
| Selling, general and administrative | 59 | 60 | 123 | 102 | 100 |
| Depreciation and amortization | 21 | 20 | 41 | 39 | 40 |
| Research and development—net | 1 | 1 | 2 | 2 | 2 |
| Business restructuring | 1 | | — | — | 6 |
| Other charges | 4 | 7 | 10 | 11 | 9 |
| Other earnings | (7) | (13) | (27) | (7) | (12) |
| Income before income taxes | 198 | 205 | 368 | 177 | 136 |
| Income tax expense | 68 | 67 | 122 | 65 | 43 |
| Net income attributable to the controlling and noncontrolling interests | 130 | 138 | 246 | 112 | 93 |
| Less: Net income attributable to noncontrolling interests | (7) | (6) | (13) | (7) | (5) |
| Net income (attributable to the PPG Chlor-alkali and Derivatives Business) | $123 | $132 | $ 233 | $ 105 | $ 88 |
| **Balance Sheet Data (at end of period):** | | | | | |
| Total assets | $766 | $716 | $ 734 | $ 621 | $ 601 |
| Working capital | $163 | $134 | $ 119 | $ 81 | $ 77 |
| Other long-term obligations | $320 | $274 | $ 320 | $ 268 | $ 264 |
| Total Parent company shareholders' equity | $229 | $226 | $ 181 | $ 132 | $ 130 |
| **Cash Flow Data:** | | | | | |
| Cash from operating activities | $102 | $106 | $ 276 | $ 142 | $ 133 |
| Cash used for investing activities | $ (22) | $ (48) | $ (86) | $ (43) | $ (22) |
| Cash used for financing activities | $ (95) | $ (63) | $ (174) | $ (95) | $ (123) |

29

PPG102245

**Summary Historical Consolidated Financial Data of PPG**

The following summary historical consolidated financial data of PPG as of and for each of the fiscal years in the three-year period ended December 31, 2011 has been derived from the audited consolidated financial statements of PPG incorporated by reference in this document (except for the balance sheet financial data as of December 31, 2009, which is not incorporated by reference in this document). The following summary historical condensed consolidated financial data of PPG as of and for each of the six-month periods ended June 30, 2012 and June 30, 2011 has been derived from the unaudited condensed consolidated financial statements of PPG incorporated by reference in this document but is not necessarily indicative of the results or financial condition to be expected for the remainder of the year or any future period. PPG's management believes that the unaudited condensed consolidated financial data reflects all normal and recurring adjustments necessary for a fair presentation of the data for the interim periods presented. This information is only a summary and should be read in conjunction with the financial statements of PPG and the notes thereto and the "Management's Discussion and Analysis of Financial Condition and Results of Operation" section contained in PPG's annual report on Form 10-K for the year ended December 31, 2011 and quarterly report on Form 10-Q for the quarter ended June 30, 2012, each of which is incorporated by reference into this document. See "Where You Can Find More Information; Incorporation By Reference."

| | Six Months Ended June 30, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 |
| *(In Millions)* | | | | | |
| **Statement of Income Data:** | | | | | |
| Net sales | $ 7,707 | $ 7,519 | $14,885 | $13,423 | $12,239 |
| Cost of sales, exclusive of depreciation and amortization | 4,581 | 4,544 | 9,081 | 8,214 | 7,539 |
| Selling, general and administrative expenses | 1,672 | 1,626 | 3,234 | 2,979 | 2,936 |
| Depreciation | 176 | 174 | 346 | 346 | 354 |
| Amortization | 56 | 62 | 121 | 124 | 126 |
| Research and development—net | 224 | 213 | 430 | 394 | 388 |
| Interest expense | 101 | 108 | 210 | 189 | 193 |
| Interest income | (19) | (21) | (42) | (34) | (28) |
| Asbestos settlement—net | 6 | 6 | 12 | 12 | 13 |
| Business restructuring | 208 | — | — | — | 186 |
| Other charges | 189 | 46 | 73 | 84 | 65 |
| Other earnings | (65) | (90) | (177) | (180) | (150) |
| Income before income taxes | 578 | 851 | 1,597 | 1,295 | 617 |
| Income tax expense | 131 | 220 | 385 | 415 | 191 |
| Net income attributable to the controlling and non controlling interests | 447 | 631 | 1,212 | 880 | 426 |
| Less: Net income attributable to noncontrolling interests | (72) | (63) | (117) | (111) | (90) |
| Net income (attributable to PPG) | $ 375 | $ 568 | $ 1,095 | $ 769 | $ 336 |
| **Balance Sheet Data (at end of period):** | | | | | |
| Total assets | $14,817 | $15,267 | $14,382 | $14,975 | $14,240 |
| Working capital | $ 2,586 | $ 3,317 | $ 2,992 | $ 3,433 | $ 2,404 |
| Long-term debt less current portion | $ 2,964 | $ 3,613 | $ 3,574 | $ 4,043 | $ 3,074 |
| Other long-term obligations | $ 3,613 | $ 3,444 | $ 3,660 | $ 3,474 | $ 3,667 |
| Total PPG shareholders' equity | $ 3,461 | $ 4,054 | $ 3,249 | $ 3,638 | $ 3,753 |
| **Cash Flow Data:** | | | | | |
| Cash from operating activities | $ 434 | $ 252 | $ 1,436 | $ 1,310 | $ 1,345 |
| Cash (used for) from investing activities | $ (430) | $ 325 | $ 353 | $ (949) | $ (203) |
| Cash used for financing activities | $ (443) | $ (961) | $(1,632) | $ (104) | $(1,123) |

PPG102246

**Summary Historical Consolidated Financial Data of Georgia Gulf**

The following summary historical consolidated financial data of Georgia Gulf for the years ended December 31, 2011, 2010 and 2009, and as of such dates, has been derived from Georgia Gulf's audited consolidated financial statements as of and for the years ended December 31, 2011, 2010 and 2009. The following summary historical consolidated financial data as of and for the six month periods ended June 30, 2012 and 2011 has been derived from the unaudited condensed consolidated financial statements of Georgia Gulf and is not necessarily indicative of the results or financial condition to be expected for the remainder of the year or for any future period. Georgia Gulf's management believes that the unaudited condensed consolidated financial statements reflect all adjustments, consisting of normal recurring adjustments, necessary for a fair presentation of the results and the financial condition as of and for the interim periods presented. This information is only a summary and should be read in conjunction with the financial statements of Georgia Gulf and the notes thereto and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section contained in Georgia Gulf's annual report on Form 10-K for the year ended December 31, 2011 and quarterly report on Form 10-Q for the period ended June 30, 2012, each of which is incorporated by reference into this document. See "Where You Can Find More Information; Incorporation by Reference."

| (In thousands, except per share data, percentages and employees) | As of and for the Six Months Ended June 30, | | As of and for the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 |
| **Results of Operations:** | | | | | |
| Net sales ........................... | $1,727,642 | $1,619,648 | $3,222,884 | $2,818,040 | $1,990,091 |
| Cost of sales ....................... | 1,537,336 | 1,460,953 | 2,919,625 | 2,543,638 | 1,778,998 |
| Selling, general and administrative expenses ......................... | 99,456 | 86,669 | 168,221 | 160,031 | 182,937 |
| Long-lived asset impairment charges ...... | — | — | 8,318 | — | 21,804 |
| Transaction related costs, restructuring and other, net ......................... | 11,581 | 1,025 | 3,271 | 102 | 6,858 |
| (Gains) losses on sale of assets .......... | (17,386) | (1,150) | (1,150) | — | 62 |
| Operating income (loss) ............... | 96,655 | 72,151 | 124,599 | 114,269 | (568) |
| Interest expense ...................... | (29,106) | (33,575) | (65,645) | (69,795) | (131,102) |
| Loss on redemption and other debt costs ... | — | (1,100) | (4,908) | — | (42,797) |
| Gain on debt exchange ................ | — | — | — | — | 400,835 |
| Foreign exchange loss ................. | (402) | (940) | (786) | (839) | (1,400) |
| Interest income ...................... | 170 | 186 | 280 | 322 | 583 |
| Income from operations before taxes ...... | 67,317 | 36,722 | 53,540 | 43,957 | 225,551 |
| Provision (benefit) for income taxes ....... | 18,384 | 10,007 | (4,217) | 1,279 | 94,492 |
| Income from operations ............... | 48,933 | 26,715 | 57,757 | 42,678 | 131,059 |
| Net income ......................... | $ 48,933 | $ 26,715 | $ 57,757 | $ 42,678 | $ 131,059 |
| Basic earnings per share ............... | $ 1.41 | $ 0.77 | $ 1.66 | $ 1.22 | $ 8.27 |
| Diluted earnings per share .............. | $ 1.40 | $ 0.77 | $ 1.66 | $ 1.22 | $ 8.26 |
| **Financial Highlights:** | | | | | |
| Net working capital .................. | $ 448,658 | $ 481,935 | $ 384,729 | $ 400,447 | $ 340,721 |
| Property, plant and equipment, net ........ | 634,053 | 663,873 | 640,900 | 653,137 | 687,570 |
| Total assets ........................ | 1,723,508 | 1,893,695 | 1,644,211 | 1,665,701 | 1,604,640 |
| Total debt.......................... | 497,665 | 666,265 | 497,464 | 577,571 | 632,569 |
| Lease financing obligation ............. | 109,287 | 115,867 | 109,899 | 112,385 | 106,436 |
| Net cash (used in) provided by operating activities ......................... | (14,989) | (72,438) | 187,449 | 183,799 | 723 |

PPG102247

| (In thousands, except per share data, percentages and employees) | As of and for the Six Months Ended June 30, | | As of and for the Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2012 | 2011 | 2011 | 2010 | 2009 |
| Net cash (used in) investing activities ........... | (18,954) | (95,162) | (136,510) | (44,645) | (26,025) |
| Net cash (used in) provided by financing activities .. | (266) | 86,266 | (85,658) | (55,719) | (29,099) |
| Depreciation and amortization ................. | 44,975 | 51,842 | 101,522 | 99,691 | 117,330 |
| Capital expenditures .......................... | 40,699 | 23,692 | 66,382 | 45,714 | 30,085 |
| Acquisition, net of cash acquired ................ | — | 71,623 | 71,371 | — | — |
| Maintenance expenditures .................... | 101,950 | 75,269 | 109,317 | 137,448 | 104,472 |
| Other Selected Data: | | | | | |
| Adjusted EBITDA(1) ........................ | $129,765 | $115,631 | $ 222,896 | $201,322 | $155,062 |
| Weighted average common shares outstanding— | | | | | |
| basic ..................................... | 34,346 | 33,971 | 34,086 | 33,825 | 14,903 |
| Weighted average common shares outstanding— | | | | | |
| diluted ................................... | 34,521 | 33,992 | 34,122 | 33,825 | 14,908 |
| Common shares outstanding ................... | 34,279 | 33,983 | 34,236 | 33,962 | 33,718 |
| Return on sales .............................. | 2.8% | 1.6% | 1.8% | 1.5% | 5.8% |
| Employees .................................. | 3,846 | 4,014 | 3,744 | 3,619 | 3,489 |

(1) For the reconciliation of Adjusted EBITDA to net income determined in accordance with GAAP, see "Selected Historical and Pro Forma Financial Data — Selected Historical Consolidated Financial Data of Georgia Gulf."

## Summary Unaudited Pro Forma Condensed Combined Financial Data of Georgia Gulf and the PPG Chlor-alkali and Derivatives Business

The following summary unaudited pro forma condensed combined financial data of Georgia Gulf and the PPG Chlor-alkali and Derivatives Business is being presented for illustrative purposes only, and this information should not be relied upon for purposes of making any investment or other decisions. The following summary unaudited pro forma condensed combined financial data assumes that the PPG Chlor-alkali and Derivatives Business had been owned by Georgia Gulf for all periods, and at the date presented. Georgia Gulf and the PPG Chlor-alkali and Derivatives Business may have performed differently had they actually been combined for all periods or on the date presented. You should also not rely on the following summary unaudited pro forma condensed combined financial data as being indicative of the results or financial condition that would have been achieved had Georgia Gulf and the PPG Chlor-alkali and Derivatives Business been combined other than during the periods or on the date presented or of the actual future results or financial condition of Georgia Gulf to be achieved following the Transactions.

| (In millions, except per share data) | As of and for the Six Months Ended June 30, 2012 | For the Year Ended December 31, 2011 |
|---|---|---|
| **Results of Operations:** | | |
| Net sales ........................................... | $2,552.5 | $4,875.7 |
| Cost of sales ....................................... | 2,121.8 | 4,124.6 |
| Net income ......................................... | 135.4 | 208.6 |
| Net income attributable to controlling shareholders ............. | 130.5 | 199.8 |
| Basic earnings per share ................................ | $  1.87 | $  2.85 |
| Diluted earnings per share ................................ | $  1.86 | $  2.85 |

PPG102248

|  | As of and for the Six Months Ended June 30, 2012 | For the Year Ended December 31, 2011 |
| --- | --- | --- |
| (In millions, except per share data) |  |  |
| **Financial Highlights:** |  |  |
| Total assets ............................................. | $5,048.4 |  |
| Total liabilities ........................................ | 3,063.4 |  |
| **Other Selected Data:** |  |  |
| Adjusted EBITDA(1) ................................... | $  351.5 | $637.9 |
| Weighted average common shares outstanding—basic .......... | 69.5 | 69.3 |
| Weighted average common shares outstanding—diluted ......... | 69.7 | 69.3 |

(1)  In addition to evaluating financial condition and results of operations in accordance with GAAP, management of Georgia Gulf also reviews and evaluates certain alternative financial measures not prepared in accordance with GAAP. Non-GAAP measures do not have definitions under GAAP and may be defined differently by and not be comparable to, similarly titled measures used by other companies. As a result, management of Georgia Gulf considers and evaluates non-GAAP measures in connection with a review of the most directly comparable measure calculated in accordance with GAAP. Management of Georgia Gulf cautions investors not to place undue reliance on such non-GAAP measures, but also to consider them with the most directly comparable GAAP measure.

In this document, Georgia Gulf supplements its financial information prepared in accordance with GAAP with Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization, cash and non-cash restructuring and certain other costs related to financial restructuring and business improvement initiatives, gains or losses on substantial modification of debt and sales of certain assets, certain purchase accounting and certain non-income tax reserve adjustments, professional fees related to a previously disclosed and withdrawn unsolicited offer and the Merger, goodwill, intangibles, and other long-lived asset impairments, and interest expense related to the OMERS sale-leaseback transaction) because Georgia Gulf believes investors commonly use Adjusted EBITDA as a main component of valuing cyclical companies such as Georgia Gulf. Adjusted EBITDA is not a measurement of financial performance under GAAP and should not be considered as an alternative to net income (loss) as a measure of performance or to cash provided by operating activities as a measure of liquidity. In addition, Georgia Gulf's calculation of Adjusted EBITDA may be different from the calculation used by other companies and, therefore, comparability may be limited.

PPG102249

A reconciliation of Adjusted EBITDA to net income (loss) determined in accordance with GAAP is provided below:

| | Six Months Ended June 30, 2012 | | | | |
| | Historical | | Pro Forma Adjustments | | |
| (in thousands) | Georgia Gulf | PPG Chlor-alkali and Derivatives Business | Acquisition Adjustments | Financing Adjustments | Pro Forma Condensed Combined |
|---|---|---|---|---|---|
| Net income | $ 48,933 | $130,000 | $(25,600) | $(17,900) | $135,433 |
| Net income attributable to non-controlling interests | — | (7,000) | 2,100 | — | (4,900) |
| (Benefit) provision for income taxes | 18,384 | 68,000 | (15,300) | (10,800) | 60,284 |
| Interest income | (170) | — | — | — | (170) |
| Interest expense | 29,106 | — | — | 28,700 | 57,806 |
| Depreciation and amortization expense | 44,975 | 21,000 | 55,000 | — | 120,975 |
| Transaction related costs, restructuring and other, net | 11,581 | 1,000 | (7,500) | — | 5,081 |
| (Gains) losses on sale of assets | (17,386) | — | — | — | (17,386) |
| Other(a) | (5,658) | — | — | — | (5,658) |
| Adjusted EBITDA | $129,765 | $213,000 | $ 8,700 | $ — | $351,465 |

| | Year Ended December 31, 2011 | | | | |
| | Historical | | Pro Forma Adjustments | | |
| (in thousands) | Georgia Gulf | PPG Chlor-alkali and Derivatives Business | Acquisition Adjustments | Financing Adjustments | Pro Forma Condensed Combined |
|---|---|---|---|---|---|
| Net income | $ 57,757 | $246,000 | $ (59,400) | $(35,800) | $208,557 |
| Net income attributable to non-controlling interests | — | (13,000) | 4,200 | — | (8,800) |
| (Benefit) provision for income taxes | (4,217) | 122,000 | (35,700) | (21,500) | 60,583 |
| Interest income | (280) | — | — | — | (280) |
| Loss on redemption and other debt costs | 4,908 | — | — | — | 4,908 |
| Interest expense | 65,645 | — | — | 57,300 | 122,945 |
| Depreciation and amortization expense | 101,522 | 41,000 | 109,900 | — | 252,422 |
| Long-lived asset impairment charges | 8,318 | — | — | — | 8,318 |
| Restructuring costs | 3,271 | — | — | — | 3,271 |
| (Gains) losses on sale of assets | (1,150) | — | — | — | (1,150) |
| Other(a) | (12,878) | — | — | — | (12,878) |
| Adjusted EBITDA | $222,896 | $396,000 | $ 19,000 | $ — | $637,896 |

(a)   "Other" for the six months ended June 30, 2012 consists of $2.0 million of loan cost amortization and $3.7 million of lease financing obligations interest. For the year ended December 31, 2011, "Other" consists of $4.1 million in loan cost amortization, $7.4 million of lease financing obligations interest and a $4.4 million reversal of non-income tax reserves, partially offset by $3.0 million in acquisition costs and inventory purchase accounting adjustments.

**PPG102250**

**Summary Comparative Historical and Pro Forma Per Share Data**

The following table sets forth certain historical and pro forma per share data for Georgia Gulf and certain historical per share data for PPG. The Georgia Gulf historical data has been derived from and should be read together with Georgia Gulf's audited consolidated financial statements and related notes thereto contained in Georgia Gulf's annual report on Form 10-K for the fiscal year ended December 31, 2011, and Georgia Gulf's unaudited condensed consolidated financial statements and related notes thereto contained in Georgia Gulf's quarterly report on Form 10-Q for the period ended June 30, 2012, each of which are incorporated by reference into this document. The pro forma data has been derived from the unaudited pro forma condensed combined financial statements of Georgia Gulf and the PPG Chlor-alkali and Derivatives Business included elsewhere in this document. The PPG historical data has been derived from and should be read together with the audited consolidated financial statements of PPG and related notes thereto contained in PPG's Form 10-K for the year ended December 31, 2011 and the unaudited condensed consolidated financial statements of PPG and related notes thereto contained in PPG's Form 10-Q for the quarter ended June 30, 2012, which are incorporated by reference into this document. See "Where You Can Find More Information; Incorporation by Reference."

This summary comparative historical and pro forma per share data is being presented for illustrative purposes only. Georgia Gulf and the PPG Chlor-alkali and Derivatives Business may have performed differently had the Transactions occurred prior to the periods or at the date presented. You should not rely on the pro forma per share data presented as being indicative of the results that would have been achieved had Georgia Gulf and the PPG Chlor-alkali and Derivatives Business been combined during the periods or at the date presented or of the actual future results or financial condition of Georgia Gulf or the PPG Chlor-alkali and Derivatives Business to be achieved following the Transactions.

| | As of and for the Six Months Ended June 30, 2012 | | As of and for the Year Ended December 31, 2011 | |
|---|---|---|---|---|
| **Georgia Gulf** | Historical | Pro Forma | Historical | Pro Forma |
| (shares in thousands) | | | | |
| Basic earnings per share | $ 1.41 | $ 1.87 | $ 1.66 | $ 2.85 |
| Diluted earnings per share | $ 1.40 | $ 1.86 | $ 1.66 | $ 2.85 |
| Weighted average common shares outstanding—Basic | 34,346 | 69,546 | 34,086 | 69,286 |
| Weighted average common shares outstanding—Diluted | 34,521 | 69,721 | 34,122 | 69,321 |
| Book value per share of common stock | $ 14.20 | $ 26.71 | $ 14.05 | |
| Dividends declared per share of common stock | $ 0.08 | $ 0.08 | — | — |

| | As of and for the Six Months Ended June 30, 2012 | For the Year Ended December 31, 2011 |
|---|---|---|
| **PPG** | | |
| Basic earnings per share ...................................... | $ 2.45 | $ 6.96 |
| Diluted earnings per share .................................... | $ 2.42 | $ 6.87 |
| Book value per common share outstanding ..................... | $22.37 | $20.40 |

**PPG102251**

### Historical Common Stock Market Price and Dividend Data

Historical market price data for Splitco has not been presented as the PPG Chlor-alkali and Derivatives Business is currently operated by PPG and there is no established trading market in Splitco common stock. Shares of Splitco common stock do not currently trade separately from PPG common stock.

Shares of PPG common stock currently trade on the NYSE under the symbol "PPG." On July 18, 2012, the last trading day before the announcement of the Transactions, the last sale price of PPG common stock reported by the NYSE was $104.19. On          , 2012, the last trading day prior to the public announcement of this exchange offer, the last sale price of PPG common stock reported by the NYSE was $    . On          , 2012, the last trading day prior to this document, the last sale price of PPG common stock reported by the NYSE was $    .

Shares of Georgia Gulf common stock currently trade on the NYSE under the symbol "GGC." On July 18, 2012, the last trading day before the announcement of the Transactions, the last sale price of Georgia Gulf common stock reported by the NYSE was $28.85. On          , 2012, the last trading day prior to the public announcement of this exchange offer, the last sale price of Georgia Gulf common stock reported by the NYSE was $    . On August 23, 2012, the last sale price of Georgia Gulf common stock reported by the NYSE was $38.90.

The following table sets forth the high and low sale prices of PPG common stock and Georgia Gulf common stock on the NYSE for the periods indicated as well as the dividends per share declared by PPG to holders of PPG common stock and Georgia Gulf to holders of Georgia Gulf common stock for these periods. The quotations are as reported in published financial sources.

| | PPG Per Share Dividends | PPG Common Stock | | Georgia Gulf Per Share Dividends | Georgia Gulf Common Stock | |
|---|---|---|---|---|---|---|
| | | High | Low | | High | Low |
| **Year Ending December 31, 2012** | | | | | | |
| First Quarter | $0.57 | $ 96.40 | $83.27 | $ — | $35.56 | $20.24 |
| Second Quarter | $0.59 | $107.95 | $91.85 | $0.08 | $37.24 | $23.80 |
| Third Quarter (through August 23, 2012) | $0.59 | $114.62 | $99.12 | $ — | $39.54 | $24.52 |
| **Year Ended December 31, 2011** | | | | | | |
| First Quarter | $0.55 | $ 96.56 | $78.75 | $ — | $38.15 | $23.68 |
| Second Quarter | $0.57 | $ 97.81 | $82.76 | $ — | $40.59 | $22.57 |
| Third Quarter | $0.57 | $ 93.85 | $68.27 | $ — | $25.35 | $13.69 |
| Fourth Quarter | $0.57 | $ 90.00 | $66.43 | $ — | $20.83 | $12.19 |
| **Year Ended December 31, 2010** | | | | | | |
| First Quarter | $0.54 | $ 66.63 | $56.96 | $ — | $19.08 | $13.91 |
| Second Quarter | $0.54 | $ 72.24 | $59.01 | $ — | $21.79 | $13.26 |
| Third Quarter | $0.55 | $ 73.99 | $59.69 | $ — | $17.00 | $11.11 |
| Fourth Quarter | $0.55 | $ 84.59 | $72.10 | $ — | $24.75 | $15.61 |

PPG102252

## RISK FACTORS

*You should carefully consider each of the following risks and all of the other information contained and incorporated by reference in this document and the exhibits hereto. Some of the risks described below relate principally to the business and the industry in which Georgia Gulf, including the PPG Chlor-alkali and Derivatives Business, will operate after the Transactions, while others relate principally to the Transactions and participation in the exchange offer. The remaining risks relate principally to the securities markets generally and ownership of shares of Georgia Gulf common stock. The risks described below are not the only risks facing Georgia Gulf following the consummation of the Transactions or to participating in the exchange offer. Additional risks and uncertainties not currently known or that are currently deemed to be immaterial may also materially and adversely affect Georgia Gulf's business operations and financial condition or the price of Georgia Gulf's common stock following the consummation of the Transactions.*

### Risks Related to the Transactions

***The calculation of the merger consideration will not be adjusted if the value of the business or assets of the PPG Chlor-alkali and Derivatives Business declines or if the value of Georgia Gulf increases before the Merger is completed.***

The calculation of the number of shares of Georgia Gulf common stock to be distributed in the Merger will not be adjusted if the value of the business or assets of the PPG Chlor-alkali and Derivatives Business declines prior to the consummation of the Merger or the value of Georgia Gulf increases prior to the Merger. Georgia Gulf will not be required to consummate the Merger if there has been any "material adverse effect" (as this term is described in the section of this document entitled "The Merger Agreement—Representations and Warranties") on the PPG Chlor-alkali and Derivatives Business. However, Georgia Gulf will not be permitted to terminate the Merger Agreement or resolicit the vote of Georgia Gulf stockholders because of any changes in the market prices of Georgia Gulf's common stock or any changes in the value of the PPG Chlor-alkali and Derivatives Business that do not constitute a material adverse effect on the PPG Chlor-alkali and Derivatives Business.

***Georgia Gulf will incur significant costs related to the consummation of the Transactions that could have a material adverse effect on its liquidity, cash flows and operating results.***

Georgia Gulf will incur significant, one-time costs in connection with the Transactions, including financial, legal, professional and accounting fees, and the other costs expected to be incurred in connection with the integration of the PPG Chlor-alkali and Derivatives Business into Georgia Gulf's current operations and necessary in order to achieve the benefits that may result from the realization of approximately $115.0 million of annualized cost synergies Georgia Gulf believes are achievable as a result of the Transactions. These costs may have a material adverse impact on Georgia Gulf's liquidity, cash flows and operating results in the periods in which they are incurred.

***Georgia Gulf will have a substantial amount of long-term indebtedness and liabilities following the Transactions, which could adversely affect its liquidity, operations and financial condition.***

Georgia Gulf has a significant amount of indebtedness and, following the consummation of the Transactions, will continue to have significant indebtedness and liabilities. In addition, as of June 30, 2012, on an actual and a pro forma basis after giving effect to the Transactions, Georgia Gulf had and would have had outstanding long-term indebtedness and liabilities of $1.2 billion and $3.1 billion, respectively. Georgia Gulf also has and will continue to have the ability to incur a significant amount of additional debt. After the consummation of the Transactions, Georgia Gulf's indebtedness could have important consequences, including but not limited to:

- limiting its ability to invest operating cash flow in its operations due to debt service and other obligations;

37

PPG102253

**A-885**

- limiting its ability to obtain additional debt or equity financing for working capital expenditures or other general corporate purposes;

- limiting its operational flexibility due to the covenants contained in its debt agreements;

- requiring it to dispose of significant assets in order to satisfy its debt service and other obligations if it is not able to satisfy these obligations from cash from operations or other sources;

- to the extent that Georgia Gulf's debt is subject to floating interest rates, increasing Georgia Gulf's vulnerability to fluctuations in market interest rates;

- limiting Georgia Gulf's ability to buy back Georgia Gulf common stock or pay cash dividends;

- limiting its flexibility in planning for, or reacting to, changes in its business or industry, thereby limiting its ability to compete with companies that are not as highly leveraged; and

- increasing its vulnerability to economic downturns and changing market conditions.

Georgia Gulf's ability to satisfy its debt service and other obligations will depend on its future performance, which will be affected by financial, business, economic and other factors, including prices, industry capacity levels and demand for Georgia Gulf's products, raw materials and energy costs and availability, feedstock availability and changes in governmental and environmental regulations. If Georgia Gulf does not generate enough cash to satisfy its debt service and other obligations, it may be required to refinance all or part of its existing debt, sell its assets, borrow more money or raise equity. There is no assurance that Georgia Gulf will be able to, at any given time, refinance its debt, sell its assets, borrow more money or raise capital on terms acceptable to it or at all.

### *Georgia Gulf will assume certain material pension and post-retirement welfare benefit obligations associated with the PPG Chlor-alkali and Derivatives Business. Future funding obligations related to these liabilities could restrict cash available for Georgia Gulf's operations, capital expenditures or other requirements, or require Georgia Gulf to borrow additional funds.*

In the Transactions, Georgia Gulf, through its wholly owned subsidiary Splitco, will assume certain substantial tax-qualified and non tax-qualified pension obligations related to employees and retirees of the PPG Chlor-alkali and Derivatives Business. In connection therewith, the legally required level of pension assets will be transferred from the tax-qualified PPG pension plans to the new pension plans to be established by Georgia Gulf in respect of those liabilities. In addition to the standard minimum funding requirements, the Pension Protection Act of 2006 (the "Pension Act") (as amended by the Worker, Retiree and Employer Recovery Act of 2008) requires companies with tax-qualified defined benefit pension plans to make contributions to such plans as frequently as quarterly in order to meet the "funding target" for such plans, as defined in the Pension Act. The failure to meet the funding target could result in the imposition of fines or penalties. Funding obligations with respect to tax-qualified pension plans change due to, among other things, the actual investment return on plan assets. Continued volatility in the capital markets may have a further negative impact on the funded status of tax-qualified pension plans, which may in turn increase attendant funding obligations. Given the amount of pension assets transferred from the tax-qualified PPG pension plans to the new pension plans to be established by Georgia Gulf, and subject to the foregoing variables, and the uncertainties associated therewith, it is possible that Georgia Gulf could be required to make substantial contributions in future years to the new pension plans. These contributions could restrict available cash for Georgia Gulf's operations, capital expenditures and other requirements, and may materially adversely affect its financial condition and liquidity. Nonqualified pension liabilities to be assumed by Georgia Gulf are unfunded and no assets will be transferred by PPG to Georgia Gulf in respect of these liabilities. These obligations will require annual funding that could restrict cash available to Georgia Gulf for other purposes.

The principal post-retirement welfare benefit liabilities to be assumed by Georgia Gulf related to retirees associated with the PPG Chlor-alkali and Derivatives Business are obligations to provide retiree health benefits. No assets will be transferred by PPG to Georgia Gulf in respect of these liabilities as these obligations are

38

PPG102254

unfunded. The obligations to make payment with respect to these liabilities in the future may increase for several reasons, including, but not limited to, because of health care costs escalation. These obligations will require annual funding that could restrict cash available to Georgia Gulf for use for other purposes.

While Georgia Gulf intends to comply with any future funding obligations for its pension and post retirement welfare benefit plans through the use of cash from operations, there can be no assurance that Georgia Gulf will generate enough cash to do so and also meet its other required or intended cash uses. Georgia Gulf's inability to fund these obligations through cash from operations could require it to seek funding from other sources, including through additional borrowings, which could materially increase Georgia Gulf's outstanding debt or debt service requirements.

### *Sales of Georgia Gulf common stock after the Transactions may negatively affect the market price of Georgia Gulf common stock.*

The shares of Georgia Gulf common stock to be issued in the Transactions to holders of Splitco common stock will generally be eligible for immediate resale. The market price of Georgia Gulf common stock could decline as a result of sales of a large number of shares of Georgia Gulf common stock in the market after the consummation of the Transactions or even the perception that these sales could occur.

It is expected that immediately after consummation of the Merger, PPG shareholders or former PPG shareholders will hold at least 50.5% of Georgia Gulf's common stock and Georgia Gulf's existing stockholders will hold no more than 49.5% of Georgia Gulf's common stock. Currently, PPG shareholders may include index funds that have performance tied to the Standard & Poor's 500 Index or other stock indices, and institutional investors subject to various investing guidelines. Because Georgia Gulf may not be included in these indices following the consummation of the Transactions or may not meet the investing guidelines of some of these institutional investors, these index funds and institutional investors may decide to or may be required to sell the Georgia Gulf common stock that they receive in the Transactions. In addition, the investment fiduciaries of PPG's defined contribution and defined benefit plans may decide to sell any Georgia Gulf common stock that the trusts for these plans receive in the Transactions, or may decide not to participate in the exchange offer, in response to their fiduciary obligations under applicable law. These sales, or the possibility that these sales may occur, may also make it more difficult for Georgia Gulf to obtain additional capital by selling equity securities in the future at a time and at a price that it deems appropriate.

### *The historical financial information of the PPG Chlor-alkali and Derivatives Business may not be representative of its results or financial condition if it had been operated independently of PPG and, as a result, may not be a reliable indicator of its future results.*

The PPG Chlor-alkali and Derivatives Business is currently operated by PPG. Consequently, the financial information of the PPG Chlor-alkali and Derivatives Business included in this document has been derived from the consolidated financial statements and accounting records of the PPG Chlor-alkali and Derivatives Business and reflects all direct costs as well as assumptions and allocations made by management of PPG. The financial position, results of operations and cash flows of the PPG Chlor-alkali and Derivatives Business presented may be different from those that would have resulted had the PPG Chlor-alkali and Derivatives Business been operated independently of PPG during the applicable periods or at the applicable dates. For example, in preparing the financial statements of the PPG Chlor-alkali and Derivatives Business, PPG made allocations of costs and PPG corporate expenses deemed to be attributable to the PPG Chlor-alkali and Derivatives Business. However, these costs and expenses reflect the costs and expenses attributable to the PPG Chlor-alkali and Derivatives Business operated as part of a larger organization and do not necessarily reflect costs and expenses that would be incurred by the PPG Chlor-alkali and Derivatives Business had it been operated independently. As a result, the historical financial information of the PPG Chlor-alkali and Derivatives Business may not be a reliable indicator of future results.

PPG102255

*Georgia Gulf may be unable to provide the same types and level of benefits, services and resources to the PPG Chlor-alkali and Derivatives Business that historically have been provided by PPG, or may be unable to provide them at the same cost.*

As a separate reporting segment of PPG, the PPG Chlor-alkali and Derivatives Business has been able to receive benefits and services from PPG and has been able to benefit from PPG's financial strength and extensive business relationships. After the Transactions, the PPG Chlor-alkali and Derivatives Business will be owned by Georgia Gulf and will no longer benefit from PPG's resources. While Georgia Gulf expects to enter into an agreement under which PPG will agree to provide certain transition services for up to 24 months following the consummation of the Transactions, it cannot be assured that Georgia Gulf will be able to adequately replace those resources or replace them at the same cost. If Georgia Gulf is not able to replace the resources provided by PPG or is unable to replace them at the same cost or is delayed in replacing the resources provided by PPG, Georgia Gulf's results of operations may be materially adversely impacted.

*Georgia Gulf's business, financial condition and results of operations may be adversely affected following the Transactions if Georgia Gulf cannot negotiate terms that are as favorable as those PPG has received when Georgia Gulf replaces contracts after the closing of the Transactions.*

Prior to consummation of the Transactions, certain functions (such as purchasing, information systems, sales, logistics and distribution) for the PPG Chlor-alkali and Derivatives Business have generally been performed under PPG's centralized systems and, in some cases, under contracts that are also used for PPG's other businesses and which are not intended to be assigned to Georgia Gulf with the PPG Chlor-alkali and Derivatives Business. In addition, some other contracts that PPG is a party to on behalf of the PPG Chlor-alkali and Derivatives Business require consents of third parties to assign them to Splitco. While PPG, under the Transition Services Agreement, will agree to provide Georgia Gulf with certain services, there can be no assurance that Georgia Gulf will be able to negotiate terms that are as favorable as those PPG received when Georgia Gulf replaces these services with its own agreements for similar services. Increased costs associated with replacement agreements for any of these services could have a material adverse impact on Georgia Gulf's business, financial condition and results of operations following the Transactions.

*If the Distribution, including the Debt Exchange, does not qualify as a tax-free transaction under Section 368(a)(1)(D) or 355 of the Code or the Merger does not qualify as a tax-free "reorganization" under Section 368(a) of the Code, including as a result of actions taken in connection with the Distribution or the Merger or as a result of subsequent acquisitions of shares of PPG, Georgia Gulf or Splitco common stock, then PPG and/or PPG shareholders may be required to pay substantial U.S. federal income taxes, and, in certain circumstances and subject to certain conditions, Splitco and Georgia Gulf may be required to indemnify PPG for any such tax liability.*

The consummation of the Transactions is conditioned on PPG's receipt of the Private Letter Ruling (as defined below in the section of this document entitled "The Transactions—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger—The Distribution"). The consummation of the Transactions is also conditioned on the receipt by PPG of the Distribution Tax Opinion and a Merger Tax Opinion, and by Georgia Gulf of a Merger Tax Opinion (each as defined below in the section of this document entitled "The Transactions—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger—The Distribution" and "—The Merger").

Although a private letter ruling from the IRS generally is binding on the IRS, PPG and Splitco will not be able to rely on the Private Letter Ruling if the factual representations made to the IRS in connection with the request for the Private Letter Ruling are untrue or incomplete in any material respect, or if undertakings made to the IRS in connection with the request for the Private Letter Ruling have been violated. In addition, the opinions of counsel will be based on, among other things, the Private Letter Ruling as to the matters addressed by the ruling, current law and certain representations and assumptions as to factual matters made by PPG, Splitco, Georgia Gulf, and Merger Sub. Any change in currently applicable law, which may be retroactive, or the failure

40

PPG102256

of any representation or assumption to be true, correct and complete in all material respects, could adversely affect the conclusions reached by counsel in the opinions. See "The Transactions—Material U.S. Federal Income Tax Consequences of the Distribution and the Merger".

Even if the Distribution were otherwise to qualify as a tax-free transaction under Sections 368(a)(1)(D) and 355 of the Code, the Distribution would be taxable to PPG (but not to PPG shareholders) pursuant to Section 355(e) of the Code if there is a 50% or greater change in ownership of either PPG or Splitco (including stock of Georgia Gulf after the Merger), directly or indirectly, as part of a plan or series of related transactions that include the Distribution. For this purpose, any acquisitions of PPG, Splitco or Georgia Gulf stock within the period beginning two years before the Distribution and ending two years after the Distribution are presumed to be part of such a plan, although PPG, Splitco or Georgia Gulf may be able to rebut that presumption. Further, for purposes of this test, the Merger will be treated as part of such a plan, but the Merger standing alone should not cause the Distribution to be taxable to PPG under Section 355(e) of the Code because PPG shareholders will hold at least 50.5% of Georgia Gulf stock immediately following the Merger. However, if the IRS were to determine that other acquisitions of PPG, Splitco or Georgia Gulf stock, either before or after the Distribution, were part of a plan or series of related transactions that included the Distribution, such determination could result in significant tax to PPG. In connection with the Private Letter Ruling and the Distribution Tax Opinion, PPG and Georgia Gulf have represented or will represent that the Distribution is not part of any such plan or series of related transactions.

In certain circumstances and subject to certain limitations, under the Tax Matters Agreement, Splitco is required to indemnify PPG against taxes on the Distribution that arise as a result of certain actions or failures to act by Georgia Gulf or Splitco (a "disqualifying action") or as a result of changes in ownership of the stock of Georgia Gulf or Splitco after the Transactions. If PPG were to recognize gain on the Distribution for reasons not related to a disqualifying action by Splitco or Georgia Gulf, PPG would not be entitled to be indemnified under the Tax Matters Agreement and the resulting tax to PPG could have a material adverse effect on PPG. If PPG were to recognize gain on the Merger for reasons not related to a breach by PPG of a representation or covenant, PPG would generally be entitled to indemnification by Splitco under the Tax Matters Agreement. If Splitco is required to indemnify PPG if the Distribution or the Merger is taxable, this indemnification obligation would be substantial and could have a material adverse effect on Georgia Gulf, including with respect to its financial condition and results of operations.

***Splitco and Georgia Gulf may be affected by significant restrictions following the Transactions in order to avoid significant tax-related liabilities.***

The Tax Matters Agreement generally will prohibit Splitco, Georgia Gulf and their affiliates from taking certain actions that could cause the Distribution, the Merger and certain related transactions to fail to qualify as tax-free transactions. In particular, for a two-year period following the date of the Distribution, Splitco may not:

- enter into any transaction or series of transactions (or any agreement, understanding or arrangement) as a result of which one or more persons would acquire (directly or indirectly) stock comprising 50% or more of the vote or value of Splitco (taking into account the stock of Splitco acquired pursuant to the Merger);

- redeem or repurchase any stock or stock rights;

- amend its certificate of incorporation or take any other action affecting the relative voting rights of its capital stock;

- merge or consolidate with any other person (other than pursuant to the Merger);

- take any other action that would, when combined with any other direct or indirect changes in ownership of Splitco capital stock (including pursuant to the Merger), have the effect of causing one or more persons to acquire stock comprising 50% or more of the vote or value of Splitco, or would reasonably be expected to adversely affect the tax-free status of the Transactions;

- liquidate or partially liquidate;

41

PPG102257

- discontinue the active conduct of the PPG Chlor-alkali and Derivatives Business; or

- sell, transfer or otherwise dispose of assets (including stock of subsidiaries) that constitute more than 30% of the consolidated gross assets of Splitco and/or its subsidiaries (subject to exceptions for, among other things, ordinary course dispositions and repayments or prepayments of Splitco debt).

If Splitco intends to take any such restricted action, Splitco will be required to cooperate with PPG in obtaining a supplemental IRS ruling or an unqualified tax opinion reasonably acceptable to PPG to the effect that such action will not affect the status of the Distribution, the Merger and certain related transactions as tax-free transactions. However, if Splitco takes any of the actions above and such actions result in tax-related losses to PPG, then Splitco generally will be required to indemnify PPG for such losses, without regard to whether PPG has given Splitco prior consent. See "Other Agreements—Tax Matters Agreement".

Due to these restrictions and indemnification obligations under the Tax Matters Agreement, Georgia Gulf may be limited in its ability to pursue strategic transactions, equity or convertible debt financings or other transactions that may otherwise be in Georgia Gulf's best interests. Also, Georgia Gulf's potential indemnity obligation to PPG might discourage, delay or prevent a change of control during this two-year period that Georgia Gulf stockholders may consider favorable to its ability to pursue strategic transactions, equity or convertible debt financings, or other transactions that may otherwise be in Georgia Gulf's best interests.

### *Georgia Gulf will have more shares of its common stock outstanding after the Transactions, which may discourage other companies from trying to acquire Georgia Gulf.*

Georgia Gulf expects to issue 35.2 million shares of its common stock as part of the Transactions. Because Georgia Gulf will be a significantly larger company and have significantly more shares of its common stock outstanding after the Transactions, an acquisition of Georgia Gulf may become more expensive. As a result, some companies may not seek to acquire Georgia Gulf, and the reduction in potential parties that may seek to acquire Georgia Gulf could negatively impact the prices at which Georgia Gulf's common stock trades.

### *Tendering PPG shareholders may receive a reduced premium or may not receive any premium in this exchange offer.*

This exchange offer is designed to permit you to exchange your shares of PPG common stock for shares of Splitco common stock at a     % discount to the per-share value of Splitco common stock, calculated as set forth in this document. Stated another way, for each $1.00 of your PPG common stock accepted in this exchange offer, you will receive approximately $     of Splitco common stock. The value of the PPG common stock will be based on the calculated per-share value for the PPG common stock on the NYSE and the value of the Splitco common stock will be based on the calculated per-share value of Georgia Gulf common stock on the NYSE, in each case determined by reference to the simple arithmetic average of the daily VWAP on each of the Valuation Dates.

The number of shares you can receive is, however, subject to an upper limit of     shares of Splitco common stock for each share of PPG common stock accepted in this exchange offer. As a result, you may receive less than $     of Splitco common stock for each $1.00 of PPG common stock, depending on the calculated per-share values of PPG common stock and Splitco common stock at the expiration date. Because of the limit on the number of shares of Splitco common stock you may receive in this exchange offer, if there is a drop of sufficient magnitude in the trading price of Georgia Gulf common stock relative to the trading price of PPG common stock, or if there is an increase of sufficient magnitude in the trading price of PPG common stock relative to the trading price of Georgia Gulf common stock, you may not receive $     of Splitco common stock for each $1.00 of PPG common stock, and could receive much less.

For example, if the calculated per-share value of PPG common stock was $     (the highest closing price for PPG common stock on the NYSE during the three–month period prior to commencement of this exchange

42

PPG102258

offer) and the calculated per-share value of Splitco common stock was $      (the lowest closing price for Georgia Gulf common stock on the NYSE during that three–month period), the value of Splitco common stock, based on the Georgia Gulf common stock price, received for PPG common stock accepted for exchange would be approximately $      for each $1.00 of PPG common stock accepted for exchange.

This exchange offer does not provide for a minimum exchange ratio. See "This Exchange Offer—Terms of this Exchange Offer." If the upper limit on the number of shares of Splitco common stock that can be received for each share of PPG common stock tendered is in effect at the expiration of the exchange offer period, then the exchange ratio will be fixed at the upper limit and a Mandatory Extension of this exchange offer will be made until 12:00 midnight, New York City time, on the second trading day following the originally contemplated expiration date to permit shareholders to validly tender or properly withdraw their PPG common stock during those days. Any changes in the prices of PPG common stock or Georgia Gulf common stock on those additional days of this exchange offer will not, however, affect the exchange ratio.

For example, if the trading price of PPG common stock were to increase during the last two trading days of the exchange offer, the average PPG stock price used to calculate the exchange ratio would likely be lower than the closing price of shares of PPG common stock on the expiration date of the exchange offer. As a result, you may receive fewer shares of Splitco common stock, and therefore effectively fewer shares of Georgia Gulf common stock, for each $1.00 of shares of PPG common stock than you would have if the average PPG stock price were calculated on the basis of the closing price of shares of PPG common stock on the expiration date of the exchange offer or on the basis of an averaging period that includes the last two trading days prior to the expiration of the exchange offer period. Similarly, if the trading price of Georgia Gulf common shares were to decrease during the last two trading days prior to the expiration of the exchange offer period, the average Georgia Gulf stock price used to calculate the exchange ratio would likely be higher than the closing price of Georgia Gulf common shares on the expiration date. This could also result in your receiving fewer shares of Splitco common stock, and therefore effectively fewer shares of Georgia Gulf common stock, for each $1.00 of PPG common stock than you would otherwise receive if the average Georgia Gulf common stock price were calculated on the basis of the closing price of Georgia Gulf common stock on the expiration date or on the basis of an averaging period that included the last two trading days prior to the expiration of the exchange offer period.

In addition, there is no assurance that holders of shares of PPG common stock that are exchanged for Splitco common stock in this exchange offer will be able to sell the shares of Georgia Gulf common stock after receipt in the Merger at prices comparable to the calculated per-share value of Splitco common stock at the expiration date.

***The trading prices of Georgia Gulf common stock may not be an appropriate proxy for the prices of Splitco common stock.***

The calculated per-share value for Splitco common stock is based on the trading prices for Georgia Gulf common stock, which may not be an appropriate proxy for the prices of Splitco common stock. There is currently no trading market for Splitco common stock and no such market will be established in the future. PPG believes, however, that the trading prices for Georgia Gulf common stock are an appropriate proxy for the trading prices of Splitco common stock because immediately following the consummation of this exchange offer, Merger Sub will be merged with and into Splitco, whereby Splitco will continue as the surviving company and a wholly-owned subsidiary of Georgia Gulf. Each outstanding share of Splitco common stock will be canceled and retired and will cease to exist and the holders of Splitco common stock will receive the right to receive a number of shares of common stock of Georgia Gulf equal to (a) the greater of (i) 35,200,000 shares of Georgia Gulf common stock or (ii) the product of (x) the number of shares of Georgia Gulf common stock issued and outstanding immediately prior to the effective time of the Merger multiplied by (y) 1.02020202, divided by (b) the number of shares of Splitco common stock issued and outstanding immediately prior to the effective time of the Merger. There can be no assurance, however, that common stock of Georgia Gulf after the issuance of Splitco common stock and the Merger will trade on the same basis as Georgia Gulf common stock trades prior to the Transactions. In addition, it is possible that the trading prices of Georgia Gulf common stock prior to consummation of the Merger will not

43

PPG102259

fully reflect the anticipated value of common stock of Georgia Gulf after the Merger. For example, trading prices of Georgia Gulf common stock on the Valuation Dates could reflect some uncertainty as to the timing or consummation of the Merger or could reflect trading activity by investors seeking to profit from market arbitrage.

*Following the exchange of shares of Georgia Gulf common stock for shares of Splitco common stock in the Merger, the former holders of shares of Splitco common stock may experience a delay prior to receiving their shares of Georgia Gulf common stock or their cash in lieu of fractional shares, if any.*

Following the exchange of shares of Georgia Gulf common stock for shares of Splitco common stock, the former holders of Splitco common stock will receive their shares of Georgia Gulf common stock or their cash in lieu of fractional shares, if any, only upon surrender of all necessary documents, duly executed, to the transfer agent. Until the distribution of the shares of Georgia Gulf common stock to the individual shareholder has been completed, the relevant holder of shares of Georgia Gulf common stock will not be able to sell its shares of Georgia Gulf common stock. Consequently, in case the market price for Georgia Gulf common stock should decrease during that period, the relevant shareholder would not be able to stop any losses by selling the shares of Georgia Gulf common stock. Similarly, the former holders of Splitco common stock who received cash in lieu of fractional shares will not be able to invest the cash until the distribution to the relevant shareholder has been completed, and they will not receive interest payments for this time period.

### Other Risks that Relate to Georgia Gulf, Including the PPG Chlor-alkali and Derivatives Business After the Transactions

*The chemicals industry is cyclical and volatile, experiencing alternating periods of tight supply and overcapacity, and the building products industry is also cyclical. This cyclicality adversely impacts Georgia Gulf's capacity utilization and causes fluctuations in Georgia Gulf's results of operations.*

Georgia Gulf's historical operating results for its chemical businesses have tended to reflect the cyclical and volatile nature of the chemicals industry. Georgia Gulf expects to continue to be subject to the cyclicality and volatility following the consummation of the Transactions. Historically, periods of tight supply of commodity chemicals have resulted in increased prices and profit margins thereon, and have been followed by periods of substantial capacity increase, resulting in oversupply and declining prices and profit margins for those products. A number of Georgia Gulf's chemical products are and will remain highly dependent on markets that are particularly cyclical, such as the building and construction, paper and pulp, and automotive markets. As a result of changes in demand for Georgia Gulf's products, its operating rates and earnings fluctuate significantly, not only from year to year, but also from quarter to quarter, depending on factors such as feedstock costs, transportation costs, and supply and demand for the product produced at the facility during that period. In order to compensate for changes in demand, Georgia Gulf has historically operated individual facilities below or above rated capacities in any period, and Georgia Gulf expects to continue this practice in the future. Georgia Gulf may idle a facility for an extended period of time because an oversupply of a certain product or a lack of demand for that product makes production uneconomical. Facility shutdown and subsequent restart expenses may adversely affect periodic results when these events occur. In addition, a temporary shutdown may become permanent, resulting in a write-down or write-off of the related assets. Industry-wide capacity expansions or the announcement of such expansions have generally led to a decline in the pricing of Georgia Gulf's chemical products in the affected product line. Following the completion of the Transactions, Georgia Gulf expects that it may be required to take similar actions in the future in response to cyclical conditions. Georgia Gulf cannot provide any assurances that future growth in product demand will be sufficient to utilize any additional capacity.

In addition, the cyclical and seasonal nature of the building products industry, which is significantly affected by changes in national and local economic and other conditions such as employment levels, demographic trends, availability of financing, interest rates and consumer confidence, could negatively affect the demand for and pricing of Georgia Gulf's building products. For example, if interest rates increase, the ability of prospective

44

**PPG102260**

buyers to finance purchases of home improvement products and invest in new real estate could be adversely affected, which, in turn, could adversely affect Georgia Gulf's financial performance. In response to the significant decline in the market for Georgia Gulf's building and home improvement products beginning in 2008, Georgia Gulf has closed facilities and sold certain businesses and assets and continues to monitor cost control initiatives. In the near-term, it is unclear whether demand for these products will return and stabilize or whether demand for Georgia Gulf's building products will further decline.

**_The integration of Georgia Gulf and the PPG Chlor-alkali and Derivatives Businesses may not be successful or the anticipated benefits from the Transactions may not be realized._**

After consummation of the Transactions, Georgia Gulf will have significantly more sales, assets and employees than it did prior to the Transactions. The integration process will require Georgia Gulf to expend significant capital and significantly expand the scope of its operations and financial systems. Georgia Gulf's management will be required to devote a significant amount of time and attention to the process of integrating the operations of Georgia Gulf's business and the PPG Chlor-alkali and Derivatives Business. There is a significant degree of difficulty and management involvement inherent in that process. These difficulties include:

- integrating the operations of the PPG Chlor-alkali and Derivatives Business while carrying on the ongoing operations of Georgia Gulf's business;

- managing a significantly larger company than before consummation of the Transactions;

- the possibility of faulty assumptions underlying Georgia Gulf's expectations regarding the integration process;

- coordinating a greater number of diverse businesses and businesses located in a greater number of geographic locations;

- integrating two separate business cultures, which may prove to be incompatible;

- attracting and retaining the necessary personnel associated with the PPG Chlor-alkali and Derivatives Business following the Transactions;

- creating uniform standards, controls, procedures, policies and information systems and controlling the costs associated with such matters; and

- integrating information, purchasing, accounting, finance, sales, billing, payroll and regulatory compliance systems.

There is no assurance that the PPG Chlor-alkali and Derivatives Business will be successfully or cost-effectively integrated into Georgia Gulf. The process of integrating the PPG Chlor-alkali and Derivatives Business into Georgia Gulf's operations may cause an interruption of, or loss of momentum in, the activities of Georgia Gulf's business after consummation of the Transactions. If Georgia Gulf management is not able to effectively manage the integration process, or if any significant business activities are interrupted as a result of the integration process, Georgia Gulf's business could suffer and its liquidity, results of operations and financial condition may be materially adversely impacted.

All of the risks associated with the integration process could be exacerbated by the fact that Georgia Gulf may not have a sufficient number of employees with the requisite expertise to integrate the businesses or to operate Georgia Gulf's business after the Transactions. If Georgia Gulf does not hire or retain employees with the requisite skills and knowledge to run Georgia Gulf after the Transactions, it may have a material adverse effect on Georgia Gulf's business.

Even if Georgia Gulf is able to successfully combine the two business operations, it may not be possible to realize the full benefits of the increased sales volume and other benefits, including the expected synergies, that are expected to result from the Transactions, or realize these benefits within the time frame that is expected. For

45

PPG102261

example, the elimination of duplicative costs may not be possible or may take longer than anticipated, or the benefits from the Transactions may be offset by costs incurred or delays in integrating the companies. If Georgia Gulf fails to realize the benefits it anticipates from the acquisition, Georgia Gulf's liquidity, results of operations or financial condition may be adversely affected.

***Georgia Gulf's operations and assets are and will continue to be subject to extensive environmental, health and safety laws and regulations; the costs associated with compliance with these regulations could materially adversely affect Georgia Gulf's financial condition and results of operations, and the failure to comply could expose Georgia Gulf to material liabilities.***

Georgia Gulf's operations and assets are, and are expected to continue to be, subject to extensive environmental, health and safety regulation, including laws and regulations related to air emissions, water discharges, waste disposal and remediation of contaminated sites, at both the national and local levels in the U.S. Georgia Gulf is also subject to similar laws and regulations in Canada and, after consummation of the Transactions, expects to be subject to similar regulations in other jurisdictions. The nature of the chemical and building products industries exposes, and is expected to continue to expose, Georgia Gulf to risks of liability under these laws and regulations due to the production, storage, use, transportation and sale of materials that can cause contamination or personal injury, including, in the case of commodity chemicals, potential releases into the environment. Environmental laws may have a significant effect on the costs of use, transportation and storage of raw materials and finished products, as well as the costs of the storage and disposal of wastes. Georgia Gulf has and will continue to incur substantial operating and capital costs to comply with environmental laws and regulations. In addition, Georgia Gulf may incur substantial costs, including fines, damages, criminal or civil sanctions and remediation costs, or experience interruptions in its operations for violations arising under these laws and regulations.

For example, some environmental laws, such as the federal Superfund statute, impose joint and several liability for the cost of investigations and remedial actions on any company that generated, arranged for disposal of or transported waste to a disposal site, or selected or presently or formerly owned or operated a disposal site or a site otherwise contaminated by hazardous substances. A number of environmental liabilities have been associated with Georgia Gulf's facilities at Lake Charles, Louisiana that Georgia Gulf acquired as part of its acquisition of the vinyls business of CONDEA Vista Company ("CONDEA Vista," which is now known as Sasol North America, Inc.) and which may be designated as Superfund sites. Although CONDEA Vista retained financial responsibility for certain environmental liabilities that relate to the acquired facilities that arose before the closing of the acquisition in November 1999, there can be no assurance that CONDEA Vista will be able to satisfy its obligations in this regard, particularly in light of the long period of time in which environmental liabilities may arise under the environmental laws. If CONDEA Vista fails to fulfill its obligations regarding these environmental liabilities, then Georgia Gulf could be held responsible. Furthermore, Georgia Gulf severally is responsible for, and does not have indemnification for, any environmental liabilities arising from certain other acquisitions, including several liabilities resulting from Royal Group's operations prior to Georgia Gulf's acquisition of that company.

In connection with the consummation of the Transactions, Georgia Gulf will acquire a significant additional number of properties and amount of assets, which could materially increase Georgia Gulf's compliance costs and exposure to liabilities. For example, the assets associated with the PPG Chlor-alkali and Derivatives Business are subject to similar environmental health and safety laws and regulations which could result in significant capital expenditures related thereto in future periods. The PPG Chlor-alkali and Derivatives Business could be responsible for, and is engaged in discussing with various parties regarding an allocation of costs relating to certain environmental remediation plans at the Calcasieu River Estuary in Lake Charles, Louisiana. These costs could be material and, if incurred, would be expected to be incurred following the consummation of the Transactions. Further, PPG is currently negotiating a settlement with the Louisiana Department of Environmental Quality relating to alleged violations of PPG's Lake Charles facility's air permit relating to the PPG Chlor-alkali and Derivatives Business. In connection with the Transactions, any settlement related thereto would be a liability

46

PPG102262

**A-894**

of the PPG Chlor-alkali and Derivatives Business. No assurances as to the ultimate costs or timing of any payments required in connection with these alleged violations can be provided. For additional information on the potential environmental liabilities associated with the Calcasieu River Estuary and the Lake Charles, Louisiana facility, including the expected timing and cost of actions related thereto, see "Information on the PPG Chlor-alkali and Derivatives Business—Regulation and Environmental Matters" and "—Legal Proceedings" elsewhere in this document.

In addition, due to the nature of environmental laws, regulations and liabilities, it is possible that the reviews Georgia Gulf conducted in connection with its evaluation of, and determination to enter into, the Transactions, may not have identified all potentially adverse conditions. Such conditions may not presently exist or be detectable through reasonable methods, or may not be able to be adequately valued. For example, the PPG Chlor-alkali and Chemical Business's facility in Natrium, West Virginia has been in operation for over 65 years. There may be significant latent liabilities or future claims arising from the operation of a facility of this age, and Georgia Gulf may be required to incur material future remediation or other costs in connection with future actions or developments at this or other facilities.

Georgia Gulf expects to be continually subjected to increasingly stringent environmental and health and safety laws and regulations and that continued compliance will require increased capital expenditures and increased operating costs, or may impose restrictions on Georgia Gulf's present or future operations. It is difficult to predict the future interpretation and development of these laws and regulations or their impact on Georgia Gulf's future earnings and operations. Georgia Gulf's policy is to accrue costs relating to environmental matters when it is probable that these costs will be required and can be reasonably estimated. Any increase in these costs, or any material restrictions, could materially adversely affect Georgia Gulf's liquidity, financial condition and results of operations. However, estimated costs for future environmental compliance and remediation may be materially lower than actual costs, or Georgia Gulf may not be able to quantify potential costs in advance. Actual costs related to any environmental compliance in excess of estimated costs could have a material adverse effect on Georgia Gulf's financial condition in one or more future periods.

*Recent heightened interest in environmental-related issues could require Georgia Gulf to incur significant compliance costs or result in material operating restrictions.*

Heightened interest in environmental regulation, such as climate change issues, have the potential to materially impact Georgia Gulf's costs and present and future operations. Georgia Gulf, and other chemicals companies, are currently required to file certain governmental reports relating to greenhouse gas ("GHG") emissions. The U.S. Government has considered, and may in the future implement, restrictions or other controls on GHG emissions which could require Georgia Gulf, including, following the consummation of the Merger, the PPG Chlor-alkali and Derivatives Business, to incur significant capital expenditures or further restrict Georgia Gulf's present or future operations.

In addition to GHG regulations, the United States Environmental Protection Agency (the "EPA") has recently taken certain actions to limit or control certain pollutants created by companies such as Georgia Gulf and the PPG Chlor-alkali and Derivatives Business. For example, in February 2012, the EPA issued its final rule to update emissions limits for air toxins from polyvinyl chloride and copolymers production ("PVC production"). The rule, known as the National Emission Standards for Hazardous Air Pollutants for Polyvinyl Chloride and Copolymers Production, establishes new, more stringent emission standards for certain regulated "hazardous air pollutants," including vinyl chloride monomer. The rule sets maximum achievable control technology ("MACT") standards for major sources of PVC production and establishes certain working practices, as well as monitoring, reporting and record-keeping requirements. Existing sources that become subject to these requirements would have three years from the effectiveness of the rule to come into compliance. Following the publication of the rule in the Federal Register, legal challenges were filed by the vinyl industry's trade organization, several vinyl manufacturers, and several environmental groups, which will likely impact provisions of a final rule. Although Georgia Gulf has conducted a preliminary evaluation of the potential impact of a final rule on its operations, the

47

PPG102263

**A-895**

preliminary evaluation was based on the final rule as it currently exists, as well as a number of assumptions concerning the equipment and process changes that would be necessary to come into compliance with the existing final rule. There could be significant changes from the currently existing rule to the final rule after all legal challenges have been exhausted.

Following the consummation of the Transactions, Georgia Gulf expects that its business and operations will also be subject to pending environmental regulations impacting the PPG Chlor-alkali and Derivatives Business. For example, in March 2011, the EPA proposed amendments to the national emission standards for hazardous air pollutants for mercury emissions from mercury cell chlor-alkali plants known as the Mercury MACT regulations. These proposed amendments would require improvements in work practices to reduce fugitive emissions and would result in reduced levels of mercury emissions while still allowing the mercury cell facilities to continue to operate. The PPG Chlor-alkali and Derivatives Business currently operates a cell production unit at its Natrium, West Virginia facility, which constitutes approximately 4% of the PPG Chemical Business's total chlor-alkali production capacity. No assurances as to the timing or content of the final rule, or its ultimate impact on Georgia Gulf, can be provided.

Separately, the PPG Chlor-alkali and Derivatives Business's Natrium, West Virginia facility currently discharges wastewater into the Ohio River pursuant to a National Pollution Discharge Elimination System ("NPDES") permit issued by the West Virginia Department of Environmental Protection ("WVDEP"). Because it discharges into the Ohio River, the wastewater permit terms must conform to water quality standards in the Ohio River set by the Ohio River Valley Water Sanitation Commission ("ORSANCO"). ORSANCO has adopted an ambient water column standard criterion for mercury in the Ohio River and, in 2009, ORSANCO adopted new standards that prohibit as of October 16, 2013, the use of a "mixing zone" as used by, among others, the PPG Chlor-alkali and Derivatives Business, to meet these standards for certain bioaccumulative chemicals, including mercury. In September 2011, PPG, on behalf of the PPG Chlor-alkali and Derivatives Business, submitted a request for a variance from the mixing zone prohibition in ORSANCO's pollution control standards. PPG, on behalf of the PPG Chlor-alkali and Derivatives Business, has requested continued use of a mixing zone for mercury through the life of its current permit, which is valid through January 2014, and for any subsequent permits. ORSANCO issued a preliminary decision approving this request and ORSANCO accepted public comments on its preliminary decision through July 31, 2012. No assurances as to the timing or content of the final decision can be provided, and any decision may require the PPG Chlor-alkali and Derivatives Business to incur material costs to remain in compliance with the regulation, or could materially impair the ability of the PPG Chlor-alkali and Derivatives Business to operate its Natrium, West Virginia facility.

Also in March 2011, the EPA issued emissions standards for large and small boilers and incinerators that burn solid waste, known as the Boiler MACT regulations. These regulations are aimed at controlling emissions of toxic air contaminants. As a result of numerous petitions from both industry and environmental groups, the EPA reconsidered its March 2011 final rule. On December 23, 2011, the EPA's proposed rule reconsidering its March 2011 final rule was published in the Federal Register. The EPA has indicated its intent to issue the final regulations in 2012 requiring that covered facilities achieve compliance within three years. The 115 megawatt coal fired power plant at the PPG Chlor-alkali and Derivatives Business's Natrium, West Virginia facility would be the source most significantly impacted by the Boiler MACT regulations. The PPG Chlor-alkali and Derivatives Business continues to evaluate alternative paths of either retrofitting the Natrium boilers to burn natural gas or to engineer and install pollution control equipment. No assurances as to the timing or content of the final rule, or its ultimate impact on Georgia Gulf, can be provided.

The potential impact of these and/or unrelated future, legislative or regulatory actions on Georgia Gulf's current or future operations cannot be predicted at this time but could be significant. Such impacts could include the potential for significant compliance costs, including capital expenditures, could result in operating restrictions or could require Georgia Gulf to incur significant legal or other costs related to compliance or other activities. Any increase in the costs related to these initiatives, or restrictions on Georgia Gulf's operations, could materially adversely affect Georgia Gulf's liquidity, financial condition or results of operations.

PPG102264

***Natural gas, electricity, fuel and raw materials costs, and other external factors beyond Georgia Gulf's control, as well as changes in the level of activity in the home repair and remodeling and new home construction sectors of the economy, can cause wide fluctuations in Georgia Gulf's margins.***

The cost of Georgia Gulf's natural gas, electricity, fuel and raw materials may not correlate with changes in the prices Georgia Gulf receives for its products, either in the direction of the price change or in absolute magnitude. Natural gas and raw materials costs represent, and will continue to represent, a substantial part of Georgia Gulf's and the PPG Chlor-alkali and Derivatives Business's manufacturing costs, and energy costs, in particular electricity and fuel, represent a component of the costs to manufacture building products. Following the consummation of the Merger, a $1.00 change in the price of natural gas per British Thermal Unit ("BTU") could raise or lower Georgia Gulf's operating costs by approximately $60 million to $80 million per year. Most of the raw materials Georgia Gulf uses are commodities and the price of each can fluctuate widely for a variety of reasons, including changes in availability because of capacity additions or facility operating problems. For example, ethylene is a key raw material used by both Georgia Gulf and the PPG Chlor-alkali and Derivatives Business. During 2011, costs for ethylene increased substantially compared to 2010 driven by a combination of tight supplies due to production outages and increased global demand, particularly in U.S. exports of ethylene derivative products. Other external factors beyond Georgia Gulf's control can cause volatility in raw materials prices, demand for Georgia Gulf's products, product prices, sales volumes and margins. These factors include general economic conditions, the level of business activity in the industries that use Georgia Gulf's products, competitors' actions, international events and circumstances, and governmental regulation in the United States and abroad. These factors can also magnify the impact of economic cycles on Georgia Gulf's business. While Georgia Gulf attempts to pass through price increases in energy costs and raw materials, Georgia Gulf has been unsuccessful in doing so in some circumstances in the past and there can be no assurance that it will be able to successfully do so in the future.

Additionally, Georgia Gulf's business is and will continue to be impacted by changes in the North American home repair and remodeling sectors, as well as the new construction sector, which may be significantly affected by changes in economic and other conditions such as gross domestic product levels, employment levels, demographic trends, consumer confidence, increases in interest rates and availability of consumer financing for home repair and remodeling projects as well as availability of financing for new home purchases. These factors can lower the demand for and pricing of Georgia Gulf's products, while Georgia Gulf may not be able to reduce its costs by an equivalent amount, which alone or in combination could cause Georgia Gulf's net sales and net income to materially decrease and, among other things, could require Georgia Gulf to recognize impairments of its assets.

***Hazards associated with manufacturing may adversely affect Georgia Gulf's business or results of operations.***

There are a number of hazards associated with chemical manufacturing and building products manufacturing in Georgia Gulf's current operations, as well as in the use, storage and transportation of related raw materials, products and wastes. These hazards will be magnified in connection with the expansion of Georgia Gulf's operations as a result of the consummation of the Transactions. The occurrence of any such hazard could lead to an interruption or suspension of operations and have a material adverse effect on the productivity and profitability of a particular manufacturing facility or on Georgia Gulf's operations as a whole. These hazards include:

- pipeline and storage tank leaks and ruptures;
- explosions and fires;
- inclement weather and natural disasters;
- mechanical failure;
- unscheduled downtime;

49

PPG102265

- labor difficulties;

- transportation interruptions;

- transportation accidents involving the chemical products of Georgia Gulf and the PPG Chlor-alkali and Derivatives Business;

- remediation complications;

- terrorist acts; and

- chemical spills and other discharges or releases of toxic or hazardous substances or gases.

These hazards may cause personal injury and loss of life, severe damage to or destruction of property and equipment, and environmental damage, any of which could lead to claims or material liability under environmental or other laws. Although Georgia Gulf maintains property, business interruption and casualty insurance of the types and in the amounts that it believes are customary for the industry, Georgia Gulf is not fully insured against all potential hazards incident to its business.

***In addition to potential exposure to claims arising from environmental liabilities, Georgia Gulf faces potential exposure to significant product liability, personal injury or other claims relating to the production and manufacture of its products, and this exposure will increase following the completion of the Merger.***

Georgia Gulf is exposed to significant losses from product liability claims relating to the products it manufactures in both its chemicals and building products business. Additionally, individuals could seek damages for alleged personal injury or property damage due to exposure to chemicals at Georgia Gulf's facilities or to chemicals otherwise owned, controlled or manufactured by Georgia Gulf. Georgia Gulf is also subject to present and future claims with respect to workplace exposure, workers' compensation and other matters. In connection with the completion of the Transactions, Georgia Gulf expects that its exposure to potential losses from products liability, personal injury and other claims will significantly increase as a result of existing and possible future lawsuits and claims relating to the PPG Chlor-alkali and Derivatives Business and its products. For example, the PPG Chlor-alkali and Derivatives Business is currently involved in litigation with, among others, the City of Modesto, California relating to the claims involving the manufacture of perchloroethylene, and a significant number of other contract, product liability and other matters. Any such claims, whether with or without merit, could be time consuming, expensive to defend and could divert management's attention and resources. Although Georgia Gulf maintains and expects to continue to maintain appropriate amounts of insurance for products liability, workplace exposure, workers' compensation and other claims, the amount and scope of such insurance may not be adequate or available to cover a claim that is successfully asserted against Georgia Gulf. In addition, such insurance could become more expensive and difficult to maintain and, in the future, may not be available to Georgia Gulf on commercially reasonable terms or at all. The results of any future litigation or claims are inherently unpredictable, but such outcomes could have a material adverse effect on Georgia Gulf's liquidity, financial condition or results of operations.

***The ABL Revolver, the indenture governing Georgia Gulf's 9 percent notes and the financing agreements expected to be entered into in connection with the Transactions will impose significant operating and financial restrictions on Georgia Gulf and its subsidiaries, which may prevent Georgia Gulf from capitalizing on business opportunities and taking some actions.***

The agreements that govern the terms of Georgia Gulf's existing debt, including the ABL Revolver and the indenture that governs the 9 percent notes, impose significant operating and financial restrictions on Georgia Gulf. In addition, Georgia Gulf expects that the financing agreements to be entered into in connection with the Transactions and described in the section of this document entitled "Debt Financing" will contain similar restrictions. These restrictions limit, and will continue to limit, Georgia Gulf's ability to, among other things:

- incur additional indebtedness;

50

PPG102266

**A-898**

- incur liens;
- make investments and sell assets, including the stock of subsidiaries;
- pay dividends and make other distributions;
- purchase its stock;
- engage in business activities unrelated to its current business;
- enter into transactions with affiliates; or
- consolidate, merge or sell all or substantially all of its assets.

As a result of these covenants and restrictions, in addition to any restrictions or limitations imposed on Georgia Gulf in connection with undertaking the Transactions and preserving the tax-free nature thereof, Georgia Gulf is limited in how it conducts its business and it may be unable to raise additional debt or equity financing to compete effectively or to take advantage of new business opportunities. The terms of any future indebtedness Georgia Gulf may incur could include more restrictive covenants. A breach of any of these covenants could result in a default in respect of the related indebtedness. If a default occurs, the relevant lenders could elect to declare the indebtedness, together with accrued interest and other fees, to be due and payable immediately and proceed against any collateral securing that indebtedness.

Furthermore, there are limitations on Georgia Gulf's ability to borrow the full amount of commitments under the ABL Revolver, and Georgia Gulf expects that the New ABL Revolver (as defined below) will contain similar limitations. Borrowings under the ABL Revolver are limited by, and borrowings under the New ABL Revolver are expected to be limited by, a specified borrowing base consisting of a percentage of eligible accounts receivable and inventory, less customary reserves. In addition, (x) if Georgia Gulf's availability under the ABL Revolver falls below a certain amount, Georgia Gulf will be subject to compliance with a covenant requiring Georgia Gulf to maintain a fixed charge coverage ratio of at least 1.1 to 1.0, and Georgia Gulf expects that the New ABL Revolver will contain a similar restrictive covenant, and (y) Georgia Gulf will be subject to a senior secured leverage ratio of 3.50 to 1.00 under the Term Facility. Georgia Gulf's ability to comply with any required fixed charge coverage ratio and senior secured leverage ratio can be affected by events beyond its control, and Georgia Gulf cannot assure you it will be able to comply with these ratios. A breach of the covenants requiring compliance with these ratios, or with any other covenants in these debt agreements, could result in a default under the ABL Revolver, or under the New ABL Revolver or the Term Facility, when entered into, as the case may be.

### *Georgia Gulf relies, and expects to continue to rely after the consummation of the Merger, on a limited number of outside suppliers for specified feedstocks and services.*

Georgia Gulf currently obtains, and expects to continue to obtain after the consummation of the Merger, a significant portion of its raw materials from a few key suppliers. If any of these suppliers are unable to meet their obligations under present or any future supply agreements, Georgia Gulf may be forced to pay higher prices to obtain the necessary raw materials. Any interruption of supply or any price increase of raw materials could have a material adverse effect on Georgia Gulf's business and results of operations. In connection with Georgia Gulf's acquisition of the vinyls business of CONDEA Vista in 1999, Georgia Gulf entered into agreements with CONDEA Vista to provide specified feedstocks for its Lake Charles facility. This facility is dependent upon CONDEA Vista's infrastructure for services such as wastewater and ground water treatment, site remediation, and fire water supply. Any failure of CONDEA Vista to perform its obligations under those agreements could adversely affect the operation of the affected facilities and Georgia Gulf's liquidity and results of operations. The agreements relating to these feedstocks and services had initial terms of one to ten years. Most of these agreements have been automatically renewed, but may be terminated by CONDEA Vista after specified notice periods. If Georgia Gulf was required to obtain an alternate source for these feedstocks or services, Georgia Gulf may not be able to obtain pricing on as favorable terms. Additionally, Georgia Gulf may be forced to pay

51

PPG102267

additional transportation costs or to invest in capital projects for pipelines or alternate facilities to accommodate railcar or other delivery or to replace other services.

While Georgia Gulf believes that its relationships with its key suppliers are strong, any vendor may choose, subject to existing contracts, to modify its relationship due to general economic concerns or concerns relating to the vendor or Georgia Gulf, at any time. Any significant change in the terms that Georgia Gulf has with its key suppliers could materially adversely affect Georgia Gulf's financial condition and liquidity, as could significant additional requirements from Georgia Gulf's suppliers that it provides them additional security in the form of prepayments or with letters of credit.

*The industries in which Georgia Gulf competes and expects to compete after the consummation of the Merger are highly competitive, and some of Georgia Gulf's competitors have greater financial and other resources than Georgia Gulf has, which may materially adversely affect Georgia Gulf's business and results of operations.*

The commodity chemicals industry is highly competitive. Many of Georgia Gulf's competitors are larger and have, and are expected to continue to have after the consummation of the Merger, greater financial and other resources and less debt than Georgia Gulf. Moreover, barriers to entry, other than capital availability, are low in most product lines of Georgia Gulf's current and contemplated commodity chemical business. Capacity additions or technological advances by existing or future competitors could also create greater competition, particularly in pricing. Georgia Gulf cannot provide assurance that it will have access to the financing necessary to upgrade Georgia Gulf's facilities in response to technological advances or other competitive developments.

In addition, Georgia Gulf competes with national and international manufacturers of vinyl-based building and home improvement products. Some of these companies are larger and have greater financial resources and less debt than Georgia Gulf. Accordingly, these competitors may be better able to withstand changes in conditions within the industries in which Georgia Gulf operates and may have significantly greater operating and financial flexibility than Georgia Gulf. Some of these competitors, who compete with Georgia Gulf's building product lines, may also be able to compete more aggressively in pricing and could take a greater share of sales and cause Georgia Gulf to lose business from its customers. Many of Georgia Gulf's competitors have operated in the building products industry for longer than Georgia Gulf. Additionally, Georgia Gulf's building products face competition from alternative materials: wood, metal, fiber cement and masonry in siding, wood and aluminum in windows and iron and cement in pipe and fittings. An increase in competition from other vinyl exterior building products manufacturers or alternative building materials could cause Georgia Gulf to lose customers and lead to decreases in net sales and profitability. To the extent Georgia Gulf loses customers in the renovation and remodeling markets, Georgia Gulf would likely have to market to the new home construction market, which historically has experienced more fluctuations in demand.

*Georgia Gulf currently relies and, after the consummation of the Merger will more heavily rely, on third party transportation, which subjects it to risks that it cannot control, and which risks may materially adversely affect Georgia Gulf's operations.*

Georgia Gulf relies heavily on railroads, barges and other shipping companies to transport raw materials to Georgia Gulf's manufacturing facilities and to ship finished product to customers. After the consummation of the Merger, Georgia Gulf expects it will more heavily rely on third party transport for products manufactured by the PPG Chlor-alkali and Derivatives Business. These transport operations are subject to various hazards, including extreme weather conditions, work stoppages and operating hazards, as well as interstate transportation regulations. If Georgia Gulf is delayed or unable to ship finished product or unable to obtain raw materials as a result of these transportation companies' failure to operate properly, or if there were significant changes in the cost of these services, Georgia Gulf may not be able to arrange efficient alternatives and timely means to obtain raw materials or ship goods, which could result in a material adverse effect on Georgia Gulf's revenues and costs of operations.

52

PPG102268

*Operation on multiple Enterprise Resource Planning ("ERP") information systems, and the conversion from multiple systems to a single system, may negatively impact Georgia Gulf's operations.*

Georgia Gulf is and will continue to remain after consummation of the Merger highly dependent on its information systems infrastructure in order to process orders, track inventory, ship products in a timely manner, prepare invoices to its customers, maintain regulatory compliance and otherwise carry on its business in the ordinary course. Georgia Gulf currently operates on multiple ERP information systems, which complicate Georgia Gulf's processing, reporting and analysis of business transactions and other information. In addition, the PPG Chlor-alkali and Derivatives Business currently operates on separate ERP systems. Since Georgia Gulf must process and reconcile its information from multiple systems, the chance of errors is increased and, after the consummation of the Merger, will be further increased, and Georgia Gulf may incur significant additional costs related thereto. Inconsistencies in the information from multiple ERP systems could adversely impact Georgia Gulf's ability to manage its business efficiently and may result in heightened risk to its ability to maintain its books and records and comply with regulatory requirements. Following the consummation of the Transactions, Georgia Gulf expects that it may transition all or a portion of its operations from one of its ERP systems to another. The transition to a different ERP system involves numerous risks, including:

- diversion of management's attention away from normal daily business operations;

- loss of, or delays in accessing data;

- increased demand on its operations support personnel;

- initial dependence on unfamiliar systems while training personnel to use new systems; and

- increased operating expenses resulting from training, conversion and transition support activities.

Any of the foregoing could result in a material increase in information technology compliance or other related costs, and could materially negatively impact Georgia Gulf's operations.

*A significant portion of the PPG Chlor-alkali and Derivatives Business's hourly workers are and, following the consummation of the Transactions, a significant portion of Georgia Gulf's hourly workers will be, represented by labor unions and therefore subject to collective bargaining agreements; if Georgia Gulf is unable to enter into new agreements or renew existing agreements before they expire, its workers subject to collective bargaining agreements could engage in strikes or other labor actions that could materially disrupt Georgia Gulf's ability to conduct its operations.*

As of June 30, 2012, Georgia Gulf had approximately 3,850 active employees. Approximately 400, or 10%, of these employees are represented by labor unions and are therefore subject to collective bargaining agreements. As of June 30, 2012, assuming the Transactions had been consummated as of that date, Georgia Gulf would have had approximately 5,900 active employees. Approximately 26% of these employees would have been represented by labor unions and would have therefore been subject to collective bargaining agreements. Of these union-represented employees, approximately 14% are subject to collective bargaining agreements that expire by the end of 2013.

If, after the consummation of the Transactions, Georgia Gulf is unable to reach new collective bargaining agreements or renew existing agreements, employees subject to collective bargaining agreements may engage in strikes, work slowdowns or other labor actions, which could materially disrupt Georgia Gulf's ability to conduct its operations. New collective bargaining agreements or the renewal of existing agreements may impose significant new costs on Georgia Gulf after the consummation of the Transactions, which could adversely affect Georgia Gulf's results of operations or financial condition in the future.

PPG102269