**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA.
WHEELING**

**CHARLES W. BELLON, ROBERT E. EAKIN,
JUDY GAY BURKE, LOUISE NICHOLS,
WILTON G. WALLACE, BERNADOT F.
VEILLON, BARBARA BROWN, and
ROBERT E. WILLIAMS, on behalf
of themselves and others similarly situated,**

       Plaintiffs,

**v.**
                        **CIVIL ACTION NO.: 5:18-CV-114
(GROH)
CLASS ACTION**

**THE PPG EMPLOYEE LIFE AND OTHER
BENEFITS PLAN, PPG INDUSTRIES, INC.,
and THE PPG PLAN ADMINISTRATOR,**

       Defendants.

## ORDER OF BENCH TRIAL

This civil action arises out of a commercial business transaction involving Defendant PPG Industries, Inc. ("PPG") merging its commodity chemicals division with Georgia Gulf to create a separate public company named Axiall Corporation ("Axiall"). The Court previously considered the parties' cross motions for summary judgment and issued a dispositive order. That Order was appealed, and this matter was argued before the Fourth Circuit, which issued a Published Opinion remanding the case for further consideration on one of Plaintiffs' claims.

**FINDINGS OF FACT**

*A.  The Parties*

1.      PPG Industries, Inc. is a publicly traded coatings and specialty products company. ECF No. 74, ¶¶ 14–15.

2.      The PPG Employee Life and Other Benefits Plan (the "Plan") is an "employee welfare benefit plan" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1).  ECF No. 74, ¶ 12.

3.      Karen Rathburn is responsible for PPG's global employee benefits. Trial Tr. 57:3–8.[1] Ms. Rathburn has been employed at PPG since 1984, and she has been involved in the administration of PPG's employee benefit plans in various roles since 1996.  Id. at 56:11–57:17, 168:15–19.

4.      Ms. Rathburn has served as PPG's plan administrator since 2011. Id. at 57:3–8, 167:7–15.

5.      Plaintiff Class and Subclass Representatives Charles Bellon, Robert Eakin, and Louise Nichols are retired former salaried employees who worked for PPG beginning in the 1960s. They participated in the PPG Plan post-retirement until 2013 when PPG removed them from the PPG Plan and transferred them to Axiall Corporation. They were terminated from Axiall's coverage at the end of 2015. Id. at 77:6-11; 81:13-23; ECF No. 441 at ¶¶3–5 and Joint Exhibit I thereto.

6.      The certified Class is defined as follows:

> All retired former salaried PPG Industries, Inc. ("PPG") employees (and the surviving spouses and other

---

[1]      The transcript of the bench trial is found at ECF Nos. 445 and 446 is cited as "Trial Tr."

> beneficiaries of such retired former employees): (a) Who were participants in the PPG Employee Life and Other Benefits Plan ("PPG Plan"); (b) Who were employed in 1969 or became employed between 1969 and September 1, 1984; (c) Who, upon retirement, began receiving life. insurance under the PPG Plan; (d) Who PPG removed from the PPG Plan in 2013 and for whom PPG transferred to Axiall Corporation ("Axiall") its retiree life insurance coverage obligations under the PPG Plan; and (e) Whose retiree life insurance coverage was terminated by Axiall effective December 31, 2015.

ECF Nos. 357 & 418.

7.    The Subclass is defined as follows:

> All Class members who elected the Surviving Spouse Income Benefit ("SIB").

Id.

8.    The parties stipulated to the identities of the PPG retirees who along with any surviving spouses or other beneficiaries are members of the certified Class and Subclass. See ECF No. 441 at ¶5 and Joint Exhibit 1.

9.    Judy Gay Burke, Wilton Wallace, Barbara Brown, and Robert Williams were previously named plaintiffs in this lawsuit. These individuals were dismissed as plaintiffs by stipulation of the parties on October 21, 2024. ECF No. 441, ¶¶ 6–9.

10.    Named plaintiff Bernadot Veillon did not testify, nor was any evidence offered in support of her claims at trial.

11.    The parties stipulated to the identities of the retired salaried former PPG employees who are members of the Class and Subclass, along with any surviving spouses or other beneficiaries. ECF No. 441, ¶ 5; Joint Trial Ex. 1.

### B.  The Axiall Transaction

12.    On January 28, 2013, PPG completed the sale of its commodity chemicals

business to an entity called Georgia Gulf Corporation.  ECF No. 441 at ¶ 1.

13.    Georgia Gulf then merged with PPG's former commodity chemicals business and became a new entity known as Axiall Corporation. As part of that transaction, liabilities for certain commodity chemicals employees and retirees, and their dependents, were transferred to Axiall, including the salaried retiree life insurance benefits at issue in this lawsuit. ECF No. 441 at ¶¶ 1–3.

14.    Subsequently, Axiall eliminated the retiree life insurance coverage for salaried, non-union PPG retirees who were participating in Axiall's benefit plans effective January 1, 2016. Id. at ¶ 4.

15.    As part of the sales agreement, the buyer (Georgia Gulf/Axiall) agreed to assume responsibility for providing retiree life and retiree healthcare benefits for current retirees from the purchased operations. Trial Tr. at 77:6-11.

16.    Once the transaction was completed, PPG terminated coverage under the Plan for commodity chemicals retirees and transferred them to Axiall. Trial Tr. at 81:12-23.

17.    Axiall's termination of its retiree life insurance plan for all transferred PPG retirees was effective on January 1, 2016.  ECF No. 441 at ¶4.

18.    After Axiall terminated transferred retirees' life insurance coverage, Plaintiff Robert Eakin asked PPG to reinstate Class members to the PPG Plan; PPG declined. Trial Tr. at 151:20-24.

### C.  Claims at Issue in This Lawsuit

19.    This proceeding is a narrow one. Most of Plaintiffs' claims were previously dismissed. The Fourth Circuit affirmed this Court's Order dismissing Plaintiffs' claims

except as to Count One. Thus, only the issues left open by the Fourth Circuit's Opinion are currently appropriate for this Court's consideration. ECF No. 418 at 5-6.

20.    The parties agree that the sole remaining claim is Count I, in which Plaintiffs allege that PPG violated the terms of the Plan, and § 502 of ERISA, when it transferred the commodity chemicals business, and corresponding retiree life insurance obligations, to Axiall. Plaintiffs allege that this transaction terminated "vested" retiree life insurance coverage. See Bellon v. PPG Emp. Life & Other Benefits Plan, 41 F.4th 244, 246–47 (4th Cir. 2022).

21.    Plaintiffs have offered three theories to support their claimed entitlement to benefits under Count I: (1) "contractual vesting based on PPG's removal of [a reservation-of-rights clause in the Plan] in the 1960s"; (2) "waiver based on PPG's removal of the original [reservation-of- rights clause]"; and (3) "that the SIB [surviving spouse] benefit in the plan was a vested benefit." ECF No. 416 at 7–8; see also Trial Tr. 17:17–20.

## D. Relevant Procedural History

22.    On July 15, 2022, the Fourth Circuit issued an order affirming in part and vacating in part this Court's prior order granting PPG's motion for summary judgment, and remanding Count I for further proceedings, including additional discovery. Bellon, 41 F.4th at 255.

23.    As for Count I, the Fourth Circuit concluded that there were disputed issues of fact related to Plaintiffs' theory that PPG's salaried retiree life insurance benefit had vested for plan participants who worked for the company between 1969 and 1984. The appellate court remanded this count for further consideration. Id. at 251–52.

24.     According to the Fourth Circuit, this Court may also consider Plaintiffs'
additional theories regarding waiver, estoppel, the surviving spouse benefit, and possible
spoliation issues while on remand. Id. at 255 & n.12. But Plaintiffs have since
abandoned their estoppel theory. ECF No. 296 at 7; ECF No. 292 at 5–6, 6 n.4.

25.     The Fourth Circuit further stated that if the retiree life insurance benefit
had vested in 1969, before the enactment of ERISA in 1974, then ERISA's vesting
standards may not apply. Bellon, 41 F.4th at 254. But Plaintiffs have since conceded
that ERISA controls the resolution of their claim. Trial Tr. 17:11–16; ECF No. 416 at 2.

26.     The Fourth Circuit further concluded that "[o]rdinary principles of contract
law" governed Plaintiffs' remaining claim regardless of whether ERISA applied. Bellon,
41 F.4th at 254.

### E.  *PPG's Retiree Life Insurance Benefit*

27.     Ms. Rathburn testified at trial on behalf of Defendants. Ms. Rathburn has
been involved in the administration of PPG benefits since 1996 in various roles and has
been the Plan Administrator of PPG's benefit plans since 2011. Trial Tr. 56:11–57:17,
167:7–15, 168:15–19.

28.     In connection with her employee benefit and plan administrator duties, and
her involvement in this lawsuit, Ms. Rathburn testified that she reviewed booklets, plan
documents, summary plan descriptions, insurance policies, and communications
regarding the salaried retiree life insurance benefit. Id. at 58:23–59:4, 67:7–13, 190:21–
191:17, 196:11–14, 202:12–203:1.

29.     Ms. Rathburn also reviewed historical minutes from 1968 to 1984
regarding the actions of PPG's Board of Directors, Management Committee—which is a

subset of the PPG CEO's direct reports—and PPG's Employee Benefits Committee, which is the committee authorized to amend or terminate PPG's salaried retiree life insurance benefit. Id. at 169:5–8, 170:11–15, 172:18–25, 174:16–18, 175:3–7, 176:13–20, 178:9–16, 182:5–12, 230:7–11, 258:18–25.

30.    PPG began providing its salaried employees with retiree life insurance in the 1940s. Id. at 60:7–10.

31.    PPG's salaried retiree life insurance benefit is, and historically was, an insured benefit, meaning that PPG contracts with an insurance carrier to provide the benefit, pays monthly premiums to the carrier for the coverage, and the insurance carrier pays out the benefit upon the participant's death. Id. at 192:2–193:8.

32.    Prior to ERISA, information about the salaried retiree life insurance benefit (provided pursuant to that underlying insurance policy) was communicated to employees and retirees via benefit booklets. After ERISA was enacted plan documents were used to describe the benefits and incorporate the terms of the life insurance policy. Id. at 60:11–22.

33.    After ERISA became effective, the document describing the salaried retiree life insurance benefit served as both the plan document and the summary plan description. See, e.g., id. at 67:5–11, 71:9–15, 110:5–16; Pls.' Trial Ex. 23 at PPG115678.

34.    Beginning on January 1, 1974, the salaried retiree life insurance benefit was amended so that PPG employees were given the ability to elect, upon retirement, a surviving spouse payment option. Trial Tr. 62:18–63:2; Defs.' Trial Ex. 32; Pls.' Trial Ex. 27.

35.     This payment option allowed the plan participant to elect a lower lump-sum life insurance benefit, plus a monthly amount that would be provided for the rest of the life of their spouse, if the spouse survived the retiree. Trial Tr. 181:5–185:3; Defs.' Trial Ex. 32; Pls.' Trial Ex. 27.

36.     However, if the spouse did not survive the retiree, the ongoing payment component of the benefit would be forfeited.  Trial Tr. 193:9–22.

37.     Subsequently, effective January 1, 1996, PPG eliminated the surviving spouse option for salaried retiree life insurance, except for those employees who were age 50 or older as of December 31, 1995: they could opt to be grandfathered in and retain the surviving spouse payment option. Id. at 185:19–190:19, 191:19–23; Defs.' Trial Exs. 100, 101.

38.     This change to the retiree life insurance benefit, eliminating the surviving spouse option, was communicated to salaried employees through Benefits News, a publication PPG periodically issued to employees to inform them of changes to PPG's benefit plans.  Trial Tr. 190:21–191:17.

39.     PPG salaried employees became eligible for retiree life insurance at the time of retirement and made their elections for retiree life insurance benefits at or around the time of their retirement.  Id. at 193:23–25.

### F.  Delegations of Authority

40.     During the time periods relevant to this lawsuit— the late 1960s to the 1980s—the only body with the authority to amend or terminate PPG's salaried retiree life insurance benefit was PPG's Employee Welfare Board, later renamed the Employee Benefits Committee (Employee Benefits Committee). Id. at 167:16–169:4, 179:22–

180:15, 369:3–7.

41.    PPG's Board of Directors delegated the authority to amend or terminate PPG's employee benefits to the Employee Benefits Committee. Id. at 168:4–14.

42.    These delegations of authority to the Employee Benefits Committee are reflected in historical minutes of meetings of the Board of Directors. Id. at 170:6–179:21, 290:2–12.

43.    In connection with this litigation, Ms. Rathburn reviewed minutes of meetings of the Board of Directors, Management Committee, and Employee Benefits Committee for the period 1968 through 1984. None of these meeting minutes contain any delegations of authority to amend or terminate PPG's employee benefits, other than the delegations to the Employee Benefits Committee. Id. at 179:22–180:10.

44.    The Employee Benefits Committee minutes do not reflect any delegation from the Employee Benefits Committee to any other entity or individual to amend or terminate PPG employee benefits. Id. at 180:11–15.

### G. Conditions and Limitations on Retiree Life Insurance

45.    Prior to the enactment of ERISA, PPG communicated its employee benefit offerings via benefit booklets. PPG issued separate booklets for each benefit, including booklets specific to salaried retiree life insurance. See id. at 84:2–89:21; Pls.' Trial Exs. 11–15.

46.    Other benefits, such as medical benefits for both active employees and retirees, were described in their own booklets. See Trial Tr. 89:25–94:19; Pls.' Trial Exs. 17–19.

47.    The evidence at trial included booklets for PPG's salaried retiree life

insurance benefit from 1944, 1954, 1959, 1962, and 1965. Trial Tr. 84:2–89:21; Pls.' Trial Exs. 11–15. The evidence also included booklets for PPG's medical benefits for salaried employees and retirees from 1957, 1959, and 1961, as well as booklets for the PPG Medical Expense Insurance Supplemental Plan for 1968, 1969, and 1971. Trial Tr. 89:25–94:19, 243:25–250:9; Pls.' Trial Exs. 17–19; Defs.' Trial Exs. 28–29, 31.

48.    PPG later issued booklets and plan documents titled "A Concern For Your Future," which included information about the company's separate benefit plan offerings. The evidence at trial included these booklets and plan documents for 1973, 1978, 1981, 1984, 1989, 2005, and 2011. See Pls.' Trial Exs. 22–24, 29; Defs.' Trial Exs. 20–22.

49.    The booklets and plan documents for the salaried retiree life insurance benefit through 1965 and beginning again in 1984 include, among other provisions, reservation-of-rights language.  Trial Tr. 84:2–89:24, 268:19–274:22, 275:7–284:5; Defs.' Trial Exs. 20–22.

50.    In addition, even the salaried retiree life insurance booklets and plan documents that did not specifically use the phrase "reservation of rights" consistently contained various other limits, conditions, and reservations. See Trial Tr. 194:1–17, 195:7–196:17, 202:7–205:12, 221:11–222:17 (Pls.' Trial Ex. 24, 1981 plan document); 222:19–225:16 (Pls.' Trial Ex. 23, 1978 plan document); 225:17–227:20 (Pls.' Trial Ex. 22, 1973 booklet); 227:21–229:6 (Pls.' Trial Ex. 15, 1965 booklet).

51.    These limitations, conditions, and reservations included the fact that employees only became eligible for the salaried retiree life insurance benefit upon retirement. Id. at 221:22–222:3 (Pls.' Trial Ex. 24, 1981 plan document); 224:22–

225:16 (Pls.' Trial Ex. 23, 1978 plan document); 226:20–227:8 (Pls.' Trial Ex. 22, 1973 booklet).

52.    Another limitation was that the salaried retiree life insurance benefit was provided subject to the underlying insurance policy and could be terminated upon termination of that policy. Id. at 203:2–205:12, 222:4–17 (Pls.' Trial Ex. 24, 1981 plan document); 222:24–224:12 (Pls.' Trial Ex. 23, 1978 plan document); 225:17–226:17, 227:13–20 (Pls.' Trial Ex. 22, 1973 booklet); 227:21–229:6 (Pls.' Trial Ex. 15, 1965 booklet).

53.    Plaintiffs suggested that the "termination" language only applied to active life insurance. See, e.g., Trial Tr. 297:5–16. But the booklets' and plans' discussions of the effect of a termination do not expressly distinguish between active and retiree life insurance. See, e.g., id. at 293:22–25. Moreover, in the 2011 plan, the "Termination of the Group Policy" language appears twice: once in the section discussing active life insurance [Pls.' Trial Ex. 29 at PPG000219–PPG00022], and again in the section discussing retiree life insurance. Id. at PPG000223–PPG000224.

54.    The underlying insurance policy contained an explicit reservation of rights clause. Trial Tr. 208:15–209:16, 214:1–21. The record contains that insurance policy for the period December 1962 through April 1968. Id. at 208:15– 220:25; Defs.' Trial Exs. 9A, 10–11, 15.

55.    The same limitations and conditions that applied to PPG's salaried retiree life insurance benefit also applied to the surviving spouse component of that benefit. Trial Tr. 287:24– 288:20; Pls.' Trial Exs. 23, 24.

56.    Beginning in 1984 PPG's plan documents, including for the salaried retiree

life insurance benefit, contained language stating that the company reserved the right to amend or terminate the benefit. Trial Tr. 268:19–274:22, 275:7–284:5; Defs.' Trial Exs. 20–22.

57.    None of the booklets or plans describing the salaried retiree life insurance benefit stated the benefit was vested. Pls.' Trial Exs. 22–24, 29; Defs.' Trial Exs. 20–22.

### H. 1984 Employee Benefits Committee Actions

58.    In June 1984, the Employee Benefits Committee considered a "[r]ecommendation to provide that under the Medical Expense Insurance Plan future increases in deductibles, co-insurance premium[s], and similar changes in the active employee coverage will automatically be passed on to retirees who retire on and after July 1, 1984." Trial Tr. 239:7–242:7, 242:24–243:6; Defs.' Trial Ex. 37 at PPG103246.

59.    In connection with that policy consideration, the Committee was provided a June 4, 1984 memorandum written by a Human Resources employee entitled "Retiree Medical Plans," which, among other things, stated: "Prior to 1969, booklets covering the retiree benefits contained the following caveat: PPG Industries reserves the right to modify, amend, or change the provisions, terms and conditions, and benefits of the policy. The Company also maintains the right to terminate the Supplemental Plan Policy with Equitable on any premium due date." Trial Tr. 242:8–23, 243:4–19, 340:14–341:4; Defs.' Trial Ex. 37 at PPG103247.

60.    The language quoted in the June 4, 1984 memorandum was from PPG's Medical Expense Insurance Supplemental Plan booklet, which addressed only retiree medical benefits, not retiree life insurance. Trial Tr. 243:20–248:5, 250:1–9; Defs.' Trial Ex. 28 at PPG113357; Defs.' Trial Ex. 29 at PPG113371; Defs.' Trial Ex. 31 at

PPG113399.

61.    In addition, the discussion in the June 4, 1984 memorandum related to the rising costs that prompted the recommendation targeted retiree medical benefits. Trial Tr. 350:9–351:5. The only mention of life insurance was a statement that "no legislation . . . requires vesting for retiree benefits such as life insurance and medical benefits." Defs.' Trial Ex. 37 at PPG103248.

62.    Following the June 1984 meeting, the Employee Benefits Committee approved the inclusion of reservation-of-rights language for "retiree benefits other than the pension plan" for individuals retiring on and after September 1, 1984. Trial Tr. 250:24–257:24.

63.    In a 1984 edition of PPG's Benefits News publication, PPG advised salaried employees about this change. Id. at 267:13–268:1, 268:9–15, 268:25–270:1.

64.    PPG also issued a new plan document in 1984. Along with the other limits, conditions, and reservations on retiree life insurance that were contained in prior plan documents and benefit booklets, the 1984 plan document included language stating: "Although the Company intends to continue the life insurance plan indefinitely, it reserves the right to modify or amend the provisions, terms, conditions, and benefits of the policy for retirees who retire on or after September 1, 1984." Id. at 268:3–6, 268:19–24, 270:8–274:22; Defs.' Trial Ex. 20 at PPG115421.

65.    After 1984, PPG continued to issue plan documents containing similar reservation of rights language, applying to both active and retiree life insurance benefits. Trial Tr. 274:23–280:12 (1989 plan document), 280:13–284:5 (2005 plan document), 284:6–287:22 (2011 plan document). The 2011 plan document remained in place at the

time of the Axiall transaction. <u>Bellon</u>, 41 F.4th at 256.

66.    Although the June 4, 1984 memorandum suggested that the reservation of rights language had been removed from the retiree medical plan in 1969, the booklets addressing retiree medical benefits continued to contain reservation of rights language as late as 1971. Trial Tr. 248:7–249:25, 250:10–23; Defs.' Trial Ex. 28 at PPG113357; Defs.' Trial Ex. 29 at PPG113371; Defs.' Trial Ex. 31 at PPG113399.

67.    Nothing in the record suggests that the Employee Benefits Committee acted to amend PPG's salaried retiree life insurance benefit to remove any reservation of rights. None of the materials from meetings of the Board of Directors, Management Committee, or Employee Benefits Committee between 1968 and 1984 discuss any such action.  Trial Tr. 230:7–16, 258:5–259:25, 342:13–15, 348:3–20, 353:20–354:23, 355:6–357:16, 362:21–364:5. Ms. Rathburn's review of these materials did not reveal any gaps in the meeting minutes. <u>Id.</u> at 259:22– 25.

68.    To the extent there is any evidence in the record that the Employee Benefits Committee took any action with respect to retiree life insurance during this period, the evidence shows that the Employee Benefits Committee granted such benefits subject to a reservation of rights.  When approving early retirements, the committee minutes showed payments to employees who were approved for early retirement were "voluntary on the part of the Company and may be discontinued at any time in the discretion of the Company." <u>Id.</u> at 260:1–267:11; Defs.' Trial Ex. 71 at PPG103576.

69.    All the Employee Benefits Committee meeting minutes from 1968 to 1970 that Ms. Rathburn reviewed included the same reservation of rights language when

addressing approval of early retirements.  Trial Tr. 266:20–267:11.

### I.  Document Search and Adverse Inference

70.    This Court previously considered PPG's discovery of materials from 1984 that was produced while the parties' first summary judgment motions were pending. See, e.g., ECF No. 227 at 4–5.

71.    On January 23, 2024, Plaintiffs moved for default judgment, alleging that PPG had intentionally destroyed records "critical" to the case and requested that the Court grant default judgment for the Class.  ECF Nos. 394, 395.

72.    On January 30, 2024, PPG opposed Plaintiffs' motion for default judgment and explained that PPG had inadvertently destroyed a box of documents because of a clerical error, and the documents that were inadvertently destroyed pre-dated the documents Plaintiffs had, at that time, requested in this case.  ECF No. 406 at 1–4.

73.    On March 27, 2024, this Court found an adverse inference was appropriate to address the destruction of a box containing documents from 1947 to 1967. See ECF No. 418 at 13–15.

74.    On June 5, 2024, this Court adopted the following adverse inference language: "As a sanction for willful spoliation, the Court has considered as part of the evidence in this case that the contents of the box labeled Employee Benefit Committee Meetings 1947-1968 contained Committee materials for the period from October 1965 to December 1967 that would have been unfavorable to Defendants' theory of the case."  ECF No. 428 at 2.

75.    Ms. Rathburn testified generally regarding the adequacy of PPG's search for responsive documents.  She explained, PPG "searched for everything [it] was asked

to produce." Trial Tr. 306:10. But, following remand, PPG "cast a wider net to look for additional materials," including reviewing an index of all boxes stored off-site and pulling any boxes that may have included relevant information. Id. at 306:14–21.

### J. Plaintiffs' Evidence at Trial

76.    Plaintiffs Bellon, Eakin, and Nichols—three of the four remaining named plaintiffs—testified during the trial. See, e.g., Trial Tr. 24:1–43:1 (Bellon), 126:8–165:14 (Eakin), 43:6–55:5 (Nichols).

77.    Plaintiff Bellon started at PPG in 1967. Trial Tr. 38:6–8. He continued at PPG until his retirement in 2002. Id. at 39:23–40:2. Shortly before his retirement, he elected his retiree life insurance benefit, including the surviving spouse benefit. Id. at 40:3–15; Plaintiffs' Trial Ex. 45. His spouse, however, has since passed away. Trial Tr. 24:9–10.

78.    Plaintiff Eakin started at PPG in 1962. Id. at 128:5–6. He continued at PPG until his retirement in 2001. Id. at 157:15–18. Shortly before his retirement, he elected his retiree life insurance benefit, including the surviving spouse benefit. Id. at 128:4, 144:12–145:17, 159:1–5; Pls.' Trial Ex. 43B at P002923.

79.    Plaintiff Nichols was hired at PPG in 1977. Trial Tr. 45:15–16. She continued at PPG until retirement in 2012. Id. at 53:1–4. Shortly before her retirement, she elected her retiree life insurance benefit, but she was not eligible to elect the surviving spouse benefit because of her age. Id. at 48:13–50:1, 185:19–190:19, 191:19–23. See also Pls.' Trial Ex. 50.

80.    Plaintiffs Bellon, Eakin, and Nichols all worked for PPG during 1984, when the reservation-of-rights language was added to the plan, and 1996. Throughout their

employment, all three named plaintiffs received communications from PPG regarding their benefits. Plaintiff Bellon recalled receiving annual statements of benefits and summary plan descriptions. Trial Tr. 38:17–39:8 (annual statement of benefits), 42:5–8 (summary plan descriptions). Plaintiff Eakin recalled receiving annual statements of benefits for most of the years he was employed at PPG, which he produced in this litigation. Trial Tr. 132:18– 19; Pls.' Trial Ex. 44. Plaintiff Nichols recalled receiving a "Concern For Your Future" booklet and annual statements of benefits throughout her career. Trial Tr. 47:15–19, 48:1–6 ("A Concern For Your Future"), 47:22–25 (annual statements of benefits).

81.     Plaintiff Eakin was the only plaintiff whose annual statements of benefits were produced in this litigation and presented at trial. He testified that those annual statements of benefits generally referred him to other benefit booklets or plan documents. For example, a 1964 copy of "PPG Reports to You" referred Plaintiff Eakin to the Employees' Booklet for more details about the retiree life insurance benefit. Pls.' Trial Ex. 44 at P002951; Trial Tr. 160:19–161:19.

82.     A 1969 annual statement of benefits provided that it was "subject to the legal documents pertaining to each benefit plan which must be controlling as to the availability and amount of benefits." Pls.' Trial Ex. 44 at P002957; Trial Tr. 161:20– 162:13. A 1992 annual statement of benefits ultimately instructed Plaintiff Eakin to refer to the "benefits handbooks" or to "contact [his] benefits representative." Pls.' Trial Ex. 44 at P002954; Trial Tr. 162:14–163:3.

83.     Although Plaintiffs Bellon and Nichols testified generally about receiving written updates on their benefits from PPG, they were not presented with any specific

documents, including Plaintiff Eakin's annual statements of benefits. Trial Tr. 152:16–156:5. Instead, Plaintiffs Bellon and Nichols only testified generally that they recalled receiving communications from PPG throughout their employment. Trial Tr. 38:17–39:8, 42:5–8 (Bellon); 47:15–19, 47:22–25, 48:1–6 (Nichols). Even Plaintiff Eakin was only asked about a few of the annual statements of benefits entered into evidence. Trial Tr. 135:2–5 (noting that documents in Pls.' Trial Ex. 27 range from 1964–1998), 135:6–14 (discussing 1964 annual statement of benefits), 136:19–137:19 (discussing 1969 annual statement of benefits), 138:10–139:4 (discussing 1992 annual statement of benefits).

84.    Neither Plaintiff Bellon nor Plaintiff Nichols recalled communications from PPG indicating their benefits could not be terminated or changed. Plaintiff Bellon did not recall the specific contents of any of the written communications that he received from PPG. Trial Tr. 38:15–39:11, 39:17–22, 42:14–22. Plaintiff Nichols did not recall being told that her retiree life insurance could not be changed or terminated or that the retiree life insurance benefit was vested, nor did she recall receiving any written communications to that effect. Id. at 53:16–54:11.

85.    Plaintiffs do not know of any purported removal of the reservation of rights. Id. at 33:18–20 (Bellon), 135:19–24 (Eakin), 45:11–13 (Nichols).

86.    No plaintiff testified that they continued to work at PPG because of a promise of vested retiree life insurance. See, e.g., id. at 24:1–43:1 (Bellon), 126:8–165:14 (Eakin), 43:6–55:5 (Nichols).

87.    None of the plaintiffs satisfied all required conditions for receipt of retiree life insurance or the surviving spouse benefit prior to when the liability for that benefit was

transferred to Axiall.  <u>See</u> Joint Trial Ex. 1.

<u>**CONCLUSIONS OF LAW**</u>

### A. Jurisdiction

1.      Plaintiffs' remaining claims are governed by ERISA.  ECF No. 416 at 2.

2.      This Court has subject matter jurisdiction under 29 U.S.C. § 1132 and 28 U.S.C. § 1331; venue is also appropriate. 29 U.S.C. §§ 1132(e)(2) and 1391.

### B. Plaintiff Veillon

3.      Judgment must be granted to PPG on Plaintiff Veillon's claim because she presented no evidence at trial in support of her claims.  <u>See, e.g.</u>, <u>Del Rio Gordo v. Hosp. Ryder Mem'l Inc.</u>, 2018 WL 542222, at *4 (D.P.R. Jan. 23, 2018) (granting motion for judgment on partial findings where negligence plaintiff presented no evidence of injury at trial); <u>Smith v. Argent Mortg. Co.</u>, 2007 WL 4105192, at *1 n.4 (D. Colo. Nov. 14, 2007) (noting that court dismissed claims of plaintiff who did not present evidence at trial), <u>aff'd</u>, 331 F. App'x 549 (10th Cir. 2009).

### C. Plaintiffs' Remaining Claims And Theories

4.      Count I of Plaintiffs' First Amended Complaint alleges Defendants violated ERISA because their salaried retiree life insurance benefit was "already earned and vested" when the liabilities for this benefit were transferred to Axiall.  ECF No. 69, ¶ 63.

5.      Plaintiffs identified three theories to support their alleged entitlement to benefits under Count I: (1) "contractual vesting based on PPG's removal of [a reservation-of-rights clause in the Plan]"; (2) "waiver based on PPG's removal of the original [reservation-of-rights clause]"; and (3) "that the SIB [surviving spouse] benefit in the plan was a vested benefit."  ECF No. 416 at 7–8; <u>see also</u> Trial Tr. 17:17–20.

19

6.      It is Plaintiffs' burden to prove the PPG Plan at issue here "contains a promise to provide vested benefits." Gable v. Sweetheart Cup Co., 35 F.3d 851, 855 (4th Cir. 1994) (citing Howe v. Varity Corp., 896 F.2d 1107, 1109 (8th Cir. 1990) and Anderson v. Alpha Portland Indus., Inc., 836 F.2d 1512, 1517, 1521 (8th Cir. 1988)).

### D. ERISA's Vesting Standards

7.      The salaried retiree life insurance benefit—including the surviving spouse payment option, at issue in this lawsuit—is an "employee welfare benefit plan." 29 U.S.C. § 1002(1); Bellon, 41 F.4th at 247 n.4 (addressing surviving spouse benefit).

8.      "ERISA does not prohibit a company from terminating or modifying previously offered [welfare] benefits that are not vested." Gable, 35 F.3d at 855 (4th Cir. 1994) (citing Wise v. El Paso Nat. Gas Co., 986 F.2d 929, 935 (5th Cir. 1993), and Owens v. Storehouse, Inc., 984 F.2d 394, 397 (11th Cir. 1993)).

9.      This is because ERISA "expressly exempts employee welfare benefit plans" from its "strict vesting requirements for pension benefits." Id. (citing 29 U.S.C. § 1051(1) and Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1348 (4th Cir. 1989)); see also Bellon, 41 F.4th at 252 (quoting 29 U.S.C. § 1002(25)) (noting that ERISA defines "vested" as "nonforfeitable").

10.      Thus, under ERISA's statutory framework, "a plan participant's interest in welfare benefits is not automatically vested and employers have a statutory right to 'amend the terms of the [welfare] plan or terminate it entirely.'" Gable, 35 F.3d at 855 (quoting Biggers v. Wittek Indus., Inc., 4 F.3d 291, 295 (4th Cir. 1993)).

11.      An employer may "waive[] its statutory right to modify or terminate" a welfare benefit. Id. (alteration in original) (quoting Wise, 986 F.2d at 937) (citing Boyer

v. Douglas Components Corp., 986 F.2d 999, 1005 (6th Cir. 1993)).

12.    That said, "[b]ecause such an obligation constitutes an extra-ERISA commitment, courts may not lightly infer the existence of an agreement to vest employee welfare benefits." Id. (citing Anderson, 836 F.2d at 1517, and Howe, 896 F.2d at 1110).

13.    Therefore, "in recognition of ERISA's requirement that employee benefit plans be governed by written plan documents . . . any participant's right to a fixed level of lifetime benefits must be 'found in the plan documents and must be stated in clear and express language.'" Id. (quoting Wise, 986 F.2d at 937) (citing Alday v. Container Corp. of Am., 906 F.2d 660, 665 (11th Cir. 1990)); accord Foggie v. Am. Nat'l Red Cross Long Term Disability Plan, 2022 WL 3580745, at *6 (E.D. Va. Aug. 18, 2022) (quoting Gable, 35 F.3d at 855) ("An agreement to provide vested benefits must be 'found in the plan documents and must be stated in clear and express language.'"), appeal dismissed per stipulation, 2023 WL 3220209 (4th Cir. Jan. 3, 2023); Fitzwater v. CONSOL Energy, Inc., 2020 WL 6231207, at *7 (S.D. W. Va. Oct. 22, 2020) (quoting Gable, 35 F.3d at 855) ("The preference for enforcing clear, written ERISA plans means that 'any participant's right to a fixed level of lifetime benefits must be "found in the plan documents and must be stated in clear and express language."'").

14.    The Supreme Court recently reiterated this point: "the rule that contractual 'provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA [welfare benefits] plan' . . . because the 'focus on the written terms of the plan is the linchpin of a system that is not so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [welfare benefits] plans

in the first place.'" M&G Polymers USA, LLC v. Tackett, 574 U.S. 427, 435 (2015) (alterations in original) (quoting Heimeshoff v. Hartford Life & Accident Ins Co., 571 U.S. 99, 108 (2013)); accord Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 724 F.2d 406, 410 (4th Cir. 1983) (ERISA does not prohibit changes to welfare benefits, because "Congress believed that the 'vesting of these ancillary benefits would seriously complicate the administration and increase the costs of plans whose primary function is to provide retirement income.'") (quoting H.R. Rep. No. 93-807, at 60 (1974)).

15.     In determining whether a welfare benefit is vested, the applicable plan should be interpreted "according to ordinary principles of contract law." Tackett, 574 U.S. at 435, 441. See also Bellon, 41 F.4th at 254 (citing Wheeler v. Dynamic Eng'g, Inc., 62 F.3d 634, 638 (4th Cir. 1995)).

16.     In accordance with those principles, a plan must be interpreted to give meaning to its terms, and the interpretation must not render any terms superfluous or nugatory. Johnson v. Am. United Life Ins. Co., 716 F.3d 813, 820 (4th Cir. 2013) ("[B]ecause contracts are construed as a whole, courts should seek to give effect to every provision in an ERISA plan, avoiding any interpretation that renders a particular provision superfluous or meaningless.").

17.     If plan terms are unambiguous, then a court may not resort to extrinsic evidence. CNH Indus. N.V. v. Reese, 583 U.S. 133, 139 (2018). That said, ambiguities do not exist where a plan is silent about vesting, nor where the plan does not contain a reservation-of-rights clause. Id. at 139; Wise, 986 F.2d at 938 ("[S]ilence" concerning the right to modify a plan does not "impliedly cede the right to later amend or discontinue coverage."); Biggers, 4 F.3d at 295 ("[T]he power to revoke or amend an employee

welfare benefit plan is inherently reserved to the employer under ERISA.").

18.    And even where an ambiguity may exist, the Supreme Court in <u>Tackett</u> also reiterated the "traditional principle that courts should not construe ambiguous writings to create lifetime promises." <u>Tackett</u>, 574 U.S. at 441 (citing 3 Arthur Linton Corbin, *Corbin on Contracts* § 553, at 216 (1960)).

### E.  Plaintiffs Failed to Meet Their Burden to Show the Retiree Life Insurance Benefit was Contractually Vested

19.    Viewing the record evidence under the foregoing principles, Plaintiffs failed to carry their burden to establish the salaried retiree life insurance was vested under any of their theories.

20.    Plaintiffs have identified no language in any of the salaried retiree life insurance booklets or plans that states the retiree life insurance was vested. <u>Gable</u>, 35 F.3d at 855 (vesting requires "clear and express" plan language); <u>Blackshear v. Reliance Standard Life Ins. Co.</u>, 509 F.3d 634, 641 (4th Cir. 2007) ("In the case of a group life insurance policy, the right to benefits vests—i.e., performance becomes due— at the time of the plan participant's death."), <u>abrogated on other grounds</u> by <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105 (2008).  <u>See also</u> <u>Hooven v. Exxon Mobil Corp.</u>, 465 F.3d 566, 575 (3d Cir. 2006) (observing that a benefit is vested when "the plan provides that an employee is irrevocably entitled to a certain benefit, and where all of the conditions precedent to the employee's receipt of that benefit have been satisfied.") (quoting ABA Section of Lab. & Emp. L., <u>Employee Benefits Law</u> 1052 (2d ed. 2000)).

21.    As the Court found above, even for those periods after 1965 and before 1984 when the booklets and plan documents describing the salaried retiree life insurance benefit did not contain the reservation of rights language added in 1984, the

booklets and plan documents contained various conditions, limitations, and reservations regarding the eligibility for, and receipt of, the salaried retiree life insurance benefit.

22.    None of these documents "clear[ly] and express[ly]" promise a vested salaried retiree life insurance benefit. Gable, 35 F.3d at 855, 856 (reservation of rights language is "plainly inconsistent with any alleged intent to vest . . . benefits"); Tackett, 574 U.S. at 441 ("[C]ourts should not construe ambiguous writings to create lifetime promises."). The language in Gable defeated a vesting claim even though it did not use the term "reservation of rights." Gable, 35 F.3d at 856 (statement that the plan "can be amended[,] modified or terminated at any time by action of the Employer" was described as an "express reservation" of rights); see also Jones v. Am. Gen. Life & Accident Ins. Co., 370 F.3d 1065, 1067, 1070 (11th Cir. 2004) (holding that retiree life insurance benefits were unambiguously not vested, in part because relevant summary plan descriptions, which lacked reservation-of-rights language, specified that coverage would terminate upon termination of underlying insurance policy).

23.    It is also undisputed that no Plaintiff or class member satisfied every condition necessary for the benefit to vest before the Axiall transaction. Joint Trial Ex. 1. See also Blackshear, 509 F.3d at 641 (life insurance vests, if ever, upon death).

24.    Plaintiffs attempt to establish vesting by citing purported extrinsic evidence to argue that the alleged removal of a reservation of rights in 1969 from the salaried retiree life insurance benefit contractually vested that benefit for anyone employed by PPG prior to 1984. ECF No. 416 at 10, ¶ A.

25.    Assuming such evidence may be considered (but see Reese, 583 U.S. at 139), none of Plaintiffs' extrinsic evidence supports any of their vesting theories.

26.     In remanding this case, the Fourth Circuit suggested vesting could be inferred from a June 4, 1984, memorandum in the 1984 Employee Benefits Committee materials that stated "that PPG had removed the reservation of rights clause in 1969 because that provision had 'caused doubt in the minds of retirees and the sense of security that retirees look for was absent.'" Bellon, 41 F.4th at 254.

27.     Viewing all record evidence, the 1984 Employee Benefits Committee materials do not support Plaintiffs' vesting claims.

28.     The June 4, 1984, memo provided to the Employee Benefits Committee quoted reservation-of-rights language regarding a separate booklet that only addressed salaried retiree medical benefits, not salaried retiree life insurance. Trial Tr. 242:22–23; Defs.' Trial Ex. 37 at PPG103246. And booklets from 1968, 1969, and 1971 describing the retiree medical benefit all contain the reservation-of-rights language that the June 4, 1984, memorandum claims was removed in 1969. Trial Tr. 248:7–249:25, 250:10–23; Defs' Trial Exs. 28–29, 31.

29.     There is also no evidence that the Board of Directors, the Management Committee, or the Employee Benefits Committee took any action from 1968 to 1984 to remove any reservation-of-rights clause from PPG's salaried retiree life insurance benefit for any reason, including because the "provision had 'caused doubt in the minds of retirees and the sense of security that retirees look for was absent.'" Bellon, 41 F.4th at 254.

30.     Ms. Rathburn testified that she had reviewed PPG Board of Directors, Management Committee, and Employee Benefits Committee materials for the 1968 to 1984 period and found no discussion regarding the removal of a reservation-of-rights

clause regarding the salaried retiree life insurance benefit. Trial Tr. 258:18–259:2. Ms. Rathbun also testified that her review of these materials did not reveal any gaps in those materials. Trial Tr. 259:22–25.

31.    There is also no evidence that the Employee Benefits Committee took any other action in 1969 or at any time after that to expressly vest the salaried retiree life insurance benefit.

32.    The Fourth Circuit suggested an issue of fact existed regarding vesting because "the 1981 summary plan description . . . included a reservation of rights clause for other Plan benefits, but not for retiree life insurance coverage." Bellon, 41 F.4th at 254. In support of that statement, the Fourth Circuit cited a reservation of rights clause from the Tax Reduction Act Stock Ownership Plan. Id. at 247 (citing J.A. 1098).

33.    Plaintiffs advanced this same theory at trial, citing reservation-of-rights language from the 1973 savings plan and the 1981 retirement plan. Trial Tr. 109:6–12; Pls.' Trial Ex. 22 at PPG116031; Trial Tr. 111:7–10; Pls.' Trial Ex. 24 at PPG001060.

34.    Still, considering all relevant record evidence, none of these reservation-of-rights provisions support Plaintiffs' claims that the salaried retiree life insurance benefit was vested.

35.    The Tax Reduction Act Stock Ownership Plan was a distinct benefit plan from the salaried retiree life insurance plan. See Pls.' Trial Ex. 24 at PPG001035–PPG001037 (describing retiree life insurance benefit); id. at PPG001073–PPG001077 (describing Tax Reduction Act Stock Ownership Plan benefit). It also provides a much earlier eligibility date (the first anniversary of the employee's hire date (id. at PPG001073 ("Eligibility and Participation"))) than the salaried retiree life insurance

benefit ("[o]n the date of . . . retirement" (id. at PPG001032)), and the Tax Reduction Act Stock Ownership Plan is not subject to any underlying insurance policy. See generally id. at PPG001049–PPG001077.

36.     In addition, unlike the salaried retiree life insurance benefit, the Tax Reduction Act Stock Ownership Plan expressly uses the term "vested" in describing the benefit. Id. at PPG001073 ("Employees' Accounts").

37.     Given these differences, no inference of vesting can be drawn from the Tax Reduction Act Stock Ownership Plan's reservation-of-rights provision. Gable, 35 F.3d at 855 (vesting requires "clear and express" language); Johnson, 716 F.3d at 820 ("[B]ecause contracts are construed as a whole, courts should seek to give effect to every provision in an ERISA plan, avoiding any interpretation that renders a particular provision superfluous or meaningless."); Tackett, 574 U.S. at 441 ("[C]ourts should not construe ambiguous writings to create lifetime promises").

38.     The 1981 document's discussion of PPG's non-contributory retirement ("pension") plan for salaried employees also includes reservation-of-rights language. See Pls.' Trial Ex. 24 at PPG001060 ("Amendment or Termination of the Plan"). But, like the Tax Reduction Act Stock Ownership Plan, the pension plan is a separate plan (id. at PPG001061 ("Summary of Plan Identification and Administrative Information")), contains a much earlier eligibility date (age 25 or date of hire (id. at PPG001050 ("You Are Eligible to Participate"))), does not subject the benefit to any underlying insurance policy or the other limitations contained in the salaried retiree life insurance benefit (see generally id. at PPG001050–PPG001069), and uses the term "vested" to describe the pension benefit (e.g., id. at PPG001050, PPG001056 ("Termination Of Employment

Before Retirement (Vested Benefit)").

39.     The same is true for the descriptions of the Employee Savings Plan contained in the 1973 booklet, which Plaintiffs also identified at trial. <u>See</u> Trial Tr. 109:6–12; Pls.' Trial Ex. 22 at PPG116031. Like Tax Reduction Act Stock Ownership Plan, the Employee Savings Plan has an earlier eligibility date than the salaried retiree life insurance benefit (Pls.' Trial Ex. 22 at PPG116024 (discussing eligibility after one year of service)) and uses the term "vest" to describe company contributions (<u>id.</u> at PPG116025–PPG116026).

40.     Thus, like the Tax Reduction Act Stock Ownership Plan, these language differences defeat any inference of vesting. <u>Gable</u>, 35 F.3d at 855; <u>Johnson</u>, 716 F.3d at 820; <u>Tackett</u>, 574 U.S. at 441.

41.     Similar language is also found in the 1978 pension plan. <u>See</u> Pls.' Trial Ex. 23 at PPG115800 (1978 Retirement Plan reservation of rights); PPG115789 (same, discussing eligibility at age 25 or upon hire); PPG115793 (same, discussing vesting of benefit).

42.     As with the language differences in the 1981 plan, these various differences again defeat any inference of vesting. <u>Gable</u>, 35 F.3d at 855; <u>Johnson</u>, 716 F.3d at 820; <u>Tackett</u>, 574 U.S. at 441.

43.     In addition, even the salaried retiree life insurance booklets and plan documents that did not include reservation-of-rights language still subjected the receipt of the retiree life insurance benefit to various conditions, limitations, and reservations, such as the fact that employees only became eligible for the salaried retiree life insurance benefit upon retirement. Trial Tr. 221:22–222:3 (Pls.' Trial Ex. 24, 1981 plan

document); 224:22–225:16 (Pls.' Trial Ex. 23, 1978 plan document); 226:20–227:8 (Pls.' Trial Ex. 22, 1973 booklet).

44.    Among those provisions was reservation of rights language in the insurance policy that was in effect at least from December 1962 to April 1968.

45.    And to the extent that the Employee Benefits Committee meeting minutes from 1968 through 1970 do discuss the grant of life insurance benefits to salaried early retirees, those grants included reservation of rights language.

46.    Thus, considering all relevant plan provisions in each of these plans, the inclusion of that language in materials describing *other* benefits does not help Plaintiffs meet their burden of showing a "clear and express" promise to vest the salaried retiree life insurance benefit, especially given the other limits, conditions, and reservations that continued to be included in the description of the salaried retiree life insurance benefit in the same 1973, 1979 and 1981 booklets. Gable, 35 F.3d at 855; Johnson, 716 F.3d at 820; Tackett, 574 U.S. at 441.

47.    Plaintiffs have thus failed to prove that the salaried retiree life insurance benefit was contractually vested.

### F. Even if The Record has Some Extrinsic Evidence of Vesting, Plaintiffs' Claim Fails Because The Transfer Of Plaintiffs' Retiree Life Insurance Liabilities Occurred Well After PPG Added The Reservation-Of-Rights Language In 1984

48.    Even if the record could be viewed as containing some evidence of vesting prior to 1984, and even if the other limits, conditions, and reservations in the salaried retiree life insurance plan could not defeat Plaintiffs' vesting claim, that claim still fails because there is no dispute that the transfer of Plaintiffs' retiree life insurance liabilities

to Axiall occurred well after PPG added reservation-of-rights language in 1984.

49.     In <u>Pierce v. Security Trust Life Ins. Co.</u>, 979 F.2d 23 (1992), the Fourth Circuit rejected a vesting claim where the evidence showed that the employer had added a reservation-of-rights clause to a plan that had been amended to provide free retiree medical coverage and had been described to plan participants as "100% vested." <u>Id.</u> at 24.

50.     The plan in <u>Pierce</u> was amended in 1978 to provide free retiree medical coverage.  In addition, the summary plan description provided to participants in 1980 did not include any reservation of rights to amend or terminate the plan. <u>Id.</u> Then, in 1984, participants were provided with a new summary plan description that included reservation-of-rights language. <u>Id.</u> at 25. And in 1988, the employer amended the plan to require participant contributions.  <u>Id.</u>

51.     The <u>Pierce</u> participants sued and the district court ruled in their favor. *Id.* The district court rested its conclusion on the fact, among other things, that the employer had amended the plan in 1978 to provide "free medical coverage," and the employer's "failure to provide notice of its right to amend the Plan until the 1984 SPD . . . could not be remedied by a disclaimer" being later added.  <u>Id.</u>

52.     The Fourth Circuit reversed. The Fourth Circuit agreed with the lower court that the summary plan description was the controlling document. <u>Id.</u> at 27–28 (citing <u>McKnight v. Southern Life & Health Ins. Co.</u>, 758 F.2d 1566, 1570 (11th Cir. 1985), and <u>Edwards v. State Farm Mut. Auto Ins. Co.</u>, 851 F.2d 134, 136 (6th Cir. 1988)).[2] But the Fourth Circuit still concluded that the district court's vesting analysis was erroneous.

---

[2]      The Supreme Court subsequently rejected this premise in <u>Cigna Corp. v. Amara</u>, 563 U.S. 421, 437–38 (2011). But <u>Cigna</u> does not undercut <u>Pierce's</u> holding as it relates to the issues in this case.

53.    The Fourth Circuit held that "the district court opinion appears to overlook . . . that [the employer] filed in 1984 and in later years SPDs which correctly notified the plan participants that the employer had the right unilaterally to terminate, change or modify the Plan and its benefits, and that . . . not until 1988-89 did the company exercise this right" to require cost-sharing. Pierce, 979 F.2d at 28. See also id. at 30 ("Security did not make any change in its hospital and medical benefits until January 1989, and as of that time, Security had long since given the plan participants the required notice in the 1984 SPD."). Accordingly, the Fourth Circuit concluded that the employer's action in requiring contributions did not violate ERISA, because the benefits in question were not vested. Id. at 30.

54.    As in Pierce, even if the record here can be read as showing an earlier removal of reservation of rights language, or the absence of reservation of rights language in some materials prior to 1984, Plaintiffs' claim still fails because well before the Axiall transaction, the PPG Plan was amended to include reservation of rights language. Id. at 30 ("Following the distribution of Security's 1984 SPD, there was no valid impediment to changes in the benefits unilaterally . . . [a]nd Security made no change in the non-contributory character of the medical benefits until 1988.").

55.    This conclusion aligns with other Fourth Circuit precedent holding that the controlling plan is the one in effect when the alleged ERISA violation occurs. Schkloven v. Hartford Life & Accident Ins. Co., No. ELH-21-0600, 2022 WL 2869266, at *18 (D. Md. July 21, 2022) (quoting McWilliams v. Metro. Life Ins. Co., 172 F.3d 863, 1999 WL 64275, at *2 (4th Cir. 1999) (unpublished table decision)) ("[A]n ERISA cause of action based on the denial of benefits accrues at the time benefits are denied, and the plan in

effect when the decision to deny benefits is controlling.") (alteration in original); Murphy v. Int'l Painters & Allied Trades Indus. Pension Fund, No. 13-cv-28760, 2015 WL 5722809, at *8 (S.D. W. Va. Sept. 29, 2015) (citing Snyder v. Titus, 513 F. Supp. 926, 931 (E.D. Va. 1981), and Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 774 (7th Cir. 2003)) ("Federal courts have found that the plan applicable to an application for benefits is either the version in effect at the time the plan is application is filed or the version in effect at the time the application is denied.") (citations omitted).

56.    Application of Pierce, Schkloven, and Murphy fully accords with Congress's decisions when it enacted ERISA and exempted welfare benefits from the statute's vesting requirements, as well as the burden imposed on Plaintiffs to prove contractual vesting by pointing to "clear and express" Plan language. "Were we to hold that the company was nonetheless bound by the original terms of the plan and prohibited from making any amendments, we would strip employers of the protection that Congress intended to provide them and accordingly 'discourage employers from offering any insurance at all.'" Gable, 35 F.3d at 860 (quoting Owens, 984 F.2d at 398 n.5) (citing Adams v. Avondale Indus., Inc., 905 F.2d 943, 947 (6th Cir. 1990), Sejman, 889 F.2d at 1349, and Moore v. Metro. Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988)).

57.    It also aligns with other Fourth Circuit precedent holding that life insurance only vests, if ever, upon the death of the retiree. Blackshear, 509 F.3d at 641 ("In the case of a group life insurance policy, the right to benefits vests—i.e., performance becomes due—at the time of the plan participant's death.").

58.    Based upon the evidence before the Court and applicable case law, Plaintiffs' contractual vesting theory fails.

### G. Plaintiffs' Waiver Theory Also Fails as a Matter of Law and Fact

59.    Plaintiffs alternatively argue that the salaried retiree life insurance benefit was vested because the alleged 1969 removal waived PPG's right to later apply the 1984 reservation of rights language to the salaried retiree life insurance benefit.

60.    Plaintiffs' waiver claim fails because, as discussed above regarding the contractual vesting theory, there is no evidence that the Employee Benefits Committee removed any reservation of rights clause from the salaried retiree life insurance benefit in 1969, or any other time later, to vest that benefit.

61.    Plaintiffs' waiver theory also fails because the Fourth Circuit has held that waiver cannot be invoked under ERISA to avoid or alter written plan terms. White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 29 (4th Cir. 1997) (citing HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross, 100 F.3d 1005, 1010 (4th Cir. 1996)) (ERISA "does not incorporate the principles of waiver and estoppel"); Gagliano v. Reliance Standard Life Ins. Co., 547 F.3d 230, 239 (4th Cir. 2008) ("[T]he district court was without authority to direct the plan administrator to administer the plan contrary to its terms by injecting the prohibited concepts of waiver and estoppel.").

62.    Because ERISA controls the resolution of Plaintiffs' claims, any attempt to invoke state-law waiver principles is preempted. White, 114 F.3d at 29. But even if such state-law principles could be considered, Plaintiffs' burden would be unchanged under ERISA. See, e.g., Potesta v. U.S. Fid. & Guar. Co., 504 S.E.2d 135, 142 (W. Va. 1998) ("[W]here the alleged waiver is implied, there must be clear and convincing evidence of the party's intent to relinquish the known right."); 28 Am. Jur. 2d Estoppel and Waiver § 209 ("A wavier must be clearly proved . . . . The facts relied upon to prove

waiver must be unequivocal."); Hoffman v. Wheeling Sav. & Loan Ass'n, 57 S.E.2d 725, 735 (W. Va. 1950) (quoting Sec. Loan & Tr. Co. v. Fields, 67 S.E. 342 (W. Va. 1910)) (the party claiming waiver must establish it by "clear and unmistakable proof").

63.     And as this Court already concluded regarding Plaintiffs' contractual vesting claim, there is no evidence in the record that would allow Plaintiffs to meet that burden because the evidence does not show any "clear and express" proof that Defendants took any action prior to 1984 to waive their right to later amend or terminate the salaried retiree life insurance benefit. Gable, 35 F.3d at 855; Johnson, 716 F.3d at 820; Tackett, 574 U.S. at 441.

64.     Having applied the appropriate law to the evidence in this case, Plaintiffs' waiver theory fails.

### H. Plaintiffs' Surviving Spouse Benefit Claim Fails for the Same Reasons as Plaintiffs' Contractual Vesting Claim

65.     As with their principal contractual vesting theory, Plaintiffs argue that the surviving spouse component of the salaried retiree life insurance benefit is a contractually vested benefit. ECF No. 416 at 11, ¶ D.

66.     Accordingly, Plaintiffs' surviving spouse claim fails for the same reasons this Court already found above regarding Plaintiffs' contractual vesting claim.

67.     Plaintiffs' surviving spouse claim also fails for several additional reasons.

68.     As much as Plaintiffs' vesting theory turns on alleged actions that occurred in 1969, such conduct, even assuming there was evidence it occurred, could not apply to the surviving spouse benefit because it was not introduced until 1974. Pierce, 979 F.2d at 30; Wise, 986 F.2d at 936–37.

69.     In addition, according to Plaintiffs' theory, the surviving spouse benefit

vested at the time the retiree retired. Trial Tr. 12:8–14:19. Assuming that is the case, <u>but see Blackshear</u>, 509 F.3d at 641 (life insurance vests, if ever, upon the death of the retiree), then the surviving spouse claim fails under <u>Pierce</u>, because there is no dispute that all class members retired after the 1984 introduction of the reservation of rights language. <u>Pierce</u>, 979 F.2d at 28, 30.

70.    Plaintiffs' surviving spouse claim is also rebutted by the fact that PPG eliminated the option to elect that benefit in 1995, an action inconsistent with a claim that the benefit was considered vested. <u>Pierce v. Sec. Tr. Life Ins. Co.</u>, 979 F.2d 23, 30 (4th Cir. 1992).

71.    The benefit was also subject to limitations, such as the fact that if the spouse did not survive the retiree, the ongoing payment component of the benefit would be forfeited. Trial Tr. 193:9–22. This limitation is also inconsistent with a finding of vesting. <u>Gable</u>, 35 F.3d at 855; <u>Blackshear</u>, 509 F.3d at 641; <u>Hooven</u>, 465 F.3d at 575.

72.    Plaintiffs additionally argue that the surviving spouse benefit is also vested because it was described using terms such as "guaranteed" and "lifetime income." ECF No. 416 at 8. But such terms must be read alongside any conditions, limitations, or reservations contained in the same plan. <u>Johnson</u>, 716 F.3d at 820.

73.    And where, as is the case here, alleged vesting language was included in a plan that also included reservation of rights language, courts concluded no vesting had occurred. <u>Kerns v. Caterpillar Inc.</u>, 791 F. App'x 568, 570–72 (6th Cir. 2019) (language limiting duration of benefits overcame promise to "provide healthcare coverage for the remainder of [a] surviving spouse's life") (internal quotation marks omitted); <u>Grove v. Johnson Controls, Inc.</u>, 694 F. App'x 864, 868– 70 (3d Cir. 2017)

(same); <u>Barnett v. Ameren Corp.</u>, 436 F.3d 830, 833 (7th Cir. 2006) ("[B]enefits described as 'lifetime' are not really vested when the same contract also reserves the right to revoke them, because the only proper construction of the two seemingly conflicting provisions is that the 'lifetime' benefits are 'good for life unless revoked or modified.'"); <u>Fulghum v. Embarq Corp.</u>, 785 F.3d 395, 405–06 (10th Cir. 2015) (same); <u>Nickles v. Liberty Life Assurance Co. of Bos.</u>, No. 10cv00014, 2010 WL 4922683, at *6 (W.D. Va. Nov. 29, 2010) (noting that reservation-of-rights clauses conflict with the vesting of benefits), <u>report and recommendation adopted</u>, 2011 WL 202464 (W.D. Va. Jan. 21, 2011).

74.    Given the record evidence and the applicable case law, Plaintiffs' surviving spouse contractual vesting theory fails.

### I.  The Previously Entered Adverse Inference Does Not Overcome Plaintiffs' Failure to Carry Their Burden as to Their Vesting Theories

75.    While the parties' recent summary judgment motions were pending, Plaintiffs filed a motion arguing the Court should enter a default judgment against Defendants because they intentionally destroyed evidence related to the claims here. ECF No. 394.

76.    This Court denied Plaintiffs' request for a default judgment, concluding that Plaintiffs' motion lacked "actual evidence of bad faith and a higher level of culpability." ECF No. 418 at 12. The Court also found that "Defendants' narrative about how the destruction occurred a more likely scenario that is supported by contemporaneous, extrinsic evidence." <u>Id.</u> at 14. The Court then noted that "*proof* of bad faith is lacking." ECF No. 428 at 2.

77.    That said, the Court concluded that an adverse inference was warranted and entered an Order adopting a slightly modified version of PPG's proposed inference:

> As a sanction for willful spoliation, the Court has considered as part of the evidence in this case that the contents of the box labeled Employee Benefit Committee Meetings 1947–1968 contained Committee materials for the period from October 1965 to December 1967 that would have been unfavorable to Defendants' theory of the case.

ECF No. 428 at 2.

78.    Having considered the inference as part of the evidence of this case, it does not overcome Plaintiffs' failure to carry their burden as to their vesting theories.

79.    There is no evidence that anyone involved in the destruction of that box "knew the evidence was relevant to some issue at trial," even though the Court previously concluded, "intentional conduct caused the destruction of potentially relevant evidence." ECF No. 418 at 14.

80.    The Court found no proof of bad faith by PPG.  ECF No. 428 at 2.

81.    The adverse inference alone does not overcome this Court's finding that Plaintiffs failed to carry their burden as to any of their vesting theories.

82.    This is because the inference applies only to the period from October 1965 to December 1967. ECF No. 428 at 2. Considering the inference along with all other relevant evidence shows that, even if there may be evidence during that time that would be "unfavorable to Defendants' theory of the case," the evidence shows that reservation-of-rights language continued to be present in the insurance policy underlying the salaried retiree life insurance benefit as late as April 1968. In addition, the earlier retiree life insurance booklets from the 1940s through 1965 all contained various limitations, including reservation-of-rights language.

83.     And the reservation-of-rights language that was allegedly removed from the retiree medical plan was still in the booklets describing that plan as late as 1971. Plaintiffs also acknowledge that any removal of the reservation-of-rights language occurred in 1969, after the period of October 1965 to December 1967.

84.     Thus, considering all relevant evidence along with the inference, Plaintiffs are still unable to meet their burden of showing a "clear and express" intent to vest the salaried retiree life insurance benefit in or around 1969 or any time from that point on. Gable, 35 F.3d at 855 (quoting Wise, 986 F.2d at 937) ("[A]ny participant's right to a fixed level of lifetime benefits must be 'found in the plan documents and must be stated in clear and express language.'"); Tackett, 574 U.S. at 441 ("[C]ourts should not construe ambiguous writings to create lifetime promises."); Pierce, 979 F.2d at 28, 30.

85.     Plaintiffs argued at trial that Defendants are limited by their pre-remand evidence and the arguments that they presented to the Fourth Circuit based on that evidence. Trial Tr. 360:23–361:12. But Defendants are not limited by the arguments they raised to the Fourth Circuit. As this Court recognized in its ruling on Plaintiffs' motion in limine, the Fourth Circuit specifically "vacate[d] the court's judgment with respect to the vesting claim and remand[ed] for further consideration thereof, which may include related discovery, spoliation issues, and class certification." ECF No. 432 at 2. See also Bellon, 41 F.4th 255. Now that the parties have engaged in additional discovery, consistent with the Fourth Circuit's decision, Defendants could put forth additional arguments based on the evidence produced to date. Id. The position they may have taken prior to remand does not preclude Defendants from doing so. Id.

## <u>CONCLUSION</u>

Plaintiffs have failed to prove the elements of any of their claims for relief. Simply stated, the benefits at issue in count one never vested during the relevant period. Judgment is therefore entered in favor of Defendants.

The Clerk of Court is **DIRECTED** to transmit copies of this Order to all counsel of record and to remove this case from the Court's active docket.

**DATED**: August 8, 2025

GINA M. GROH
UNITED STATES DISTRICT JUDGE